ACCEPTED
01-15-00478-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/18/2015 10:19:04 AM
CHRISTOPHER PRINE
CLERK

No. 01-15-00478-CV

In the First District Court of Appeals
Houston, Texas

_____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/18/2015 10:19:04 AM
CHRISTOPHER A. PRINE
Clerk

AMERICAN ZURICH INSURANCE COMPANY,

*Appellant,*

v.

DANIEL SAMUDIO,

*Appellee.*

_____

ON APPEAL FROM THE 127TH JUDICIAL DISTRICT COURT
OF HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2006-18753

_____

# BRIEF OF APPELLEE
_____

DOYLE LLP

Michael P. Doyle
State Bar No. 06095650
mdoyle@doylelawfirm.com
Patrick M. Dennis
State Bar No. 24045777
pdennis@doylelawfirm.com
2402 Dunlavy Street, Suite 200
Houston, Texas 77006
Telephone: (713) 571-1146
Facsimile: (713) 571-1148

KEELING & DOWNES, P.C.

Byron C. Keeling
State Bar No. 11157980
bck@keelingdownes.com
Anna E. Williams
State Bar No. 24088638
aew@keelingdownes.com
1500 McGowen, Suite 220
Houston, Texas 77004
Telephone: (832) 214-9900
Facsimile: (832) 214-9908

Attorneys for Appellee Keith Morris,
as the administrator of the Estate of Daniel Samudio

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**

American Zurich Insurance Company

Appellate and Trial Counsel:

Robert D. Stokes
David Owen Cluck
Greg D. Solcher
FLAHIVE, OGDEN & LATSON
P.O. Drawer 201329
Austin, Texas 78720
Telephone:  (512) 435-2150
Facsimile:  (512) 867-1705


**Appellee:**

Keith Morris, as Administrator of the Estate of Daniel Samudio

Appellate and Trial Counsel:

Byron C. Keeling
Anna E. Williams
KEELING & DOWNES, P.C.
1500 McGowen, Suite 220
Houston, Texas 77004
Telephone:  (832) 214-9900
Facsimile:  (832) 214-9908

Michael P. Doyle
Patrick M. Dennis
DOYLE LLP
2402 Dunlavy Street, Suite 200
Houston, Texas 77006
Telephone:  (713) 571-1146
Facsimile:  (713) 571-1148

**TABLE OF CONTENTS**

**Page**

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Reference Citation Guide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.     The Trial Court Correctly Ruled that Dr. Machado's 20%
           Impairment Rating Conformed With the AMA Guides.. . . . . . . . . . 11

         A.     The Evidence of Samudio's Impairment Supports
              Dr. Machado's 20% Impairment Rating. . . . . . . . . . . . . . . . . 12

         B.     The Trial Court Had No Discretion to Adopt Any
              Impairment Rating Other Than Dr. Machado's 20%
              Rating. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         C.     Zurich's Attacks on Dr. Machado's 20% Impairment
              Rating for Samudio Are Irrelevant.. . . . . . . . . . . . . . . . . . . . 19

**TABLE OF CONTENTS (cont'd)**

Page

II. The Trial Court Did Not Err in Declining to Formally Remand Samudio's Impairment Rating to the DWC for a New Determination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A. The Trial Court Had No Basis for Remanding Samudio's Impairment Rating to the DWC After Samudio Died. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B. The Trial Court Had No Basis for Remanding Samudio's Impairment Rating to the DWC After Samudio Received All of His Benefits. . . . . . . . . . . . . . . . . 31

III. The Trial Court Correctly Ordered Zurich to Pay Samudio's Reasonable and Necessary Attorney's Fees. . . . . . . . . . . . . . . . . . . . . 34

    A. Samudio Was the Prevailing Party on the Issue for Which Zurich Sought Judicial Review. . . . . . . . . . . . . . . . . 36

    B. Samudio is Entitled to Recover Attorney's Fees for His Counsel's Work in Defending Against Zurich's First Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    C. Samudio is Entitled to Recover Attorney's Fees for His Counsel's Work in Defending the Trial Court's Fee Awards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Appendix. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# INDEX OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*American Zurich Ins. Co. v. Samudio*,
370 S.W.3d 363 (Tex. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Arthur Andersen v. Perry Equip. Corp.*,
945 S.W.2d 812 (Tex. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Austin v. Weems*,
337 S.W.3d 415 (Tex. App.—Houston [1st Dist.] 2011, no pet.). . . . . . . . 20

*Ballard v. Arch Ins. Co.*,
No. 14-14-00647-CV, 2015 WL 6560531
(Tex. App.—Houston [14th Dist.] Oct. 29, 2015, no pet. h.).. . . . . . 18, 19, 20

*Cervantes v. New Hampshire Ins. Co.*,
No. 04-12-00722-CV, 2013 WL 3486824
(Tex. App.—San Antonio July 10, 2013, pet. denied).. . . . . . . . . . . . . . . 31

*City of Tyler v. St. Louis S.W. Ry. Co.*,
405 S.W.2d 330 (Tex. 1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Commissioner v. Jean*,
496 U.S. 154 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Dean Foods Co. v. Anderson*,
178 S.W.3d 449 (Tex. App.—Amarillo 2005, pet. denied). . . . . . . 36, 37, 40

*Discover Prop. & Cas. Ins. Co. v. Tate*,
298 S.W.3d 249 (Tex. App.—San Antonio 2009, pet. denied). . . . . . . . . 40

*Entergy Gulf States, Inc. v. Summers,*
282 S.W.3d 433 (Tex. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Fin. Ins. Co. v. Ragsdale*,
166 S.W.3d 922 (Tex. App.—El Paso 2005, no pet.).. . . . . . . . . . . . . . . 34

# INDEX OF AUTHORITIES (cont'd)

**Cases**                                                    **Page(s)**

*FM Properties Operating Co. v. City of Austin*,
    22 S.W.3d 868 (Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*G & H Towing Co. v. Magee*,
    347 S.W.3d 293 (Tex. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Helfman Motors, Inc. v. Stockman*,
    616 S.W.2d 394 (Tex. App.—Fort Worth 1981, writ ref'd n.r.e.). . . . . . . . 38

*In re Estate of Pilkilton*,
    No. 05-11-00246, 2013 WL 485773
    (Tex. App.—Dallas Feb. 6, 2013, no pet.). . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Gallardo*,
    No. 13-14-00203-CV, 2015 WL 730920
    (Tex. App.—Corpus Christi Feb. 19, 2015, no pet.). . . . . . . . . . . . . . . . . 33

*Insurance Co. of the State of Pa. v. Orosco*,
    170 S.W.3d 129 (Tex. App.—San Antonio 2005, no pet.). . . . . . . . . . . . 36

*Liberty Mut. Ins. Co. v. Adcock*,
    412 S.W.3d 492 (Tex. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Liberty Mut. Ins. Co. v. Montana*,
    49 S.W.3d 599 (Tex. App.—Fort Worth 2001, no pet.). . . . . . . . . . . . . . 38

*Lumbermens Mut. Cas. Co. v. Portillo*,
    No.13-10-00470-CV, 2011 WL 2976869
    (Tex. App.—Corpus Christi July 21, 2011, no pet.). . . . . . . . . . . . . . . . 34

*Nauslar v. Coors Brewing Co.*,
    170 S.W.3d 242 (Tex. App.—Dallas 2005, no pet.). . . . . . . . . . . . . . . . 34

*OHBA Corp. v. City of Carrollton*,
    203 S.W.3d 1 (Tex. App.—Dallas 2006, pet. denied). . . . . . . . . . . . . . . 32

# INDEX OF AUTHORITIES (cont'd)

**Cases**                                                                                   **Page(s)**

*Old Republic Ins. Co. v. Rodriguez*,
    966 S.W.2d 208 (Tex. App.—El Paso 1998, no pet.).. . . . . . . . . . . . . . . . . 14

*Old Republic Ins. Co. v. Stafford*,
    No. Civ. A. 3:03-CV-1611, 2005 WL 2026853
    (N.D. Tex. Aug. 22, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Phillips v. Bramlett*,
    407 S.W.3d 229 (Tex. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Public Util. Comm'n v. City Pub. Serv. Bd.*,
    53 S.W.3d 368 (Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Rodriguez v. Service Lloyds Ins. Co.*,
    997 S.W.2d 248 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Russell v. Russell*,
    No. 14-13-01100-CV, 2015 WL 5723109
    (Tex. App.—Houston [14th Dist.] Sept. 29, 2015, no pet. h.). . . . . . . . . . . 28

*State Bar of Tex. v. Gomez*,
    891 S.W.2d 243 (Tex. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*State Office of Risk Mgmt. v. Joiner*,
    363 S.W.3d 242 (Tex. App.—Texarkana 2012, pet. denied). . . . . . . . . 12, 17

*State Office of Risk Mgmt. v. Ramirez*,
    No. 04-09-00541-CV, 2010 WL 2601667 (Tex. App.—San Antonio
    June 20, 2010, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Texas Dep't of Ins., Workers' Comp. Div. v. De Los Santos*,
    446 S.W.3d 800 (Tex. App.—San Antonio 2014, no pet.). . . . . . . . . . . . . 33

*Texas Dept. of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.*,
    212 S.W.3d 870 (Tex. App.—Austin 2006, pet. denied). . . . . . . . . . . . . 9, 10

**Cases** Page(s)

*Texas Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Texas Mun. League Intergovernmental Risk Pool v. Burns*,
209 S.W.3d 806 (Tex. App.—Fort Worth 2006, no pet.). . . . . . . . . . . . 42-43

*Texas Nat. Res. Comm'n v. Lakeshore Util. Co.*,
164 S.W.3d 368 (Tex. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Texas Workers' Comp. Comm'n v. Texas Builders Ins. Co.*,
994 S.W.2d 902 (Tex. App.—Austin 1999, pet. denied). . . . . . . . . . . . . . 32

*Texas Workers' Comp. Comm'n v. Garcia*,
893 S.W.2d 504 (Tex.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Transcontinental Ins. Co. v. Crump*,
274 S.W.3d 86 (Tex. App.—Houston [14th Dist.] 2008),
*rev'd on other grounds*, 330 S.W.3d 211 (Tex. 2010). . . . . . . . . . . . . . . 42

*Twin City Fire Ins. Co. v. Vega-Garcia*,
223 S.W.3d 762 (Tex. App.—Dallas 2007, pet. denied). . . . . . . . . . . . . . 36

**Statutes**

28 TEX. ADMIN CODE § 130.1 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . . . 24, 29

TEX. LABOR CODE ANN. § 401.011 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . 7

TEX. LABOR CODE ANN. § 403.006 (Vernon Supp. 2015). . . . . . . . . . . . . . . . 31, 33

TEX. LABOR CODE ANN. § 408.041 (Vernon Supp. 2015). . . . . . . . . . . . . . . . 33

TEX. LABOR CODE ANN. § 408.083 (Vernon Supp. 2015). . . . . . . . . . . . . . . . 32

TEX. LABOR CODE ANN. § 408.122 (Vernon Supp. 2015). . . . . . . . . . . . . . . . 3

# INDEX OF AUTHORITIES (cont'd)

**Statutes**                                                     **Page(s)**

TEX. LABOR CODE ANN. § 408.123 (Vernon Supp. 2015). . . . . . . . . . 24, 25, 29, 30

TEX. LABOR CODE ANN. § 408.124 (Vernon Supp. 2015). . . . . . . . . . . . . . . passim

TEX. LABOR CODE ANN. § 408.143 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . . 33

TEX. LABOR CODE ANN. § 408.147 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . . 33

TEX. LABOR CODE ANN. § 408.221 (Vernon Supp. 2015). . . . . . . . . . . . . 35, 38, 41

TEX. LABOR CODE ANN. § 410.209 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . . 31

TEX. LABOR CODE ANN. § 410.210 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . . 31

TEX. LABOR CODE ANN. § 410.302 (Vernon Supp. 2015). . . . . . . . . . . . . . . . . . 8

TEX. LABOR CODE ANN. § 410.306 (Vernon Supp. 2015). . . . . . . . . . . . . . . . 9, 18

**Other**

American Medical Association Guides to the Evaluation
of Permanent Impairment § 2.1 (4th ed. 1993). . . . . . . . . . . . . . . . . . . . . . 25

Div. Workers' Comp., Appeal No. 061713-s, 2006 WL 3064080
(Oct. 20, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Div. Workers' Comp., Appeal No. 061940, 2006 WL 3187285
(Oct. 25, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Tex. Workers' Comp. Comm'n, Appeal No. 042108-s, 2004 WL 2421582
(Oct. 20, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Tex. Workers' Comp. Comm'n, Appeal No. 051587, 2005 WL 2507672
(Aug. 22, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# REFERENCE CITATION GUIDE

**The Parties**

This Brief may refer to the parties as follows:

Appellant American Zurich Insurance
    Company                                 "Appellant" or "Zurich"

Appellee Keith Morris, as the
    administrator of the
    Estate of Daniel Samudio            "Appellee" or "Samudio"

**The Record on Appeal**

This Brief will refer to the record as follows:

| | |
|---|---|
| Clerk's Record | "CR __" |
| First Supplemental Clerk's Record | "I Supp. __" |
| Reporter's Record | "RR __" |
| Zurich's Brief of Appellant | "App't Br. at __" |

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Keith Morris, as the administrator of the Estate of Daniel Samudio, respectfully submits that oral argument is unnecessary in this case. This case presents no novel issues of law or fact, and this Court may easily resolve the case on the briefs and the record. Nonetheless, if the Court sets the case for oral argument, Appellee would request the opportunity to participate in the oral argument.

## STATEMENT OF THE CASE

*Nature of the Case*:

This case is a judicial review of an impairment rating that the Division of Worker's Compensation assigned to Samudio in 2006. (CR 129).

*Trial Court*:

The Honorable R.K. Sandill, 127th Judicial District Court, Harris County, Texas.

*Course of Proceedings*:

The trial court originally entered a judgment in Samudio's favor back in 2008. This Court affirmed the trial court's judgment, but on June 29, 2012, the Texas Supreme Court reversed this Court's judgment and remanded the case back to the trial court. Samudio passed away on August 7, 2013, and Appellant continued the case against Keith Morris, the administrator of Samudio's estate. (CR 18, 21). On December 12, 2013, Appellant filed a motion for summary judgment. (CR 10). On May 22, 2014, Samudio filed a cross-motion for summary judgment. (CR 845).

*Trial Court's Disposition*:

On October 7, 2014, the trial court signed an order granting Samudio's cross-motion for summary judgment and implicitly denying Appellant's motion for summary judgment. (CR 922) (attached at Tab A). After the parties agreed to submit the issue of attorney's fees to the trial court, the trial court signed a final judgment in Samudio's favor. The trial court's judgment awarded attorney's fees to Samudio under Section 408.221 of the Texas Labor Code. (CR 1346) (attached at Tab B).

**ISSUES PRESENTED**

Pursuant to Rule 38.2(a) of the Texas Rules of Appellate Procedure, Samudio objects to Appellant's characterization of the issues presented in this appeal. Samudio identifies the following issues:

1. Did the trial court correctly comply with this Court's mandate of August 21, 2012, on remand from the Texas Supreme Court?

2. Did the trial court correctly grant Samudio's motion for summary judgment and deny Appellant's cross-motion for summary judgment?

3. Did the trial court correctly order Appellant to pay Samudio's reasonable and necessary attorney's fees under Section 408.221 of the Texas Labor Code?

No. 01-15-00478-CV

$$\blacksquare \quad \blacksquare$$

In the First District Court of Appeals
Houston, Texas

————————————

**AMERICAN ZURICH INSURANCE COMPANY,**

*Appellant,*

**v.**

**DANIEL SAMUDIO,**

*Appellee.*

————————————

ON APPEAL FROM THE 127TH JUDICIAL DISTRICT COURT
OF HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2006-18753

————————————

## BRIEF OF APPELLEE
————————————

TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:

Appellee Keith Morris, as the administrator of the Estate of Daniel Samudio, respectfully files this Brief of Appellee in support of his request that this Court affirm the trial court's final judgment in Cause No. 2006-18753, *American Zurich Insurance Company v. Daniel Samudio*, in the 127th Judicial District Court of Harris County, Texas. The trial court correctly granted summary judgment in Samudio's favor and properly awarded attorney's fees to Samudio.

# INTRODUCTION

This case — an action seeking judicial review of an impairment rating for a workers' compensation claimant — has a long procedural history. In a prior appeal, the Texas Supreme Court remanded the case to the trial court with instructions that the trial court determine whether a valid impairment rating had ever been presented to the DWC and, if not, that it send the case back to the DWC for a new impairment rating.

On remand, the trial court granted summary judgment in Samudio's favor, agreeing with Samudio that while the DWC's designated doctor may have used an improper methodology to calculate a 20% impairment rating for Samudio, the doctor's 20% rating was nonetheless a valid rating. Other evidence presented to the DWC showed that Samudio had suffered a compression fracture of greater than 50%, and such an injury requires a 20% rating.

And by the time the case reached the trial court on remand, it was no longer possible to remand the case to the DWC. Samudio passed away on August 7, 2013. The DWC cannot assess a new impairment rating on a dead claimant.

Because Samudio and his counsel prevailed on the issue for which Zurich sought judicial review, Samudio was entitled to recover his reasonable and necessary attorney's fees, which the trial court properly awarded. This Court should affirm the trial court's judgment in Samudio's favor.

**STATEMENT OF FACTS**

Pursuant to Rule 38.2(a)(1)(B) of the Texas Rules of Appellate Procedure, Samudio offers the following Statement of Facts:

### *The Injury*

On October 16, 2001, Samudio fell backwards from a ladder in the course of a job that he was performing for his employer, HC Beck, Ltd. (CR 654). Samudio suffered injuries to his head, back, and left arm. (CR 660, 556). His back injuries were especially severe. (CR 654).

On October 27, 2001, Samudio underwent an MRI, which revealed that he had suffered a compression fracture at his L1 and L2 discs. (CR 556). Samudio was later diagnosed with lumbar radicular syndrome, post-traumatic instability at his L1 to L3 discs, and spinal stenosis from his T11 to L3 discs. (CR 556-557). Over the next two years, Samudio had four surgeries to repair his injured back, including a laminectomy and a multilevel spinal fusion. (CR 557-558).

### *DWC Proceedings*

Because of his extensive injuries, Samudio sought workers' compensation benefits. (CR 31-33). The Division of Workers' Compensation ("DWC") appointed a designated doctor, Dr. Gaston Machado, to determine the extent of Samudio's

injuries, and Dr. Machado assigned Samudio a 20% impairment rating. (CR 33).[1]

Zurich never evaluated Samudio, nor did it go through any of the steps necessary to create a viable, alternative impairment rating for Samudio. (CR 33). Consistent with Dr. Machado's findings, the DWC ruled that Samudio had suffered a 20% impairment rating and ordered that Zurich pay benefits accordingly. (CR 33).

### The Ensuing Litigation

Zurich filed the present action on March 22, 2006. (CR 129). In Zurich's Original Petition, Zurich asked the trial court to set aside the DWC's decision in Samudio's favor, asserting that Dr. Machado's 20% impairment rating violated the AMA Guides to the Evaluation of Permanent Impairment and was therefore invalid. Zurich requested that the trial court either hold that Samudio had no impairment rating at all or determine that Samudio's impairment rating was 10% rather than 20%. (*Id.*).

On August 7, 2007, Samudio filed a motion to dismiss Zurich's lawsuit for lack of jurisdiction. Samudio argued that Zurich's claims raised no justiciable controversy because (i) the Texas Labor Code required a court to adopt one of the impairment ratings that the parties had presented to the DWC and (ii) the only rating that any

---

[1]Effective September 1, 2005, the operations of the former Texas Workers' Compensation Commission became the responsibility of the Texas Department of Insurance Division of Workers' Compensation. TEX. LABOR CODE ANN. § 402.001(b) (Vernon Supp. 2015). Any reference in the Texas Labor Code to the former TWCC is presumed to refer to the current DWC. *Id.* § 401.025. This brief will use DWC to refer both to the former TWCC and the current DWC.

party had ever presented to the DWC was Dr. Machado's impairment rating. The trial court signed an order granting Samudio's motion to dismiss. (*See* CR 6). This Court affirmed the trial court's order.[2]

On June 29, 2012, the Texas Supreme Court reversed this Court's judgment and remanded the case back to the trial court. (CR 891).[3] The supreme court stated:

> While [the Texas Labor Code] limits the evidence that a trial court may consider in reviewing an impairment rating assigned by the Division and precludes the court from assigning a rating that was not presented to the agency, it does not prevent the court from setting aside an invalid rating and remanding to the Division for further proceedings.

(CR 896). The supreme court directed the trial court to determine on remand whether any of the parties had presented to the DWC an impairment rating consistent with the AMA Guides to the Evaluation of Permanent Impairment and, if not, to remand the case to the DWC for a new impairment determination. (*Id.*).

### *Procedural History on Remand*

Daniel Samudio died on August 7, 2013. (CR 18). After Samudio's counsel filed a suggestion of death, Zurich amended its pleadings to assert its claims against Keith Morris, the administrator of Samudio's estate. (CR 21).

---

[2] *American Zurich Ins. Co. v. Samudio*, 317 S.W.3d 336, 349 (Tex. App.—Houston [1st Dist.] 2010), *rev'd*, 370 S.W.3d 363 (Tex. 2012).

[3] *American Zurich Ins. Co. v. Samudio*, 370 S.W.3d 363, 369 (Tex. 2012).

Subsequently, both Zurich and Samudio filed motions for summary judgment. (CR 10, 845). The trial court granted Samudio's motion for summary judgment. (CR 922).

The parties agreed to submit the issue of Samudio's reasonable and necessary attorney's fees to the trial court. (CR 1346). On February 27, 2015, the trial court signed a final judgment awarding $80,519.53 in trial fees, $49,000.00 in appellate fees for the first appeal, and up to $60,000 in appellate fees for Zurich's current appeal. (*Id.*).

## SUMMARY OF ARGUMENT

The trial court correctly granted Samudio's motion for summary judgment. The Texas Supreme Court directed the trial court on remand to determine whether the parties had presented to the DWC an impairment rating that conformed with the AMA Guides. Consistent with the supreme court's mandate, the trial court determined that even though the DWC's designated doctor, Dr. Gaston Machado, had improperly relied on DWC advisories in calculating his 20% impairment rating for Samudio, Dr. Machado's 20% impairment rating nonetheless conformed with the AMA Guides because evidence that the parties presented to the DWC was sufficient to show that Samudio had suffered a compression fracture of greater than 50% — an injury that warrants a 20% rating under the AMA Guides.

Moreover, the trial court correctly ordered Zurich to pay Samudio's reasonable and necessary attorney's fees. Under Section 408.221(c) of the Labor Code, an award of attorney's fees is mandatory to a claimant who prevails on an issue for which a carrier sought judicial review. Zurich sought judicial review of the DWC's decision holding that Samudio had a 20% impairment rating. Samudio was the prevailing party on that issue. And because Section 408.221 permits a prevailing claimant to recover the fees that he incurs "as a result" of a carrier's unsuccessful judicial review proceeding, a claimant may recover all of the fees that he incurs "as a result" of a carrier's appeal from a DWC decision, including those fees necessary to enforce his right under Section 408.221 to recover his attorney's fees.

Zurich's arguments in this appeal have no merit. Accordingly, this Court should affirm the trial court's judgment in Samudio's favor.

## STANDARD OF REVIEW

Zurich and Samudio filed competing motions for summary judgment. "When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented." *FM Properties Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). "The reviewing court should render the judgment that the trial court should have rendered." *Id.* If the trial court's summary judgment does not specify the grounds for its judgment, "the reviewing

court must affirm summary judgment if any of the summary judgment grounds are meritorious." *Id.*

## ARGUMENT

A claimant, like Samudio here, may receive impairment income benefits from his employer's workers' compensation carrier if he continues to have an impairment even after reaching maximum medical improvement. TEX. LABOR CODE ANN. §§ 401.011(24), 408.124 (Vernon Supp. 2015). The amount of the claimant's benefits will depend on his "impairment rating," a percentage which expresses the extent to which the claimant's injury permanently impaired his body. *Id.* § 408.124. "The greater this percentage, the greater the amount the employee receives as impairment income benefits." *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 253 (Tex. 1999).

The DWC will typically assign a "designated doctor" to examine the claimant and calculate the claimant's impairment rating. TEX. LABOR CODE ANN. § 408.124 (Vernon Supp. 2015). The claimant and the carrier may retain their own respective physicians to examine the claimant and calculate an impairment rating. *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 513 (Tex. 1995). Whether it comes from a designated doctor or from one of the parties' physicians, any impairment rating must comply with the requirements of the AMA Guides to the

Evaluation of Permanent Impairment. Tex. Labor Code Ann. § 408.124(c) (Vernon Supp. 2015).

The DWC has exclusive jurisdiction to resolve any dispute over the proper impairment rating for a claimant. *Id.* § 408.124. In a contested case hearing that raises such a dispute, the designated doctor's impairment rating carries presumptive weight. *Id.* § 408.125(c). The claimant or carrier may try to rebut this presumption by offering an impairment rating from one of their own physicians. The DWC may not arbitrarily assess an impairment rating for the claimant. If the preponderance of medical evidence is contrary to the designated doctor's impairment rating, the DWC must adopt one of the impairment ratings that it receives from "one of the other doctors." *Id. See Garcia*, 893 S.W.2d at 514.

A party may seek judicial review of an impairment rating. Under Section 410.303 of the Labor Code, a party who seeks judicial review of an impairment rating bears the burden of proving his challenge by a preponderance of the evidence. Tex. Labor Code Ann. § 410.303 (Vernon Supp. 2015). The trial court in such a judicial review proceeding must review a DWC's impairment rating for a claimant under a modified *de novo* standard. *Garcia*, 893 S.W.2d at 528. The modified *de novo* standard in Section 410.303 of the Labor Code restricts the factfinder's discretion to decide the relevant fact issues. *Id.*

Specifically, the trial court, like the DWC, may not arbitrarily assess an impairment rating for a claimant. The trial court — or, as appropriate, a jury as the finder of fact — must adopt one of the impairment ratings that the designated doctor or one of the parties' physicians actually presented to the DWC. *Id.* § 410.306(c). As the Texas Supreme Court explained in *Garcia*:

> [T]he jury is required to adopt the specific impairment rating arrived at by one of the physicians in the case. . . . For example, if three doctors testify, respectively opining that the claimant is 10, 14, and 20 percent impaired, the jury must return one of those three numbers as its verdict. It may not consider the entirety of the testimony to find, for example, an impairment rating of 16 percent.

*Garcia*, 893 S.W.2d at 528.

Here, the only impairment rating in evidence at the contested case hearing was Dr. Machado's 20% impairment rating. (CR 32).

Both then and now, the DWC required that physicians use the fourth edition of the AMA Guides to calculate an impairment rating. *See* TEX. LABOR CODE ANN. § 408.124(c) (Vernon Supp. 2008). Because the medical community had expressed concerns about how to apply the AMA Guides to patients who had undergone spinal fusion surgery, the DWC issued two bulletins, Advisories 2003-10 and 2003-10b, recommending that physicians assign Category DRE IV — equivalent to a 20% impairment rating — to any patients who received a multilevel fusion.[4] At the time,

---

[4] *See Texas Dep't of Ins. v. Lumbermens Mutual Cas. Co.*, 212 S.W.3d 870 (Tex. App.— Austin 2006, pet. denied) (discussing the history of the advisories).

Dr. Machado was required to — and therefore did — consider the advisories in calculating his impairment rating for Samudio. (CR 32).[5]

After the DWC issued its opinion finding that Samudio had a 20% impairment rating, and after Zurich filed this lawsuit seeking judicial review, the Austin Court of Appeals held that the DWC had acted outside its authority in issuing Advisories 2003-10 and 2003-10b. *Texas Dep't of Ins. v. Lumbermens Mutual Cas. Co.*, 212 S.W.3d 870 (Tex. App.—Austin 2006, pet. denied). The court in *Lumbermens* ruled that the advisories were invalid. *Id.* at 877. Subsequently, on July 18, 2007, the DWC issued a bulletin stating that Advisories 2003-10 and 2003-10b "shall no longer be used in determining impairment ratings." Commissioner's Bulletin B-0033-07, July 18, 2007.

When the present case reached the Texas Supreme Court, the supreme court ruled that the trial court could properly exercise jurisdiction over Zurich's judicial review proceeding even though Dr. Machado's 20% rating was the only impairment rating in evidence before the DWC. *American Zurich Ins. Co. v. Samudio,* 370 S.W.3d 363, 364 (Tex. 2012). The supreme court directed the trial court on remand to determine whether any impairment rating in conformance with the fourth edition

---

[5]The DWC required that a certifying physician consider the advisories in calculating an impairment rating for a claimant who had undergone a multilevel spinal fusion. *See, e.g.,* Div. Workers' Comp., Appeal No. 061940, 2006 WL 3187285, *2 (Oct. 25, 2006); Div. Workers' Comp., Appeal No. 061713-s, 2006 WL 3064080, *5 (Oct. 20, 2006); Tex. Workers' Comp. Comm'n, Appeal No. 051587, 2005 WL 2507672, *1 (Aug. 22, 2005); Tex. Workers' Comp. Comm'n, Appeal No. 042108-s, 2004 WL 2421582, *2 (Oct. 20, 2004).

of the AMA Guides was presented to the DWC and, if not, to remand the matter to the DWC for a new impairment determination. *Id.* at 369.

On remand, the trial court correctly determined that even though Dr. Machado considered Advisories 2003-10 and 2003-10b in calculating his impairment rating for Samudio, Dr. Machado's 20% impairment rating nonetheless conformed with the fourth edition of the AMA Guides.

## I. The Trial Court Correctly Ruled that Dr. Machado's 20% Impairment Rating Conformed With the AMA Guides

The trial court on remand did exactly what it was supposed to do under the Texas Supreme Court's mandate. Under the supreme court's mandate, the trial court was to determine whether a "rating made in conformance with the Guides was presented to the agency." *Samudio*, 370 S.W.3d at 369. On May 22, 2014, Samudio filed a motion for summary judgment arguing, among other things, that the evidence conclusively established that Dr. Machado's 20% impairment rating conformed with the fourth edition of the AMA Guides. (CR 845). The trial court granted Samudio's motion, effectively determining that Dr. Machado's rating, which was indisputably presented to the DWC, conformed with the AMA Guides. (CR 922).

Zurich argues that because Dr. Machado considered Advisories 2003-10 and 2003-10b in calculating his impairment rating for Samudio, Dr. Machado's 20% impairment rating is necessarily invalid. *See* App't Br. at 16. But the fact that Dr.

Machado relied upon the advisories in calculating his impairment rating does not mean that his 20% rating is inconsistent with the AMA Guides. The advisories relate to spinal fusions. There are other conditions besides multilevel fusions that may give rise to a 20% impairment rating under the AMA Guides. As Samudio noted in his motion for summary judgment, "it is undisputed that a vertebral compression fracture greater than 50% (*i.e.,* 50.0000001% or greater) entitles a workers' compensation claimant to a 20% impairment rating." (CR 845-46).[6]

The summary judgment evidence shows that Samudio suffered a vertebral compression fracture of greater than 50%. Thus, the trial court correctly ruled that Dr. Machado's 20% impairment rating conformed with the AMA Guides.

## A.    The Evidence of Samudio's Impairment Supports Dr. Machado's 20% Impairment Rating

In remanding this case, the Texas Supreme Court tasked the trial court with a "purely legal" question — to determine "whether the proffered rating was made in accordance with statutory requirements." *Samudio*, 370 S.W.3d at 368. In resolving that "purely legal" question, the trial court did not need to approve Dr. Machado's methodology or to agree with all of Dr. Machado's factual or legal assumptions. *See State Office of Risk Mgmt. v. Joiner*, 363 S.W.3d 242, 247 (Tex. App.—Texarkana

---

[6]Zurich does not deny that a compression fracture of greater than 50% requires a 20% impairment rating. Dr. Casey Cochran, one of Zurich's experts, admitted as much in his deposition. (CR 888).

2012, pet. denied). Rather, the trial court needed only to determine whether Dr. Machado's 20% impairment rating for Samudio conformed with the AMA Guides. *Samudio*, 370 S.W.3d at 369.

On remand, Keith Morris, as the administrator of Samudio's estate, filed Samudio's motion for summary judgment in the trial court in March 2014. (CR 42, 845). Not only had Samudio died by March 2014, but so too had Dr. Machado. (CR 21, 848). In Dr. Machado's absence, Samudio attached the affidavit of his treating physician, Dr. Jose Rodriguez, in support of his motion for summary judgment. Among other things, Dr. Rodriguez's affidavit explained:

1. that the injury for which Samudio sought workers' compensation benefits included a compression fracture of the L1 and L2 vertebrae in Samudio's lumbar spine;

2. that Dr. Rodriguez himself, in reports going back to 2002, had expressed the opinion that Samudio had suffered a compression fracture of greater than 50%;

3. that the radiologist who had reviewed Samudio's x-ray images confirmed that Samudio suffered an "approximately 50% compression deformity of L1 vertebral body;"

4. that it is normal for radiologists to provide an approximation of a compression fracture; and

5. that a compression fracture of greater than 50% at the L1 vertebrae would place Samudio in the DRE IV category, which is equivalent to a 20% impairment rating.

(CR 857-59).

Zurich objects that Dr. Rodriguez's affidavit is irrelevant because Samudio did not offer Dr. Rodriguez's testimony to the DWC. *See* App't Br. at 16-20. In support of its argument, Zurich relies on Section 410.306(c) of the Labor Code. *Id.* Section 410.306(c) states that except for evidence of a substantial change in the claimant's condition, the evidence in a judicial review proceeding of the extent of the claimant's impairment "shall be limited to that presented to the division." TEX. LABOR CODE ANN. § 410.306(c) (Vernon Supp. 2015).

But especially under circumstances like those here, Section 410.306(c) did not bar Samudio from offering Dr. Rodriguez's affidavit as summary judgment evidence. *See, e.g.*, *Old Republic Ins. Co. v. Rodriguez*, 966 S.W.2d 208, 210 (Tex. App.—El Paso 1998, no pet.). *Rodriguez* is on point. In *Rodriguez*, the claimant's physician, Dr. Palafox, assigned the claimant a 31% impairment rating. Dr. Palafox died before trial in the carrier's judicial review proceeding. At trial, the claimant offered the testimony of another physician, Dr. Moreno, to explain Dr. Palafox's records and findings. The claimant had not previously offered Dr. Moreno's testimony to the DWC. Nonetheless, the court of appeals concluded:

> Dr. Moreno explained the procedures used during medical examinations to assess impairment ratings, discussed the American Medical Association guidelines for impairment ratings, and explained how the guidelines are used by doctors to arrive at the percentage impairment ratings employed in workers' compensation cases. *The statute does not prohibit all evidence not presented to the Commission.* It prohibits only evidence of the extent of impairment not presented to the Commission.

*Id.* at 209 (emphasis added).

The issue that the Texas Supreme Court asked the trial court to address on remand was whether Dr. Machado's 20% impairment rating conformed with the fourth edition of the AMA Guides. Dr. Machado, having passed away in 2011, was unavailable to explain how his 20% impairment rating conformed with the AMA Guides. Relying on evidence of Samudio's impairment presented to the DWC, Dr. Rodriguez explained how Dr. Machado's 20% impairment rating conformed with the Guides. Specifically, Dr. Rodriguez attested that because Samudio had suffered a compression fracture of greater than 50%, a 20% impairment rating was consistent with the AMA Guides. (CR 857-60).

Dr. Rodriguez did not offer any "new" impairment rating. To the contrary, Dr. Rodriguez confirmed the same 20% impairment rating that Dr. Machado had previously presented to the DWC — albeit on the basis that Samudio had suffered a compression fracture of greater than 50%, not on the basis of Advisories 2003-10 or 2003-10b. Dr. Rodriguez's affidavit is consistent with, and necessarily arises from, the evidence of Samudio's impairment presented to the DWC:

- ***Evidence that Samudio suffered a compression fracture was presented to the DWC.*** Dr. Rodriguez noted in his affidavit that the radiologist who had reviewed the x-rays of Samudio's back confirmed that Samudio had suffered an "approximately 50%" compression fracture. (CR 858;

*see also* CR 872). Dr. Machado, *in a report previously presented to the DWC*, discussed at length the same radiologist's findings and stated: "The results showed a 50% compression deformity of the L1 vertebral body . . . ." (CR 159). Dr. Ronald Flasner*, in another report presented to the DWC*, noted that Samudio "sustained a compression fracture at L1 and L2." (CR 678).

- ***Evidence that Samudio's compression fracture was greater than 50% was presented to the DWC.*** Dr. Rodriguez stated in his affidavit that "[w]ithin reasonable medical probability, Mr. Samudio's compression fracture of the L1 vertebrae was more than 50%." (CR 858).[7] Dr. Machado, *in his report presented to the DWC*, specifically noted that Dr. Rodriguez, as Samudio's treating physician in 2003, had reviewed Samudio's x-rays and determined that Samudio's fracture might be even more serious than described in the radiologist's report. (CR 159) (noting that "there was some splaying of the predicates at L1, which implies that the fracture was unstable").[8] Dr. Flasner, *in his report*

---

[7]Zurich protests that Dr. Rodriguez's affidavit "contradicts the opinion of the radiologist who read the X-ray in question." App't Br. at 18 (citing CR 872). The radiologist reported that Samudio had suffered an "approximately 50% compression deformity." (CR 872). Dr. Rodriguez noted in his affidavit that the term "approximately 50%," as used in the radiologist's report, does not mean "50% or less." (CR 859). "That would be a distortion of the radiologist's statement." (*Id.*).

[8]In a report dated November 8, 2002, Dr. Rodriguez stated: "Lateral projections confirm that [Samudio] has more than 50% compression of the superior end plate of L1." (CR 870).

*presented to the DWC*, noted that Samudio's fracture had rapidly degenerated from the time of his injury and, by April 2002, was at 50% and continuing to degenerate. (CR 678) (stating that as of April 24, 2002, Samudio's compression fracture had "gone from about 10% to 20% to 50%," and that Samudio had still not reached maximum medical improvement").

The question on remand to the trial court was *not* whether Dr. Machado's methodology was correct: indeed, a jury as factfinder did not need to approve Dr. Machado's methodology to adopt his impairment rating. *Joiner*, 363 S.W.3d at 247. Rather, the question on remand was whether Dr. Machado's 20% impairment rating conformed with the AMA Guides. *Samudio*, 370 S.W.3d at 369.

Dr. Machado's 20% impairment rating conformed with the AMA Guides. Evidence presented to the DWC showed that Samudio suffered a compression fracture of greater than 50%. *See supra* at 16-17. At a minimum, the preponderance of the evidence presented to the DWC was not so contrary to Dr. Machado's 20% impairment rating that it necessarily rebutted the statutory presumption favoring his rating. TEX. LABOR CODE ANN. § 408.124(c) (Vernon Supp. 2015). Thus, Dr. Machado's 20% impairment rating had a sufficient evidentiary basis from the evidence that the parties presented to the DWC. Whether or not Dr. Machado's methodology was correct, his 20% impairment rating was valid; and a jury as

factfinder could properly have adopted a 20% impairment rating for Samudio under the modified *de novo* standard of review.

Because the evidence presented to the DWC — and provided to the trial court as part of the summary judgment record — was sufficient to enable a factfinder to determine that Samudio suffered a compression fracture of greater than 50%, the trial court correctly ruled that Dr. Machado's 20% impairment rating conformed with the AMA Guides.

## B.     The Trial Court Had No Discretion to Adopt Any Impairment Rating Other Than Dr. Machado's 20% Rating

If, based on the evidence presented to the DWC, the jury *could* properly have adopted Dr. Machado's 20% impairment rating for Samudio, then the trial court necessarily *had to* find that Samudio had a 20% impairment rating.

Under the modified *de novo* standard, a trial court must adopt one of the impairment ratings that the parties actually presented to the DWC. TEX. LABOR CODE ANN. § 410.306(c) (Vernon Supp. 2015); *see Garcia*, 893 S.W.2d at 528.[9] If only one impairment rating was presented to the DWC, and if the evidence presented to the DWC is sufficient to show that the rating was valid under the AMA Guides, then the trial court is "required to accept" that rating. *Ballard v. Arch Ins. Co.*, No. 14-14-

---

[9] Section 410.306(c) of the Labor Code requires that on judicial review of a DWC decision determining a claimant's impairment rating, the reviewing court's rating "must match one of the doctors' findings," and the only relevant fact question is "which doctor's rating should prevail." *Garcia*, 893 S.W.2d at 528; *see* TEX. LABOR CODE ANN. § 410.306(c) (Vernon Supp. 2015).

00647-CV, 2015 WL 6560531, *7 (Tex. App.—Houston [14th Dist.] Oct. 29, 2015, no pet. h.).

Here, the only impairment rating in evidence at the contested case hearing in the DWC was Dr. Machado's 20% impairment rating. Although Dr. Machado relied on the DWC advisories for his 20% rating, the evidence presented to the DWC was sufficient to enable a reasonable factfinder to determine that Samudio suffered a compression fracture of greater than 50% — an impairment that justifies a 20% rating under the AMA Guides. *See supra* at 15-17. Consequently, the trial court had no discretion to adopt any impairment rating for Samudio other than Dr. Machado's 20% rating.

Because the trial court could not adopt any impairment rating other than Dr. Machado's 20% rating, the trial court did not err in granting summary judgment in Samudio's favor. *See Ballard*, 2015 WL 6560531, at *7.

C.    **Zurich's Attacks on Dr. Machado's 20% Impairment Rating for Samudio Are Irrelevant**

Zurich complains that Dr. Rodriguez's affidavit contradicts Dr. Machado's deposition testimony. *See* App't Br. at 18-19. But Zurich misses the point. Any court that reviews an impairment rating for a workers' compensation claimant must ask two preliminary questions:

1.    What impairment ratings did the parties and the designated doctor present to the DWC?, and

2.     Is there sufficient evidence presented to the DWC showing that those impairment ratings are valid under the AMA Guides?

If there are two or more ratings presented to the DWC that find sufficient support in the evidence presented to the DWC, then a factfinder in a judicial review proceeding may adopt one of those ratings for the claimant. *Garcia*, 893 S.W.2d at 528. If only one rating presented to the DWC finds sufficient support in the evidence presented to the DWC, then the trial court must adopt that rating. *Ballard*, 2015 WL 6560531, at *7.

What Zurich is essentially suggesting is that if its judicial review proceeding had gone to trial, Zurich would have offered Dr. Machado's deposition testimony to try to persuade the factfinder not to adopt Dr. Machado's 20% impairment rating. Zurich's argument might have some merit if Zurich had offered an alternative impairment rating to the DWC. *But it did not do so*. Thus, Dr. Machado's deposition testimony is irrelevant. Because Dr. Machado's 20% rating was the only rating presented to the DWC, and because there was some evidence presented to the DWC sufficient to support it, the trial court had no discretion to adopt any rating other than Dr. Machado's rating. *Id.*[10]

---

[10]Even outside the workers' compensation context, the fact that the evidence conflicts on an issue does not mean that the evidence is insufficient to support a finding on that issue. *See In re Estate of Pilkilton*, No. 05-11-00246, 2013 WL 485773, *4 (Tex. App.—Dallas Feb. 6, 2013, no pet.) (not designated for publication); *see also Austin v. Weems*, 337 S.W.3d 415, 427 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (noting that the jury, as factfinder, was the judge of contradictory evidence). Here, because there was legally sufficient evidence presented to the DWC supporting a 20% impairment rating under the AMA Guides, a fact finder could adopt a 20% rating for Samudio.

Even if Dr. Machado's deposition were arguably relevant, he hardly made any conclusive concession in his deposition. At best, his deposition is inconclusive. Dr. Machado testified:

Q:      You gave him twenty with the advisory; is that correct?

A:      Advisory, that's correct.

Q:      Okay. If you take the advisory out, what DRE category does he fall into?

A:      Well, I think he'd probably go — I still say he go IV, Category IV.

. . .

A:      . . . . We are talking about something that happened in 2004, an injury that occurred in 2001. That's six — six years ago. That's a long time. I'm just shooting in the dark here to tell you how much he's doing and how much he's going to do in the future.

Q:      So would it be fair to say that based on your knowledge today, you can't say that Mr. Samudio is below a twenty percent impairment rating?

A:      Well, I can't say he's not below, but I can't say he's above either.

Q:      Okay. And right now, based on the information that you have and based on your examination of Mr. Samudio and based on all of the other things that you had to rely on, would you stand by the impairment rating that you gave at the time that you gave it?

A:      That is correct.

(CR 77-78, 93).

Irrespective of Dr. Machado's testimony, there was at least some evidence presented to the DWC that would have justified a 20% impairment rating for Samudio under the AMA Guides. Samudio relied on that same evidence in support of his motion for summary judgment. Consequently, the trial court correctly ruled that Dr. Machado's 20% impairment rating conformed with the AMA Guides; and because the trial court could not have adopted any rating other than Dr. Machado's 20% impairment rating for Samudio, the trial court properly granted summary judgment in Samudio's favor.

## II. The Trial Court Did Not Err in Declining to Formally Remand Samudio's Impairment Rating to the DWC for a New Determination

The Texas Supreme Court directed the trial court to determine whether any of the impairment ratings presented to the DWC conformed with the AMA Guides and, if not, to remand the case to the DWC for a new impairment determination. *Samudio*, 370 S.W.3d at 369. Because the trial court correctly determined that Dr. Machado's 20% impairment rating for Samudio conformed with the AMA Guides, *see supra* at 11-18, the trial court did not need to remand the case to the DWC for a new impairment determination. Accordingly, this Court may affirm the trial court's judgment without reaching the question of whether the trial court should have — or even could have — remanded the case to the DWC.

In Samudio's motion for summary judgment, Samudio asserted, as an alternative basis for judgment, that "the relief sought by Zurich — remand — is not available." (CR 848). Samudio observed:

> No such relief is available because Mr. Samudio is deceased. No proceeding or new rating could be completed at the DWC without Mr. Samudio. In addition, the designated doctor, Dr. Machado, who would be instructed to perform any new rating is also deceased. Here, remand is not available because both of the two parties that would be involved in further proceedings are deceased.

(CR 854).

Zurich complains that the trial court, by failing to remand Samudio's 20% impairment rating formally to the DWC, necessarily disregarded the Texas Supreme Court's mandate. *See* App't Br. at 28. But even aside from the fact that Dr. Machado's 20% impairment rating for Samudio conformed with the AMA Guides, the trial court had two valid reasons — unknown to the Texas Supreme Court at the time of its mandate — for concluding that it could *not* remand the case to the DWC: (i) Samudio died after the supreme court released its mandate; and (ii) by the time Samudio died, he had already received all of the benefits to which he would have been entitled under a 20% rating.

A. **The Trial Court Had No Basis for Remanding Samudio's Impairment Rating to the DWC After Samudio Died**

If, as Zurich claims, the trial court impliedly found that the remedy of remanding Samudio's impairment rating to the DWC was unavailable, then the trial

court was undoubtedly correct in doing so. The very purpose of a remand would be for the DWC to assign a new impairment rating for Samudio. *Samudio,* 370 S.W.3d at 369. Section 408.123 of the Labor Code specifies the procedure for the DWC to assign a new impairment rating:

> After an employee has been certified by a doctor as having reached maximum medical improvement, the certifying doctor shall evaluate the condition of the employee and assign an impairment rating using the impairment rating guidelines described by Section 408.124. If the certification and evaluation are performed by a doctor other than the employee's treating doctor, the certification and evaluation shall be submitted to the treating doctor, and the treating doctor shall indicate agreement or disagreement with the certification and evaluation.

TEX. LABOR CODE ANN. § 408.123(a) (Vernon Supp. 2015); *see also* 28 TEX. ADMIN. CODE § 130.1(c)(3) (2015).

Under the plain terms of Section 408.123, a physician — either the designated doctor or the claimant's treating doctor — must examine the claimant to be able to assign an impairment rating for the claimant. TEX. LABOR CODE ANN. § 408.123(a) (Vernon Supp. 2015). *See State Office of Risk Mgmt. v. Ramirez*, No. 04-09-00541-CV, 2010 WL 2601667, *2 (Tex. App.—San Antonio June 30, 2010, pet. denied) (not designated for publication) ("In assigning an impairment rating, a doctor must perform a complete medical examination of the employee . . . ."). The supreme court itself expressly recognized as much. *See Samudio*, 370 S.W.3d at 367 (acknowledging that Section 408.123 requires that before a physician may assign an impairment rating for a claimant, the physician must examine the claimant).

Yet, that is impossible here. No one can examine Samudio now that he has died.

### 1. The DWC Had No Jurisdiction to Assign a New Impairment Rating for Samudio After He Died

Zurich argues that the trial court had no choice other than to remand Samudio's impairment rating to the DWC. But Zurich's argument begs the question: Just what was the DWC supposed to do on remand?

Zurich suggests that the DWC could have assigned a posthumous impairment rating for Samudio. However, Zurich cites no statutory provision that would have enabled the DWC to do so. Section 408.123 of the Labor Code requires a physical examination. Because Samudio is dead, neither the DWC nor any new doctor can now examine him. Only two doctors actually examined Samudio before his death: his designated doctor, Dr. Machado, who likewise is dead; and his treating doctor, Dr. Rodriguez, who agrees with Dr. Machado that Samudio had a 20% impairment rating. (CR 857).

As Zurich concedes, an impairment rating must comply with the fourth edition of the AMA Guides. The AMA Guides themselves explicitly require a medical examination. *See AMA Guides to the Evaluation of Permanent Impairment* § 2.1 (4th ed. 1993) ("According to the *Guides*, the first step in assessing an individual's impairment is gathering thorough and complete historical information on the medical condition(s) and then carrying out a medical evaluation supported by appropriate tests

and diagnostic procedures."). Because no one can examine a deceased claimant, the DWC has no way to assign any new impairment rating for Samudio.

Nor can the DWC arbitrarily assess any posthumous impairment rating for Samudio other than Dr. Machado's 20% rating. To assess any such rating, the DWC would have to apply procedures other than those in Section 408.123 of the Labor Code, presumably relying — if Zurich has its way — on the opinion of a doctor who never actually examined Samudio. The Texas Workers' Compensation Act, as reflected in the Labor Code, "precludes the application of claims and procedures not contained within the Act." *Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 493 (Tex. 2013).[11]

The DWC simply has no authority to assign a new impairment rating for a claimant outside the requirements of Section 408.123. An agency like the DWC may "exercise only those powers that the Legislature confers upon [it] in clear and express language." *Texas Nat. Res. Comm'n v. Lakeshore Util. Co.*, 164 S.W.3d 368, 377 (Tex. 2005). *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001) (noting that an agency has no authority to "exercise what is effectively a new power, or a power contradictory to the statute, on the theory such a power is expedient for administrative purposes").

---

[11]Indeed, the Texas Supreme Court expressly recognized that Zurich's expert, Dr. John Obermiller, could not assign an impairment rating for Samudio because Dr. Obermiller "never examined Samudio." *Samudio*, 370 S.W.3d at 367.

Zurich is well aware of this. At the trial court's request, the parties scheduled a benefit review conference with the DWC to discuss whether the DWC could assign a new impairment rating for Samudio. (CR 918). The parties disagree about what exactly took place at the benefit review conference. (*Compare* CR 915 *with* CR 917). But Zurich itself reported back to the trial court:

> Mr. Craddock [the DWC benefit review officer] acknowledged the difficulty in having the claimant seen by a designated doctor for the assignment of a new impairment rating. The original designated doctor is dead, so a re-designation would have to occur. In addition, the claimant is also dead, so no re-examination could occur. Mr. Craddock agreed that the *Division would have to engage in an equity measure* (essentially waiving the requirement of an examination) in order to get Mr. Samudio a certification of MMI and impairment rating from a second designated doctor, should that become necessary.

(CR 915) (emphasis added). Essentially, Zurich reported to the trial court that the DWC would have to make up an entirely new procedure as an "equity measure" to assign another impairment rating to Samudio — something the DWC has no power to do. *Adcock*, 412 S.W.3d at 493.

Zurich complains that even if the DWC had no authority to assign a new impairment rating for Samudio, the trial court nonetheless had a duty to remand Samudio's impairment rating to the DWC under the supreme court's mandate. A trial court must comply with a higher court's mandate "in the absence of changed circumstances," and the power to determine those changed circumstances "lies alone with the trial court." *City of Tyler v. St. Louis S.W. Ry. Co.*, 405 S.W.2d 330, 332

(Tex. 1966).[12]   Unquestionably, the circumstances here have changed:  Samudio passed away after the supreme court issued its mandate.

The Labor Code gives the DWC only the power to assign impairment ratings for the living, not for the dead.  Because Samudio passed away in 2013, the DWC cannot assign him a new impairment rating.  The trial court did not err in declining to remand this case for the DWC to do something that it had no power to do.

### 2.   The Trial Court Committed No Harmful Error in Ruling that Samudio Had a 20% Impairment Rating

As is true in any appeal, Zurich, as the appellant, must show that the trial court committed harmful error.  TEX. R. APP. P. 44.1.  Proof of harm is a necessary gate through which Zurich must pass to prevail on appeal.  *See, e.g., Phillips v. Bramlett*, 407 S.W.3d 229, 243 (Tex. 2013); *G&H Towing Co. v. Magee*, 347 S.W.3d 293, 297-98 (Tex. 2011).  Zurich has not shown — and cannot show — that it has suffered any harm.  By granting summary judgment for Samudio, the trial court upheld a 20% impairment rating for Samudio.  Even if the trial court had remanded Samudio's impairment rating to the DWC, the only valid rating that the DWC could possibly have assigned to Samudio is a 20% impairment rating.

---

[12]A trial court "is given a reasonable amount of discretion to comply with the mandate." *Russell v. Russell*, No. 14-13-01100-CV, 2015 WL 5723109, *3 (Tex. App.—Houston [14th Dist.] Sept. 29, 2015, no pet. h.).

Section 408.123 of the Labor Code specifies that the first doctor to assign an impairment rating for a claimant is the designated doctor — here, Dr. Machado, who assigned Samudio a 20% impairment rating. Tex. Labor Code Ann. § 408.123(a) (Vernon Supp. 2015). Whether a rating comes from the designated doctor or some other physician, the claimant's treating doctor — here, Dr. Rodriguez — must review any impairment rating and "indicate agreement or disagreement." *Id.* Dr. Rodriguez agrees with Dr. Machado that "Mr. Samudio's impairment rating is 20% for his work injury of October 16, 2001." (CR 859).

A doctor must first examine the claimant before he may assign an impairment rating for the claimant. Tex. Labor Code Ann. § 408.123(a) (Vernon Supp. 2015); *see supra* at 24. Besides the late Dr. Machado, Dr. Rodriguez is the only available doctor who actually examined Samudio: Dr. Rodriguez initially examined Samudio in November 2002, he treated Samudio from 2002 to 2006, and he performed Samudio's two surgeries. (CR 857-58). Consequently, Dr. Rodriguez is the only available doctor who at this stage could possibly provide an impairment rating that would comply with Section 408.123 of the Labor Code.

An assignment rating must be based on objective clinical or laboratory findings. 28 Tex. Admin. Code § 130.1(c)(3) (2015). Here, in agreeing that Samudio's impairment rating is 20%, Dr. Rodriguez relied on his own documented clinical findings, including his initial evaluation report in November 2002 stating that

Samudio had a compression fracture of "more than 50%." (CR 857-58; *see* CR 870). Dr. Rodriguez also relied on specific laboratory findings — all of the "available diagnostic images," including the March 2002 x-ray images of Samudio's compression fracture. (CR 858-59).

Zurich complains that Dr. Rodriguez's opinion about Samudio's impairment rating is invalid under Section 408.122 of the Labor Code. *See* App't Br. at 18. Section 408.122, which is entitled "Eligibility for Impairment Income Benefits," does not apply here: it describes the procedure for a "finding of impairment" — *i.e.,* a determination of whether the claimant has suffered *any impairment at all*. TEX. LABOR CODE ANN. § 408.122 (Vernon Supp. 2015). Zurich does not dispute that Samudio suffered an impairment and was eligible to receive impairment income benefits. The Texas Supreme Court explicitly acknowledged that Samudio suffered *some* compensable impairment:

> [N]o one presented evidence to the Division that Samudio's impairment rating was zero, and it is undisputed that he had suffered some permanent impairment.

*Samudio*, 370 S.W.3d at 367. The only question now is the *level* of Samudio's impairment — in other words, Samudio's impairment rating. Section 408.123, not Section 408.122, defines the procedure for assigning an impairment rating. TEX. LABOR CODE ANN. § 408.123(a) (Vernon Supp. 2015).

Under Section 408.123, Dr. Rodriguez, who actually examined Samudio, is the only available doctor who can assign an impairment rating for Samudio. Based on objective clinical and laboratory findings, Dr. Rodriguez has confirmed that Samudio suffered a compression fracture of greater than 50%, which entitles Samudio to a 20% impairment rating.[13] Thus, the trial court's summary judgment in Samudio's favor is not harmful error to Zurich: even if the trial court arguably erred in failing to remand Samudio's impairment rating to the DWC, the only rating that the DWC could possibly assign to Samudio is a 20% rating, which is exactly the same rating that the trial court agreed to be conclusively established under the summary judgment evidence.

## B. The Trial Court Had No Basis for Remanding Samudio's Impairment Rating to the DWC After Samudio Received All of His Benefits

Not only did Samudio's death negate any reason for the trial court to remand Samudio's impairment rating to the DWC, but so too did the fact that by the time of Samudio's death, he had already received all of the benefits to which he would have been entitled under a 20% rating. Under Texas workers' compensation law, a carrier may not recover benefits back from a claimant after it has already paid those benefits to the claimant. TEX. LABOR CODE ANN. §§ 403.006, 410.209-.210 (Vernon Supp.

---

[13]*Cf. Cervantes v. New Hampshire Ins. Co.*, No. 04-12-00722-CV, 2013 WL 3486824, *2 (Tex. App.—San Antonio July 10, 2013, pet. denied) (not designated for publication) (holding that the trial court did not err in granting summary judgment upholding the designated doctor's impairment rating for the claimant where the designated doctor was the only doctor whose rating was presented to the DWC).

2015); *see Texas Workers' Comp. Comm'n v. Texas Builders Ins. Co.*, 994 S.W.2d 902, 904 (Tex. App.—Austin 1999, pet. denied). Zurich itself admits as much. *See* App't Br. at 29.

Because the DWC assessed a 20% impairment rating for Samudio back in 2005, Zurich paid impairment income benefits to Samudio based on a 20% rating. By statute, Samudio continued to receive those benefits until June 23, 2009 — during the pendency of the original appeal of this case. TEX. LABOR CODE ANN. § 408.083 (Vernon Supp. 2015). As of June 23, 2009, Samudio received all of the benefits that he could possibly have received under the Texas workers' compensation laws. In short, he won. He received full payment of impairment income benefits based on a 20% rating; and after Zurich paid those benefits to Samudio, it could no longer get them back from him.

Samudio asked the trial court to grant summary judgment because, among other reasons, there was no longer any justiciable issue for the trial court to resolve. (CR 854). For a trial court to exercise subject matter jurisdiction, a case must raise a justiciable controversy. *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). "To constitute a justiciable controversy, there must exist a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute." *OHBA Corp. v. City of Carrollton*, 203 S.W.3d 1, 5 (Tex. App.—Dallas 2006, pet. denied).

Here, there is no longer any justiciable issue as between Zurich and Samudio: even if Zurich is correct that Samudio's impairment rating should be less than 20%, Zurich cannot recover from Samudio any of the benefits that it already paid to him. Zurich's remedy at this point is solely against the Texas Subsequent Injury Fund ("SIF"), which is authorized to reimburse carriers if they overpaid benefits to a claimant. *See* TEX. LABOR CODE ANN. § 403.006(b)(4) (Vernon Supp. 2015). The Labor Code specifies the procedures by which a carrier may recover from the SIF. *E.g., id.* §§ 408.0041, 408.143, 408.147.[14] None of those procedures authorizes a carrier to continue pursuing a judicial review proceeding even after the claimant has received full payment of benefits.

Essentially, Zurich suggests that even though it may never recover the benefits that it fully paid to Samudio under a 20% rating, it was entitled to continue pursuing its judicial review action against Samudio and to force Samudio's attorneys to continue defending the action even after they had successfully done what Samudio had retained them to do — secure full benefits for Samudio. Zurich's position is particularly troubling in light of Zurich's claim that Samudio's attorneys are not

[14]The Texas Workers' Compensation Act is a comprehensive statutory scheme, and therefore, it bars a court from applying or enforcing any remedies or procedures that are not specified in the Act. *In re Gallardo*, No. 13-14-00203-CV, 2015 WL 730920, *8 (Tex. App.—Corpus Christi Feb. 19, 2015, no pet.) (not designated for publication); *see also Texas Dep't of Ins., Workers' Comp. Div. v. De Los Santos*, 446 S.W.3d 800, 805-06 (Tex. App.—San Antonio 2014, no pet.) (holding that a trial court exceeded its authority in ordering the SIF to pay benefits to a claimant where the Act did not grant Texas courts any authority to make such an order).

entitled to recover any fees for the work that Zurich forced them to do in continuing to defend the case even after Samudio received all of the benefits that he was entitled to receive under a 20% rating. *See* App't Br. at 35-37.[15]

There was no longer any justiciable controversy after Samudio received full payment of his benefits. Absent any justiciable controversy, the trial court lacked subject matter jurisdiction over Zurich's claims, and there was nothing for the trial court to remand to the DWC. Accordingly, the trial court did not err in granting summary judgment in Samudio's favor.[16]

## III. The Trial Court Correctly Ordered Zurich to Pay Samudio's Reasonable and Necessary Attorney's Fees

A carrier that files an unsuccessful judicial review action is liable for the claimant's reasonable and necessary attorney's fees. *Financial Ins. Co. v. Ragsdale*, 166 S.W.3d 922, 930 (Tex. App.—El Paso 2005, no pet.). Specifically, Section 408.221(c) of the Texas Labor Code provides:

---

[15]To support its argument that it necessarily had to continue pursuing its claims against Samudio, Zurich relies on the unpublished opinion in *Lumbermens Mut. Cas. Co. v. Portillo*, No. 13-10-00470-CV, 2011 WL 2976869 (Tex. App.—Corpus Christi July 21, 2011, no pet.) (not designated for publication). But *Portillo* is distinguishable. The claimant in *Portillo* was still alive. And nothing in *Portillo* suggests that the claimant had received all of the benefits he was entitled to receive; instead, it states merely that the carrier intended to seek reimbursement for past overpayments from the SIF rather than from the claimant. *Id.* at *2.

[16]A trial court may properly grant summary judgment if it lacks subject matter jurisdiction over an action. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Even if a trial court dismisses a case for lack of subject matter jurisdiction, it retains jurisdiction to grant attorney's fees to the prevailing party. "A trial court's dismissal for lack of subject-matter jurisdiction does not prevent the concurrent award of attorney's fees under [a] mandatory award provision." *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 257 (Tex. App.—Dallas 2005, no pet.).

An insurance carrier that seeks judicial review under Subchapter G, Chapter 410, of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, income or death benefits is liable for reasonable and necessary attorney's fees as provided by Subsection (d) incurred by the claimant as a result of the insurance carrier's appeal *if the claimant prevails on an issue on which judicial review is sought by the insurance carrier . . . .*

TEX. LABOR CODE ANN. § 408.221(c) (Vernon Supp. 2015) (emphasis added).

Zurich sought judicial review of a single issue, "What is claimant Samudio's impairment rating?" After years of protracted litigation, the trial court ruled that Samudio was the prevailing party on this issue, agreeing with the DWC that Samudio's impairment rating was 20%. (CR 922). Applying Section 408.221(c) of the Labor Code, the trial court awarded $80,519.53 in fees and expenses in the trial court, $49,000.00 in fees for the first appeal, and up to $60,000.00 in fees for the present appeal. (CR 1346-47).

Zurich raises three objections to the trial court's fee award. First, Zurich contends that Samudio was not the prevailing party on Zurich's claims. Second, Zurich contends that Samudio is not entitled to recover any fees for the first appeal. Third, Zurich contends that Samudio is not entitled to recover any fees for the work that Zurich necessarily forced Samudio's attorneys to do in defending the trial court's fee awards. Each of Zurich's three objections to the trial court's fee award lacks merit.

**A.    Samudio Was the Prevailing Party on the Issue for Which Zurich Sought Judicial Review**

Zurich argues that Samudio "is not entitled to recover attorneys' fees in this case because he has not proved that he is a prevailing party under the act." App't Br. at 32.  Curiously, Zurich does not cite any definition for the term "prevailing party." Although Section 408.221(c) does not itself define the term, courts have ruled that a "prevailing party is one who is vindicated by the trial court's judgment." *Insurance Co. of the State of Pa. v. Orosco*, 170 S.W.3d 129, 134 (Tex. App.—San Antonio 2005, no pet.); *see also Dean Foods Co. v. Anderson*, 178 S.W.3d 449, 454 (Tex. App.—Amarillo 2005, pet. denied) (holding that a party "prevails" if he "successfully prosecutes the action or successfully defends against it, prevailing on the main issue, *even though not to the extent of its original contention*") (emphasis added).

The purpose of Section 408.221(c) is to place the burden of the claimant's fees on the carrier in the event that the carrier chooses to file an unsuccessful judicial review action.  *Twin City Fire Ins. Co. v. Vega-Garcia*, 223 S.W.3d 762, 768 (Tex. App.—Dallas 2007, pet. denied).  As the Amarillo Court of Appeals has explained:

> In enacting that statute, it appears that the intent of the legislature was to ensure that if the insurance carrier appealed an award, thereby delaying the payment of benefits to an injured worker, it ran the risk of having to pay the claimant's attorney's fees if its appeal was not well taken.  Additionally, there is another valid reason for the statute and the apparent legislative intent.  While a worker is not required to have an attorney to represent him or her in TWCC proceedings, in an appeal to the district court, the worker must obtain an attorney or run the risk of

representing himself or herself with the pitfalls that may await a non-legally trained participant in a court of record.

*Dean Foods Co.*, 178 S.W.3d at 454-55.

Zurich filed this action asking the trial court to set aside the DWC's final decision approving Dr. Machado's 20% impairment rating for Samudio. (CR 129). The Texas Supreme Court remanded this action for the trial court to resolve that specific issue. *Samudio*, 370 S.W.3d at 368. The trial court granted Samudio's motion for summary judgment and found that Samudio had a valid 20% impairment rating. (CR 922). Consequently, Samudio was the prevailing party on Zurich's judicial review action: he successfully defended against Zurich's request that the trial court set aside the DWC's final decision. Because Samudio was the prevailing party, the trial court correctly awarded attorney's fees to Samudio.

**B.     Samudio is Entitled to Recover Attorney's Fees for His Counsel's Work in Defending Against Zurich's First Appeal**

Zurich argues that the trial court's fee award to Samudio improperly includes $49,000.00 in fees for the work that Samudio's attorneys performed in defending against Zurich's first appeal. *See* App't Br. at 33. In short, Zurich contends that even though Samudio ultimately was the prevailing party, Samudio may not recover any fees for what Zurich characterizes as an "unsuccessful" appeal. *Id.* Under Zurich's argument, a trial court must parse an attorney's fee statements, and even if the attorney ultimately secured a successful judgment, the court must eliminate any fees

for work that the attorney may have performed in pursuing unsuccessful motions or arguments.

While Zurich's argument might describe the rule in federal court, it has never been the rule in Texas state court. The *Andersen* factors for a fee award emphasize the ultimate "results obtained," not the success of an attorney's work on individual tasks. *Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). *See Helfman Motors, Inc. v. Stockman*, 616 S.W.2d 394, 399 (Tex. App.—Fort Worth 1981, writ ref'd n.r.e.) (affirming an attorney's fee award even though it included fees for an injunction that became moot); *see also Liberty Mut. Ins. Co. v. Montana*, 49 S.W.3d 599, 604 (Tex. App.—Fort Worth 2001, no pet.).

Section 408.221 of the Labor Code, which incorporates the *Andersen* factors, requires that a trial court consider "the benefits to the claimant that the attorney is responsible for securing." TEX. LABOR CODE ANN. § 408.221(d)(6) (Vernon Supp. 2015). Although tailored to a judicial review proceeding, this language — consistent with the *Andersen* factors — emphasizes the ultimate result of an attorney's work, not the success of an attorney's work on individual tasks. Here, Samudio's attorneys secured *all* of the benefits that Samudio was entitled to receive from Zurich under a 20% impairment rating, and the trial court confirmed that Samudio's 20% impairment rating was valid. *See supra* at 31-32.

Zurich cannot validly complain that the work of Samudio's attorneys on the first appeal was "unnecessary." The ruling that prompted the first appeal was the trial court's order dismissing Zurich's claims because Dr. Machado's 20% impairment rating was the only rating presented to the DWC. Zurich appealed the trial court's order, and Zurich's appeal necessitated the work of Samudio's attorneys. This Court affirmed the trial court's order. Significantly, the Texas Supreme Court did not reverse and render judgment in Zurich's favor; it reversed and remanded the case for the trial court to determine whether Dr. Machado's 20% rating conformed with the AMA Guides. The trial court on remand confirmed that Dr. Machado's 20% rating conformed with the AMA Guides.

The work of Samudio's attorneys in the first appeal did not go to waste. Because some evidence presented to the DWC shows that Dr. Machado's 20% rating is proper under the AMA Guides, then — as Samudio's attorneys argued in the first appeal — the trial court had no choice other than to assess a 20% impairment rating for Samudio. The circumstances here are no different than a situation where a trial court initially denies a motion for summary judgment but later grants a directed verdict on similar arguments. Counsel's work on an unsuccessful summary judgment motion (or a first appeal) is not "unnecessary" if the same or similar arguments are later vindicated through additional development of the evidence.

The trial court did not err in awarding $49,000 in fees for Samudio's first appeal. Accordingly, this Court should affirm the trial court's award of attorney's fees to Samudio.

## C.     Samudio is Entitled to Recover Attorney's Fees for His Counsel's Work in Defending the Trial Court's Fee Awards

Zurich argues that Samudio is not entitled to recover allegedly "improper 'fees-for-fees.'" App't Br. at 35-36 (citing *Discover Prop. & Cas. Ins. Co. v. Tate*, 298 S.W.3d 249, 260 (Tex. App.—San Antonio 2009, pet. denied)). Of course, Zurich was the party who originally sought judicial review of Samudio's impairment rating. (CR 129). Zurich named Samudio as a defendant in the lawsuit. (*Id.*). Zurich filed the first appeal. (CR 6). And Zurich has now filed the present appeal. Zurich has continually pursued litigation against Samudio, and Samudio was entitled to defend himself, as the Labor Code provides. Because Zurich has failed in its litigation, the Labor Code entitled Samudio to recover fees for having to defend against Zurich's failed litigation.

Zurich's argument defeats the very purpose of Section 408.221, which among other things was intended to ensure that injured workers have the ability to secure adequate legal representation in a judicial review proceeding. *Dean Foods Co.,* 178 S.W.3d at 454-55. Attorneys will be less likely to represent injured workers if those attorneys must themselves bear the costs of pursuing an award of attorney's fees.

The present case is a perfect example: Zurich takes the position that Samudio's attorneys cannot recover any fees for any work after June 23, 2009, even though Zurich continues to press its claims against Samudio. *See* App't Br. at 36.[17] Under Zurich's position, Samudio's attorneys must defend Zurich's continued claims *pro bono* — exactly the result that the Texas Legislature sought to avoid in amending Section 408.221 to ensure that the carrier, and not the claimant, assumed the risk of paying the claimant's attorney's fees in the event of an unsuccessful judicial review proceeding.

Moreover, Zurich's argument is contrary to the plain terms of the statute. Section 408.221(c) states that a carrier which unsuccessfully seeks judicial review of a DWC decision is liable for the attorney's fees "incurred by the claimant *as a result of* the insurance carrier's appeal." TEX. LAB. CODE ANN. § 408.221(c) (Vernon Supp. 2015) (emphasis added). By its plain terms, Section 408.221(c) contains both a condition ("if the claimant prevails. . . .") and a consequence ("[a]n insurance carrier . . . is liable for reasonable and necessary attorney's fees . . . incurred by the claimant as a result of the . . . appeal"). If the condition occurs, then the consequence logically

<hr />

[17]Significantly, the federal government took a similar — and unsuccessful — position with respect to the Equal Access to Judgment Act, arguing that it does not permit a prevailing claimant to recover "fees for fees." *Commissioner v. Jean*, 496 U.S. 154, 162 (1990). The Supreme Court ruled that if the government could impose the cost of litigating fee disputes on prevailing claimants, then "the financial deterrent that the EAJA aims to eliminate would be resurrected." *Id.* at 164.

follows — the claimant may recover all of the reasonable and necessary fees he incurs *as a result* of the carrier's judicial review proceeding.

Zurich relies on the San Antonio Court of Appeals opinion in *Tate*, neglecting to mention the contrary opinion of this Court's sister court, the Fourteenth Court of Appeals, in *Transcontinental Ins. Co. v. Crump*, 274 S.W.3d 86 (Tex. App.— Houston [14th Dist.] 2008), *rev'd on other grounds*, 330 S.W.3d 211 (Tex. 2010). Interpreting the "as a result of" language in Section 408.221(c), the court of appeals in *Crump* stated:

> [I]f the claimant successfully performs the predicate — prevailing on an issue on which the carrier sought judicial review — the claimant is entitled to attorney's fees incurred *as a result of* the appeal. Here, appellee, through her attorneys, was required to prepare and submit written evidence to the trial court supporting her request for attorney's fees. . . . In addition, because the parties could not agree on the amount of appellee's reasonable and necessary attorney's fees, her attorney was required to set and attend a trial court hearing on that matter. We hold appellee incurred these attorney's fees *as a result of* appellant's appeal.

*Crump*, 274 S.W.3d at 104 (emphasis added).

Other courts have reached similar results. *See, e.g., Old Republic Ins. Co. v. Stafford*, No. Civ. A. 3:03-CV-1611, 2005 WL 2026853, *7 (N.D. Tex. Aug. 22, 2005) ("[T]he Court finds that Stafford is entitled to recover attorney's fees for time spent on preparing his fee application. … The preparation of a fee application for fees that are specifically provided for by [Section 408.221(c)] necessarily *result[s] from* the carrier's appeal.") (emphasis added); *Texas Mun. League Intergovernmental Risk*

*Pool v. Burns*, 209 S.W.3d 806, 819-20 (Tex. App.—Fort Worth 2006, no pet.) (affirming an award of attorney's fees resulting from a carrier's appeal).

Zurich argues that whether it "owes fees to Samudio's attorneys is not a matter involving entitlement to or eligibility for benefits." App't Br. at 36. But Zurich's argument effectively changes the language of Section 408.221(c) to say that it permits a claimant to recover only those fees incurred *in defense of* the carrier's judicial review proceeding, as opposed to those fees incurred *as a result of* the carrier's proceeding. Zurich's argument thus fails to comply with one of the most basic rules of statutory construction — that a court must give effect to the plain terms of Section 408.221(c) as they are written. *See Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 443 (Tex. 2009).

The trial court correctly awarded attorney's fees for the fees that Samudio's attorneys incurred *as a result of* Zurich's judicial review proceeding, including the fees that Samudio's attorneys necessarily incurred in pursuit of an award of attorney's fees. Accordingly, this Court should affirm the trial court's judgment.

## CONCLUSION

Zurich's arguments have no merit. The trial court correctly found that Dr. Machado's 20% impairment rating for Samudio conformed with the AMA Guides; and because Samudio was the prevailing party on Zurich's claims, the trial court correctly awarded reasonable and necessary attorney's fees to Samudio. Samudio

respectfully requests that this Court affirm the trial court's judgment in Samudio's favor and grant Samudio all such further and additional relief to which he may show himself to be justly entitled.

Respectfully submitted,

KEELING & DOWNES, P.C.

/S/ Byron C. Keeling

By:_____
Byron C. Keeling
State Bar No. 11157980
bck@keelingdownes.com
Anna E. Williams
State Bar No. 24088638
aew@keelingdownes.com
1500 McGowen, Suite 220
Houston, Texas 77004
Telephone: (832) 214-9900
Facsimile:  (832) 214-9908

DOYLE LLP
Michael P. Doyle
State Bar No. 06095650
mdoyle@doylelawfirm.com
Patrick M. Dennis
State Bar No. 24045777
pdennis@doylelawfirm.com
2402 Dunlavy Street, Suite 200
Houston, Texas 77006
Telephone:  (713) 571-1146
Facsimile:  (713) 571-1148

COUNSEL FOR APPELLEE
DANIEL SAMUDIO

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of December, 2015, the foregoing document was forwarded to the following via electronic service:

Mr. Robert D. Stokes
Mr. Gregory D. Solcher
Mr. David Owen Cluck
Flahive, Ogden & Latson
P.O. Box 201329
Austin, Texas 78720
Telephone: (512) 435-2150
Facsimile: (512) 241-3305

*Counsel for Appellant*
*American Zurich Insurance Company*

/S/ Byron C. Keeling

_____

Byron C. Keeling

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this Brief of Appellee complies with the typeface requirements in Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.

Additionally, the undersigned certifies that this brief complies with the word-count limitations of Tex. R. App. P. 9.4(i )(2) because, excluding all parts exempted under Tex. R. App. P. 9.4(i)(1), the brief contains 10,796 words.

/S/ Byron C. Keeling

_____

Byron C. Keeling

# APPENDIX

A          Order, Oct. 7, 2014 (CR 922);

B          Judgment, Feb. 27, 2014 (CR 1346).

# TAB A

CAUSE NO. 2006-18753

P. 1

7a

| | | |
|---|---|---|
| AMERICAN ZURICH INSURANCE SYSTEM | § § § | IN THE DISTRICT COURT |
| VS. | § § § | HARRIS COUNTY, TEXAS |
| DANIEL SAMUDIO | § | 127TH JUDICIAL DISTRICT |

## ORDER ON DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

Came to be heard Defendant's Amended Motion for Summary Judgment, and the Court is of the opinion that the motion should be and hereby is GRANTED.

Signed this ___7th___ day of __Oct.__, 2014.

_____
DISTRICT JUDGE

1

922

# TAB B

FILED
Chris Daniel
District Clerk

FEB 27 2015
Time _____
Harris County, Texas
By _____ Deputy

CAUSE NO 2006-18753

| | | |
|---|---|---|
| AMERICAN ZURICH INSURANCE COMPANY | § § § | IN THE DISTRICT COURT |
| VS | § § § | HARRIS COUNTY, TEXAS |
| DANIEL SAMUDIO | § | 127TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On October 7, 2014, this Court Granted Defendant's Amended Motion for Summary Judgment, finding that Defendant is the prevailing party on all issues Subsequently, the parties stipulated that the issue of reasonable and necessary attorneys' fees would be submitted to the Court on written evidence, and a hearing was held on February 13, 2015

Having considered the evidence and briefs submitted by the parties, the Court finds that the following fees are reasonable and necessary fees incurred in the defense of this matter through October 7, 2014

| | | |
|---|---|---|
| a | Doyle Raizner LLP Fees | $69,140 50 |
| b | Doyle Raizner LLP Expenses | $5,475 03 |
| c | Blackwell & Haag, P C Fees | $3,334 00 |
| d | Tonya D Carter & Associates | $2,570 00 |
| e | Keeling & Downes, P C (first appeal) | $49,000 00 |

Defendant has also requested reimbursement of attorneys' fees should Plaintiff file a second appeal of this matter

| | | |
|---|---|---|
| a | In the event of an appeal to the Court of Appeals | $30,000 00 |

1

1346

b   In the event of a Petition to the Texas Supreme Court  $10,000 00

c   In the event that a Petition for Review is Granted      $20,000 00

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that Plaintiff pay the amounts set for above  This is a final order and is appealable

Signed this 27th day of February, 2015

DISTRICT JUDGE

2

1347

## HYPERLINKED MATERIALS

**Clerk's Record Excerpts**

Tab A          (Appendix) CR 922

Tab B          (Appendix) CR 1346-47

Tab C          CR 857-60

**Cases**

Tab 1          *American Zurich Ins. Co. v. Samudio*, 370 S.W.3d 363 (Tex. 2012)

Tab 2          *Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997)

Tab 3          *Ballard v. Arch Ins. Co.*, No. 14-14-00647-CV, 2015 WL 6560531 (Tex. App.—Houston [14th Dist.] Oct. 29, 2015, no pet. h.)

Tab 4          *City of Tyler v. St. Louis S.W. Ry. Co.*, 405 S.W.2d 330 (Tex. 1966)

Tab 5          *Dean Foods Co. v. Anderson*, 178 S.W.3d 449 (Tex. App.—Amarillo 2005, pet. denied)

Tab 6          *Insurance Co. of the State of Pa. v. Orosco*, 170 S.W.3d 129 (Tex. App.—San Antonio 2005, no pet.)

Tab 7          *Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492 (Tex. 2013)

Tab 8          *Old Republic Ins. Co. v. Rodriguez*, 966 S.W.2d 208 (Tex. App.—El Paso 1998, no pet.)

Tab 9          *Old Republic Ins. Co. v. Stafford*, No. Civ. A. 3:03-CV-1611, 2005 WL 2026853 (N.D. Tex. Aug. 22, 2005)

Tab 10         *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 368 (Tex. 2001)

Tab 11         *State Office of Risk Mgmt. v. Joiner*, 363 S.W.3d 242 (Tex. App.—Texarkana 2012, pet. denied)

Tab 12      *State Office of Risk Mgmt. v. Ramirez*, No. 04-09-00541-CV, 2010 WL 2601667 (Tex. App.—San Antonio June 20, 2010, pet. denied)

Tab 13      *Texas Nat. Res. Comm'n v. Lakeshore Util. Co.*, 164 S.W.3d 368 (Tex. 2005)

Tab 14      *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504 (Tex.1995)

Tab 15      *Transcontinental Ins. Co. v. Crump*, 274 S.W.3d 86 (Tex. App.—Houston [14th Dist.] 2008), *rev'd on other grounds*, 330 S.W.3d 211 (Tex. 2010)

Tab 16      *Twin City Fire Ins. Co. v. Vega-Garcia*, 223 S.W.3d 762 (Tex. App.—Dallas 2007, pet. denied)

## Texas Labor Code

Tab 17      TEX. LABOR CODE ANN. § 408.122 (Vernon Supp. 2015)

Tab 18      TEX. LABOR CODE ANN. § 408.123 (Vernon Supp. 2015)

Tab 19      TEX. LABOR CODE ANN. § 408.124 (Vernon Supp. 2015)

Tab 20      TEX. LABOR CODE ANN. § 408.221 (Vernon Supp. 2015)

Tab 21      TEX. LABOR CODE ANN. § 410.306 (Vernon Supp. 2015)

# TAB C

CAUSE NO. 2006-18753

| | | |
|---|---|---|
| AMERICAN ZURICH INSURANCE SYSTEM | § § § | IN THE DISTRICT COURT |
| VS. | § § § | HARRIS COUNTY, TEXAS |
| DANIEL SAMUDIO | § | 127TH JUDICIAL DISTRICT |

### <u>AFFIDAVIT OF JOSE RODRIGUEZ, M.D.</u>

I, Jose Rodriguez, M.D., being first duly sworn upon my oath, depose and say under penalty of perjury under the laws of the United States of America and State of Texas that the following is true and correct:

1.    My name is Jose Rodriguez, M.D. I am of sound mind and capable of making this affidavit. I have personal knowledge of the facts contained in this affidavit, and I attest that the facts are true and accurate.

2.    I am physician, licensed to practice medicine in the State of Texas since 1989. I specialize in Orthopaedic and Spine Surgery and have been board certified in Orthopaedic Surgery since 1992 and Spine Surgery since 1998. In my years of practice, I have acted as the primary treating physician and surgeon for hundreds of patients like Daniel Samudio. I am also the author of various publications in the area of orthopaedic surgery (and other areas of medicine), have acted as a member of the faculty of The University of Texas Health Science Center at Hermann Hospital, and hold hospital privileges at a number of hospitals in the Houston Medical Center. A true and correct copy of my curriculum vitae is attached as Exhibit A-1 to this affidavit. Exhibit A-1 is a fair and accurate summary of my training, education, and background in the field of medicine.

3.    All of the opinions that I am offering in this matter, as set forth below, are being given with reasonable medical probability. I was the treating orthopedist of Daniel Samudio for a work injury suffered on or about October 16, 2001. My treatment of Mr. Samudio spanned from approximately November 8, 2002 through approximately 2006. My treatment included surgeries, including on

I

August 4, 2003 and April 22, 2004. Part of my treatment also included a review of the diagnostic imaging taken of Mr. Samudio's spine. My opinions in this case, which are all offered within reasonable medical probability, are based upon my treatment of Mr. Samudio, the surgeries I performed on Mr. Samudio, review of the diagnostic images, and over two decades of experience as an orthopaedic surgeon.

4.     Mr. Samudio's work injury of October 16, 2001, included a compression fracture of the L1 and L2 vertebrae in his lumbar spine. The October 16, 2001 work injury was the producing cause and a substantial factor in bringing about the compression fracture at L1 and L2 in Mr. Samudio's lumbar spine and without the October 16, 2001 work injury the compression fracture at L1 and L2 would not have occurred. At my initial evaluation of Mr. Samudio, on November 8, 2002, I reviewed all of the available diagnostic images, including diagnostic images taken on or about March 20, 2002. My review of these images confirmed that Mr. Samudio had a compression fracture of "more than 50%" of the L1 vertebrae. This is still my opinion today. A true and correct copy of my November 8, 2002 report is attached as Exhibit A-2 to this affidavit. Exhibit A-2 is a record that was compiled and maintained by me in the regular course of business, and it was the regular course of business of my medical practice for an employee or representative or doctor with personal knowledge of the act, event, condition, opinion, or diagnosis recorded in this record to personally make this record. Exhibit A-2 was made at or near the time of the act, event, condition, opinion, or diagnosis recorded therein.

5.     Within reasonable medical probability, Mr. Samudio's compression fracture of the L1 vertebrae was more than 50%. My reasonable appraisal, within reasonable medical probability, of the size of the compression fracture at L1 in Mr. Samudio's spine is between 51% and 60%. This opinion is based upon my review of the diagnostic images, my clinical evaluation and physical examination of him, and my direct view of Mr. Samudio's L1 vertebrae at the time of the surgeries I performed. In addition, my clinical evaluation and physical examination of Mr. Samudio revealed that there was instability in his lumbar spine at the L1 level. The degree of instability that I saw in

2

EXHIBIT "A"                                                    858

my treatment of Mr. Samudio was consistent with a compression fracture of L1 that was more than 50%. It was for that reason that I determined that the surgery performed on August 4, 2003 was reasonable and necessary to treat the October 16, 2001 injury.

6.     At the time of my review of the diagnostic images, I also noted that the radiologist who reviewed Mr. Samudio's March 20, 2002 images also confirmed "approximately 50% compression deformity of L1 vertebral body." His opinion appears to be consistent with mine; however, I took efforts to further define the amount of the compression fracture. The reason that I took such efforts is because I was the treating physician and was tasked with determining the necessity of and performing spinal surgery. It is normal for radiologists, like Dr. Raman Mocharia, who also read the March 20, 2002 images, to provide an approximation of a compression fracture and not to provide a more solid quantification as I did in my November 8, 2002 medical record and am doing here as well. However, under no circumstances should a radiologist's statement of "approximately 50% compression" be used to suggest that a compression fracture is 50% or less. That would be a distortion of the radiologist's statement.

7.     A compression fracture of more than 50% at the L1 vertebrae puts Mr. Samudio in the DRE IV category under the American Medical Association Guides to the Evaluation of Permanent Impairment, Fourth Edition. The DRE IV category confirms, within reasonable medical probability, that Mr. Samudio's impairment rating is 20% for his work injury of October 16, 2001.

8.     Finally, I understand that Dr. John Obermiller and Dr. Casey Cochran have offered impairment rating opinions in this matter. Neither of these two physicians ever examined Mr. Samudio, as I have done. And more importantly, neither of these physicians reviewed the diagnostic images, including the March 20, 2002 images, as I have done. Therefore, it would appear that neither of them has any personal knowledge of the percentage of the compression fracture at L1 in Mr. Samudio's spine. As such, I disagree with any impairment rating offered by these physicians because it is unsupported.

I, Jose Rodriguez, M.D., declare under penalty of perjury under the laws of the United

3

EXHIBIT "A"                    859

States and the State of Texas that the foregoing is true and correct.

Executed in May 12, 2014, at Houston, Texas

JOSE E. RODRIGUEZ, M.D.

BEFORE ME, the undersigned authority in and for said county and state, on this day personally appeared _Jose E. Rodriguez, MD_ proved to me through a current identification care or other document issued by the federal government containing his/her photograph and signature to be the person whose name is subscribed to this affidavit, who, being by me duly sworn, deposed as follows:

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of Mau , 2014.

NOTARY PUBLIC IN AND FOR
THE STATE Texas
My commission expires: April 24, 2017

LUCY C. LOZANO
Notary Public, State of Texas
My Commission Expires
April 24, 2017

4

# TAB 1

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Liberty Mut. Ins. Co. v. Adcock,    Tex.,    August 30, 2013

370 S.W.3d 363
Supreme Court of Texas.

AMERICAN ZURICH INSURANCE COMPANY, Petitioner,

v.

Daniel SAMUDIO, Respondent.

No. 10–0554.    |    Argued Jan. 10, 2012.    |    Decided June 29, 2012.

**Synopsis**

**Background:** Workers' compensation insurer filed petition for judicial review of decision of the Department of Insurance Division of Workers' Compensation, finding that claimant had a 20% impairment rating. The 127th District Court, Harris County, 2007 WL 5527082, Sharolyn P. Wood, J., dismissed petition and awarded claimant attorney fees. Insurer appealed. The Houston Court of Appeals, 317 S.W.3d 336, affirmed. Insurer sought further review, which was granted.

**Holdings:** The Supreme Court, Lehrmann, J., held that:

[1] Workers' Compensation Act did not deprive trial court of subject matter jurisdiction to review impairment rating, and

[2] Act permitted trial court to reverse impairment rating and remand to Division.

Reversed and remanded.

West Headnotes (6)

**[1]    Workers' Compensation** ☞ Record

Workers' Compensation Act section limiting evidence in an appeal to the trial court of the Department of Insurance Division of Workers' Compensation's impairment rating determination to evidence of impairment that was presented to the agency did not deprive trial court of subject matter jurisdiction to review impairment rating; while section did not allow a reviewing court to consider impairment evidence that was not before the Division, or to award an impairment rating that was not presented to the agency, it did not limit the trial court's subject matter jurisdiction. V.T.C.A., Labor Code § 410.306(c).

6 Cases that cite this headnote

**[2]    Courts** ☞ Jurisdiction of Cause of Action

Subject matter jurisdiction limits speak to the power of courts to decide a particular type of controversy, not to the evidence that courts may consider or the scope of the remedy they can afford in a particular case.

Cases that cite this headnote

[3] **Workers' Compensation** Remand in general

Workers' Compensation Act section limiting evidence in an appeal to the trial court of the Department of Insurance Division of Workers' Compensation's impairment rating determination to evidence of impairment that was presented to the agency permitted trial court to reverse impairment rating and remand to the Division; in considering whether an impairment rating submitted to the Division was valid, a reviewing court was not making a determination of impairment, rather the court was deciding the purely legal question of whether the proffered rating was made in accordance with statutory requirements. V.T.C.A., Labor Code § 410.306(c).

6 Cases that cite this headnote

[4] **Statutes** Intent

The Supreme Court's fundamental purpose in construing statutes is to determine and give effect to the legislature's intent.

8 Cases that cite this headnote

[5] **Statutes** Language and intent, will, purpose, or policy

The words the legislature employed are the best indicators of legislative intent.

5 Cases that cite this headnote

[6] **Statutes** Other Statutes

When interpreting a statute, the Supreme Court may be aided by the interpretive context provided by the surrounding statutory landscape.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*364** Robert D. Stokes, Gregory D. Solcher, Flahive, Ogden & Latson PC, Austin TX, for American Zurich Insurance Company.

Byron C. Keeling, Ruth B. Downes, Keeling & Downes, P.C., Michael P. Doyle, Doyle Raizner LLP, David Q. Haag II, Blackwell & Haag, P.C., Houston TX, for Daniel Samudio.

Nicholas Canaday III, Office of the Attorney General, Austin, TX, for Amicus Curiae Texas Department of Insurance Division of Workers' Compensation.

Marcos Benjamin Guerra, Assistant Attorney General, for Amicus Curiae State Office Risk Management.

**Opinion**

Justice LEHRMANN delivered the opinion of the Court.

Under the Texas Workers' Compensation Act, an injured worker's impairment income benefits are determined in part by the impairment rating assigned by the Texas Department of Insurance's Division of Workers' Compensation. TEX. LAB.CODE § 408.121(a)(1). In an appeal to the district court of the Division's impairment rating determination, unless there is evidence of a

substantial change in the worker's condition, the court may consider only evidence of impairment that was presented **\*365** to the agency, and may only adopt an impairment rating assigned by a doctor in the administrative proceedings. TEX. LAB.CODE § 410.306(c). We must decide whether a reviewing court lacks subject matter jurisdiction to resolve an impairment rating appeal if the only rating presented to the agency was invalid. We hold that the absence of a valid impairment rating does not deprive the court of jurisdiction. Consequently, we reverse the court of appeals' judgment and remand to the trial court.

## I. Background

Daniel Samudio suffered a back injury during the course of his employment that was compensable under the Texas Workers' Compensation Act. *See* TEX. LAB.CODE § 401.11. He eventually had four surgeries to rectify the injury, including a spinal fusion and a laminectomy. His physicians did not order preoperative flexion or extension x-rays, which would have provided evidence of any loss of motion segment integrity, a factor in determining the level of impairment. *See Am. Home Assur. Co. v. Poehler,* 323 S.W.3d 626, 631 (Tex.App.-Tyler 2010, pet. pending). Petitioner Zurich American Insurance Company provided workers' compensation coverage to Samudio's employer.

After Samudio filed a claim for medical benefits under the Act, the Division appointed Dr. Gaston Machado as the designated doctor in the case to determine the date Samudio reached maximum medical improvement and his impairment rating under section 408.123 of the Act. An injured worker who suffers a permanent functional or anatomical impairment after reaching maximum medical improvement is entitled to impairment income benefits, the duration of which depend on the assigned impairment rating. TEX. LAB.CODE §§ 408.123, 408.121(a)(1). The impairment rating represents "the percentage of permanent impairment of the whole body resulting from a compensable injury." *Id.* § 401.011(24). Impairment income benefits equal seventy percent of the worker's average weekly wages; the benefits are paid for three weeks for each percentage point of impairment. *Id.* §§ 408.121(a)(1); 408.126. An impairment rating of more than fifteen percent may entitle the worker to supplemental income benefits after impairment income benefits would otherwise expire. *Id.* § 408.142(a)(1).

Section 408.123 of the Act provides that an impairment rating "must be based" upon the fourth edition of the Guides to the Evaluation of Permanent Impairment, published by the American Medical Association. [1] The methodology for determining impairment ratings recognized in that edition of the Guides used objectively verifiable evidence to place injured workers into one of eight diagnosis-related estimate (DRE) categories. In cases where spinal fusion surgery like Samudio's had been performed, the Guides called for the impairment rating to be based upon pre-operative flexion and extension x-rays. At the time of the administrative proceedings to determine Samudio's impairment rating, however, the Division had implemented two advisories, Advisory 2003–10 and Advisory 2003–10B, which attempted to provide an alternative standard for establishing an impairment rating when no preoperative flexion or extension x-rays had been performed. Under the advisories, a physician could consider evidence of spinal **\*366** fusion surgery of the type Samudio had in assigning a DRE. In his initial report to the Division, Dr. Machado concluded that Samudio's impairment rating was twenty percent based on a Category IV DRE. He initially asserted that the rating was based upon the Guides, but later submitted a letter clarifying that he had relied on the advisories in light of the absence of the pre-operative flexion or extension x-rays called for in the Guides. Under the advisories, Machado included Samudio's spinal fusion surgery as a factor in calculating the impairment rating.

[1]   Although as originally enacted, section 408.124 required use of the third edition of the Guides, in 1999, the Legislature authorized the Commissioner of Workers' Compensation to adopt the fourth edition of the Guides. Act of May 30, 1999, 76th Leg., R.S., ch. 1426, § 12, 1999 Tex. Gen. Law 4865, 4869 (codified at TEX. LAB.CODE § 408.124(c)).

American Zurich disputed the impairment rating, and the Division commenced a contested case hearing. At the hearing, the carrier submitted a letter from Dr. John Obermiller. Although he opined that Samudio's impairment rating would be properly calculated at ten percent, Obermiller never examined Samudio, and expressly stated that he was not providing an impairment rating. Instead, he explained that his purpose was to show that Machado's analysis did not conform to the Guides. After the close of the hearing, the hearing examiner issued a decision finding that Samudio had an impairment rating of twenty percent. The

examiner also specifically found that only one impairment rating was offered during the contested case proceeding. American Zurich appealed the examiner's decision to the appeals panel. In February 2006, the Division notified the parties that the hearing officer's decision was final.

American Zurich then appealed to the district court. It contended that the impairment rating the Division assigned was invalid, and that Samudio had either no impairment rating, or that the correct rating was ten. While the appeal was pending, the Austin court of appeals decided *Texas Department of Insurance Workers Compensation Division v. Lumbermens Mutual Casualty Co.,* 212 S.W.3d 870 (Tex.App.-Austin 2006, pet. denied). In that case, the court ruled that the advisories were inconsistent with the Guides and thus invalid, and enjoined their further use. *Id.* at 876–77.[2] After the *Lumbermens* decision, Samudio filed a plea to the jurisdiction contending that the trial court lacked subject matter jurisdiction because the trial court was not empowered to provide the relief American Zurich sought. Samudio argued that American Zurich's petition presented no justiciable controversy because the trial court was only empowered to award an impairment rating that was presented to the agency, and the only rating before the agency was the twenty percent rating advocated by Machado. The trial court granted Samudio's plea and dismissed the case, awarding Samudio $29,246.40 in attorney's fees under section 408.221(c) of the Act. The court of appeals affirmed. 317 S.W.3d 336, 348.

[2]     The Division issued Bulletin B–0033–77 providing that the advisories would no longer be used after we denied the Division's petition for review in *Lumbermens.* Albert Betts, Tex. Dep't of Ins., Comm'r's Bll. No. B–0033–07 (July 18, 2007), http://www.tdi.texas.gov/bulletins/2007/cc34.html.

## II. Jurisdiction

In an appeal of an injured worker's entitlement to impairment income benefits, the Legislature has provided for a modified trial de novo. *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 515 (Tex.1995); TEX. LAB.CODE § 410.306(c). Under that standard, the trier of fact is informed of the impairment rating assigned by the Division. TEX. LAB.CODE § 410.304. Unless there has been a substantial change in the worker's condition, *id.* §§ 410.306(c), 410.307, evidence of the extent of impairment is limited to that **\*367** presented to the Division, and the trier of fact "shall adopt one of the impairment ratings under Subchapter G, Chapter 408." *Id.* § 410.306(c). In affirming the trial court's dismissal for lack of subject matter jurisdiction, the court of appeals reasoned that only one impairment rating, Machado's, had been presented to the Division. 317 S.W.3d at 348. The court concluded that the trial court could not, therefore, grant American Zurich any relief, even assuming that the rating presented to the agency was invalid under *Lumbermens. Id.* at 348–49.

### A. Section 410.306(c) is not a jurisdictional limit

 [1]     In *Garcia,* we rejected the contention that section 410.306(c) of the Act violated injured workers' right to trial by jury. 893 S.W.2d at 528–30 (Tex.1995). We equated the provision with procedural rules barring the presentation of witnesses or information that was not timely disclosed in a civil trial. *Id.* at 528 (citing TEX.R. CIV. P. 215.5). Section 410.306(c) shaped the manner of submitting the impairment issue to the jury and the scope of the permissible remedy. *Id.* at 528–529. But because the provision still left the determination of impairment within the jury's hands, it did not violate the right to trial by jury. *Id.* at 530. At no point did we suggest that section 410.306(c) could be seen as a limit on trial courts' subject matter jurisdiction.

 [2]     Subject matter jurisdiction limits speak to the power of courts to decide a particular *type* of controversy, not to the evidence that courts may consider or the scope of the remedy they can afford in a particular case. *See Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 74–75 (Tex.2000). In the case the court of appeals primarily relied upon, for example, *State Bar of Texas v. Gomez,* 891 S.W.2d 243 (Tex.1994), we concluded that the district court lacked subject matter jurisdiction in a case in which the plaintiffs sought to require Texas attorneys to provide pro bono legal services. *Id.* at 246. We noted that the case fell within our exclusive administrative power to regulate the bar. *Id.* The district court could not grant relief because it "would ... be cast in the impermissible role of effectively promulgating policies and regulations governing Texas lawyers." *Id.* American Zurich's appeal of the impairment rating the Division assigned Samudio is the type of case for which judicial review is available under

the Act, so long as the appealing party has exhausted its administrative remedies. TEX. LAB.CODE §§ 410.251, 410.301. While section 410.306(c) does not allow a reviewing court to consider impairment evidence that was not before the Division, or to award an impairment rating that was not presented to the agency, it does not limit the trial court's subject matter jurisdiction.

The court of appeals' decision was driven largely by its conclusion that the trial court was not empowered to set aside the impairment rating assigned by the division in the absence of a competing rating that was presented to the agency. *See* 317 S.W.3d at 349. We agree with the court that the trial court could not have awarded Samudio a rating of zero or, alternatively, of ten percent. While Obermiller opined that an appropriate impairment rating for Samudio would be ten percent, he never examined Samudio, as section 408.123 requires, and expressly disclaimed an intent to assess an impairment rating. Further, no one presented evidence to the Division that Samudio's impairment rating was zero, and it is undisputed that he had suffered some permanent impairment. We disagree with the court of appeals, however, that the trial court was left with **\*368** no alternative but to leave in place a putatively invalid impairment rating.

## B. Remand to the agency

 [3]     Samudio contends that the trial court properly dismissed this case because section 410.306(c) deprived it of any power to set aside the impairment rating assigned by the Division, even if the rating was invalid. American Zurich and amicus curiae Texas Department of Insurance Workers' Compensation Division disagree. They maintain that, if the trial court concluded that the assigned rating was invalid, it could reverse the Division's decision and remand to the agency.[3] We agree with American Zurich and the Division.

[3]     Amicus curiae State Office of Risk Management agrees that section 410.306(c) does not preclude a reviewing court from setting aside an impairment rating, but disagrees that the court could remand to the agency. It contends that a remand is unnecessary because the parties could reinitiate the case at the agency if an impairment rating is invalidated.

 [4]     [5]     [6]     Our fundamental purpose in construing statutes is to determine and give effect to the Legislature's intent. *LTTS Charter Sch., Inc. v. C2 Constr., Inc.,* 342 S.W.3d 73, 75 (Tex.2011). The words the Legislature employed are the best indicators of that intent. *Id.* And we may be "aided by the interpretive context provided by 'the surrounding statutory landscape.' " *Id.* at 75 (quoting *Presidio Ind. Sch. Dist. v. Scott,* 309 S.W.3d 927, 929–30 (Tex.2010)). The application of these principles lead us to conclude that a trial court may remand to the Division to allow it to determine a valid impairment rating if the court concludes that no valid impairment rating was presented to the agency in the underlying contested case.

First, under section 410.306(c) the trier of fact, "in its determination of the extent of impairment, shall adopt one of the impairment ratings under Subchapter G, Chapter 408." As the Division argues, if a rating does not comport with the Guides, as section 408.124 requires, it is not adopted "under subchapter G." To the contrary, such an impairment rating would be invalid precisely because it was not adopted in compliance with section 408.124(b). Moreover, in considering whether an impairment rating submitted to the Division is valid, a reviewing court is not making a "determination of impairment." Instead, the court is deciding a purely legal question: whether the proffered rating was made in accordance with statutory requirements.

More importantly, the general statutory scheme laid out by the Legislature compels a remand to allow the Division to determine Samudio's impairment rating as of April 7, 2004, the date the parties stipulated he reached maximum medical improvement, if the trial court finds that Samudio's twenty percent rating is invalid. The Legislature established a detailed, very specific process for the assignment of impairment ratings and the resolution of ratings disputes. *See* TEX. LAB.CODE §§ 408.122–.125, 410.021–.209. And the Legislature unequivocally mandated that impairment ratings be determined according to the Guides. *Id.* § 408.124(b) ("For determining the existence and degree of an employee's impairment, the division *shall use* [the Guides]"). The regulatory scheme as a whole illustrates an intent that impairment ratings be determined by the Division, subject to limited de novo review. *Id.* § 410.306(c); *Garcia,* 893 S.W.2d at 515. Furthermore, no language in the Act prohibits a reviewing court from remanding to the agency. Instead, while a reviewing court cannot assign an impairment rating that was not presented to the Division, the statute is silent as to the court's power to remand. Accordingly, **\*369** section 410.306(c) does not preclude a trial court from remanding to the Division when the only impairment rating offered is invalid. To the contrary, a remand is

the course most consistent with the overall process established by the Legislature. The court of appeals erred in affirming the trial court's judgment dismissing American Zurich's appeal.

### III. Attorney's fees

Finally, American Zurich contends that, to the extent the court of appeals erred in affirming the trial court's judgment, it also erred in awarding fees under section 408.221 of the Act. We agree. In light of our reversal, it is no longer true that Samudio prevailed on an issue on which judicial review was sought by the carrier. See TEX. LAB.CODE § 408.122(c).

### IV. Conclusion

While section 410.310(c) limits the evidence that a trial court may consider in reviewing an impairment rating assigned by the Division and precludes the court from assigning a rating that was not presented to the agency, it does not prevent the court from setting aside an invalid rating and remanding to the Division for further proceedings. We therefore reverse the court of appeals' judgment and remand to the trial court. If the trial court determines that no rating made in conformance with the Guides was presented to the agency, it should remand to the Division for a new impairment determination.

**All Citations**

370 S.W.3d 363, 55 Tex. Sup. Ct. J. 1028

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 2**

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**   McGee v. Deere & Co.,   Tex.App.-Austin,   March 24, 2005

945 S.W.2d 812
Supreme Court of Texas.

ARTHUR ANDERSEN & CO., Petitioner,

v.

PERRY EQUIPMENT CORPORATION, Respondent.

No. 95–0444.   |   Argued March 19, 1997.   |   Decided May 16, 1997.

Purchasing corporation sued accounting firm, alleging violations of Deceptive Trade Practices Act (DTPA) in connection with firm's preparation of audited financial statements of acquired corporation. The 55th District Court, Harris County, Kathleen S. Stone, J., entered judgment for purchasing corporation, and the Houston Court of Appeals, First District, 898 S.W.2d 914, affirmed. On writ of error, the Supreme Court, Cornyn, J., held that: (1) purchasing corporation was "consumer" under DTPA although it did not pay for audit; (2) failure to instruct jury on proper measure of direct damages was reversible error; and (3) award of attorney fees under DTPA had to be dollar amount, not percentage of judgment.

Reversed and remanded.

West Headnotes (19)

**[1]**   **Antitrust and Trade Regulation**   Accountants and tax preparers

For purposes of Deceptive Trade Practices Act (DTPA) claim against accounting firm, purchasing corporation was a "consumer," although it did not pay for audit, where purchasing corporation insisted as condition of sale that acquired corporation provide audited financial statements, acquired corporation hired accounting firm for that purpose, purchasing corporation then relied on those statements in reaching its decision to purchase acquired corporation, and accounting firm was aware that purchasing corporation had required audit and would rely on its accuracy and knew specific purpose for which it was conducted. V.T.C.A., Bus. & C. § 17.45(4).

23 Cases that cite this headnote

**[2]**   **Antitrust and Trade Regulation**   Consumers, purchasers, and buyers;  consumer transactions

In determining whether plaintiff is consumer under Deceptive Trade Practices Act (DTPA), focus is on plaintiff's relationship to transaction. V.T.C.A., Bus. & C. § 17.45(4).

19 Cases that cite this headnote

**[3]**   **Antitrust and Trade Regulation**   Measure and amount

Under Deceptive Trade Practice Act (DTPA), amount of actual damages recoverable is total loss sustained as result of deceptive trade practice. V.T.C.A., Bus. & C. § 17.50(b)(1).

2 Cases that cite this headnote

**[4]**    **Antitrust and Trade Regulation** 🔑 Grounds and Subjects

Under Deceptive Trade Practices Act (DTPA), actual damages are those damages recoverable under common law, either direct or consequential. V.T.C.A., Bus. & C. § 17.50(b)(1).

16 Cases that cite this headnote

**[5]**    **Damages** 🔑 Direct or indirect consequences

Direct damages are necessary and usual result of defendant's wrongful act; they flow naturally and necessarily from the wrong.

50 Cases that cite this headnote

**[6]**    **Damages** 🔑 Direct or indirect consequences

Direct damages compensate plaintiff for loss that is conclusively presumed to have been foreseen by defendant from his wrongful act.

22 Cases that cite this headnote

**[7]**    **Damages** 🔑 Proximate or Remote Consequences

Consequential damages result naturally, but not necessarily, from defendant's wrongful acts; under common law, they need not be usual result of the wrong, but they must be foreseeable, and must be directly traceable to wrongful act and result from it.

68 Cases that cite this headnote

**[8]**    **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

Foreseeability is not an element of producing cause under Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.50(b)(1).

1 Cases that cite this headnote

**[9]**    **Antitrust and Trade Regulation** 🔑 Grounds and Subjects

Under Deceptive Trade Practices Act, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. V.T.C.A., Bus. & C. § 17.50(b)(1).

10 Cases that cite this headnote

**[10]**    **Fraud** 🔑 Difference between actual and represented value

       **Fraud** 🔑 Difference between value and price paid

Under common law, direct damages for misrepresentation are measured either by out-of-pocket damages, which measure difference between value buyer has paid and value of what he has received, or by benefit-of-the-bargain damages, which measure difference between value as represented and value received.

44 Cases that cite this headnote

**[11]**   **Antitrust and Trade Regulation**   👉 Measure and amount

Under Deceptive Trade Practices Act (DTPA), plaintiff may recover under damage theory that provides greater recovery, either out-of-pocket damages or benefit-of-the-bargain damages. V.T.C.A., Bus. & C. § 17.50(b)(1).

25 Cases that cite this headnote

**[12]**   **Antitrust and Trade Regulation**   👉 Measure and amount

Under Deceptive Trade Practices Act(DTPA), both out-of-pocket and benefit-of-the-bargain measure of damages are determined at time of sale. V.T.C.A., Bus. & C. § 17.50(b)(1).

29 Cases that cite this headnote

**[13]**   **Antitrust and Trade Regulation**   👉 Instructions

**Appeal and Error**   👉 Failure or refusal to charge

Failure to instruct jury on proper measure of direct damages on purchasing corporation's claim under Deceptive Trade Practices Act (DTPA) regarding accounting firm's audit of acquired corporation was reversible error, where jury was not asked to find direct damages at time of sale as well as consequential damages attributable to accounting firm's misrepresentations, but was simply asked to consider purchase price as part of overall damages, and purchasing corporation did not establish how much of its loss was attributable to accounting firm. V.T.C.A., Bus. & C. § 17.50(b)(1).

17 Cases that cite this headnote

**[14]**   **Antitrust and Trade Regulation**   👉 Grounds and Subjects

Under Deceptive Trade Practice Act, losses subsequent to time of sale are recoverable only if misrepresentation is producing cause of loss. V.T.C.A., Bus. & C. § 17.50(b)(1).

Cases that cite this headnote

**[15]**   **Fraud**   👉 Reliance on Representations and Inducement to Act

Basis of a misrepresentation claim is that defendant's false statement induced plaintiff to assume risk he would not have taken had truth been known.

1 Cases that cite this headnote

**[16]**   **Antitrust and Trade Regulation**   👉 Grounds and Subjects

Plaintiff's recovery of damages under Deceptive Trade Practices Act (DTPA) is limited not only by his own evidence, but also by defendant's evidence of plaintiff's failure to reasonably mitigate losses or evidence of intervening causes.

4 Cases that cite this headnote

**[17]**   **Attorney and Client**   👉 Construction and Operation of Contract

Attorney contingency fee contracts allow plaintiffs who cannot afford to pay a lawyer up-front to pay lawyer out of any recovery, and, because they offer potential of greater fee than might be earned under hourly billing method, compensate attorney for risk that attorney will receive no fee whatsoever if case is lost.

151 Cases that cite this headnote

**[18]    Antitrust and Trade Regulation** 👉 Proceedings to impose;  evidence

Party's contingent fee agreement should be considered by fact finder, and is therefore admissible in evidence, but that agreement cannot alone support award of attorney's fees under Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.50(d); State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04(b)(8).

136 Cases that cite this headnote

**[19]    Antitrust and Trade Regulation** 👉 Attorney fees

**Antitrust and Trade Regulation** 👉 Proceedings to impose;  evidence

To recover attorney's fees under Deceptive Trade Practices Act (DTPA), plaintiff must prove that amount of fees was both reasonably incurred and necessary to prosecution of case, and must ask jury to award fees in specific dollar amount, not as percentage of judgment. V.T.C.A., Bus. & C. § 17.50(d); State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04.

229 Cases that cite this headnote

**Attorneys and Law Firms**

**\*813** Ben Taylor, Dallas, Thomas C. Godbold, Houston, for Petitioner.

Christopher B. Allen, Michael P. Cash, James W. Paulsen, Houston, for Respondent.

**Opinion**

CORNYN, Justice.

We withdraw our opinion of January 10, 1997, and substitute the following in its place. The parties' motions for rehearing are overruled.

**\*814**  In this accounting malpractice case, Perry Equipment Corporation (PECO) sued the accounting firm of Arthur Andersen for a faulty audit, which PECO relied on to purchase another company, Maloney Pipeline Systems. The audit favorably reported Maloney's financial condition when, in fact, the company was suffering substantial losses. Fourteen months after the sale, Maloney filed for bankruptcy. PECO sued for violations of the Deceptive Trade Practice Act, fraud, negligence, negligent misrepresentation, gross negligence, and breach of implied warranty. Based on the jury's verdict, the trial court rendered judgment for PECO. The court of appeals affirmed. 898 S.W.2d 914.

We address three issues presented by Arthur Anderson's application for writ of error. First, Arthur Andersen challenges PECO's consumer status because Maloney, rather than PECO, actually paid for the audit. Second, Arthur Andersen claims that the trial court failed to instruct the jury on the correct measure of damages. Third, Arthur Andersen contests the attorney's fees award, arguing that the percentage of recovery method is not a proper measure of attorney's fees under the DTPA, and that even if such fees were recoverable, no evidence supports the award. For the reasons discussed below, we reverse the judgment of the court of appeals and remand this case to the trial court for further proceedings.

# I

When PECO, a successful manufacturer of oil filters used in compressors for gas pipelines, decided to expand its business into the gas metering field, it looked into acquiring Maloney Pipeline Systems, one of three United States companies in the liquid metering market. In the mid–1980s, PECO began negotiating with Maloney's owner, Ramteck II. As a condition of the sale, PECO required an audit of Maloney's financial statements. Maloney retained Arthur Andersen to conduct the audit. Maloney eventually provided PECO financial statements audited by Arthur Andersen. The statements showed Maloney to be a profitable business. Relying upon this information, on August 23, 1985, PECO purchased the Maloney stock from Ramteck II, Inc. for $4,088,237.

Soon after the purchase, Maloney began to show signs of serious financial decline. For example, three months after the sale, Maloney ran out of cash and required a $400,000 advance from PECO to continue operating. PECO also attempted other emergency financial measures, but to no avail. Fourteen months after the sale, Maloney filed bankruptcy. PECO presented uncontradicted evidence at trial that the purchase price for Maloney was a total loss from which PECO realized no return and which PECO wrote off.

PECO's experts testified that Arthur Andersen's audit contained serious errors and otherwise failed to follow acceptable auditing procedures. One of the most significant errors, the evidence showed, was the failure to verify that contracts Maloney reported as complete were in fact complete or that Maloney's estimates of costs and percentage of completion for ongoing contracts were accurate. Maloney later incurred substantial losses on these contracts. One expert testified that the audit was one of the worst he had ever seen. Another expert, an auditing professor, stated that if a student submitted the work, he would have given the student a failing grade.

The jury found Arthur Andersen 51 percent at fault and PECO 49 percent at fault. The jury also found that Arthur Andersen had committed fraud, DTPA violations, and breach of warranty, but that it was not liable for negligent misrepresentation or gross negligence. The jury assessed damages of $5,449,468, including the $4,088,237 PECO paid for Maloney and $1,361,231 for other expenses incurred by PECO in its attempt to salvage the company. PECO elected to recover under the DTPA. The trial court credited Arthur Andersen with the two million dollars that Ramteck II had already paid PECO in settlement, and then awarded PECO a total of $9,297,601.20, including damages, prejudgment interest, DTPA additional damages, attorney's fees, and costs.

## *815  II

 [1]    [2]   Arthur Andersen first contends that PECO is not a "consumer," a prerequisite to recovery under the DTPA. The DTPA defines a consumer as one "who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM.CODE § 17.45(4). In determining whether a plaintiff is a consumer, our focus is on the plaintiff's relationship to the transaction. *Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 650 (Tex.1996). As a condition of sale, PECO insisted that Maloney provide audited financial statements. Maloney hired Arthur Andersen for this specific purpose. PECO then relied on those statements in reaching its decision to purchase Maloney. Under these circumstances, we hold that PECO sought and acquired Arthur Andersen's services.

The next question is whether PECO sought and acquired these services *by purchase or lease,* inasmuch as it did not pay for the audit. Our decision in *Kennedy v. Sale,* 689 S.W.2d 890 (Tex.1985), controls this issue. There, we held that the DTPA does not require the consumer to be an actual purchaser or lessor of the goods or services, as long as the consumer is the beneficiary of those goods or services. *Id.*

The Texas Society of Certified Public Accountants, as amicus curiae, argues that a stock purchaser should not be considered a consumer simply because the corporation paid for an audit for the purchaser's benefit because virtually every external audit benefits third parties. Thus, any stock purchaser who reviews audited financial statements could bring a DTPA claim against the auditor. [1] Our holding is not so broad. In this case, the audit was rendered in connection with the sale of Maloney and was specifically required by PECO and intended to benefit PECO. Arthur Andersen was aware that PECO had required the audit and would rely on its accuracy and knew the specific purpose for which it was conducted. We accordingly hold that PECO is a consumer under the DTPA.

[1] After PECO brought this action, the Legislature amended the DTPA to preclude consumers from suing under the DTPA for professional negligence or for claims arising from transactions involving consideration of more than $500,000. TEX. BUS. & COM.CODE § 17.49(c) & (g).

Arthur Andersen also urges us to reject PECO's consumer status based on the decision in *Hand v. Dean Witter Reynolds Inc.,* 889 S.W.2d 483 (Tex.App.—Houston [14th Dist.] 1994, writ denied). In *Hand,* the plaintiff alleged that her stock broker failed to purchase certain commodity option contracts after she requested that he do so. *Id.* at 487–88. After deciding that a commodity option contract is a right, not a "good," under the DTPA, *id.* at 498, the court next considered whether the plaintiff was a consumer by virtue of her purchase of "services." The DTPA defines services as including "services furnished in connection with the sale or repair of goods." TEX. BUS. & COM.CODE § 17.45(2). The court reasoned that the omission of any reference in the definition to services in connection with the sale of something other than a good indicated that services furnished in connection with the sale of intangibles did not fall within the definition of services under the DTPA. *Hand,* 889 S.W.2d at 498. The court then concluded: "The key to the [consumer status] determination is whether the purchased goods or services are an objective of the transaction or merely incidental to it." *Id.* at 500.

We believe that *Hand* confirms, rather than defeats, PECO's consumer status. Arthur Andersen's audit was not merely incidental to the sale of Maloney to PECO; it was required by PECO and was central to PECO's decision to consummate the purchase. Determining Maloney's financial condition was PECO's primary objective in acquiring Arthur Andersen's services. We therefore reject Arthur Andersen's contention that *Hand* defeats PECO's status as a consumer under the DTPA.

### III

Arthur Andersen next complains that the jury charge allowed the jury to award PECO the entire purchase price of Maloney, without instructing the jury to subtract the value of Maloney stock at the time of the sale. [2] Arthur ***816** Andersen also contends that even if the court had properly instructed the jury, PECO failed to introduce any evidence that the stock was valueless at the time of sale, and thus failed to establish that it was entitled to the entire purchase price under either the "benefit-of-the-bargain" or the "out-of-pocket" measure of damages. PECO responds that in addition to direct damages, consequential damages are also recoverable under the DTPA. PECO thus argues that it is entitled to recover the purchase price as consequential damages.

[2] The charge asked the jury:
      What sum of money, if any, if paid now in cash, would fairly and reasonably compensate PECO for its losses which resulted from such conduct?
        Do not increase or reduce the amount in one answer because of your answer to any other question about damages.
        ....
        ....
        Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.
        ....
      a. Purchase price of MPSI [Maloney] _____

b. Costs and expenses incurred by PECO as a result of its purchase and ownership of MPSI [listing 13 categories of costs and expenses]

**[3]** Under the version of the DTPA in effect at the time PECO brought this action, a consumer could recover "the amount of actual damages" caused by the defendant's false, misleading, or deceptive conduct. TEX. BUS. & COM.CODE § 17.50(b)(1). [3] The amount of actual damages recoverable is "the total loss sustained as a result of the deceptive trade practice." *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex.1985)(citing *Smith v. Baldwin,* 611 S.W.2d 611, 617 (Tex.1980)).

[3]     In 1995, the Legislature amended § 17.50(b)(1) to permit recovery of "economic damages" and, if the defendant acted knowingly, "damages for mental anguish," instead of "actual damages." Act of May 17, 1995, 74th Leg., R.S., ch. 414, 1995 Tex.Gen. Laws 2992.

**[4] [5] [6]** Actual damages are those damages recoverable under common law. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). At common law, actual damages are either "direct" or "consequential." *Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring); see RESTATEMENT (SECOND) OF TORTS § 549 (1977) (outlining measure of damages for fraudulent misrepresentation). Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *See Southwind Aviation, Inc. v. Avendano,* 776 S.W.2d 734, 736 (Tex.App.—Corpus Christi 1989, writ denied); *Anderson Dev. Corp. v. Coastal States Crude Gathering Co.,* 543 S.W.2d 402, 405 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *See Bynum,* 836 S.W.2d at 163 (Phillips, C.J., concurring); *Coastal States,* 543 S.W.2d at 405; Anderson, *Incidental and Consequential Damages,* 7 J.L. & COM. 327, 328 (1987).

**[7] [8] [9]** Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995); *Moore v. Anderson,* 30 Tex. 224, 230 (1867). Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, *see Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 687 (Tex.1981), and must be directly traceable to the wrongful act and result from it. *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 295 (Tex.App.—El Paso 1992, writ denied); *El Paso Dev. Co. v. Ravel,* 339 S.W.2d 360, 363 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.). Of course, foreseeability is not an element of producing cause under the DTPA. *See Haynes & Boone,* 896 S.W.2d at 182; *Prudential Ins. v. Jefferson Assocs.,* 896 S.W.2d 156, 161 (Tex.1995). Still, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. *See White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d 260, 262 (Tex.1983); *see also Bynum,* 836 S.W.2d at 164 (Phillips, C.J., concurring).

**\*817 [10] [11] [12]** Under Texas common law, direct damages for misrepresentation are measured in two ways. *W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988); *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984). Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received; benefit-of-the-bargain damages measure the difference between the value as represented and the value received. *Leyendecker,* 683 S.W.2d at 373. Under the DTPA, a plaintiff may recover under the damage theory that provides the greater recovery. *Id.* Both measures of damages are determined at the time of sale. *See id.* at 373 (out-of-pocket damages are measured at the time of sale); *see also* Bullion, *An Understanding of Damages Recoverable Under the DTPA,* 20 ST. MARY'S L.J. 667, 670–72 (1989).

**[13]** In this case, the jury was not asked to find direct damages at the time of the sale as well as consequential damages attributable to Arthur Anderson's misrepresentations. Rather, the jury was simply asked to consider the purchase price as part of the overall damages. PECO did present evidence that the purchase price was eventually a total loss. There was also evidence that Maloney was losing money at the time of the sale and continued to do so until it declared bankruptcy. What PECO did not establish, however, was how much of its loss occurred at the time of the sale and how much was attributable to subsequent events for which Arthur Anderson should bear legal responsibility. If subsequent losses were caused by Arthur Andersen's wrongful conduct and were not simply part of the risk a buyer of the business would have assumed, they may be part of PECO's consequential damages.

[14] [15] Subsequent losses, however, are recoverable only if the misrepresentation is a producing cause of the loss. *See Haynes & Boone,* 896 S.W.2d at 182. Without this limitation, an investor could shift the entire risk of an investment to a defendant who made a misrepresentation, even if the loss were unrelated to the misrepresentation. The basis of a misrepresentation claim is that the defendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known. But to allow the plaintiff to transfer the entire risk of loss associated with his investment, even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant, would unfairly transform the defendant into an insurer of the plaintiff's entire investment.

Because the charge failed to instruct the jury on the proper measure of direct damages, the submission was reversible error. But, because we find some evidence that Arthur Andersen's misrepresentation was a producing cause of PECO's loss, we remand this case for a new trial. *See Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994) (holding that remand is proper when defective liability question is submitted); *Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87, 90 (Tex.1973) (remanding for new trial when defective damages question submitted); *Moulton v. Alamo Ambulance Serv., Inc.,* 414 S.W.2d 444, 449–50 (Tex.1967) (affirming remand for new trial when defective damages question submitted).

[16] We emphasize that a plaintiff's recovery of damages is limited not only by his own evidence, but also by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses or evidence of intervening causes. *See Dubow v. Dragon,* 746 S.W.2d 857, 860 (Tex.App.—Dallas 1988, no writ); EDGAR & SALES, TEXAS TORTS & REMEDIES § 43.04[1][b]; Tschoepe et al., *Aspects of Defending A Texas Deceptive Trade Practices–Consumer Protection Act Claim,* 20 ST. MARY'S L.J. 527, 561 (1989). If a plaintiff's losses are attributable to his own mistakes or factors outside either of the parties' control, the defendant may be entitled to an appropriate limiting instruction to the jury.

## IV

Because we are remanding this case for a new trial, we turn now to Arthur Andersen's complaint that the trial court improperly awarded PECO attorney's fees calculated as a percentage of recovery. [4]

4    The jury charge requested the jury to calculate attorney's fees three ways: in dollars and cents, as a percentage of PECO's recovery, and as a combination of dollars and cents and percentage of recovery.

**\*818** [17] Attorney contingency fee contracts serve two main purposes. First, they allow plaintiffs who cannot afford to pay a lawyer up-front to pay the lawyer out of any recovery. *See* See, *An Alternative to the Contingent Fee,* 1984 UTAH L.REV. 485, 490 n. 14. Second, such contracts, because they offer the potential of a greater fee than might be earned under an hourly billing method, compensate the attorney for the risk that the attorney will receive no fee whatsoever if the case is lost. *Id.* The lawyer in effect lends the value of his services, which is secured by a share in the client's potential recovery. POSNER, ECONOMIC ANALYSIS OF LAW § 21.9 (4th ed.1992). Under some contingency fee contracts, the attorney also agrees to advance the out-of-pocket costs of the litigation. In such cases, the attorney not only risks loss of the fee, but also risks loss of actual expenditures.

Arthur Andersen complains that an award of contingency fees under a fee-shifting statute like the DTPA forces defendants to pay fees unrelated to the amount of work performed. While this is not always true, shifting these fees to the defendant presents two problems.

First, a contingent fee award based solely on evidence of a percentage fee agreement between a lawyer and client may be determined without regard to many of the factors that should be considered when determining reasonableness. The DTPA allows recovery of "reasonable and necessary attorneys' fees." TEX. BUS. & COM.CODE § 17.50(d). Factors that a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. DISCIPLINARY R. PROF. CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9); *see also Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990); *cf. General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 960–961 (Tex.1996) (discussing the relative strengths and weaknesses of the contingent fee and lodestar methods of awarding attorneys fees in the context of a court-approved class action settlement). While we do not doubt that many plaintiffs must contract for a contingent fee to secure the services of a lawyer, we do not believe that the DTPA authorizes the shifting of the plaintiff's entire contingent fee to the defendant without consideration of the factors required by the Rules of Professional Conduct. A contingent fee may indeed be a reasonable fee from the standpoint of the parties to the contract. But, we cannot agree that the mere fact that a party and a lawyer have agreed to a contingent fee means that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant.

 [18]    A party's contingent fee agreement should be considered by the factfinder, see TEX. DISCIPLINARY R. PROF. CONDUCT 1.04(b)(8), and is therefore admissible in evidence, but that agreement cannot alone support an award of attorney's fees under Texas Business and Commerce Code section 17.50(d). *See* Brister, *Proof of Attorney's Fees in Texas,* 24 ST. MARY'S L.J. 313, 324 (1993). In other words, the plaintiff cannot simply ask the jury to award a percentage of  **\*819**  the recovery as a fee because without evidence of the factors identified in Disciplinary Rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary.

Second, because the jury is not informed what the total amount of the judgment will be, the jury can only speculate about whether a percentage of that unknown recovery will represent a reasonable and necessary fee in that particular case. Rather than leave this question to speculation, the jury must decide the question of attorney's fees specifically in light of the work performed in the very case for which the fee is sought.

 [19]    In light of these concerns, we hold that to recover attorney's fees under the DTPA, the plaintiff must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case at bar, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment.

For the foregoing reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

**All Citations**

945 S.W.2d 812, 40 Tex. Sup. Ct. J. 591

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

2015 WL 6560531
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,
Houston (14th Dist.).

Joe Ballard, Appellant
v.
Arch Insurance Company and Transforce, Inc., Appellees

NO. 14–14–00647–CV    |    Opinion filed October 29, 2015

On Appeal from the 113th District Court, Harris County, Texas, Trial Court Cause No. 2012–68526

**Attorneys and Law Firms**

David K. Mestemaker, Jonathan Brian Zumwalt, for Joe Ballard.

Richard A. Sheehy, George P. Pappas, for Arch Insurance Company and Transforce, Inc.

Panel consists of Chief Justice Frost and Justices Jamison and Busby.

**OPINION**

Kem Thompson Frost, Chief Justice

 **\*1**  This is an appeal of a summary judgment in favor of an employer and a workers' compensation carrier. The employee suffered a compensable injury to his left eye. The employee claimed the injury aggravated his pre-existing glaucoma and sought compensation for vision loss associated with glaucoma. In this appeal we are presented with questions about the qualifications of the designated doctor, and whether or not the record contains fact issues regarding the extent of the employee's injury, the employee's date of maximum medical improvement (MMI), and the employee's impairment rating. We affirm.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Appellant Joe Ballard suffers from chronic glaucoma. Ballard was working for appellee Transforce, Inc. delivering auto parts when a customer, angry about the delivery of an incorrect order, hit Ballard in the left eye with a box. Ballard sought medical treatment from ophthalmologists Dr. Florence Wooten and Dr. Michael Mapp. Dr. Wooten noticed a contusion. Transforce, Inc. and Arch Insurance Company (hereinafter the "Carrier Parties") agreed the contusion was a compensable injury and paid for the treatment.

Ballard alleges that the contusion aggravated his pre-existing glaucoma, causing the intraocular pressure to spike in his left eye, which he claims resulted in permanent blindness in his left eye. The Carrier Parties contend Ballard's vision loss resulted from his pre-existing glaucoma, not the compensable injury. Ballard and the Carrier Parties participated in a benefit review conference. After the benefit review conference, Ballard requested a contested case hearing. At the contested case hearing, the parties presented evidence to a hearing officer. The hearing officer determined Ballard was not entitled workers' compensation

benefits for his vision loss. The officer determined Ballard's date of MMI was January 25, 2011, and his permanent impairment rating is zero percent. Ballard appealed that determination to the Appeals Panel of the Workers' Compensation Division. The Appeals Panel did not issue a decision and the hearing officer's decision became final.

Ballard then sought review in the trial court, where he challenged the conclusions of law that he had reached MMI, that he had an impairment rating of zero percent, and that the compensable injury did not include his glaucoma. The Carrier Parties filed a summary-judgment motion in which they asserted as traditional summary-judgment grounds that Ballard's date of MMI was January 25, 2011, his impairment rating is zero percent, Dr. Philip Rothenberg, the doctor designated by the Division of Workers' Compensation, had the appropriate credentials to address Ballard's eye injury, and Ballard's eye injury did not extend to his glaucoma. The Carrier Parties also asserted a no-evidence ground that there was no evidence the compensable injury extended to glaucoma. The trial court granted the motion in its entirety and Ballard now challenges that ruling on appeal.

## II. STANDARD OF REVIEW

**\*2** In a traditional summary-judgment motion, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000). In reviewing a no-evidence summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence raising a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 206–08 (Tex.2002). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007). When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000).

## III. ANALYSIS

Ballard challenges the trial court's summary judgment in favor of the Carrier Parties in four issues. Ballard asserts the trial court erred in granting summary judgment because (1) fact issues preclude determining the Carrier Parties proved as a matter of law that Ballard reached MMI on January 25, 2011, (2) fact issues preclude finding the Carrier Parties proved as a matter of law that Ballard's impairment rating is zero percent, (3) Dr. Rothenberg was not qualified to give an opinion on the medical issues in the case, and (4) the interests of justice excuse any failure by Ballard to preserve error. We address Ballard's third issue first.

### A. Dr. Rothenberg's Qualifications

Because the parties disputed Ballard's impairment rating and date of MMI, the Division of Workers' Compensation appointed a designated doctor, Dr. Rothenberg, to evaluate Ballard. Ballard argues that Dr. Rothenberg's opinion should have been excluded because Dr. Rothenberg is not qualified to evaluate Ballard's condition.[1] In particular, Ballard argues that Dr. Rothenberg is a plastic surgeon rather than an ophthalmologist and therefore Dr. Rothenberg did not have the appropriate experience to examine Ballard.

---

[1] We presume for the sake of argument that Ballard timely presented this argument to the trial court and obtained a ruling on his objection.

Texas Labor Code section 408.0041(a) provides for the appointment of a designated doctor to resolve any question about the impairment caused by a compensable injury, the attainment of MMI, and the extent of an employee's compensable injury. Tex. Lab. Code Ann. § 408.0041(a) (West, Westlaw through 2015 R.S.). Section 408.0041(b) states that the medical examination shall be performed by the next available doctor on the Division of Workers' Compensation's list of certified designated doctors whose credentials are appropriate for the area of the body affected by the injury and the injured employee's diagnosis as determined by commission rule. *Id.* § 408.0041(b). Texas Labor Code section 408.0043(b) provides that a designated doctor "who reviews a workers' compensation case must hold a professional certification in a health care specialty appropriate to the type of health care that the injured employee is receiving." *Id.* §§ 408.0043(b), 408.0043(a)(4).

In support of his argument that Dr. Rothenberg, as a plastic surgeon, is not qualified to perform an eye examination, Ballard argues that Texas Administrative Code section 127.130(b)(6) requires an eye exam to be conducted by an ophthalmologist. The provision does not apply in this case. *See* Tex. Admin. Code § 127.130(b)(6) (West, Westlaw through 2015 R.S.). It applies to eye examinations conducted after January 1, 2013, and the exam in this case occurred in January 2011. *See id.* But, Ballard argues even if the statute does not apply, this statute shows the Legislature intended for eye exams to be conducted by ophthalmologists. Section 127.130(b)(6) provides, "[t]o examine injuries and diagnoses relating to the eyes, including the eye and adnexal structures of the eye, a designated doctor must be a licensed medical doctor, doctor of osteopathy, or doctor of optometry." Dr. Rothenberg is a licensed medical doctor. Accordingly, even if section 127.130(b)(6) applied to this case, it would not preclude Dr. Rothenberg from examining Ballard's injuries. *See id.*

 **\*3** Dr. Rothenberg holds a professional certification in plastic surgery and his experience matrix indicates he has experience in performing surgery on the eyes, providing follow-up care for eyes, and prescribing eye medication after surgery. The hearing officer indicated the evidence strongly supports a determination that Dr. Rothenberg is qualified to evaluate Ballard's injuries. Ballard was hit in the eye and suffered a contusion. Dr. Rothenberg is a specialist certified in surgery with experience performing eye surgery and taking responsibility for follow-up, including prescribing medication. Dr. Rothenberg had the qualifications to evaluate Ballard's impairment and date of MMI related to the contusion. Ballard argues that Dr. Rothenberg's experience matrix is "self-serving," but Ballard did not present any evidence that Dr. Rothenberg's experience matrix is inaccurate.

Ballard also asserts that Dr. Rothenberg did not perform an appropriate examination. The Carrier Parties assert Ballard waived this issue by failing to present it to the Appeals Panel. The Labor Code sets up a scheme for reviewing applications for workers' compensation benefits that is similar to other administrative-review schemes. *See* Tex. Lab. Code Ann. 410.001 et. seq. (West, Westlaw through 2015 R.S.); *Am. Motorists Ins. Co. v. Fodge,* 63 S.W.3d 801, 803–04 (Tex.2001). The statutory scheme requires a claimant to exhaust the claimant's administrative remedies before filing a claim in the trial court. *See Am. Motorists Ins. Co.,* 63 S.W.3d at 803–04; Tex. Lab. Code Ann. § 410.302(b) (West, Westlaw through 2015 R.S.) (providing "[a] trial under this subchapter is limited to issues decided by the appeals panel and on which judicial review is sought"). To present an issue to the trial court, a claimant must have presented the issue at the contested case hearing and to the Appeals Panel. *See Trinity Universal Ins. Co. v. Berryhill,* No. 14–03–00629–CV, 2004 WL 744417, at \*3–4 (Tex.App.–Houston [14th Dist.] Apr. 8, 2004, no pet.) (mem.op.) (noting there was no indication the issue was before the contested case hearing, concluding it was not before Appeals Panel, and determining claimant was precluded from seeking judicial review of the issue); *Southern Ins. Co. v. Brewster,* 249 S.W.3d 6, 16 (Tex.App.–Houston [1st Dist.] 2007, pet. denied) (holding that "the issues decided by the appeals panel are those decided in the contested-case hearing"). Under the statutory regime, a claimant is prohibited from raising new issues at later stages of review. *See* Tex. Lab. Code Ann. § 410.151(b) (West, Westlaw through 2015 R.S.); Tex. Lab. Code Ann. § 410.202(a), (c) (West, Westlaw through 2015 R.S.).

At the contested case hearing, only one issue was presented regarding Dr. Rothenberg: "Was Dr. Philip Rothenberg, M.D. appointed as the designated doctor in accordance with TEXAS LABOR CODE ANN. § 408.0041 and Rule 126.7?" The hearing officer concluded Dr. Rothenberg was appointed as the designated doctor in accordance with Texas Labor Code section 408.041. In challenging this issue before the Appeals Panel, Ballard asserted that Dr. Rothenberg did not follow the American Medical Association's examination guidelines and therefore his report should not be adopted. The Appeals Panel did not issue a decision, so the hearing officer's decision became final. *See* Tex. Lab. Code Ann. § 410.204(c) (West, Westlaw through 2015 R.S.). That

decision contained the conclusion of law that Dr. Rothenberg was appointed as the designated doctor in accordance with Labor Code section 408.041.

Ballard now seeks to raise the issue of whether Dr. Rothenberg's report should be excluded for failure to follow the American Medical Association guidelines. We conclude this issue was not before the Appeals Panel because Ballard did not raise the issue at the contested case hearing and the Appeals Panel was limited to the issues presented at the contested case hearing. *See* Tex. Lab. Code Ann. § 410.151(b) (West, Westlaw through 2015 R.S.); *Trinity Universal Ins. Co.,* 2004 WL 744417, at \*3 (noting that although waiver was raised throughout the administrative process, the particular waiver claim raised in the judicial process had not been raised); *Krueger v. Atascosa County,* 155 S.W.3d 614, 620 (Tex.App.–San Antonio 2004, no pet.) (holding claimant could not raise issue not decided by Appeals Panel). By failing to present this issue to the Appeals Panel, Ballard waived the issue. *See* Tex. Lab. Code Ann. § 410.302(b) (providing "[a] trial under this subchapter is limited to issues decided by the appeals panel and on which judicial review is sought"); *Am. Motorists Ins. Co.,* 63 S.W.3d at 803–04; *Trinity Universal Ins. Co.,* 2004 WL 744417, at \*3; *Southern Ins. Co.,* 249 S.W.3d at 16.

 **\*4** Because Ballard has waived any issue relating to whether Dr. Rothenberg performed an evaluation that complied with American Medical Association guidelines and because Dr. Rothenberg was qualified to perform the designated doctor evaluation, the trial court did not abuse its discretion by considering Dr. Rothenberg's opinions as part of the summary-judgment evidence. *See* Abilene Indep. Sch. Dist. v. Marks, 261 S.W.3d 262 (Tex.App.–Eastland 2008, no pet.). We overrule Ballard's third issue.

## B. Extent of the Compensable Injury

Under his first and second issues, Ballard argues that his compensable injury included the aggravation of his glaucoma. We conclude the Carrier Parties asserted both traditional and no-evidence summary-judgment grounds that Ballard's compensable injury did not include glaucoma.[2] A compensable injury is "damage or harm to the physical structure of the body." Tex. Lab. Code Ann. § 401.011(26) (West, Westlaw through 2015 R.S.). The aggravation of a preexisting condition is a compensable injury. *See* Peterson v. Continental Cas. Co., 997 S.W.2d 893, 895 (Tex.App.–Houston [1st Dist.] 1999, no pet.). To prove the aggravation of a pre-existing condition, a claimant need not provide expert testimony, but a claimant must have evidence showing a reasonable medical probability that the compensable injury contributed to, or probably contributed to, the aggravation of the pre-existing condition. *See* Klein Indep. Sch. Dist. v. Wilson, 834 S.W.3d 3, 4 (Tex.1992); *Humphrey v. AIG Life Ins. Co.,* No. 14–08–00973, 2010 WL 2635643, at \*5 n.3 (Tex.App.–Houston [14th Dist.] Jul. 1, 2010, pet. denied) (noting that workers' compensation benefits are available only when a claimant proves a causal connection between the injury and the disability) (mem.op.).

[2]	In Ballard's petition, he sought to challenge the conclusion of law that the compensable injury did not extend to glaucoma. In their summary-judgment motion, the Carrier Parties wrote "there is no evidence that Plaintiff's condition has substantially changed or that his compensable injury extends to the left eye glaucoma." We conclude Ballard asserted a challenge to the Division's finding that the compensable injury did not cause his glaucoma and that the Carrier Parties asserted a no-evidence ground with respect to causation.

Ballard asserts the record contains a fact issue on the extent of the compensable injury because evidence in the record shows the compensable injury aggravated his pre-existing glaucoma.[3] The record contains the following evidence:

• Dr. Mitchell Porias performed a peer review in December 2010. Dr. Porias reviewed Dr. Wooten's treatment notes. Dr. Porias concluded that Ballard's current complaints relate to pre-existing glaucoma. Dr. Porias determined "there is no causal relation between the injury and his current treatment."

• Dr. Rothenberg filed a medical report on January 25, 2011. In his report, Dr. Rothenberg concluded there was no permanent impairment from the compensable injury. Dr. Rothenberg determined Ballard attained MMI on January 25, 2011. He determined Ballard's impairment rating is zero percent.

• In April 2011, Dr. Wooten challenged Dr. Rothenberg's report, characterizing his conclusion that there is no causal relationship between the compensable injury and the current treatment as "premature." Dr. Wooten stated that "[t]he aggravation of Mr. Ballard's intraocular pressure may be caused by or at least aggravated by the injury." Dr. Wooten reached this conclusion because a "recognized connection" between trauma and elevated intraocular pressure showed "a causal connection, even if attenuated, could exist between the injury and later treatment for glaucoma."

**\*5** • Dr. Porias performed a second peer review in June 2011. In that review, he addressed whether or not Ballard's current treatment was a result of the compensable injury. Dr. Porias stated:

I would opine that this is a pre-existing of advanced glaucoma[,] that the optic nerve imaging and visual field loss that occurred and examined approximately one week after the injury would be untenable. Retinal nerve fibers do not show this kind of loss unless there has been a chronic process.

Dr. Porias noted "there is a small possibility that the glaucoma could have momentarily been worsened[,] however[,] based on the findings of the optic nerve imaging and the visual fields, angle recession and previous history of cataract surgery[,] I feel that this is an old preexisting."

• In August 2011, Ballard saw Dr. Charles Miller. Dr. Miller determined that Ballard had glaucoma before the compensable injury. Dr. Miller stated that the ongoing treatment need for both eyes "is not related to the injury sustained in 2010." According to Dr. Miller, the compensable injury for a corneal abrasion and subsequent iritis was treated.

• In January 2012, after the contested benefit case hearing, Dr. Michael Mapp sent a letter to the Division stating that Ballard's pre-existing glaucoma became more difficult to manage after the injury. In particular, Dr. Mapp noted that the traumatic iritis resulting from the injury may have made it more difficult for Ballard to control his eye pressure. The eye pressure fluctuation required intervention. Dr. Mapp concluded that, as a result of intervention, Ballard's eye pressure stabilized and was controlled without glaucoma therapy. Dr. Mapp noted that Ballard's eye pressure fluctuation could have damaged an optic nerve in his left eye, but Dr. Mapp could not determine whether the injury caused damage because he had no documentation of Ballard's glaucoma before the injury.

• In August 2012, Dr. Mapp sent a second letter stating the permanent damage to Ballard's eyesight is a result of glaucoma. He wrote, "glaucoma may have been a pre-existing condition, but that does not negate the fact that trauma to the eye may exacerbate the glaucoma and make it more difficult to manage."

3      We presume for the sake of argument that this issue is fairly encompassed within the first issue Ballard presented to the Appeals Panel. In his fourth issue, Ballard asserts "to the extent that Appellees argue that the issue of intraocular pressure was not raised by Appellant initially, this also violates all notions of equity." We need not address this issue because we presume Ballard preserved error. Ballard's fourth issue is overruled.

Ballard argues that this evidence creates a fact issue regarding whether or not the compensable injury extended to the blindness in his left eye. The record contains evidence that several doctors concluded the compensable injury did not aggravate Ballard's pre-existing glaucoma to cause blindness. No doctor affirmatively stated that the trauma probably aggravated Ballard's pre-existing glaucoma; instead, their opinions were limited by the word "may." The record does not contain any causation evidence linking the compensable injury to an aggravation of Ballard's glaucoma.

**\*6** Ballard points to the opinions of Dr. Wooten and Dr. Mapp to assert he has raised a fact issue, but neither doctor attested to more than the theoretical possibility that trauma could exacerbate glaucoma. Dr. Mapp stated generally that trauma to the eye can exacerbate glaucoma. Specifically, Dr. Mapp opined that traumatic iritis could have caused an eye pressure spike that could have damaged Ballard's optic nerve, but Dr. Mapp did not state that the trauma Ballard suffered made Ballard's glaucoma more difficult to control. Nor did Dr. Mapp address whether trauma could make glaucoma more difficult to control permanently. Dr. Wooten stated that an attenuated connection could exist between Ballard's injury and his later treatment for glaucoma, but she was unable to say this connection did exist. Dr. Miller explained that it was possible that the trauma could "momentarily

worsen" glaucoma, but he explained that Ballard's loss was due to a chronic process. There is no causation evidence in the record showing that the compensable injury aggravated Ballard's pre-existing glaucoma. *See Ins. Co. of N. Am. v. Myers,* 411 S.W.2d 710, 714 (Tex.1996) (holding evidence insufficient to prove injury was a producing cause of death when evidence expressed no more than a medical possibility injury caused aggravation of pre-existing brain tumor). Because the record contains no causation evidence, the trial court did not err in granting summary judgment for the Carrier Parties on the ground that no evidence shows the compensable injury extended to glaucoma in the left eye. *See id.*

## C. Date Ballard Attained Maximum Medical Improvement

In his first issue, Ballard asserts that the trial court erred in granting the Carrier Parties' summary-judgment motion because Ballard raised a fact issue regarding his date of MMI. A doctor may certify an impairment rating when the employee reaches MMI. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 253 (Tex.1999). MMI is the point at which the employee's injury will not materially improve with additional rest or treatment. *Id.*

Ballard does not state which evidence raises a fact issue, nor does he explain whether he believes he has not yet reached MMI or reached MMI on another date. The record contains reports from Dr. Miller, Dr. Porias, Dr. Wooten, and Dr. Rothenberg. Only two of the doctors, Dr. Wooten and Dr. Rothenberg, address the date of MMI. Dr. Rothenberg stated that the date of maximum medical improvement was January 25, 2011. The Carrier Parties argue the trier of fact could not consider Dr. Wooten's opinion because she is not certified to perform MMI or impairment rating evaluations. Even presuming for the sake of argument that the trier of fact could consider Dr. Wooten's opinion, her opinion does not raise a fact issue because she provided the same date of MMI as Dr. Rothenberg. Dr. Wooten wrote that Ballard's date of MMI was on or near January 25, 2011. Because all of the evidence regarding MMI showed Ballard reached MMI on or near January 25, 2011, the trial court did not err in granting summary judgment on the Carrier Parties' claim that they proved as a matter of law Ballard attained MMI on January 25, 2011. *See Ausaf v. Highland Ins. Co.,* 2 S.W.3d 363, 367 (Tex.App.—Houston [1st Dist.] 1999, pet. denied) (limiting jury's consideration of evidence to valid impairment ratings presented to Division). We overrule Ballard's first issue.

## D. Ballard's Impairment Rating

Dr. Rothenberg determined Ballard's impairment rating from the compensable injury is zero percent. Ballard argues the Carrier Parties have not proved his impairment rating is zero percent as a matter of law.

To obtain impairment benefits, an employee must be certified by a doctor as having reached MMI and must be assigned an impairment rating by a certifying doctor. *Fireman's Fund Ins. Co. v. Weeks,* 259 S.W.3d 335, 340 (Tex.App.–El Paso 2008, pet. denied). An impairment rating is defined as "the percentage of permanent impairment of the whole body resulting from the current compensable injury." *Id.* When a party challenges the Division of Workers' Compensation's impairment rating, the trier of fact is informed of the impairment rating assigned by the Division. Tex. Lab. Code Ann. § 410.306(c); *Am. Zurich Ins. Co. v. Samudio,* 370 S.W.3d 363, 366 (Tex.2012). In determining the extent of impairment, the finder of fact must adopt the specific rating of one of the physicians in the case. Tex. Lab.Code Ann. § 410.306(c). Evidence of the extent of impairment is limited to that presented to the Division, unless the court makes a threshold finding that the claimant's condition has changed substantially, in which case new evidence may be introduced. [4] *Tex. Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 515 (Tex.1995). The Division of Workers' Compensation's record is admissible to the extent allowable under the Texas Rules of Evidence. Tex. Lab. Code Ann. § 410.306(b).

[4]     Ballard argues that the Division of Workers' Compensation was not required to accept Dr. Rothenberg's impairment rating because Texas Labor Code section 408.1225(c) allows the trial court to disregard an impairment rating if the preponderance of other medical evidence is to the contrary. Section 408.1225(c) does not apply to impairment ratings; it applies to the designated doctor's determination of whether an employee has reached MMI. *See* Tex. Lab. Code Ann. § 408.1225(c). Under Texas Labor Code section 410.306(c), the trial court is not required to accept Dr. Rothenberg's impairment rating, but it must accept an impairment rating that was presented to the Division. *See id.* § 410.306(c).

**\*7** Under his second issue, Ballard makes two main arguments. First, Ballard argues Dr. Rothenberg's impairment rating is invalid and should not be considered as evidence. Second, Ballard points to evidence in the record and argues it creates a fact issue regarding his impairment rating.

Ballard asserts Dr. Rothenberg's impairment rating is invalid because (1) Dr. Rothenberg is not qualified to provide an impairment rating, (2) Dr. Rothenberg did not follow the appropriate guidelines for issuing an impairment rating because he did not physically examine Ballard, and (3) this court should reject Dr. Rothenberg's impairment rating because his findings are inconsistent with the findings of the other providers in this case. We already have rejected Ballard's first two complaints. With respect to Ballard's third contention, our review of the record indicates that Dr. Rothenberg's findings are consistent with the findings of the other providers.

The record before the trial court contained only two impairment ratings. Dr. Rothenberg stated that Ballard's contusion had resolved and Ballard had a zero percent impairment rating as a result of the compensable injury. Even presuming for the sake of argument that (1) Ballard preserved error regarding his claim that Dr. Wooten's impairment rating is admissible evidence, and (2) Dr. Wooten's impairment is admissible evidence, Dr. Wooten's impairment rating does not raise a fact issue because it does not address the compensable injury. Dr. Wooten stated that because Ballard's "vision is 20/400[,] the corresponding percentage of loss noted in the PDR for Ophthalmology's impairment rating is 90%."

We already have rejected Ballard's argument that the compensable injury includes aggravation of his pre-existing glaucoma. In her impairment rating, Dr. Wooten did not distinguish between Ballard's vision loss from his pre-existing glaucoma and his vision loss from the compensable injury. To the contrary, Dr. Wooten's impairment rating encompasses Ballard's overall vision loss, including vision loss from Ballard's pre-existing glaucoma. Because Dr. Wooten's impairment rating does not rate Ballard's impairment from the compensable injury, Dr. Wooten did not provide an "impairment rating that determined the percentage of permanent impairment of the whole body resulting from the current compensable injury." *Weeks,* 259 S.W.3d at 340.

The only other impairment rating in the record is Dr. Rothenberg's impairment rating of zero percent. If there is a valid rating, the trier of fact must accept an impairment rating from a physician in the case. Tex. Lab. Code Ann. § 410.306(c). Dr. Rothenberg's impairment rating is the only valid impairment rating that determines the extent of Ballard's impairment from the compensable injury. Accordingly, the trier of fact was required to accept Dr. Rothenberg's impairment rating. The trial court did not err in granting summary judgment for the Carrier Parties on the ground that they conclusively proved Ballard's impairment rating is zero percent. Accordingly, we overrule Ballard's second issue. *See* Tex. Lab. Code Ann. § 410.306(c); *Am. Zurich Ins. Co.,* 370 S.W.3d at 366.

## IV. CONCLUSION

The trial court did not err in granting the Carrier Parties' summary-judgment motion because Dr. Rothenberg was qualified to conduct a designated-doctor examination of Ballard, and the record does not contain any fact issues with respect to (1) the extent of the compensable injury, (2) Ballard's date of MMI, and (3) Ballard's impairment rating. Accordingly, the judgment of the trial court is affirmed.

**All Citations**

--- S.W.3d ----, 2015 WL 6560531

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

405 S.W.2d 330
Supreme Court of Texas.

The CITY OF TYLER et al., Plaintiffs in Error,

v.

ST. LOUIS SOUTHWESTERN RAILWAY COMPANY OF TEXAS et al., Defendants in Error.

No. A-11260. | July 20, 1966.

Proceeding by motion to vacate, modify or suspend judgment entered by Supreme Court in 1906 as a court of review. The Supreme Court, Calvert, C.J., held that power to vacate of modify the judgment due to changed circumstances was in trial court alone; therefore Supreme Court lacked jurisdiction to hear the motion.

Motion dismissed.

West Headnotes (5)

[1]     **Appeal and Error** 🔑 Amendment or Modification of Judgment

Where Supreme Court as court of review had rendered judgment which trial court should have rendered, Supreme Court lacked jurisdiction to vacate, modify or suspend the judgment because of changed conditions, such jurisdiction being in trial court in which case was pending when final judgment was entered.

12 Cases that cite this headnote

[2]     **Courts** 🔑 Texas

The Supreme Court is primarily court of appellate review with powers limited to questions of law, and generally court's jurisdiction to act beyond scope of appellate review is limited to issuance of writs as prescribed by constitution. Vernon's Ann.St.Const. art. 5, § 3.

Cases that cite this headnote

[3]     **Courts** 🔑 In Issuance of Writs

When Supreme Court directs issuance of a writ as original proceeding it necessarily has jurisdiction to vacate or modify judgment directing its issuance.

Cases that cite this headnote

[4]     **Appeal and Error** 🔑 Effect of Affirmance

**Appeal and Error** 🔑 Failure to Obey Mandate or Follow Decision of Appellate Court

**Appeal and Error** 🔑 Amendment or Modification of Judgment

When Supreme Court as court of review affirms judgment of trial court or enters judgment which trial court should have entered, judgment becomes judgment of both courts and Supreme Court has power to compel trial court to enforce it but does not have power to vacate or modify judgment because of changed conditions.

4 Cases that cite this headnote

**[5]**    **Courts**  Exclusive or Concurrent Jurisdiction

Sections of constitution defining jurisdiction of several courts should be interpreted so as to avoid conflict between authority confided to trial and appellate court. Vernon's Ann.St.Const. art. 5, § 3.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*330**  Troy Smith, Tyler, for plaintiffs.

Roy P. Cosper and Clyde W. Fiddes, Ramey, Brelsford, Flock & Devereux, Tyler, Jackson, Walker, Winstead, Cantwell & Miller, D. L. Case, Dallas, for defendants.

**Opinion**

**\*331**  CALVERT, Chief Justice.

This is an original proceeding in this Court in the form of a motion to vacate, modify or suspend a judgment entered in 1906 in City of Tyler v. St. Louis Southwestern Ry. Co. of Texas, 99 Tex. 491, 91 S.W. 1. The proceeding is dismissed for want of jurisdiction.

In 1902 the City of Tyler and three of its residents, Johanah Pabst, W. H. Cousins and Sue Cousins, instituted a suit in the District Court of Smith County, Texas, in which they sought to enjoin St. Louis Southwestern Railway Company of Texas, movant here, from removing its general offices, machine shops and roundhouses from the City of Tyler. The trial court issued a temporary writ of injunction; but after a trial on the merits, the Court dissolved the temporary injunction and denied all relief sought. The judgment provided, however, that the temporary injunction should remain in force pending an appeal upon the filing by the plaintiffs of a proper supersedeas bond. The bond was filed.

The Court of Civil Appeals affirmed the judgment of the trial court. 87 S.W. 238 (1905). This Court reversed the judgments of the Court of Civil Appeals and trial court and proceeded to render the judgment which the trial court should have rendered, and decreed:

> '* * * it is ordered adjudged and decreed that the plaintiffs in error * * * recover Judgment against defendant in error, the St. Louis Southwestern Railway Company of Texas, that said St. Louis Southwestern Railway Company of Texas, Shall Keep and maintain in said City of Tyler * * * its general offices, and shall Keep and maintain in said City its machine shops and it is further ordered, adjudged and decreed that the injunction heretofore granted on to wit; April 20th 1902, by the Judge of the District Court of Smith County, Texas * * * is hereby perpetuated * * *.'

On July 12, 1965, the City of Tyler filed its petition in the District Court of the 7th Judicial District, Smith County, in which it alleged that St. Louis Southwestern Railway Company of Texas was moving its general offices and machine shops from Tyler in violation of the court's judgment. The City prayed for a cease and desist order and for an order to show cause why the Railway Company and its officers and agents should not be held in contempt for violating the injunction perpetuated by the judgment of this Court. The Railway Company removed the suit to the United States District Court for the Eastern District of Texas, Tyler division, and filed a separate suit in that Court in which the principal relief sought was (1) a declaratory judgment that the judgment of 1906 was void and unenforceable, and (2) enjoining further prosecution of the contempt proceedings in

the state district court. The United States District Court remanded the contempt action to the state district court and dismissed the separate suit for declaratory and injunctive relief. Railway Company then filed the instant proceeding in this Court.

Railway Company seeks to vacate, modify or suspend the judgment of 1906 on the ground that the Congress of the United States by enactment of the Transportation Act of 1920 and subsequent amendments, pre-empted the subject matter of the judgment and vested exclusive jurisdiction to regulate the subject matter thereof in the Interstate Commerce Commission, which jurisdiction the Interstate Commerce Commission has exercised by an order entered in 1953 expressly relieving Railway Company of any obligation under the laws of Texas, 'contractual, statutory or other,' to maintain machine shops or other facilities at any particular place or places, and authorizing location changes of such facilities as in the judgment of the Board of Directors would enable Railway Company to operate the properties in the public interest with the greatest economy and efficiency.

**\*332** **[1]** The first question presented is whether this Court has jurisdiction to grant the relief sought. Before the relief sought can be granted, a preliminary determination must be made that changed conditions require or authorize vacation, modification or suspension of the 1906 judgment. The question to be decided, then, is this: Does the Supreme Court have jurisdiction to determine in the first instance whether a judgment rendered and entered by it as a court of review has become void or unenforceable because of changed conditions? We hold that it does not; that jurisdiction so to determine lies with the trial court in which the case was pending when final judgment was entered.

**[2]** The Supreme Court is primarily a court of appellate review, with its powers of review limited to questions of law. Sec. 3, Art. 5, Constitution of Texas, Vernon's Ann.St.; City of Dallas v. Dixon, Tex.Sup., 365 S.W.2d 919, 923 (1963); Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 645-646 (1933). Other than with respect to some particular matters not relevant to this discussion, the Court's jurisdiction to act beyond the scope of appellate review is granted and limited by Sec. 3, Art. 5, supra, to the issuance of writs of habeas corpus 'as may be prescribed by law, and under such regulations as may be prescribed by law;' the issuance of such writs 'as may be necessary to enforce its jurisdiction;' the issuance of 'writs of quo warranto and mandamus' in such cases as may be specified by the Legislature; and the ascertainment of 'such matters of fact as may be necessary to the proper exercise of its jurisdiction.' Jurisdiction to vacate or modify its prior judgments not being expressly conferred on this Court, it must exist, if at all, by implication.

**[3]** When the Supreme Court directs the issuance of a writ as an original proposition to preserve or enforce its jurisdiction, there can be no doubt of its jurisdictional power to vacate or modify the judgment which directed its issuance; having entered the judgment in the exercise of its original jurisdiction, it necessarily has the power to vacate or to modify it. It does not follow, however, that it may vacate or modify a judgment it has rendered and entered as a court of review after the judgment has become final.

**[4]** **[5]** When as a court of review this Court affirms a judgment of a trial court or enters a judgment which a trial court should have entered, the judgment becomes a judgment of both courts—the trial court and this Court. Crouch v. McGaw, 134 Tex. 633, 138 S.W.2d 94, 96 (1940); Houston Oil Co. of Texas v. Village Mills Co., 123 Tex. 253, 71 S.W.2d 1087, 1089 (1934). In that situation and in the absence of changed conditions it is the duty of the trial court to enforce the judgment as entered; and, if necessary, this Court can compel its enforcement. Gulf, Colorado & Santa Fe Ry. Co. v. City of Beaumont, Tex.Sup., 373 S.W.2d 741 (1964); Conley v. Anderson, Tex.Sup., 164 S.W. 985 (1913); Hovey v. Shepherd, 105 Tex. 237, 147 S.W. 224 (1912). But jurisdiction of this Court to compel enforcement of the judgment does not include jurisdictional power to vacate or modify the judgment because of changed conditions; that power lies alone with the trial court which can subpoena witnesses, take evidence and make findings of fact from a preponderance of the evidence. While this question has not heretofore been decided, we have no doubt of the correctness of our holding. Any other holding would bring the jurisdiction of this Court and of trial courts into conflict in violation of the rule of construction announced in Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 645 (1933), as follows:

> 'We should, of course, interpret and construe the various sections of the Constitution defining the jurisdiction of our several courts in such manner as to harmonize them, to the end that each court, whether trial or appellate, shall be **\*333** permitted to exercise the power conferred upon it without conflict with the authority confided to another tribunal.'

Trial courts undoubtedly have jurisdiction to modify or vacate their judgments granting permanent injunctions because of changed conditions. See 68 A.L.R. 1180; 136 A.L.R. 765; Carleton v. Dierks, Tex. Civ.App., 203 S.W.2d 552, 557 (1947); writ ref., n. r. e.; Uvalde Paving Co. v. Kennedy, Tex.Civ.App., 22 S.W.2d 1091, 1092 (1929), no writ hist. Their judgments doing so or refusing to do so are, of course, reviewable on appeal; but their original jurisdiction to make the decision is exclusive.

The motion is dismissed.

**All Citations**

405 S.W.2d 330

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**   Hagberg v. City of Pasadena,   Tex.App.-Hous. (1 Dist.),   February 15, 2007

178 S.W.3d 449
Court of Appeals of Texas,
Amarillo.

DEAN FOODS COMPANY d/b/a Bell Gandy's, Inc. and Texas Worker's Compensation Commission, Appellants,
v.
Debra ANDERSON, Appellee.

No. 07–04–0016–CV.   |   Oct. 13, 2005.   |   Rehearing Overruled Dec. 21, 2005.

**Synopsis**
**Background:** Employer appealed the Texas Worker's Compensation Commission's (TWCC's) award of death benefits to claimant for death of her husband, who was murdered while employed by employer. Claimant counterclaimed seeking attorney fees of $320,855.20, and employer subsequently filed a motion for nonsuit. The 237th District Court, Lubbock County, Sam Medina, J., found that reasonable fees of $100,167.86 were incurred by claimant, and that attorney fees were to be paid out of death benefit award. Both parties appealed.

**Holdings:** The Court of Appeals, John T. Boyd, Senior Justice (Retired), held that:

[1] claimant's request for attorney fees was a timely claim for affirmative relief, such that nonsuit by employer did not deprive trial court of subject matter jurisdiction over that request;

[2] claimant was "prevailing party" entitled to attorney fees; and

[3] trial court's discretion in assessing reasonable and necessary attorney fees was not limited, restricted, or dictated by a contingency fee contract entered into by claimant and her attorneys.

Affirmed in part, reversed and rendered in part.

Brian Quinn, C.J., filed a concurring opinion.

West Headnotes (11)

[1]     **Appeal and Error**   Cases Triable in Appellate Court

Statutory construction is a question of law, and the appellate court reviews the trial court's action de novo.

1 Cases that cite this headnote

[2]     **Workers' Compensation**   Construction in favor of employee or beneficiary

In ascertaining the legislative intent, the court should liberally construe workers' compensation provisions in favor of injured workers.

Cases that cite this headnote

**[3]** **Appeal and Error** Cases Triable in Appellate Court

Whether a court has subject matter jurisdiction is a question of law reviewed de novo.

1 Cases that cite this headnote

**[4]** **Appeal and Error** Jurisdiction

In determining whether a pleader has alleged facts sufficient to demonstrate the trial court's subject matter jurisdiction, the appellate court construes the pleadings in favor of the pleader.

Cases that cite this headnote

**[5]** **Workers' Compensation** Dismissal, withdrawal, or abandonment of appeal

**Workers' Compensation** Review

Claimant properly and timely requested attorney fees related to judicial review of Texas Worker's Compensation Commission (TWCC) award of death benefits and, thus, made a request for affirmative relief such that trial court had subject matter jurisdiction over the issue of attorney fees, even though employer nonsuited its claims in the appeal and contended that claimant's request related to fees incurred in pursuit of severed counterclaims; claimant's request was made in a general manner and could reasonably have been construed as relating to the judicial review. Vernon's Ann.Texas Rules Civ.Proc., Rules 45, 97, 162.

3 Cases that cite this headnote

**[6]** **Pretrial Procedure** Effect

**Pretrial Procedure** Operation and Effect

A request for attorney fees is a claim for affirmative relief, such that nonsuit or dismissal does not prejudice the right of party with a pending claim for attorney fees to be heard. Vernon's Ann.Texas Rules Civ.Proc., Rule 162.

2 Cases that cite this headnote

**[7]** **Workers' Compensation** Dismissal, withdrawal, or abandonment of appeal

**Workers' Compensation** Fees on appeal or proceedings to set aside award

Workers' compensation claimant was "prevailing party," so as to be statutorily entitled to award of attorney fees, in employer's appeal of Texas Worker's Compensation Commission's (TWCC's) award, even though employer nonsuited its appeal and thus the trial court did not render a judgment on the merits; the effect of employer's nonsuit was to make TWCC's award to claimant final and enforceable, such that claimant became the "prevailing party." V.T.C.A., Labor Code §§ 408.221(c), 410.205(a, b).

3 Cases that cite this headnote

**[8]** **Costs** Prevailing party

Whether a party "prevails," for purposes of awarding attorney fees, should be based upon success on the merits, rather than whether damages are awarded.

Cases that cite this headnote

**[9]** **Workers' Compensation** Discretion

**Workers' Compensation** Amount

The manner and amount of the award of attorney fees for a workers' compensation claimant is within the trial court's discretion. V.T.C.A., Labor Code § 408.221.

Cases that cite this headnote

**[10]** **Workers' Compensation** Amount

The trial court's discretion in assessing reasonable and necessary attorney fees in a workers' compensation case is not limited, restricted, or dictated by a contingency fee contract entered into by a claimant and her attorneys. V.T.C.A., Labor Code § 408.221.

Cases that cite this headnote

**[11]** **Workers' Compensation** Dismissal, withdrawal, or abandonment of appeal

**Workers' Compensation** Amount

Trial court acted within its discretion, after employer nonsuited its appeal from benefits award of Texas Worker's Compensation Commission (TWCC), in reviewing affidavits in making its determination as to the amount of attorney fees to award to claimant; claimant timely raised issue of attorney fees prior to filing of nonsuit motion, and trial court was required to consider evidence of statutory factors in making its determination as to what fees were reasonable and necessary. V.T.C.A., Labor Code § 408.221(d).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*451** Abel Reyna, Jr., Michael L. Byrd, Byrd & Associates, Lubbock, for Appellants.

Kevin Heyburn, Asst. Atty. Gen., Austin, for Appellant TWCC.

Christopher Carver, John E. Gibson, Gibson Carver, L.L.P., Lubbock, for Appellee.

Before QUINN, C.J., CAMPBELL, J., and BOYD, S.J. [1]

[1]    John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp.2004).

**OPINION**

JOHN T. BOYD, Senior Justice (Retired).

In this appeal, appellants Dean Foods Company d/b/a Bell Gandy's, Inc. (Dean Foods) and the Texas Worker's Compensation Commission (TWCC) challenge the trial court's award of attorney's fees to cross-appellant Debra Anderson (Anderson). In her

appeal, Anderson challenges the amount of attorney's fees awarded and specifically complains of the trial court's refusal to consider a contingent fee contract in determining the amount of its award of attorney's fees to her. We reverse the trial court's judgment in part and render a corrected judgment.

## Background

Anderson's husband was murdered by an unknown assailant while employed by Dean Foods. She filed a claim for workers' compensation benefits because of his death. That claim was opposed by Dean Foods, [2] which contended that the death was the result of personal animosities with the assailant or assailants and also contended that the death occurred outside of the course and scope of his employment. [3] The claim proceeded to hearing before a **\*452** TWCC hearing officer, who found that the death was a compensable injury. That finding was affirmed by a TWCC appeals panel. Anderson was the sole beneficiary and entitled to whatever TWCC benefits might be payable.

[2]     Dean Foods is a certified self-insurer subject to the Texas Workers' Compensation Act. Tex. Lab.Code Ann. § 407.042 (Vernon 1996).

[3]     Dean Foods additionally based its denial of compensability on other grounds but abandoned them prior to the contested case hearing.

Dean Foods appealed the compensability determination to the district court. In her answer and counterclaim, *inter alia,* Anderson sought affirmative relief, including attorney's fees. Other than her quest for attorney's fees, Anderson's counterclaims were severed into separate causes and are not at issue in this appeal.

A year after filing its suit, Dean Foods filed a motion for nonsuit. In filing her answer to the suit, Anderson had asked for the award of attorney's fees and, after receiving notice of the nonsuit motion, also submitted a motion seeking attorney's fees in the amount of $320,855.20 with supporting affidavits. In the judgment giving rise to this appeal, the trial court found: 1) it had jurisdiction to award attorney's fees, 2) Anderson was not the "prevailing party" in the suit, 3) reasonable and necessary attorney's fees in the amount of $100,167.86 were incurred by Anderson, and 4) the attorney's fees were to be paid out of Anderson's death benefit award. *See* Tex. Lab.Code Ann. § 408.221 (Vernon Supp.2004–2005) (the Code). Both parties appealed this decision and TWCC intervened in the appeal. *See id.* § 410.254 (Vernon 1996).

In its appeal, Dean Foods challenges the trial court's 1) subject matter jurisdiction to assess attorney's fees, 2) the judgment awarding attorney's fees, and 3) the trial court's receipt of evidence regarding attorney's fees after Dean Foods had filed its nonsuit motion. TWCC also appeals the trial court's award of attorney's fees. Anderson appeals 1) the trial court's finding that she was not the "prevailing party" within the purview of the Code, 2) the judgment failing to award her attorney's fees pursuant to a contingency fee agreement between herself and her attorneys, and 3) the trial court's decision that Dean Foods had standing to contest the award of attorney's fees to her.

## Discussion

We will consolidate the parties' issues and discuss the three determinative questions presented in those issues. Those questions are: 1) whether the trial court had subject matter jurisdiction to award attorney's fees, 2) the statutory interpretation of the "prevailing party" requirement for attorney's fees under section 408.221(c) of the Code, and 3) the trial court's award of attorney's fees.

## Standard of Review

 **[1]** **[2]** Statutory construction is a question of law, and we review the trial court's action *de novo. Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). The primary goal in statutory construction is to ascertain and give effect to the legislature's intent, the evil, and the remedy. Tex. Gov't Code Ann. § 312.005 (Vernon 2005). In ascertaining the legislative intent, we should liberally construe these workers' compensation provisions in favor of injured workers. *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000).

### Subject Matter Jurisdiction

 **[3]** **[4]** Whether a court has subject matter jurisdiction is a question of law reviewed *de novo. See Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). A district court may judicially review a TWCC appeals decision once a party has exhausted all administrative remedies. Tex. Lab.Code Ann. § 410.251 (Vernon 1996); *see also* **\*453** *Cervantes v. Tyson Foods, Inc.,* 130 S.W.3d 152, 155 (Tex.App.-El Paso 2003, pet. denied). In determining whether a pleader has alleged facts sufficient to demonstrate the trial court's subject matter jurisdiction, we construe the pleadings in favor of the pleader. *See Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982).

 **[5]** TWCC contends that the trial court lacked statutory authority to award Anderson any attorney's fees. Dean Foods asserts that Anderson only pled for attorney's fees related to her counterclaims and did not seek attorney's fees related to the request for judicial review until after it had filed its nonsuit motion. At that time, it reasons, the nonsuit had terminated the trial court's jurisdiction, and Anderson could not subsequently file a request for affirmative relief. *See Ault v. Mulanax,* 724 S.W.2d 824, 828 (Tex.App.-Texarkana 1986, orig. proceeding).

 **[6]** Once Dean Foods exhausted its administrative remedies and sought judicial review, the trial court gained jurisdiction over the dispute. When the court obtained jurisdiction, Anderson was entitled to and indeed obligated to respond, and in that response, seek attorney's fees. Tex.R. Civ. P. 97; *Falls County v. Perkins and Cullum,* 798 S.W.2d 868, 870 (Tex.App.-Fort Worth 1990, no pet.). Although Anderson's answer only requested attorney's fees in a general manner, it can reasonably be construed as requesting attorney's fees associated with her defense in the judicial review of the award the appeals panel had made to her. That being so, we conclude that Anderson properly and timely requested an award of attorney's fees incurred as a result of the judicial review. Tex.R. Civ. P. 45; *Tex. Dep't of Parks and Wildlife v. Miranda,* 133 S.W.3d at 226. A request for attorney's fees is a claim for affirmative relief. *Falls County v. Perkins and Cullum,* 798 S.W.2d at 870–71. Texas Rule of Civil Procedure 162 specifically provides that a dismissal or nonsuit "shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief...." Therefore, we conclude that Dean Foods' nonsuit did not deprive the trial court of subject matter jurisdiction over Anderson's request for attorney's fees.

### Prevailing Party

 **[7]** Dean Foods next contends that the trial court could not have awarded attorney's fees under section 408.221(c) of the Code because the court determined that Anderson was not the "prevailing party" in the suit and that status was a prerequisite to the award of attorney's fees to be paid by the insurance carrier. TWCC contends the trial court had no authority to award attorney's fees under section 408.221(b) of the Code, which provides for attorney's fees to be paid from the claimant's recovery, because in its judgment, the court did not award a "recovery" from which attorney's fees could be paid.

In deciding these arguments, we will first consider the implications of section 408.221(c) of the Code. In pertinent part, that statute provides:

> An insurance carrier that seeks judicial review under Subchapter G, Chapter 410, of a final decision of a commission appeals panel regarding compensability or eligibility for, or the amount of, income or death benefits is liable for reasonable and necessary attorney's fees as provided by Subsection (d) incurred by

the claimant as a result of the insurance carrier's appeal *if the claimant prevails on an issue on which judicial review is sought by the insurance carrier* in accordance with the limitation of issues contained in Section 410.302.... [Emphasis added].

**\*454** Tex. Lab.Code Ann. § 408.221(c) (Vernon Supp.2004–2005).

 **[8]**  The concept of "prevailing party" is not defined in the statute. However, it has been defined in other contexts as when "one of the parties to a suit ... successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of its original contention." *City of Amarillo v. Glick,* 991 S.W.2d 14, 17 (Tex.App.-Amarillo 1997, pet. denied), *quoting F.D.I.C. v. Graham,* 882 S.W.2d 890, 900 (Tex.App.-Houston [14th Dist.] 1994, no writ). Whether a party "prevails" should be based upon success on the merits, rather than whether damages are awarded. *City of Amarillo v. Glick,* 991 S.W.2d at 17; *Scholl v. Home Owners Warranty Corp.,* 810 S.W.2d 464, 468 (Tex.App.-San Antonio 1991, no writ).

Dean Foods contends that because of its nonsuit, Anderson could not and did not obtain a favorable judgment on the merits and therefore, she was not and could not have been the "prevailing party" in the suit Dean Foods filed. *See generally Cigna Ins. Co. of Tex. v. Middleton,* 63 S.W.3d 901, 903 (Tex.App.-Eastland 2001, pet. denied); *see also Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 605, 121 S.Ct. 1835, 1840–41, 149 L.Ed.2d 855 (2001). In advancing that proposition, Dean Foods places considerable reliance upon the court's reasoning employed in the *Cigna Ins. Co.* case which is the most nearly analogous authority cited by it. In that case, the court did reverse an award of attorney's fees to the claimant from the carrier because the claimant was not a "prevailing party" in the suit. However, the facts in that case are distinguishable from those before us.

In reaching its decision, the *Cigna* court noted that the insurance company and the claimant had settled and *both* had nonsuited their claims. Because of this, the court reasoned, there "were no remaining issues upon which Middleton [the worker claimant] could prevail." *Cigna Ins. Co. of Tex. v. Middleton,* 63 S.W.3d at 903. As we noted above, the facts in that case are different from those before us here. This is not a case in which both parties sought a nonsuit of their claims.

In this case, Anderson had received a legal determination from the TWCC hearing officer that was affirmed by an appeals panel and which was binding upon Dean Foods during the pendency of an appeal. *See* Tex. Lab.Code Ann. § 410.205(b) (Vernon Supp.2004–2005). Upon Dean Foods' nonsuit, the appeal panel's award became final and received the *imprimatur* of the trial court, marking the end of any further appeal on the issue of compensability. *Id.* § 410.205(a). Thus, even though the trial court, because of Dean Foods' nonsuit, did not render a judgment on the merits of the case, the effect of Dean Foods' nonsuit was to make TWCC's award final and enforceable. Thus, Anderson became the "prevailing party" within the purview of the statute. *See Pacific Employers Insurance Co.,* No. 08–05–00086–CV, 2005 WL 2044936 (Tex.App.-El Paso August 25, 2005, no pet. h.). Moreover, because Anderson had not joined in the nonsuit, the issue of her attorney's fees still remained to be disposed of. Tex.R. Civ. P. 162.

Further, although the general rule is that the workers' compensation claimant's attorney's fees are paid out of the claimant's recovery, section 408.221(c) is an exception to that general rule. In enacting that statute, it appears that the intent of the legislature was to ensure that if the insurance carrier appealed an award, thereby delaying the payment of benefits to an injured worker, it ran the risk of **\*455** having to pay the claimant's attorney's fees if its appeal was not well taken. Additionally, there is another valid reason for the statute and the apparent legislative intent. While a worker is not required to have an attorney to represent him or her in TWCC proceedings, in an appeal to the district court, the worker must obtain an attorney or run the risk of representing himself or herself with the pitfalls that may await a non-legally trained participant in a court of record. The trial court here had before it affidavits that showed the activities undertaken by counsel necessitated by the carrier's appeal to the district court.

For these reasons, the section 408.221(c) authorization of the award of attorney's fees to the "prevailing party" is applicable in this case. Having made that decision, we need not address TWCC's issue regarding the trial court's authority to award attorney's fees under section 408.221(b) of the Code or Anderson's issue regarding Dean Foods' standing under section 408.221(b). *See* Tex.R.App. P. 47.1.

**Award of Attorney's Fees**

[9]   We now address Anderson's contention that the trial court erred in failing to consider her contingency fee contract with her attorneys in assessing the amount of reasonable and necessary attorney's fees to be awarded to her. [4] In doing so, we also note Dean Foods' contention that the trial court erred by allowing affidavit evidence after it had filed its nonsuit motion. Attorney's fees must be approved by TWCC or the trial court and must be based upon the attorney's time and expense as evidenced by written documentation. *See* Tex. Lab.Code Ann. § 408.221(a) & (b) (Vernon Supp.2004–2005). However, the manner and amount of the award of attorney's fees is within the trial court's discretion. *Texas Employers Ins. Ass'n v. Motley,* 491 S.W.2d 395, 397 (Tex.1973); *Transcontinental Ins. Co. v. Smith,* 135 S.W.3d 831, 838 (Tex.App.-San Antonio 2004, no pet.).

[4]   The factors listed include 1) the time and labor required, 2) the novelty and difficulty of the questions involved, 3) the skill required to perform the legal services necessary, 4) the fee customarily charged in the locality for similar legal services, 5) the amount involved in the controversy, 6) the benefits to the claimant that the attorney is responsible for securing, and 7) the experience and ability of the attorney performing the services. Tex. Lab.Code Ann. § 408.221(d) (Vernon Supp.2004–2005).

[10]   Applying the principles of statutory construction we have noted, a plain reading of the statute would appear to allow contingency agreements. However, any agreement as to the amount of attorney's fees still must be approved by the trial court. Tex. Lab.Code Ann. § 408.221(a) (Vernon Supp.2004–2005). In addition, section 408.221(c) states the trial court *shall* take into consideration the additional factors listed in section 408.221(d) in making its determination as to the amount of attorney's fees that were reasonable and necessary. Parenthetically, in cases such as this one in which the carrier has filed the appeal, the trial court is not limited by 25 percent of the claimant's recovery applicable in some other workers' compensation cases. *See id.* § 408.221(i). Reading the statute as a whole, we conclude the trial court's discretion in assessing reasonable and necessary attorney's fees is not limited, restricted, or dictated by a contingency fee contract entered into by a claimant and her attorneys. Anderson's issue in that regard is overruled.

[11]   We next address Dean Foods' contention that the trial court erred by allowing evidence relating to attorney's **\*456** fees by affidavit after the filing of the nonsuit motion. As we have noted above, Anderson had timely raised the issue of attorney's fees prior to the filing of that motion. Further, again as we noted above, the trial court was required to consider evidence of the factors listed in section 408.221(d) of the Code in making its decision as to what attorney's fees were reasonable and necessary. Dean Foods has failed to uphold its burden to show that the trial court abused its discretion in reviewing affidavits in making its determination. *See Transcontinental Ins. Co. v. Smith,* 135 S.W.3d at 839. Without such a showing by Dean Foods, we presume the evidence supported the trial court's decision as to attorney fees. *Id.* Dean Foods' argument is overruled.

For the reasons we have expressed, we reverse the trial court's finding as to the "prevailing party" and its holding that the attorney's fees would be paid out of Anderson's recovery. We do affirm its finding as to the amount of attorney's fees to be awarded. Accordingly, and pursuant to the applicable provisions of section 408.221(c) of the Code, we render judgment awarding Anderson the amount of $100,167.86 as the attorney's fees reasonably and necessarily incurred by her to be paid by Dean Foods. *See* Tex.R.App. P. 43.3.

BRIAN QUINN, Chief Justice, concurs.

BRIAN QUINN, Chief Justice, concurring.
I concur with the majority with regard to the "prevailing party," but write separately to explain that the majority's decision also follows analogous precedent. We have recognized that of the many statutes and rules which may entitle a prevailing party to recover attorney's fees, the analysis applied has been uniform. *City of Amarillo v. Glick,* 991 S.W.2d 14, 17 (Tex.App.-Amarillo 1997, no pet.) (dealing with the recovery of fees under § 143.015(c) of the Local Government Code). Furthermore, included

among the category of statutes and rules alluded to in *City of Amarillo* is Rule 131 of the Texas Rules of Civil Procedure, and though it speaks in terms of a "successful party," the definition accorded that phrase is the same one accorded the term "prevailing party." *Id.* So, given the uniformity of definition utilized throughout the differing bodies of law, it seems only logical that opinions implicating Rule 131 would be authoritative when deciding whether a party prevailed under § 408.221(c) of the Texas Labor Code. After all, they encompass the same concept.

Next, it consistently has been held that the beneficiary of a non-suit, *e.g.,* the defendant when a plaintiff files a non-suit, is the prevailing or successful party for purposes of Rule 131. *City of Houston v. Woods,* 138 S.W.3d 574, 581 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Harris v. Shotwell,* 490 S.W.2d 860, 861 (Tex.App.-Fort Worth 1973, no writ); *Reed v. State,* 78 S.W.2d 254, 256 (Tex.App.-Austin 1935, writ dism'd). If we are to retain the uniformity spoken of above, then we cannot but conclude that Anderson was the successful or prevailing party here when Dean Foods filed its non-suit.

**All Citations**

178 S.W.3d 449

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

170 S.W.3d 129
Court of Appeals of Texas, San Antonio.

INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, Appellant,

v.

Albert OROSCO, Appellee.

No. 04–04–00691–CV.    |    May 25, 2005.    |    Rehearing Overruled June 17, 2005.

**Synopsis**

**Background:** Insurance carrier filed petition, challenging determination of Texas Workers' Compensation Commission Appeals Panel (TWCC) that claimant's right-arm injury was work-related. Claimant filed counterclaim, challenging TWCC's determination that claimant did not timely notify employer of injury. The 73rd Judicial District Court, Bexar County, Karen H. Pozza, J., denied carrier's motion to dismiss counterclaim and granted claimant's motion to dismiss carrier's petition for lack of jurisdiction. Carrier appealed.

**Holdings:** The Court of Appeals, Sandee Bryan Marion, J., held that:

[1] carrier was not aggrieved by TWCC's decision;

[2] claimant "prevailed," for purposes of attorney fees statute;

[3] order dismissing carrier's action was not void; and

[4] order severing counterclaim did not render earlier order denying carrier's motion to dismiss counterclaim final and appealable.

Affirmed in part; appeal dismissed in part.

West Headnotes (11)

[1]     **Workers' Compensation**  👈 Persons Entitled

Insurance carrier was not "aggrieved" by decision of Texas Workers' Compensation Commission Appeals Panel (TWCC) that found that claimant's right-arm injury was work-related but was not compensable due to untimely notice to employer, and thus carrier lacked standing to seek judicial review of decision; carrier's claim that TWCC's finding that right-arm injury was work-related may result in later finding that claimant's left-arm injury was work-related raised only possibility of future loss, not actual or immediate loss. V.T.C.A., Labor Code § 410.251.

7 Cases that cite this headnote

[2]     **Workers' Compensation**  👈 Persons Entitled

For purposes of statute addressing standing and allowing aggrieved party to seek judicial review of final decision of Texas Workers' Compensation Commission Appeals Panel (TWCC), a party is "aggrieved" by a final decision of

TWCC if the injury or loss resulting from the final decision is actual and immediate; a possible future injury or loss as a consequence of the decision is not sufficient to show an aggrievement. V.T.C.A., Labor Code § 410.251.

4 Cases that cite this headnote

[3]     **Workers' Compensation**   Matters concluded

Issue preclusion would not prevent insurance carrier from arguing in workers' compensation proceeding concerning claimant's left-arm injury that injury was not work-related, although Texas Workers' Compensation Commission Appeals Panel (TWCC) had determined in prior proceeding that claimant's right-arm injury was work-related, and although both injuries were allegedly due to same repetitive trauma; since determination of whether left-arm injury was compensable was fact specific, carrier could seek to controvert any evidence presented by claimant regarding circumstances of case, preexisting risk factors, and amount and type of work done.

Cases that cite this headnote

[4]     **Workers' Compensation**   Fees on appeal or proceedings to set aside award

For purposes of statute allowing workers' compensation claimant to recover attorney fees if claimant prevails in insurance carrier's action seeking judicial review of decision of Texas Workers' Compensation Commission Appeals Panel (TWCC), claimant "prevailed"; claimant sought and obtained dismissal of insurance carrier's claim. V.T.C.A., Labor Code § 408.221.

4 Cases that cite this headnote

[5]     **Costs**   Who is prevailing party in general

For purposes of statutory chapter governing award of attorney fees and rule of civil procedure governing award of costs, "prevailing party" is one who is vindicated by the trial court's judgment. V.T.C.A., Civil Practice & Remedies Code § 38.001 et seq.; Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

1 Cases that cite this headnote

[6]     **Workers' Compensation**   Dismissal, withdrawal, or abandonment of appeal

Order dismissing insurance carrier's action that sought judicial review of decision of Texas Workers' Compensation Commission Appeals Panel (TWCC) was not required to recite that parties complied with statute requiring party initiating proceeding to file proposed judgment with executive director of Workers' Compensation Commission, and thus order was not void; order and record as a whole were silent on whether parties complied with statute. V.T.C.A., Labor Code § 410.258(a, f).

2 Cases that cite this headnote

[7]     **Appeal and Error**   Judgment

Court of Appeals presumes the regularity of a judgment absent controverting evidence.

3 Cases that cite this headnote

[8]     **Workers' Compensation**   Form and Contents and Nature and Extent of Relief

Statute prohibiting the trial court from rendering a judgment that does not comply with provision of labor code requiring party initiating proceeding for judicial review of administrative decision in workers' compensation

proceeding to file proposed judgment with executive director of Workers' Compensation Commission does not require the trial court to recite the requirements of the labor code within the judgment. V.T.C.A., Labor Code § 410.258(a, f).

Cases that cite this headnote

**[9]** **Workers' Compensation** 🔑 On appeal

Trial court's order severing workers' compensation claimant's counterclaim, which challenged determination of Texas Workers' Compensation Commission Appeals Panel (TWCC) that claimant did not timely notify employer of injury, did not render earlier order denying insurance carrier's motion to dismiss counterclaim final and appealable; counterclaim remained pending after order severing counterclaim.

2 Cases that cite this headnote

**[10]** **Appeal and Error** 🔑 Necessity of final determination

Judgment must be final before it can be appealed.

Cases that cite this headnote

**[11]** **Appeal and Error** 🔑 Final Judgments or Decrees

Judgment issued without a conventional trial is final for purposes of appeal if and only if it actually disposes of all claims and parties then before it; otherwise, the judgment is interlocutory.

Cases that cite this headnote

**\*131** From the 73rd Judicial District Court, Bexar County, Texas, Trial Court No. 2004–CI–10900; Karen H. Pozza, Judge Presiding. [1]

[1] The Honorable Karen Pozza, presiding judge of the 407th Judicial District Court, signed the order granting appellee's motion to dismiss appellant's claim for lack of jurisdiction. The Honorable Andy Mireles, presiding judge of the 73rd Judicial District Court, signed the order awarding appellee attorney's fees. The Honorable David Peeples, retired judge of the 224th Judicial District Court, signed the order denying appellant's motion to dismiss appellee's counterclaim for lack of jurisdiction.

**Attorneys and Law Firms**

William J. Gamble, Gamble & Russell, P.C., Castroville, for appellant.

Teresa N. Smith, Smith & Habenicht, P.C., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

**\*132 OPINION**

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the trial court's (1) denial of appellant's motion to dismiss appellee's counterclaim, (2) granting of appellee's motion to dismiss for lack of the jurisdiction, and (3) awarding appellee attorney's fees. We affirm the trial court's

granting of appellee's motion to dismiss for lack of the jurisdiction and awarding appellee attorney's fees. Because this court lacks jurisdiction, we dismiss appellant's appeal from the order denying appellant's motion to dismiss appellee's counterclaim.

## BACKGROUND

In April 2003, appellee, Albert Orosco, filed a claim for workers' compensation benefits, alleging he had sustained an injury to his right hand, wrist, and forearm while in the course and scope of his employment. On June 10, 2004, the Texas Workers' Compensation Commission Appeals Panel ("TWCC") determined Orosco had sustained a work-related injury, but because he failed to timely notify his employer, the TWCC held that Orosco was not entitled to workers' compensation benefits.

On June 19, 2003, Orosco filed a second claim, this time complaining of a work-related injury to his left arm.

On July 20, 2004, appellant timely-filed its petition in district court, challenging the TWCC's determination that Orosco's right-arm injury was work-related. On August 6, 2004, Orosco filed a counterclaim, challenging the TWCC's determination that he did not timely notify his employer of his injury. Orosco filed a plea to the jurisdiction and a motion to dismiss appellant's suit for lack of jurisdiction, asserting appellant did not have standing because appellant was not "aggrieved" by the TWCC's decision. Appellant moved to dismiss Orosco's counterclaim on the grounds it was not filed within the forty-day deadline imposed by Texas Labor Code section 410.252, which provides that "[a] party may seek judicial review not later than the 40th day after the date on which the decision of the appeals panel was filed with the division." TEX. LAB.CODE ANN. § 410.252(a) (Vernon Supp.2005). The trial court denied appellant's motion, but granted Orosco's motion to dismiss for lack of jurisdiction. The trial court also awarded appellant attorney's fees in the amount of $2,187.50. The trial court subsequently severed Orosco's counterclaim into a separate cause.

## STANDING

[1] In his plea to the jurisdiction and motion to dismiss, Orosco argued that appellant was not aggrieved by the TWCC's decision because that decision relieved appellant of any liability for payment of worker's compensation benefits. Therefore, according to Orosco, appellant does not have standing and dismissal for lack of jurisdiction was proper. Appellant asserts it is aggrieved because both alleged injuries are based upon Orosco's repetitive keyboarding and, if it is not allowed to pursue its suit for judicial review against Orosco on his right-arm injury, then it may be precluded from presenting a future defense to the second claim on his left-arm injury.

"A party that has exhausted its administrative remedies under this subtitle *and that is aggrieved* by a final decision of the appeals panel may seek judicial review under this subchapter and Subchapter G, if applicable." TEX. LAB.CODE ANN. § 410.251 (Vernon 1996) (emphasis added). The Worker's Compensation Code does not define when a party is "aggrieved." However, an aggrieved party is commonly defined **\*133** as one who has suffered a loss or injury. *See* BLACK'S LAW DICTIONARY 60 (5th ed.1979); *see also City of Houston v. Public Util. Comm'n,* 618 S.W.2d 428, 431 (Tex.Civ.App.-Austin 1981, writ ref'd n.r.e.) (defining the term "aggrieved" as a "substantial grievance, a denial of some personal or property right or the imposition of a burden or obligation on a party."); *Southern Nat'l Bank of Houston v. City of Austin,* 582 S.W.2d 229, 235 (Tex.Civ.App.-Tyler 1979, writ ref'd n.r.e.) (an aggrieved person is one whose interest in the subject-matter of a judgment has been injuriously affected by the court's action); *Persky v. Greever,* 202 S.W.2d 303, 306 (Tex.Civ.App.-Fort Worth 1947, writ ref'd n.r.e.) (holding that to be aggrieved one must have a substantial grievance as to the imposition of a legal injustice, obligation, or burden, or denial of some equitable or legal right).

[2] [3] We conclude that a party is aggrieved by a final decision of the appeals panel if the injury or loss resulting from the final decision is actual and immediate; a possible future injury or loss as a consequence of the panel decision is not sufficient to show an aggrievement.[2] Here, the TWCC awarded appellant the ultimate relief it requested, that it be relieved of liability for

Orosco's claim. Appellant's argument that a finding by the TWCC of a right-arm injury may result in a later finding of a left-arm injury raises only the possibility of a future loss, and not an actual or immediate loss.[3] Therefore, appellant is not aggrieved by the TWCC decision and appellant does not have standing to seek judicial review of that **\*134** decision. Accordingly, the trial court did not err in granting Orosco's motion to dismiss.

[2]    Cf. *Patterson v. Planned Parenthood of Houston & Southeast Tex., Inc.,* 971 S.W.2d 439, 442 (Tex.1998) (standing emphasizes need for a concrete injury for a justiciable claim to be presented); *Benker v. Texas Dept. of Ins.,* 996 S.W.2d 328, 330 (Tex.App.-Austin 1999, no pet.) (to establish standing, one must show a justiciable interest by alleging an actual or imminent threat of injury peculiar to one's circumstances and not suffered by the public generally).

[3]    We conclude appellant has not established its issue preclusion argument for two reasons. First, on appeal, appellant asserts the "administrative decision establishing that Orosco's work activity causes repetitive traumatic injury affects [appellant's] right to deny the causal relationship in a subsequent claim by Orosco where he contends another injury is work related due to repetitive trauma." The record before this court does not contain a copy of the contested case hearing officer's decision. Second, the record contains a copy of the TWCC's decision, in which the appeals panel states as follows:

At the [contested case hearing] there was considerable discussion whether CTS [carpal tunnel syndrome] was an ordinary disease of life or an occupational disease. [Citation omitted.] The hearing officer, in his discussion regarding CTS, and citing an Appeals Panel decision, comments that CTS "if not an ordinary disease of life, it must be work related." We suggest that the question of whether CTS is compensable is not an absolute "always or never work related" but rather is fact specific depending on the circumstances of the case, preexisting risk factors, and the amount and type of work done, etc.

Regarding the injury determination, the hearing officer discussed the medical evidence and commented on how he reached his conclusion. On appeal, [appellant] contends the hearing officer "placed too much emphasis on the nerve conduction studies" and did not consider other medical records. We have long cited Section 410.165(a) that makes the hearing officer the sole judge of the weight and credibility of the evidence and that is equally true of medical evidence. [Citation omitted.] The hearing officer's determinations on this issue are supported by the evidence.

Because a determination of whether Orosco's alleged left-arm injury is compensable is "fact specific," appellant is not precluded from controverting any evidence presented by Orosco regarding "the circumstances of the case, preexisting risk factors, and the amount and type of work done, etc."

## ATTORNEY'S FEES

[4]    Appellant asserts Orosco is not entitled to attorney's fees for two reasons. First, according to appellant, Orosco did not prevail on a judicial issue brought by appellant; therefore, Orosco is not entitled to fees under Labor Code section 408.221, which provides as follows:

An insurance carrier that seeks judicial review under Subchapter G, Chapter 410, of a final decision of a commission appeals panel regarding compensability or eligibility for, or the amount of, income or death benefits is liable for reasonable and necessary attorney's fees as provided by Subsection (d) incurred by the claimant as a result of the insurance carrier's appeal if *the claimant prevails* on an issue on which judicial review is sought by the insurance carrier in accordance with the limitation of issues contained in Section 410.302. If the carrier appeals multiple issues and *the claimant prevails* on some, but not all, of the issues appealed, the court shall apportion and award fees to the claimant's attorney only for the issues on which the claimant prevails.....

TEX. LAB.CODE ANN. § 408.221(c) (Vernon Supp.2005) (emphasis added).

[5]    The Labor Code does not define "prevailing party." However, cases construing the same phrase under Civil Practice and Remedies Code chapter 38 and under Texas Rule of Civil Procedure 131 have consistently applied the same definition and analysis to the phrase. A prevailing party is one who is vindicated by the trial court's judgment. *Flagship Hotel, Ltd. v. City of Galveston,* 117 S.W.3d 552, 564–65 (Tex.App.-Texarkana 2003, pet. denied) (Chapter 38); *Scholl v. Home Owners Warranty Corp.,* 810 S.W.2d 464, 468–69 (Tex.App.-San Antonio 1991, no writ) (Rule 131); *see also Weng Enter., Inc. v. Embassy World*

*Travel, Inc.,* 837 S.W.2d 217, 222–23 (Tex.App.-Houston [1st Dist.] 1992, no writ) (term "prevailing party" refers to a party who successfully prosecutes an action or successfully defends against an action on the main issue). Here, Orosco sought and obtained dismissal of appellant's claim against him. Therefore, he "prevailed."

 **[6]**     Second, appellant argues that, even if Orosco prevailed, he is still not entitled to attorney's fees because the order of dismissal is void. Appellant contends the order is void because Orosco did not comply with the following sections of the Labor Code:

> (a) The party who initiated a proceeding under this subchapter or Subchapter G must file any proposed judgment or settlement made by the parties to the proceeding, including a proposed default judgment, with the executive director of the commission not later than the 30th day before the date on which the court is scheduled to enter the judgment or approve the settlement. The proposed judgment or settlement must be mailed to the executive director by certified mail, return receipt requested.

**...**

> (f) A judgment entered or settlement approved without complying with the requirements of this section is void.
> TEX. LAB.CODE ANN. § 410.258(a), (f).

 **[7]**     **[8]**     "We presume the regularity of a judgment absent controverting evidence." *Casillas v. State Office of Risk Management,* 146 S.W.3d 735, 738 (Tex.App.-El Paso 2004, no pet.). Here, neither the order dismissing appellant's claim, nor the order awarding Orosco his attorney's fees  **\*135**  recites whether the parties complied with section 410.258(a). However, although the plain language of section 410.258(f) prohibits the trial court from rendering a judgment that does not comply with section 410.258, it does not require the trial court to recite the requirements of the labor code within the judgment. *Id.* at 739; *Continental Cas. Co. v. Davilla,* 139 S.W.3d 374, 381 (Tex.App.-Fort Worth 2004, pet. denied). Both the judgment and the record as a whole are silent on whether the parties complied with section 410.258(a). Therefore, we cannot say this judgment is void. *Casillas,* 146 S.W.3d at 739 (holding same).

**JURISDICTION OVER COUNTERCLAIM**

 **[9]**     Appellant asserts the trial court erred in denying its motion to dismiss Orosco's counterclaim. On our own motion, this court considered whether it has jurisdiction over appellant's appeal of the order denying appellant's motion to dismiss. We conclude we do not.

On September 1, 2004, the trial court granted Orosco's motion to dismiss appellant's claim. On September 10, 2004, the trial court awarded attorney's fees to Orosco. On October 1, 2004, appellant filed its notice of appeal from the September orders. On November 2, 2004, the trial court denied appellant's motion to dismiss Orosco's counterclaim. On November 15, 2004, the trial court severed Orosco's counterclaim into a separate cause.

 **[10]**     **[11]**     A judgment must be final before it can be appealed. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 192 (Tex.2001). A judgment issued without a conventional trial is final for purposes of appeal if and only if it actually disposes of all claims and parties then before it. *Id.* at 192–93. Otherwise, the judgment is interlocutory. *Id.* Here, the trial court's severance order rendered its September orders final and appealable because those orders finally and fully disposed of appellant's claim against Orosco and Orosco's claim for attorney's fees. *Cf. Brown v. Todd,* 53 S.W.3d 297, 300 (Tex.2001) (noting that "[a]fter the trial court dismissed Hotze's claim for lack of standing, he could have sought a severance so that the dismissal against him would have been an appealable final judgment."). However, the severance order did not render the November 2nd order final and appealable because that order did not "dispose" of the counterclaim. Because the counterclaim remains pending, the November 2nd order remains interlocutory; therefore, this court lacks jurisdiction over appellant's appeal from that order.

## CONCLUSION

Appellant is not aggrieved by the appeals panel decision and, therefore, does not have standing to seek judicial review of that decision. Accordingly, we affirm the trial court's order granting Orosco's motion to dismiss appellant's claim. Because Orosco prevailed on his defense against appellant's claim, we affirm the trial court's order awarding Orosco his attorney's fees. The order denying appellant's motion to dismiss Orosco's counterclaim is not final and appealable; therefore, we dismiss appellant's appeal from that order for lack of jurisdiction.

**All Citations**

170 S.W.3d 129

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Texas Dept. of Ins., Workers' Compensation Div. v. De Los Santos,](#) Tex.App.-San Antonio, August 27, 2014

412 S.W.3d 492
Supreme Court of Texas.

LIBERTY MUTUAL INSURANCE COMPANY, Petitioner,

v.

Ricky ADCOCK, Respondent.

[Texas Department of Insurance](#), Division of Workers' Compensation, Respondent.

No. 11–0934. | Argued Dec. 6, 2012. | Delivered Aug. 30, 2013. | Rehearing Denied Nov. 22, 2013.

**Synopsis**

**Background:** Workers' compensation claimant who had previously been awarded lifetime income benefits for loss of use of right foot and right hand at wrist petitioned for judicial review of Division of Workers' Compensation (DWC) that it had jurisdiction to reopen award for contested case. DWC intervened. The 67th District Court, Tarrant County, [Donald J. Cosby](#), J., entered summary judgment in claimant's favor. DWC and workers' compensation carrier appealed. The Fort Worth Court of Appeals, [353 S.W.3d 246,](#) affirmed. Petition for review was granted.

**[Holding:]** The Supreme Court, [Guzman](#), J., held that award of lifetime income benefits for total and permanent loss of use of body part, to be "paid until the death of the employee," was not subject to reopening.

Affirmed.

[Green](#), J., filed dissenting opinion in which [Jefferson](#), C.J., and [Hecht](#) and [Devine](#), JJ., joined.

West Headnotes (8)

**[1]** **Statutes**  Language and intent, will, purpose, or policy

A fundamental constraint on the courts' role in statutory interpretation is that the Legislature enacts the laws of the state and the courts must find their intent in that language and not elsewhere.

[Cases that cite this headnote](#)

**[2]** **Workers' Compensation**  Statutory foundation and relation to common law

**Workers' Compensation**  Exclusiveness of Remedies Afforded by Acts

The Workers' Compensation Act is a comprehensive statutory scheme, and therefore precludes the application of claims and procedures not contained within the Act. [V.T.C.A., Labor Code § 401.001 et seq.](#)

[6 Cases that cite this headnote](#)

**[3]** **Workers' Compensation**  Period of compensation

Provision of Workers' Compensation Act that lifetime income benefits "are paid until the death of the employee for" total and permanent loss of use of body part did not permit reopening of award to claimant for total loss of use of right foot and right hand at wrist for new contested case based on belief of employer's workers' compensation carrier that claimant may have regained use of extremities. V.T.C.A., Labor Code § 408.161(a)(4), (b).

3 Cases that cite this headnote

**[4]** **Constitutional Law** 🔑 Judicial rewriting or revision

**Statutes** 🔑 Construction as written

Enforcing the law as written is a court's safest refuge in matters of statutory construction, and the court should always refrain from rewriting text that lawmakers chose.

1 Cases that cite this headnote

**[5]** **Appeal and Error** 🔑 Cases Triable in Appellate Court

**Statutes** 🔑 Intent

An appellate court reviews issues of statutory construction de novo, and the court's primary objective in construing a statute is to ascertain and give effect to the Legislature's intent.

2 Cases that cite this headnote

**[6]** **Statutes** 🔑 Plain Language; Plain, Ordinary, or Common Meaning

**Statutes** 🔑 Context

The plain meaning of the statutory text, given the context of the statute as a whole, provides the best expression of legislative intent.

1 Cases that cite this headnote

**[7]** **Administrative Law and Procedure** 🔑 Statutory basis and limitation

**Administrative Law and Procedure** 🔑 Implied powers

Although the Legislature, when it expressly confers a power on an administrative agency, impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties, the agency has no authority to exercise what is effectively a new power, or a power contradictory to the statute, on the theory such a the power is expedient for administrative purposes.

1 Cases that cite this headnote

**[8]** **Statutes** 🔑 Absent terms; silence; omissions

When the Legislature expresses its intent regarding a subject in one setting, but remains silent on that subject in another, the court will generally abide by the rule that such silence is intentional.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*493** David L. Plaut, Jeffrey C. Glass, Robert Fred Josey, Hanna & Plaut, LLP, Austin, TX, for Petitioner Liberty Mut. Ins. Co.

Joan M. Durkin, Durkin & Graham, P.C., Bedford, TX, for Respondent Rick Adcock.

Bryan Dwayne Snoddy, Assistant Attorney General, Daniel T. Hodge, David A. Talbot Jr., Consumer Protection Office of the Attorney General, David C. Mattax, Director of Defense Litigation Office of the Attorney General, Greg W. Abbott, Attorney General of Texas, Ted Anthony Ross, Assistant Attorney General Administrative Law Division, Austin, TX, for Amicus Curiae Texas Department of Insurance, Division of Workers' Compensation.

**Opinion**

Justice GUZMAN delivered the opinion of the Court, in which Justice JOHNSON, Justice WILLETT, Justice LEHRMANN, Justice BOYD, and Justice DEVINE joined.

 **[1]**    **[2]**    A fundamental constraint on the courts' role in statutory interpretation is that the Legislature enacts the laws of the state and the courts must find their intent in that language and not elsewhere. Under the guise of agency deference, an agency asks us to judicially engraft into the Texas Workers' Compensation Act a statutory procedure to re-open determinations of eligibility for permanent lifetime income benefits—a procedure the Legislature deliberately removed in 1989. The Legislature's choice is clear, and it is not our province to override that determination. This is especially true because, as we held in *Texas Mutual Insurance Co. v. Ruttiger,* the Act is a comprehensive statutory scheme, and therefore precludes the application of claims and procedures not contained within the Act. [1] In light of the Act's comprehensive nature, we decline to judicially engraft into it a procedure the Legislature deliberately removed. Accordingly, we affirm the judgment of the court of appeals.

[1]      381 S.W.3d 430, 451 (Tex.2012).

## I. Background

In 1991, Ricky Adcock suffered a compensable injury to his right ankle. Though he underwent reconstructive surgery, he developed reflex sympathetic dystrophy in the injured ankle. In 1997, the appeals panel determined that Adcock was entitled to Lifetime Income Benefits (LIBs) because "the great weight and preponderance of the evidence is that the claimant has the total and permanent loss of use of his right hand *at* his wrist" in addition to the stipulated loss of use of Adcock's right foot. Liberty Mutual Insurance Company (Liberty), the workers' compensation carrier for Adcock's employer, did not seek judicial review of that decision.

Over a decade later, Liberty sought a new contested case hearing on Adcock's **\*494** continuing eligibility for LIBs based on Liberty's belief that Adcock may have regained the use of his extremities. The hearing officer determined that Liberty could re-open the previous LIB determination but ultimately concluded Adcock remained entitled to LIBs based on his loss of use of his right hand and both feet. The appeals panel affirmed.

Both parties sought judicial review. Adcock moved for summary judgment, contending the hearing officer lacked jurisdiction to re-open the previous LIB determination. The Texas Department of Insurance, Division of Workers' Compensation (the Division) subsequently intervened, asserting that it has jurisdiction to re-open LIB determinations. [2] The trial court granted Adcock's motion for summary judgment. The court of appeals affirmed, noting the Legislature had specifically removed the procedure to re-open LIB determinations in 1989 and the current Act only provides for ongoing review of temporary income benefits. 353 S.W.3d 246, 249–52.

2     In 2005, the Legislature abolished the Texas Workers' Compensation Commission and transferred its functions to the Texas Department of Insurance, Workers' Compensation Division. *See* Act of May 29, 2005, 70th Leg., R.S., ch. 265, § 8.001, 2005 Tex. Gen. Laws 469, 607–08.

## II. Discussion

 [3]    [4]    [5]    [6]    "Enforcing the law as written is a court's safest refuge in matters of statutory construction, and we should always refrain from rewriting text that lawmakers chose...." *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 443 (Tex.2009). We review issues of statutory construction *de novo,* and our primary objective in construing a statute is to ascertain and give effect to the Legislature's intent. *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). The plain meaning of the text, given the context of the statute as a whole, provides the best expression of legislative intent. *Id.; Ruttiger,* 381 S.W.3d at 454.

 [7]    Although we have held that "when the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties," an agency has no authority to "exercise what is effectively a new power, or a power contradictory to the statute, on the theory such a the power is expedient for administrative purposes." *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 316 (Tex.2001).

The narrow question before us is whether the current version of the Act contains a procedure to re-open LIB determinations. Liberty and the Division assert that if an employee medically improves and no longer meets the statutory requirements for eligibility for LIBs, the Division has "necessarily implicit" authority to re-open the LIB determination. Adcock counters that the plain language of the statute indicates the LIB determination is permanent and offers no procedure to reopen it. We agree with Adcock.

### A. Plain Language

Section 408.161(a) of the Texas Workers' Compensation Act (Act) states that "[l]ifetime income benefits are paid until the death of the employee for" loss of one foot at or above the ankle and one hand at or above the wrist. TEX. LAB.CODE § 408.161(a)(4). Moreover, "the total and permanent loss of use of a body part is the loss of that body part." *Id.* § 408.161(b). And importantly, the Act does not provide any procedure to re-open the LIB determination. *Id.* § 408.161. On the contrary, **\*495** the Legislature's express mandate that LIBs "are paid until the death of the employee" manifests its intent to make LIB determinations permanent.[3] *Id.* § 408.161(a).

3     The dissent concedes the statute no longer contains a procedure to re-open the LIB determination, indicating that "the Legislature cannot and need not envision every circumstance that may arise in the workers' compensation context" and that it "happened to leave a particular circumstance unaddressed." 412 S.W.3d 492, 502 (Green, J., dissenting).

Liberty argues that the term "lifetime" in LIBs "pertains to the duration of a worker's eligibility for benefits; it does not determine entitlement." But the statute does not state that LIBs "may be paid" until the employee's death; rather, it mandates LIBs "are paid" until the employee's death. *Id.* Thus, when, as here, the Division has determined that an employee is eligible for LIBs, the plain language of the statute mandates that such benefits continue until the employee's death.

### B. The Legislature's Comprehensive Benefits Scheme

We recently determined that "[t]he Act effectively eliminates the need for a judicially imposed cause of action outside the administrative processes and other remedies in the Act." *Ruttiger,* 381 S.W.3d at 451. "It is apparent that the Act prescribes detailed, [Division]-supervised, time-compressed processes for carriers to handle claims and for dispute resolution." *Id.* at 443. We observed: "[k]ey parts of the [workers' compensation] system are the amount and types of benefits, the delivery system for

benefits, *the dispute resolution processes for inevitable disputes that arise among participants,* the penalties imposed for failing to comply with legislatively mandated rules, and the procedures for imposing such penalties." *Id.* at 450 (emphasis added). Further, we questioned "to what extent the judiciary will respect the Legislature's function of addressing the concerns and adjusting the rights of the parties in the workers' compensation system as part of its policy-making function." *Id.* In answering that question, we ultimately held that "[t]he Act effectively eliminates the need for a judicially imposed cause of action outside the administrative processes and other remedies in the Act." *Id.* at 451. In sum, the Legislature devised a comprehensive workers' compensation system, with specific benefits and procedures based on the public policy of the State of Texas. We concluded in *Ruttiger* that the Court should not alter the Act's comprehensive scheme, and we reaffirm that principle today.

The Act's comprehensive framework requires that we respect the Legislature's choice to not include a procedure to re-open the LIB determination. Before its comprehensive reform of the workers' compensation system in 1989, the Legislature specifically incorporated such a procedure, providing that:

> [u]pon its own motion or upon the application of any person interested showing a change of condition, mistake, or fraud, *the Board at any time within the compensation period, may review any award or order, ending, diminishing or increasing compensation previously awarded,* within the maximum and minimum provided in this Law, or change or revoke its previous order denying compensation, sending immediately to the parties a copy of its subsequent order or award.

Act of May 20, 1931, 42d Leg., R.S., ch. 155, § 1, 1931 Tex. Gen. Laws 260. But the Legislature repealed this provision as part of its reform of the workers' compensation system in 1989. *See* Act effective **\*496** Jan. 1, 1991, 71st Leg., 2d C.S., ch. 1, § 16.01(7), 1989 Tex. Gen. Laws 114; *see also Ruttiger,* 381 S.W.3d at 439 ("The key, and most controversial, reforms were in the areas of employee benefits and dispute resolution."). Because the Legislature specifically chose to remove the authority to re-open the permanent LIB determination as part of its reforms, we must credit that choice. *See Entergy,* 282 S.W.3d at 443 ("It is, of course, axiomatic that the deletion of language better indicates the Legislature's intent to remove its effect, rather than to preserve it.").

As part of its revised comprehensive scheme of the workers' compensation system, the Legislature established a dichotomy containing two distinct classes of income benefits: temporary benefits and permanent benefits. Temporary benefits are only paid as long as certain conditions (*e.g.,* medical conditions) continue to exist, whereas permanent benefits continue until the occurrence of a statutory, terminating event (*e.g.,* death).

With respect to temporary benefits, the Act lays out specific procedures to re-open benefits determinations. For example, supplemental income benefits (SIBs), a form of temporary benefits, are based upon an employee's demonstration of an active effort to obtain employment. TEX. LAB.CODE § 408.1415(a). The Act expressly allows carriers to "request a benefit review conference to contest an employee's entitlement to supplemental income benefits or the amount of supplemental income benefits." *Id.* § 408.147(a). The Act also specifies the procedures for evaluating whether SIBs should end, allowing a medical evaluation once every twelve months, *id.* § 408.149(a), and permitting the Division to designate a doctor for a medical evaluation to determine if the employee's condition has sufficiently improved to allow him to return to work, *id.* § 408.151(b).

Similarly, temporary income benefits (TIBs)—another form of temporary benefits—are contingent on the employee's recovery. "An employee is entitled to temporary income benefits if the employee has a disability and has not attained maximum medical improvement." *Id.* § 408.101. " 'Disability' means the inability because of a compensable injury to obtain and retain employment at wages equivalent to the preinjury wage." *Id.* § 401.011(16). "If the report of a designated doctor indicates that an employee has reached maximum medical improvement or is otherwise able to return to work immediately, the insurance carrier may suspend or reduce the payment of temporary income benefits immediately." *Id.* § 408.0041(k). Because TIBs and SIBs are paid until the employee reaches statutorily sufficient medical improvement, eligibility determinations require periodic evaluation.

While temporary benefits require continuous monitoring to determine whether the employee has achieved the statutory level of improvement, permanent benefits require no such monitoring. This is because such benefits are permanent determinations,

only terminating on the occurrence of a specific statutorily mandated life event. For example, death income benefits (DIBs) are paid to eligible beneficiaries when an injury to an employee results in death. *Id.* § 408.181(a). The statute sets out eligibility requirements for children, spouses, and parents. *Id.* § 408.182. Once eligible, benefits continue until the occurrence of some specific event, whether it be death, remarriage, or attaining a certain age. *Id.* § 408.183. There is no provision that allows a carrier to reassess DIBs after eligibility is established. Further, a carrier is permitted to pay DIBs through an annuity, thus removing the act of paying **\*497** the benefits from the carrier's purview. *Id.* § 408.181(d). According to Division rules, such an annuity is not assignable by the beneficiary. 28 TEX. ADMIN. CODE § 132.16(d)(6). By authorizing use of a method providing a non-assignable right to payment, the Legislature indicated that the right to DIBs exists until the statutory contingency is met —with no procedure for further review.

Similarly, LIBs—like DIBs—are permanent income benefits. LIBs are paid upon the establishment of eligibility—here by the loss of use of two limbs—until the occurrence of a particular event: the death of the employee. TEX. LAB.CODE §§ 408.161(a) (4), (b). Unlike temporary benefits, the statute provides no express statutory procedure to re-open an eligibility determination for LIBs or to assess the medical improvement of the employee. In addition, LIBs, like DIBs may be paid through an annuity. *Id.* § 408.161(d). Such an annuity is likewise not assignable by the beneficiary. 28 TEX. ADMIN. CODE § 131.4(d)(5). As with DIBs, the Legislature has authorized the use of a payment method that provides a non-assignable right to payment for the life of the obligation. Construing the Act in accordance with this dichotomy, the Legislature has established LIBs as a permanent right to benefits with no procedure to re-open that determination.

 **[8]**　When the Legislature expresses its intent regarding a subject in one setting, but, as here, remains silent on that subject in another, we generally abide by the rule that such silence is intentional.[4] Thus, the Legislature's express provision of procedures for re-evaluating temporary benefit eligibility and the absence of such a procedure for permanent benefits indicates a deliberate choice, and we must respect the Legislature's prerogative to establish the rights and procedures in the workers' compensation system. Therefore, we decline Liberty's invitation to judicially engraft a procedure inconsistent with the dichotomy the Legislature constructed. *Ruttiger,* 381 S.W.3d at 450; *Entergy,* 282 S.W.3d at 443.[5]

[4]　　　*See In re Nalle Plastics Family Ltd. P'ship,* 406 S.W.3d 168, 175 (Tex.2013) (holding that the Legislature's use of the word "costs" did not include attorney's fees as the definition of "litigation costs" elsewhere included both costs and attorney's fees); *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 859 (Tex.2002) ("[T]he Legislature knows how to clearly and unambiguously waive sovereign immunity from suit.... Here, neither section 5.351 nor 5.352 clearly and unambiguously waives the [Texas Natural Resource Conservation Commission]'s sovereign immunity from suit for breach-of-contract claims."); *Bally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 358 (Tex.2001) ("The Legislature could have added similar language to Section 51.014(a)(3) and permitted appeals from orders refusing to decertify a class, but did not."); *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 885 (Tex.2000) ("Section 26.177(d) shows the Legislature knows how to provide a right of appeal to persons affected by a water quality plan or government action relating to a plan. Yet, the Legislature chose not to provide such a right to persons affected by section 26.179 plans or [Texas Natural Resource Conservation Commission] approval of plans.").

[5]　　　Adcock also asserts that the doctrines of *res judicata* and collateral estoppel act to bar Liberty from re-litigating a previously determined issue. But because the statute grants no authority to re-open LIB determinations, these doctrines do not affect our analysis.

Liberty responds that if—as we hold today—the LIB determination is permanent, this will harm injured employees because they will not be able to obtain LIBs if their initial request is denied but their medical condition subsequently deteriorates. But the Legislature's scheme for payment of LIBs belies this argument. Specifically, section 408.081 states that **\*498** "[a]n employee is entitled to timely and accurate income benefits as provided by this chapter," and further requires that income benefits be paid weekly without action by the commissioner. TEX. LAB.CODE §§ 408.081(a), (b). Section 408.161 indicates that LIBs are to be paid when the permanent loss of use of certain body parts occurs. *Id.* § 408.161. Thus, when viewed in context, the statute requires that carriers begin paying benefits to employees once eligibility is established. *See Ruttiger,* 381 S.W.3d at 454 ("legislative intent emanates from the Act as a whole"). There is no restriction on *when* such eligibility may be established. Rather, the statute contemplates that whenever a compensable injury leads to a qualifying permanent loss of use, eligibility

occurs and the employee becomes entitled to permanent LIBs. This is in direct contrast to the termination of LIBs, which specifically occurs at the employee's death. TEX. LAB.CODE § 408.161(a).

### C. Response to the Dissent

The dissent argues that: (1) despite the statute's failure to include a procedure to re-open the LIB determination, the Act's general definition of "impairment" implies such a procedure; (2) the Act also necessarily implies the authority of the Division to re-open the LIB determination; (3) our remand in *American Zurich Insurance Co. v. Samudio,* 370 S.W.3d 363 (Tex.2012), requires us to allow the Division to re-open LIB determinations; and (4) the Legislature's framework credits the Division as "being able to predict the future and knowing absolutely which claimants will always be entitled to" LIBs. These assertions, however, are unavailing.

To support its first argument, the dissent relies on the Act's general definition of "impairment" as "reasonably presumed to be permanent" to conclude that the finding of permanency is merely a prediction. TEX. LAB.CODE § 401.011(23). The dissent searches for support in our observation in *Insurance Co. of State of Pennsylvania v. Muro* that all injuries under section 408.161 result in impairments. 347 S.W.3d 268, 275 (Tex.2011). But the dissent fails to consider that in *Muro,* we heavily relied on the fact that the Legislature's deletion of certain language in the Act indicated its intent to change the former law. *Id.* ("Because the Legislature chose both to retain the enumerated injuries and to repeal the 'other loss' clause, it clearly did not intend to continue the broader application of lifetime income benefits formerly recognized by some courts of appeals under the old-law's 'other loss' clause."). This generic definition of impairment does not re-inject into the Act an entire procedure for re-opening LIB determinations that the Legislature previously removed.

Additionally, the dissent contends that principles of agency deference necessarily imply the authority for the Division to re-open the LIB determination. *See R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 624 (Tex.2011) ("We have long held that an agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language."). But such deference is in direct conflict with the "well-established principle that" administrative agencies "may exercise only those powers that the Legislature confers upon [them] in *clear and express language,* and cannot erect and exercise what really amounts to a new or additional power for the purpose of administrative expediency." *See Tex. Natural Res. Conservation Comm'n v. Lakeshore Util. Co.,* 164 S.W.3d 368, 377 (Tex.2005) (emphasis added). Here, the Legislature deliberately **\*499** removed the procedure for re-opening the LIB determination, and that deliberate silence neither creates ambiguity nor confers authority to an agency. *See id.; Entergy,* 282 S.W.3d at 443.

Further, the dissent's reliance on *Samudio* is misplaced. *Samudio* involved workers' compensation impairment income benefits. 370 S.W.3d at 365. The Act mandates that the Division assign an impairment rating determined in accordance with certain criteria. *Id.* at 368. In *Samudio,* although the carrier and employee agreed the employee was impaired, they disagreed on the extent of the impairment. *Id.* at 366. Because the Act mandated the Division assign a valid impairment rating but no valid impairment rating was before the Division, we remanded the claim to the Division to consider a valid impairment rating. *Id.* at 368. Thus, *Samudio* stands for the proposition that the Division must comply with the Act's mandates (which was to assign a valid impairment rating). In this case, the Act mandates that the carrier make payments until the employee's death because the Division determined Adcock is eligible for permanent LIBs. *See* TEX. LAB.CODE § 408.161. Re-opening that determination would not enforce the mandate—it would violate it. If the Legislature determines that the employers and employees of Texas are best served by allowing for re-opening LIB determinations, it may craft a review procedure in the statute—as it has done with temporary benefits and previously did with LIBs. This Court, however, must avoid such policy determinations.

Lastly, the dissent asserts that our construction of the comprehensive scheme requires the Division to predict with certainty which claimants will always be entitled to LIB s, a requirement that is unworkable because the future is unknowable. Yet common law and statutory claims, and their procedures for recovering future damages, have long been a cornerstone of our

court system. The question is not whether future damages are absolutely knowable but whether the plaintiff proved such damages within a reasonable degree of certainty. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 247 (Tex.2008). It is not grounds to re-open a judgment simply because a plaintiff incurred fewer future medical expenses than the judgment awarded. Here, the question is whether the Division could determine that an employee lost the use of two limbs. TEX. LAB.CODE §§ 408.161(a)(4), (b). The Division made that determination over a decade ago, and the record indicates no difficulty in doing so. The requirement that an injury be permanent is a familiar concept to the courts and the Legislature and does not yield absurd results.

### III. Conclusion

We defer to the Legislature to craft statutes and we interpret them as written. The Legislature previously included a procedure to re-open LIB determinations—which it removed in 1989. Currently, the Legislature only allows temporary benefit determinations (not permanent benefit determinations like LIBs) to be re-opened. We will not judicially engraft into this comprehensive statute a procedure the Legislature deliberately removed. Accordingly, the Division had no jurisdiction to re-open Adcock's LIB determination, and we therefore affirm the judgment of the court of appeals.

Justice GREEN filed a dissenting opinion, in which Chief Justice JEFFERSON and Justice HECHT joined.

Justice GREEN, joined by Chief Justice JEFFERSON, Justice HECHT, and Justice DEVINE, dissenting.

The Court today holds that, once awarded, lifetime income benefits (LIBs) are **\*500** irrevocable and must be paid for the rest of a claimant's life, even when it can be established at a later date that the claimant's injury is no longer total and permanent. While the Court's rationale makes sense for anatomical losses, it defies reason for functional losses. Advances in medicine and science offer previously unforeseen therapies and treatments that enable some persons who once seemed permanently injured to regain functionality. The Court says none of this matters, that the Legislature intended to foreclose any reopening of a finding of total and permanent loss of use, even when evidence would show that the claimant has recovered. Because I read the Labor Code's scheme governing income benefits as giving the Texas Department of Insurance, Division of Workers' Compensation (the Division) jurisdiction to ensure that only claimants who meet the statutory eligibility criteria receive LIBs, I respectfully dissent.

### I. Background

In March 1991, Ricky Adcock sustained on-the-job injuries to his right foot and his right hand. Six years later, he was awarded LIBs. Liberty Mutual, the worker's compensation insurance carrier for Adcock's employer, did not appeal that decision to the trial court and began issuing payments pursuant to the order. [1] More than ten years later, Liberty Mutual sought a new hearing, asserting that it had received video evidence of Adcock walking and handling objects, indicating that his condition had improved enough that he no longer had total and permanent functional loss of his ankle and hand, and he was therefore not entitled to LIBs. At a contested case hearing, the parties agreed on the following questions to be certified to the hearing officer:

[1] If a party disputes the appeals panel decision, it "may seek judicial review by filing suit not later than the 45th day after the date on which the [D]ivision mailed the party the decision of the appeals panel." TEX. LAB.CODE § 410.252(a). "A decision of the appeals panel regarding benefits is final in the absence of a timely appeal for judicial review." *Id.* § 410.205(a).

(1) Is [Adcock] entitled to lifetime income benefits (LIBs) as of this date based on total and permanent loss of use of his hands and legs?

(2) As a result of the decision and order of Appeals Panel in Appeal No. 970981, does the Division have jurisdiction to determine continuing entitlement to lifetime income benefits (LIBs)?

The video evidence presented at the hearing clearly demonstrated that, at one time, Adcock could walk and handle objects. The hearing officer issued its decision and order, finding that it had jurisdiction to hear the case but that, despite the video evidence, Adcock remained entitled to LIBs. The appeals panel affirmed. Adcock appealed to the district court, arguing that the Division lacked jurisdiction to hear the case under section 408.161 of the Labor Code, and asserting res judicata and collateral estoppel.

## II. The Division's Jurisdiction

The Court holds that jurisdiction to determine continuing eligibility for LIBs cannot be found in the plain language of the Act, and therefore our inquiry can go no further. I disagree. When construing a statute, "[w]e rely on the plain meaning of the text as expressing legislative intent unless a different meaning is ... apparent from the context." *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 635 (Tex.2010). Additionally, we are not constrained to the text of the statute if "the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). **\*501** I believe that disallowing the Division jurisdiction in these cases will lead to absurd and nonsensical results, which the Legislature did not intend.

### A. The Statute Indicates Jurisdiction to Consider Continuing Eligibility to Receive LIBs

Section 408.161 of the Texas Labor Code provides that "[l]ifetime income benefits are paid until the death of the employee" when an impairment qualifies under the statute. TEX. LAB.CODE § 408.161(a). Additionally, "the total and permanent loss of use of a body part is the loss of that body part" for purposes of entitlement to LIBs. *Id.* § 408.161(b). The Division is charged with reviewing an employee's condition and awarding LIBs when the claimant is entitled to them. *See id.* § 402.00114 (providing that "the division shall: (1) regulate and administer the business of workers' compensation in this state; and (2) ensure that this title and other laws regarding workers' compensation are executed"); *see also id.* § 408.161 (establishing the requirements for entitlement to LIBs). As the Court explains, administrative agencies are creatures of the Legislature and, therefore, may exercise only the powers the Legislature confers upon them in clear and express language. 412 S.W.3d at 493; *Tex. Natural Res. Conservation Comm'n v. Lakeshore Util. Co.,* 164 S.W.3d 368, 377–78 (Tex.2005). As the Court also recognizes, however, "[w]hen the Legislature expressly confers power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties." *Lakeshore Util. Co.,* 164 S.W.3d at 378. "In deciding whether an agency has acted within its powers, a court should also determine whether an agency's power is *implied in the statute.*" *Id.* at 377–78 (emphasis added). We recently held in *American Zurich Insurance Co. v. Samudio,* 370 S.W.3d 363 (Tex.2012), that the trial court had the power to remand an impairment rating decision to the Division even though "the statute [was] silent as to the court's power to remand" because the "regulatory scheme as a whole illustrate[d]" that was the Legislature's intent. 370 S.W.3d at 368. Likewise, the overall income benefit scheme indicates the Legislature's intent for the Division to have jurisdiction to consider continuing eligibility for LIBs.

We determine legislative intent by reading the statute as a whole and interpreting the legislation to give effect to the entire act and not just its isolated portions. *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003). We may be "aided by the interpretive context provided by the surrounding statutory landscape." *LTTS Charter Sch., Inc. v. C2 Constr., Inc.,* 342 S.W.3d 73, 75 (Tex.2011) (internal quotation marks omitted). The Division is charged with the duty to "administer and operate the workers' compensation system." TEX. LAB. CODE § 402.001(b). And it must "provide appropriate income benefits and medical benefits in a manner that is timely and cost-effective." *Id.* § 402.021(b)(3). As the Division is charged with the efficient and cost-effective administration of benefits, it follows that the Legislature intended that the Division have the power to ensure that those who are permanently impaired receive just compensation and those whose impairments are not permanent do not receive a windfall. Without the implied power to determine continuing eligibility for LIBs, the Division could not ensure

that income benefits are administered in a cost-effective way. It is unlikely that the Legislature would require the workers' compensation system and its carriers to allocate resources in such a way as to require the **\*502** payment of lifetime benefits, often for decades, to workers who do not meet the statutory criteria.

Although we held in *Texas Mutual Insurance Co. v. Ruttiger,* 381 S.W.3d 430 (Tex.2012), that a common law cause of action for breach of the duty of good faith and fair dealing against a workers' compensation insurance carrier "operate[d] outside the administrative processes and other remedies in the Act and [was] in tension with ... the Act's goals or processes," *id.* at 450, here an action to determine continuing eligibility for LIBs is not in tension with the Act; rather, it is consistent with the Legislature's intent to give the Division the responsibility of properly administering benefits. I agree with the Court that the Legislature has enacted a comprehensive scheme for workers' compensation. 412 S.W.3d at 493. As discussed below, however, the Legislature cannot and need not envision every circumstance that may arise in the workers' compensation context. And the Court should not be required to order absurd results if the Legislature happened to leave a particular circumstance unaddressed. *See R.R. Comm'n v. Lone Star Gas Co.,* 844 S.W.2d 679, 689 (Tex.1992) (noting that requiring the Legislature to anticipate all circumstances would defeat the purpose of delegation).

As Adcock and the Court point out, other income benefits in the Act, such as supplemental income benefits and temporary income benefits, have a cap on the length of time an employee may receive benefits, while an award of LIBs does not. *See* 412 S.W.3d at 496 (citing TEX. LAB.CODE §§ 408.0041(k), .011(16), .101, .1415(a), .147(a), .149(a), .151(b)). Adcock and the Court argue this is significant and indicates the Legislature's intent that LIBs be awarded until the claimant dies, regardless of whether his condition may have improved. But the Legislature's use of "lifetime" does not mean there can be no cap; rather, it denotes the maximum possible duration of the benefit—an employee is eligible to receive up to a lifetime's worth of benefits, but he is entitled to those benefits only if he meets the statutory condition. Section 408.161 provides that LIBs "are to be paid until the death of the employee *for*" the total and permanent loss, or loss of use, of statutorily specified body parts. TEX. LAB.CODE § 408.161(a) (emphasis added). The word "for" limits the required payment of LIBs, thus conditioning the entitlement to LIBs upon a total and permanent loss of, or loss of use of, those body parts. *Id.* § 408.161(a), (b). As long as an employee is still entitled to the LIBs by virtue of his condition, the award is indefinite. So, while the Legislature did not expressly provide for a review process of a grant of LIBs, the plain language of the statute signals the Legislature's intent to allow the Division to ensure that LIBs are paid only to those entitled to them and that those entitled to them are actually receiving the benefits.

The Court argues that because the provisions governing death income benefits (DIBs)—a form of permanent benefit that is paid to a deceased employee's beneficiaries until the occurrence of a specified event—contain no procedure for ensuring continuing eligibility, LIBs must likewise be paid in perpetuity with no mechanism for ensuring continuing eligibility. *See* 412 S.W.3d at 496 (citing TEX. LAB.CODE §§ 408.181(a), .181(d), .182, .183). But the Court misses a critical difference—death *is* permanent; loss of use may be, but only time will tell. DIBs are paid until triggering events that are sure to occur—either beneficiaries will reach a certain age, or they will die, for example. *See* TEX. LAB.CODE § 408.183. LIBs for anatomical losses work the same way—they *are* permanent, **\*503** even when a claimant uses a prosthesis and is thus fully functional. LIBs for functional losses such as Adcock's are different, however. They are paid "for" the total and permanent loss of use of certain body parts—something that lacks the certainty of death and amputations. [2]

[2]     The Court also argues that because LIBs, like DIBs, can be paid through a non-assignable annuity, the Legislature must intend that there be no mechanism other than the claimant's death to end the payment of LIBs. 412 S.W.3d at 496. That the Legislature allows payment through an annuity for benefits that truly are permanent—DIBs and LIBs for anatomical losses—however, does not mean that the Legislature intends to foreclose a process to ensure that claimants receiving LIBs for functional losses are actually entitled to those benefits.

The Court holds, and I agree, that the Division has jurisdiction to later consider a claimant's eligibility for LIBs when LIBs have previously been denied. *See* 412 S.W.3d at 496. Just as the Act must be construed to impliedly allow an injured employee to subsequently establish eligibility for LIBs based upon a change of condition after LIBs were denied, the Act should also be construed to impliedly allow an insurance carrier to establish, based upon a change of condition, that eligibility no longer exists for a claimant receiving LIBs. The Legislature must have intended an effective and efficient exercise of the Division's

power to award LIBs, including the power to assess LIB entitlement, whether previously awarded or previously denied, to determine if the statutory criteria for receipt of benefits are satisfied. *See Samudio,* 370 S.W.3d at 368–69 (explaining that the overall regulatory scheme suggested that the trial court had the authority to remand to the Division despite the lack of an express provision in the statute).

I recognize that we are to construe the Act liberally in favor of employees and not supply "by implication restrictions on an employee's rights." *In re Poly–Am., L.P.,* 262 S.W.3d 337, 350 (Tex.2008) (orig. proceeding) (quoting *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000)). However, the Legislature could not have intended that "liberally construing the statute" would include permitting employees who are not entitled to LIBs to receive them. Moreover, this interpretation does not act as a "restriction" on an employee's rights because an employee does not have a right to LIBs unless his or her injury qualifies under the statute. A contrary interpretation of section 408.161 would lead to nonsensical results. *See Kimbrell,* 356 S.W.3d at 411.

The Court holds that the words "total and permanent" and "death" foreclose the Division from evaluating a claimant's continuing eligibility to receive LIBs. 412 S.W.3d at 493, 496. But the determination that an injury is permanent can be "nothing more than a prediction" that the condition will continue indefinitely. *Hartford Accident & Indem. Co. v. McCardell,* 369 S.W.2d 331, 338 (Tex.1963), *superseded by rule on other grounds as recognized in Bay Area Healthcare Grp., Ltd. v. McShane,* 239 S.W.3d 231, 235 (Tex.2007); *cf. Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 272 (Tex.2004) (defining a permanent nuisance as an activity which is presumed to continue indefinitely). We have explained that the "injuries enumerated in section 408.161 all result in impairments," *Ins. Co. of State of Pa. v. Muro,* 347 S.W.3d 268, 275 (Tex.2011), and "impairment" is defined in the Act to include an injury that "is reasonably presumed to be permanent," and therefore may change at a later time. TEX. LAB.CODE § 401.011(23) (" 'Impairment' means any anatomic or functional abnormality or loss **\*504** existing after maximum medical improvement that results from a compensable injury and is reasonably presumed to be permanent."). Although LIBs are awarded on a presumption that an impairment will continue indefinitely, with modern medicine and science we cannot preclude the possibility that a functional impairment may improve. The workers' compensation system and the individual carrier should not have to continue to pay LIBs in the rare and fortunate event that a LIB claimant's condition improves and the claimant no longer has total and permanent loss of use. I agree with Liberty Mutual and the Division that the Division must have jurisdiction to determine a claimant's continuing eligibility for LIBs when there is evidence that his or her impairments are no longer total and permanent.

### B. The Division's Interpretation of the Statute Is Entitled to Serious Consideration

If a statute is ambiguous, "[c]onstruction of [that] statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute." *Mid–Century Ins. Co. of Tex. v. Ademaj,* 243 S.W.3d 618, 623 (Tex.2007) (internal quotation marks and citation omitted); *see R.R. Comm'n. v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 624 (Tex.2011) ("We have stated this principle in differing ways, but our opinions consistently state that we should grant an administrative agency's interpretation of a statute it is charged with enforcing some deference."). In this case, both the hearing officer and the appeals panel held that the Division had jurisdiction to consider continuing eligibility to receive LIBs under section 408.161, and the Division has taken that position throughout these proceedings. The appeals panel reached a similar result in a decision the parties refer to as *Deep East Texas Self Insurance Fund,* Appeals Panel No. 020432–s, 2002 WL 971079 (Tex. Workers' Comp. Comm'n Apr. 10, 2002), in which an insurance carrier challenged the claimant's continuing entitlement to LIBs and sought to show that the claimant fraudulently obtained the award. *Id.* at \*1–2. The appeals panel held that the Division had jurisdiction to consider a claimant's continuing entitlement to LIBs, but the court of appeals in this case disagreed with the appeals panel's reasoning in *Deep East Texas,* concluding that because the insurance company was claiming fraud, it should have sought a remedy under section 415.031. 353 S.W.3d 246, 252 (Tex.App.-Fort Worth 2011, pet. granted); *see* TEX. LAB.CODE § 415.031 (allowing any person to initiate administrative violation proceedings). Unlike *Deep East Texas,* however, Liberty Mutual does not contend that Adcock obtained his LIBs by fraud; it merely challenges his continuing eligibility for LIBs. As I have discussed, it is reasonable and does not contradict the plain language of the statute to construe section 408.161 as impliedly allowing the Division to have

jurisdiction to determine eligibility for LIBs. Therefore, I see no reason that the Division's construction of the Act as conferring jurisdiction to determine Adcock's continuing eligibly for LIBs should not be afforded serious consideration.

The Court asserts that the Legislature knows how to provide for review of income benefit determinations, as it has done with temporary income benefits, and the lack of an express review provision in section 408.161 indicates the Legislature's intent to prohibit the Division from considering continuing eligibility to receive LIBs. 412 S.W.3d at 498. However, "[t]he Legislature is not required to set forth in detail all the provisions necessary to govern the agency *505 in the performance of its functions." *Lone Star Gas Co.,* 844 S.W.2d at 689 (quoting *State v. Tex. Mun. Power Agency,* 565 S.W.2d 258, 273 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ dism'd)) (internal quotation marks omitted). Liberty Mutual asserted at oral argument that typically in LIB cases the functional loss of use of an appendage worsens over time, so a determination of a claimant's continuing eligibility for LIBs is not necessary. Just because the Legislature did not expressly provide for this unusual situation does not mean that it did not intend for the Division to possess the power to carry out its duties to effectively distribute workers' compensation benefits. *Cf. Samudio,* 370 S.W.3d at 368–69 (explaining that, despite the lack of an express provision in the Workers' Compensation Act, trial courts nevertheless have the authority to remand cases to the Division as evinced by the overall statutory scheme).

As the Court points out, article 8306, section 12d of the former Workers' Compensation Act gave the reviewing commission power "to review any award or order, ending, diminishing or increasing compensation previously awarded" based on "a change of condition, mistake or fraud," a provision that is absent from the current Act. Act of May 20, 1931, 42d Leg., R.S., ch. 155, § 1, art. 8306, 1931 Tex. Gen. Laws 260, 260–61, *repealed by* Act of Dec. 13, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(7), art. 8306, 1989 Tex. Gen. Laws 114, 114. The current Act provides for specific review within each particular type of benefit. *See* 353 S.W.3d at 250 (explaining the review systems for supplemental and temporary income benefits). The absence of a broad review provision does not necessarily indicate the Legislature's intent to deprive the Division of jurisdiction, as the Court contends. While the Legislature's omission of a provision from an old statute to a new may signal an intent to change the law, *see Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 443 (Tex.2009), it may also signal a change in the statutory scheme, as is the case here. *See Jones v. Fowler,* 969 S.W.2d 429, 432–33 (Tex.1998) (holding that the Legislature did not intend the deletion of a statutory provision in the Family Code to be a substantive change in light of changes to the entire statutory scheme). Under the former statute, benefits were paid "predictively," meaning that they were set "at the time of adjudication based on a prediction of the injury's future impact on employment." *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 516 (Tex.1995). The current Act instead pays long-term benefits retrospectively, where "benefits are adjusted periodically over time based on actual lost wages for that period." *Id.* The Legislature did not merely amend the former statute and deliberately leave out the review provision; it significantly overhauled the entire workers' compensation system, including provisions for how claims are evaluated and benefits are awarded. *See id.* at 513. A difference in language, therefore, is less indicative of intent in this circumstance. I recognize that the Legislature knows how to provide for review, as it did so with the other compensation schemes. *See* 353 S.W.3d at 249–50. It follows then that the Legislature also knows how to expressly prohibit the Division from considering continuing eligibility for LIBs. It did not do so here. I believe that the Legislature intended for the Division to have jurisdiction to determine continuing eligibility for an award of LIBs.

The Court characterizes the issue in this case as one of re-opening a previous LIB adjudication. 412 S.W.3d 492, 499. I view Liberty Mutual's claims as seeking a new determination of Adcock's continuing eligibility to LIBs. As a new claim, as opposed to an appeal of the original LIB award, the *506 Division's process for determining a claimant's continuing eligibility for LIBs should be the same as an original determination to grant or deny benefits. A claimant or insurance carrier may request a benefit review conference by giving notice to the other parties after attempting to resolve the dispute. *See* TEX. LAB.CODE §§ 410.023–.025; 28 TEX. ADMIN. CODEE § 141.1. If the parties cannot resolve their dispute at the benefit review conference or arbitration, the parties may proceed to a contested case hearing, where a Division hearing officer hears the dispute and makes a record of the proceedings. *See* TEX. LAB.CODE § 410.151. The parties may then appeal that decision to the Division's appeals panel. *See id.* § 410.202. Further, the Act provides the Division with the power to monitor carrier actions. *See id.* § 414.002(a). It lists numerous actions that constitute administrative violations by an insurance carrier, including a carrier's contest of a claim to benefits when evidence clearly indicates liability. *See id.* § 415.002. The Act allows for sanctioning and penalties when carriers violate such provisions of the Act, and therefore guards against potential harassing actions by carriers against

claimants receiving LIBs. *See id.* § 415.021(a). [3] Because the Act already provides a procedure for contesting a claimant's current eligibility to benefits, there was no need for the Legislature to include a separate provision in the statute.

[3] Although not raised by the parties, I do not believe that section 410.209 of the Labor Code, which provides for reimbursement of funds to an insurance carrier who has overpaid a claimant, applies in cases such as this. *See id.* § 410.209. Liberty Mutual and the Division do not contend that Adcock was not entitled to LIBs in 1997, and thus they are not arguing that the Division should "revers[e] or modif[y]" that decision as is required to trigger potential reimbursement. *See id.* Rather, I view this is an entirely new determination of a claimant's current entitlement to LIBs and not an appeal of the original grant of LIBs.

## III. Conclusion

Section 408.161 awards LIBs for functional impairments that equate to a total and permanent loss of body parts and other serious life-altering injuries. It is impossible for the Division or anyone else to know whether loss of use will actually be total and permanent. When, by good fortune or advances in medical science, a claimant's impairments improve so that he no longer meets the statutory eligibility criteria for LIBs, he should not receive a windfall, as the Court would hold, merely because the Legislature failed to provide for this unique circumstance. Surely the Legislature did not intent such a nonsensical result. I would hold that the Division, which is charged with the effective administration of income benefits, has jurisdiction to consider a claimant's continuing eligibility to receive LIBs. I respectfully dissent.

**All Citations**

412 S.W.3d 492, 56 Tex. Sup. Ct. J. 1161

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

966 S.W.2d 208
Court of Appeals of Texas,
El Paso.

OLD REPUBLIC INSURANCE COMPANY, Appellant,

v.

Inez RODRIGUEZ, Appellee.

No. 08–97–00089–CV.   |   March 31, 1998.

Claimed filed action against workers' compensation insurance carrier, seeking higher impairment rating than that found by Workers' Compensation Commission and entitlement to supplemental income benefits. The 34th District Court, El Paso County, William E. Moody, J., entered judgment on jury verdict in favor of claimant. Carrier appealed. The Court of Appeals, Larsen, J., held that: (1) statute precluding introduction of any evidence of impairment which was not presented to Commission did not prohibit claimant from presenting other types of evidence for first time at trial; (2) statute requiring jury to adopt specific impairment rating arrived at by one of physicians in case did not preclude jury from adopting new impairment rating to reflect correction of minor clerical error in physician's computation; and (3) evidence supported findings that claimant had only temporarily returned to work and that he was prevented from returning to work as direct result of his initial knee and back injury at time he became eligible for supplemental income benefits for those injuries.

Affirmed.

West Headnotes (3)

**[1]**    **Workers' Compensation**  ⚷  Nature and extent of disability

Statute precluding introduction at trial of any evidence of impairment which was not presented to Workers' Compensation Commission did not prohibit claimant from presenting other types of evidence for first time at trial, and specifically did not prohibit claimant's new expert from describing procedures used during medical examinations to assess impairment ratings, discussing guidelines for impairment ratings and how guidelines would be used by doctors to arrive at percentage impairment ratings used in workers' compensation cases, and identifying clerical error in calculations presented to Commission. V.T.C.A., Labor Code § 410.306.

4 Cases that cite this headnote

**[2]**    **Workers' Compensation**  ⚷  Verdict and findings

Statute requiring jury in workers' compensation case to adopt specific impairment rating arrived at by one of physicians in case did not preclude jury from adopting new impairment rating to reflect correction of minor clerical error in one doctor's use of tables to compute impairment rating; jury believed doctor's impairment findings and merely corrected his clerical mistake, but did not enter improper compromise verdict. V.T.C.A., Labor Code § 410.306(c).

3 Cases that cite this headnote

**[3]**    **Workers' Compensation**  ⚷  Supplemental and impaired earning benefits

Evidence, though conflicting, supported findings that claimant had temporarily, but not permanently, returned to work and that he was prevented from returning to work as direct result of his initial knee and back injury at time he became

eligible for supplemental income benefits for those injuries; claimant continued to have problems with his knee and back from initial injuries, had surgery on his knee as result of initial injury and received second release from work for that injury, and, after second injury, claimant's doctor reported that claimant was unable to work because of knee injury and had been unable to work since his surgery. V.T.C.A., Labor Code § 408.142(a).

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*208** J.L. Jay, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, for Appellant.

Monty B. Roberson, El Paso, for Appellee.

Before BARAJAS, C.J., and LARSEN and CHEW, JJ.

## *OPINION*

LARSEN, Justice.

This is an appeal from a jury verdict in favor of the plaintiff employee on his workers' compensation claims. We affirm.

## **\*209** *FACTS*

Appellee Inez Rodriguez injured his low back and left knee on August 6, 1991 while working as a general laborer at the Asarco plant in El Paso, Texas. Rodriguez saw Dr. Mario Palafox, who examined him and assigned him a 31 percent impairment rating for purposes of his workers' compensation claim. Appellant Old Republic Insurance Company, Asarco's workers' compensation carrier, sent Rodriguez to the doctor of its choice, Dr. Arsavir Arat, who assigned Rodriguez a 15 percent impairment rating. Because the findings conflicted, the Texas Workers' Compensation Commission appointed Dr. Charlotte Smith to examine Rodriguez. She also found Rodriguez's impairment rating to be 15 percent. Rodriguez returned to work at Asarco on January 11, 1993, but sustained an additional injury to his low back and right shoulder on April 16, 1993. Rodriguez also began experiencing problems with his 1991 knee injury in August 1993 while he was still off work and receiving workers' compensation benefits for his 1993 shoulder injury. Rodriguez had knee surgery and was unable to work until at least April 1994. Rodriguez applied for, and was denied, supplemental income benefits for the 1991 injury.

Rodriguez appealed both Dr. Smith's impairment rating, and the denial of supplemental income benefits through a benefit review conference, contested case hearing, and administrative appeal to the Commission. The Commission found 15 percent impairment and no entitlement to supplemental income benefits. Rodriguez sued Old Republic in district court seeking a higher impairment rating and entitlement to supplemental income benefits. The jury agreed with Rodriguez and awarded him a 30 percent impairment rating and supplemental income benefits for the first quarter he became eligible. Old Republic appeals the jury's verdict with six points of error.

## *TESTIMONY OF DR. MORENO*

In its first and second points of error, Old Republic contends that the trial court impermissibly allowed Dr. Manuel Moreno to testify concerning Rodriguez's impairment rating because Dr. Moreno did not testify before the Commission. Section 410.306

of the Texas Labor Code provides that at trial, evidence of extent of impairment shall be limited to that presented to the Commission. [1] This procedural limitation encourages parties to present relevant evidence during administrative proceedings, thus increasing the accuracy and efficiency of those proceedings. [2] Rodriguez had presented only the medical records and reports of Dr. Mario Palafox to the Commission. Dr. Palafox unfortunately died before trial of this case. Rodriguez therefore presented Dr. Palafox's records and reports along with testimony from Dr. Moreno even though neither Dr. Moreno himself, nor any of Dr. Moreno's reports or records, were ever presented before the Commission.

[1]     TEX. LAB.CODE ANN. § 410.306(c) (Vernon 1996).

[2]     *Texas Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 528 (Tex.1995).

 **[1]**     Our review of the record reveals, however, that Dr. Moreno did not testify about Rodriguez's "extent of impairment" as forbidden by the statute. Rather, Dr. Moreno explained the procedures used during medical examinations to assess impairment ratings, discussed the American Medical Association guidelines for impairment ratings, and explained how the guidelines are used by doctors to arrive at the percentage impairment ratings employed in workers' compensation cases. The statute does not prohibit all evidence not presented to the Commission. It prohibits only evidence of the extent of impairment not presented to the Commission. In this case, no evidence of the extent of Rodriguez's impairment not previously presented to the Commission was elicited from Dr. Moreno. [3] Accordingly, we overrule Old Republic's first two points of error.

[3]     Dr. Moreno did point out a clerical error in Dr. Palafox's calculations. As discussed under points of error three through five, we do not find the correction of a clerical error to be evidence of the extent of impairment not presented to the Commission within the meaning of the statute.

### *210  *VIABILITY OF JURY AWARD OF 30 PERCENT IMPAIRMENT*

In its next three points, Old Republic contends that the jury's finding of 30 percent impairment was not legally permissible and therefore was immaterial. Old Republic maintains that the trial court had no choice but to enter a judgment of 15 percent impairment as found by Drs. Arat and Smith because their impairment ratings were the only impairment ratings in this case both presented to the Commission and calculated in accordance with the American Medical Association guidelines.

### *1. "Presented" to the Commission*

 **[2]**     The Texas Labor Code requires that a jury adopt the specific impairment rating arrived at by one of the physicians in the case and evidence of the extent of impairment is limited to that presented to the Commission. [4] The only impairment ratings arrived at by the physicians and presented to the Commission were Drs. Smith's and Arat's 15 percent ratings, and Dr. Palafox's 31 percent rating. No 30 percent impairment rating was ever presented to the Commission. The 30 percent figure was raised for the first time at trial during Old Republic's cross-examination of Dr. Moreno. Old Republic's counsel pointed out, and Dr. Moreno agreed, that Dr. Palafox made an error when he combined his diagnostic impairment rating with his range of motion impairment rating for Rodriguez's back. [5] Instead of 21 percent, the impairment rating for Rodriguez's back should have been 20 percent. Accordingly, Dr. Palafox's total body impairment rating was also off by 1 percent. Old Republic therefore contends that the 30 percent impairment figure should not have been submitted to the jury because a 30 percent impairment rating was not one of the specific impairment ratings presented to the Commission.

[4]     *Garcia,* 893 S.W.2d at 528; TEX. LAB.CODE ANN. § 410.306(c) (Vernon 1996).

[5]     Dr. Palafox assigned a 14 percent impairment to Rodriguez's range of motion and 7 percent for diagnostic impairment. Dr. Palafox concluded that Rodriguez's total impairment rating for his back was 21 percent. Impairment ratings, however, are not calculated by adding the diagnostic and range of motion impairment ratings together. Rather, as Dr. Moreno explained at trial, the doctor uses

a table provided in American Medical Association guidelines which may result in an impairment rating different from that which would be obtained through a simple addition of the various individual impairment ratings.

Old Republic relies on *Garcia* to support its position. The Supreme Court held in *Garcia* that:

> [I]f three doctors testify, respectively opining that the claimant is 10, 14, and 20 percent impaired, the jury must return one of those three numbers as its verdict. It may not consider the entirety of the testimony to find, for example, an impairment rating of 16 percent.... The Act simply does not contemplate or allow any other rating; e.g., one 'in between' the physicians' findings. In other words, the requirement that the impairment rating match one of the physicians' findings is part of the substantive statutory scheme. [6]

[6]    *Garcia,* 893 S.W.2d at 528.

We believe this language in *Garcia* is intended to address compromise verdicts, not a situation like that presented here. The jury here did not reach a compromise verdict somewhere between 15 percent and 31 percent. Rather, the jury accepted Dr. Palafox's findings with a correction for his clerical error. We do not find that *Garcia* forbids jury correction of clerical errors in impairment calculations.

### 2. Impairment Calculation According to AMA Guidelines

Old Republic maintains that Dr. Palafox's 31 percent impairment rating should not have been submitted to the jury because his clerical mistake rendered it invalid under the American Medical Association guidelines. [7] We find no cases on point. We cannot, however, accept Old Republic's contention. In this case, the substance of Dr. Palafox's examination and the resulting impairment rating were not shown to be invalid pursuant to **\*211** AMA guidelines. Rather, it was shown that Dr. Palafox made a clerical error in using the AMA tables to combine impairment ratings. The jury believed the substance of Dr. Palafox's impairment findings and appropriately corrected his clerical mistake by finding a 30 percent, rather than a 31 percent, impairment. We do not believe that the statute should be construed to deprive a litigant, whether that litigant be an injured employee or a workers' compensation insurance carrier, of the right to present its impairment evidence to the jury simply because the doctor committed a minor clerical error such as the one in this case. Accordingly, we overrule Old Republic's third, fourth and fifth points of error.

[7]    *See Garcia,* 893 S.W.2d at 526 ("... Act ... specifically requires all determinations of impairment to be made under the Guides").

### SUFFICIENCY OF THE EVIDENCE

In its sixth point, Old Republic challenges the sufficiency of the evidence to support the jury's finding that Rodriguez was entitled to supplemental income benefits. Supplemental income benefits are available to an injured employee upon the termination of impairment income benefits if the employee:

(1) has an impairment rating of 15 percent or more as determined by this subtitle from the compensable injury;

(2) has not returned to work or has returned to work earning less than 80 percent of the employee's average weekly wage as a direct result of the employee's impairment;

(3) has not elected to commute a portion of the impairment income benefit under Section 408.128; and

(4) has attempted in good faith to obtain employment commensurate with the employee's ability to work. [8]

[8]    TEX. LAB.CODE ANN. § 408.142(a) (Vernon 1996).

Old Republic contends that the evidence is legally and factually insufficient to show that Rodriguez had not returned to work.

### 1. Standard of Review

In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. [9] If any probative evidence supports the jury's determination, it must be upheld. [10]

[9]     *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 83 (Tex.App.—El Paso 1992, no writ).

[10]    *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Neily v. Aaron,* 724 S.W.2d 908, 913 (Tex.App.—Fort Worth 1987, no writ); *see generally* WILLIAM POWERS, JR. & JACK RATLIFF, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515 (1991).

The test for factual insufficiency points is set forth in *In re King's Estate.* [11] In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. It is for the jury to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. [12] The jury's finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. [13] The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." [14] Thus, we cannot substitute our judgment for that of the fact finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the **\*212** verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained.

[11]    150 Tex. 662, 244 S.W.2d 660 (1951).

[12]    *Carrasco v. Goatcher,* 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ).

[13]    *Id.*

[14]    See, e.g., *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994); *Beall v. Ditmore,* 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied).

### 2. Factual Summary

Rodriguez was originally injured on August 6, 1991. He became eligible for supplemental income benefits on September 21, 1993. There was evidence in this case that Rodriguez had returned to work in January 1993, before he became eligible for supplemental income benefits. There was also evidence that Rodriguez left work in April 1993 because of new injuries to his shoulder and back and began receiving workers' compensation benefits for those injuries. Old Republic presented evidence that Rodriguez believed his August 1991 injuries were healed at the time he suffered the 1993 injuries. On the other hand, there was evidence that Rodriguez continued to have problems with his knee and back from the 1991 injuries. In August of 1993, Rodriguez had surgery on his knee as the result of the 1991 injury and received a second release from work for that injury. As late as April 20, 1994, Rodriguez's doctor reported that Rodriguez was unable to work because of the knee injury and had been unable to work since the 1993 surgery.

### 3. Conclusion: Sufficiency of the Evidence

 **[3]**    We find that the evidence in this case, although conflicting, was sufficient under either a factual or legal sufficiency review to show that Rodriguez had temporarily, but not permanently, returned to work in 1993. There was evidence from which the jury could have concluded that Rodriguez was prevented from returning to work as the direct result of his 1991 knee and back

injury at the time he became eligible for supplemental income benefits for those injuries on September 21, 1993. Although a different jury on a different day may have decided differently from this evidence, we find it legally and factually sufficient to support the jury's verdict. Accordingly, we overrule Old Republic's sixth point of error.

## *CONCLUSION*

Having considered and overruled each of Old Republic's points of error, we affirm the judgment of the trial court.

**All Citations**

966 S.W.2d 208

**End of Document**                                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

2005 WL 2026853
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

OLD REPUBLIC INSURANCE COMPANY, Plaintiff,

v.

Ronald STAFFORD, Defendant.

No. Civ.A. 3:03-CV-1611-. | Aug. 22, 2005.

*MEMORANDUM ORDER*

[BOYLE](), J.

**\*1** Before the Court are Defendant Ronald Stafford's ("Stafford") Motion for Approval of Second and Final Application for Defendant's Attorney's Fees ("Fee Application"), filed November 4, 2004, and Plaintiff Old Republic's ("Old Republic") Motion for Approval of Attorney's Fees, filed October 6, 2004. Stafford moves the Court for an award of attorney's fees and expenses against Old Republic in the amount of $85,668.04, plus additional fees for appellate work performed should an appeal be filed. On December 27, 2004, the Court issued a Memorandum Order in which it found that the evidence presented in support of Stafford's motion was insufficient to support the requested award; however, the Court allowed Stafford an opportunity to file supplemental evidence before ruling definitively on the motion. On January 25, 2005, Stafford presented a Supplemental Submission of Evidence in Support of Application for Attorney's fees, to which Old Republic responded and filed objections on February 10, 2005.

For the reasons set forth in this order, the Court GRANTS Stafford's Fee Application in part, OVERRULES Old Republic's objections to Defendant's Supplemental Submission of Evidence (to the extent not otherwise addressed in this order), and DENIES without prejudice Old Republic's Motion for Approval of Attorney's Fees.

### I. Background [1]

[1]  The following background facts are undisputed and are gleaned from the Joint Pretrial Order submitted by the parties on October 12, 2004.

This diversity action is an appeal of a final decision of the Texas Workers' Compensation Commission ("TWCC"). The TWCC determined, after a Contested Case Hearing, that Stafford sustained a compensable injury within the meaning of the Texas Labor Code on May 2, 2002 while working as a mechanic for his employer, Roadway Express. The TWCC further found that Stafford was disabled from May 3, 2002 through May 16, 2002, and from July 14, 2002 through the date of the Contested Case Hearing. The TWCC accordingly found that Stafford was entitled to receive workers' compensation benefits. The TWCC Appeals Panel affirmed the decision of the Contested Case Hearing Officer.

Old Republic is the workers' compensation insurance carrier for Roadway Express. Old Republic filed this lawsuit under [§ 410.251 of the Texas Labor Code](), seeking to overturn the Contested Case Hearing and Appeals Panel decisions of the TWCC. A jury trial was held, and on October 15, 2004, the jury found that Stafford had sustained an injury in the course and scope of his employment for Roadway Express on May 2, 2002 and that Stafford had a disability resulting from that injury from May 3, 2002 through May 16, 2002 and from July 14, 2002 through April 17, 2003. Judgment was entered on December 2, 2004. As the prevailing party, Stafford moves for an award of attorney's fees under [§ 408.221(c) of the Texas Labor Code]().

## II. Analysis

In diversity cases, state law determines whether a party is entitled to an award of attorney's fees. *Atchison, Topeka and Santa Fe Ry. Co. v. Sherwin-Williams Co.,* 963 F.2d 746, 751 (5th Cir.1992). [2] Section 408.221(c) of the Texas Labor Code provides that an insurance carrier that seeks judicial review of a final decision of a TWCC Appeals Panel regarding the compensability or eligibility of income benefits is liable for "reasonable and necessary attorney's fees ... incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought by the insurance carrier...."TEX. LABOR CODE § 408.221(c). An attorney's fee is based on the attorney's time and expenses.*Id.* at § 408.221(b).

[2]    The Court notes that while Stafford's entitlement to attorney's fees is clearly governed by Texas law, it remains unsettled whether federal or state law controls the calculation of reasonable fees. *Robinson v. State Farm Fire & Cas. Co.,* 13 F.3d 160, 164 (5th Cir.1994); *Keeton v. Wal-Mart Stores, Inc.,* 21 F.Supp.2d 653, 656-57 (E.D.Tex.1998). The Fifth Circuit has sidestepped this issue "because the Texas courts look to many of the same factors as do the federal court in making attorney-fee awards."*Robinson,* 13 F.3d at 164. Here, as discussed *infra,* the Texas Labor Code enumerates seven factors to be considered by a court in approving attorney's fees under § 408.221. TEX. LABOR CODE § 408.221(d). Because these factors are largely subsumed within the *Johnson* factors applied in federal cases, discussed *infra,* the Court finds that the application of either state or federal law would yield the same results.

**\*2**  The Texas Labor Code provides a number of factors to be considered by a court in approving an attorney's fee, including: 1) the time and labor required;

2) the novelty and difficulty of the questions involved;

3) the skill required to perform the legal services properly;

4) the fee customarily charged in the locality for similar legal services;

5) the amount involved in the controversy;

6) the benefits to the claimant that the attorney is responsible for securing; and

7) the experience and ability of the attorney performing the services.

TEX. LABOR CODE § 408.221(d).

In awarding statutorily-authorized attorney's fees, district courts in the Fifth Circuit employ a two-step procedure. *See Louisiana Power and Light Co. v. Kellstrom,* 50 F.3d 319, 323-24 (5th Cir.1995). First, the reasonable number of hours expended by counsel is multiplied by the reasonable hourly rate charged by lawyers in the community. *Id.* at 324.The product of this multiplication is the base fee, or "lodestar", which the Court then either accepts or adjusts upward or downward based on twelve factors enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). [3] The Court may modify the lodestar if any of the *Johnson* factors not already considered in the reasonable fee analysis warrant an adjustment. *See Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir.1993). The lodestar is presumptively reasonable, however, and should be modified only in exceptional cases. *Id.* (citing *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992)).

[3]    The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the case; (3) the skill required; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed; (8)

the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717-19.

### A. Whether the Hourly Rates Charged by Stafford's Attorneys are Reasonable

Stafford seeks reimbursement for $85,668.04 in fees and expenses for the work of six different lawyers who billed at hourly rates ranging from $350.00 down to $225.00. Old Republic objects to the hourly rates of the six attorneys who represented Stafford, contending that they far exceed the standard fees sought by Dallas lawyers for performing similar work. Reasonable hourly rates are determined by the "prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.,* 119 F.3d 1228, 1234 (5th Cir.1997); *Wheeler v. Mental Health and Mental Retardation Auth. of Harris County, Texas,* 752 F.2d 1063, 1073 (5th Cir.1985). The forum district, here Dallas, Texas, is generally the relevant "market." *Hawkins v. Nat'l Ass'n of Sec. Dealers, Inc.,* 1998 WL 74259, at *1 (N.D.Tex. Feb. 13, 1998). Stafford shoulders the burden of producing satisfactory evidence, in addition to his attorneys' affidavits, that the requested rate is consistent with prevailing market rates. *Wheeler,* 752 F.2d at 1073; *Guidry v. Jen Marine, LLC,* 2003 WL 23095590, at *4 (E.D.La. Dec. 24, 2003). "When the attorney's customary hourly rate is within the range of hourly fees in the prevailing market, that rate should be considered in setting a reasonable hourly rate." *League,* 119 F.3d at 1234.

**\*3** As stated, six attorneys performed legal work for Stafford in this matter. Jeffrey L. Raizner and Michael P. Doyle, of the Doyle Raizner LLP law firm, both seek compensation at the rate of $350.00 per hour. Jack F. Burleigh and Timothy N. Smith, also of Doyle Raizner, seek compensation at the rate of $250.00 per hour. Peter N. Rogers of Rogers, Booker and Trevino, seeks compensation at the rate of $225.00 per hour, and Byron C. Keeling, of Holman, Keeling & York, seeks compensation at the rate of $350.00 per hour. Based upon Stafford's supplemental filings, the Court finds that these billable rates are reasonable. Mr. Raizner has almost 13 years of litigation experience, has represented clients in sophisticated commercial cases, and is an equity party in the Doyle Raizner law firm. (App. to Def.'s Supp. Submission of Evid. ["Def.'s App."] at Ex. 1, pp. 1-3). A significant part of his current practice includes the representation of workers' compensation claimants, and he has written and published Continuing Legal Education materials related to workers' compensation matters. (*Id.* at p. 3). Mr. Doyle has approximately 15 years of litigation experience and currently represents plaintiffs in complex cases involving maritime law, medical negligence, insurance bad faith, deceptive trade issues, toxic torts, and product liability. (*Id.* at Tab B).

Mr. Raizner opines that the hourly rate for himself, his co-partner, Mr. Doyle, and Mssrs. Smith, Burleigh, and Rogers are reasonable and consistent with the rates charged for similar services by attorneys of comparable skill, experience, and reputation in the Dallas legal community. (*Id.* at Ex. 1, p. 4). Attached to Stafford's supplemental application is an affidavit from Kay E. Coggin, who has handled workers' compensation and personal injury matters for approximately 17 years. (*Id.* at Ex. 3, p. 1). Ms. Coggin states that the rates charged by Messrs. Raizner, Doyle, Burleigh, Smith, and Rogers are reasonable and consist with what other lawyers of comparable skill, experience, and reputation in the Dallas area charge for like services. (*Id.* at pp. 1-2). While Ms. Coggin's billing rate is currently $300.00 per hour, she states that she has "seen other attorneys representing the claimant in this type of dispute charge as low as $225.00 per hour and as high as $350.00 per hour." (*Id.* at 3).

Stafford has also presented evidence from a Texas Lawyer survey showing that the average billing rate for an equity partner in the Dallas area for 2004 was $361.00 per hour. (*Id.* at Ex. 6, p. 14). The average billing rate for equity partners in firms with fewer than 30 lawyers was $299.00 per hour, and for firms with over 100 lawyers, the rate was $488.00 per hour. (*Id.*). Although the Doyle Raizner law firm has fewer than 30 attorneys, the Court finds that the $350.00 billing rate for Mssrs. Doyle and Raizner is reasonable given their distinguished background and level of experience. *See Fin. Ins. Co. v. Ragsdale,* 2005 WL 1536279, at *7-8 (Tex.App.-El Paso, June 30, 2005, no pet.)(finding "ample evidence" to support award of attorney's fees in workers' compensation case where attorney billing rate amounted to $377.36 per hour). The Court further finds that the billing rates for Mssrs. Smith and Burleigh, at the rate of $250.00 per hour, and for Mr. Rogers, at the rate of $225.00 per hour, are reasonable.

**\*4** Old Republic makes a tortured argument in its supplemental briefing that Stafford's billing rates are subject to a $150.00 per hour statutory cap. First, the Court must express its befuddlement, and displeasure, with Old Republic for now arguing that

a $150.00 statutory cap governs this case while, in its previously-filed objections to Stafford's fee application it represented to the Court that "judicial review cases are not controlled by the maximum hourly rate per hour", but that instead the $150.00 per hour figure should merely provide "guidance" to the Court when making its determination as to the reasonableness of hourly rates. (Old Republic's Obj. to Def.'s Fee Application, at 4). Old Republic provides no explanation for the contradiction between its own briefs.

Nevertheless, despite Old Republic's reversal of position, its current argument is without merit. As stated above, § 408.221(c) of the Texas Labor Code provides that an insurance carrier that seeks judicial review of a final decision of a TWCC Appeals Panel decision is liable for a prevailing claimant's reasonable and necessary attorney's fees incurred as a result of the carrier's appeal. TEX. LABOR CODE § 408.221(c).Section 408.221(d) then goes on to list a number of factors for the Court to consider in approving an attorney's fee under the section. *Id.* at § 408.221(d). Notably, § 408.221(c) states that "[a]n award of attorney's fees under this subsection is *not* subject to commission rules adopted under Subsection (f)."*Id.* at § 408.221(c) (emphasis added). Subsection (f) provides that "[t]he commission by rule shall provide guidelines for maximum attorney's fees for specific services in accordance with this section."*Id.* at § 408.221(f).

Notwithstanding § 408.221(c)'s plain statement that an award of attorney's fees under that subsection is not subject to commission rules adopted under subsection (f), Old Republic goes straight to the commission rules to argue that the $150.00 cap on hourly attorney rates provided by § 152.4 of those rules operates to cap any award of attorney's fees to Stafford in this case. Old Republic's strained logic appears to be as follows: while § 408.221(c) does provide that an award of attorney's fees under that subsection is not subject to commission rules promulgated under subsection (f), subsection (f) only provides that the commission shall provide guidelines for maximum attorney's fees for specific services. Those guidelines are set forth in the commission rules at § 152.4(c).28 TEX. ADMIN. CODE § 152.4(c).Section 152.4(d) of the rules, which sets forth the maximum hourly rate for legal services, is not a part of the guidelines for specific legal services set forth in § 152.4(c). Therefore, says Old Republic, there is nothing to bar the application of § 152.4(d)'s rate cap to an award of attorney's fees under § 408.221(c).

The Court disagrees with Old Republic's reading of these provisions. First, the maximum hourly rates established by § 152.4(d) are naturally viewed as part of the commission's "guidelines for maximum attorney's fees for specific services" as contemplated by § 408.221(f).Section 152.4(c) merely sets forth guidelines for maximum total *hours* that can be charged to claimants and carriers. Section 152.4(d) sets a cap on the *hourly rates* that can be charged. Together, those sections provide guidelines on the "maximum *attorney's fees* for specific services."Thus, the statutory caps imposed by § 152.4(d) of the commission rules are inapplicable to this action per § 408.221(c). And in any event, the commission rules themselves provide that § 152 .4 does not apply to fee awards in cases where an employee prevails in an action brought by a carrier to contest a commission determination of eligibility for supplemental income benefits. 28 TEX. ADMIN. CODE § 152.1(f). Furthermore, § 152.4 provides that the factors outlined thereunder shall be considered by "the Commission"; it does not speak of "courts", thus indicating that the section does not apply to judicial review cases, as Old Republic originally conceded.

 *5  The Court has also considered the affidavits of Kenneth K. Stephens, David Michael Hymer, and Darryl J. Silvera submitted by Old Republic. However, these affidavits do not alter the Court's conclusion that Stafford has shown that the hourly rates charged by his attorneys are reasonable. Mr. Stephens states that the fee award sought by Stafford represents only "one of the highest" fee requests he has seen since the enactment of § 408.221(c) in 2001, thus suggesting that he has seen fee requests of similar magnitude. (Old Republic's Resp. to Def.'s Supp. Submission ["Pl.'s Resp.App."], at Ex. B, p. 2). Mr. Stephens also states that he believes that the $350.00 rate requested by Mssrs. Raizner and Doyle are not reasonable because the rules of the TWCC and the Texas Labor Code provide that the reasonable hourly rate for representation of both injured employees and insurance carriers is $150.00 per hour. (*Id.* at p. 4). As discussed above, however, the $150.00 statutory cap does not apply to fee awards under § 408.221(c). Mr. Stephens's opinion that any hourly rate in excess of $150.00 is in itself unreasonable is thus entitled to little weight.

David Hymer, a Texas board-certified lawyer in workers' compensation law, also disputes that the $350.00 rate charged by Mssrs. Doyle and Raizner is consistent with the prevailing market rates for attorneys handling workers' compensation matters

in Dallas. He states that he is "not aware of any other cases or any other law firms where counsel for the injured worker has sought recovery of fees under Texas Labor Code § 408.221 at the $350.00 per hour rate."(*Id.* at Ex. B). Daryl Silvera also states that "$350.00 per hour is not the prevailing market rate in Dallas County, Texas for attorneys handling workers' compensation cases."(*Id.* at Ex. C, p. 8). Even so, neither Mr. Hymer nor Mr. Silvera enlighten the Court as to just what the prevailing market rate for handling such cases in Dallas is, leaving the Court without any meaningful guide to assess the reasonableness of the fees charged by Stafford's attorneys. Nor do they evaluate the rates charged by Mssrs. Doyle and Raizner in light of their experience, skill, and reputation. In short, the Court finds that Old Republic has failed to cast sufficient doubt on Stafford's evidence that the rates charged by his attorneys are consistent with prevailing market rates for similar services by lawyers of comparable skill, experience, and reputation. In sum, for the reasons stated above, the Court accepts the rates charged by Stafford's attorneys as reasonable.

**B. Reasonableness of Hours Expended**

The Court must next determine the number of hours by which such hourly rates should be multiplied. Old Republic disputes the number of hours Stafford's attorneys claim to have reasonably expended on this litigation. First, Old Republic complains that Stafford simply had too many lawyers representing him. Old Republic contends that only one of Stafford's six lawyers, Mr. Raizner, actually participated at trial and that the other five attorneys who performed legal work for Stafford throughout this case were simply "non-participants" whose fees should be excluded from the fee calculation. Old Republic overlooks the fact that this case was filed on July 17, 2003, about a year and three months before the trial even began. Mr. Raizner did not even bill *any* time on this case until October 6, 2004, less than a week before trial started. Old Republic cannot seriously contend that no legal work should have been expended on Stafford's behalf until less than one week before trial. Section 408.221(c), by its terms, provides that a claimant is entitled to recover its reasonable and necessary attorney's fees incurred "as a result of the insurance carrier's appeal".TEX. LABOR CODE § 408.221(c). This necessarily includes recovery for all attorney's fees incurred since the inception of the case, not just those fees incurred at, and in preparation for, trial by only the lead trial attorney.

 **\*6** Old Republic also contends that Mssrs. Burleigh and Rogers's presence at the trial was wholly superfluous because they did not conduct voir dire, examine witnesses, or present argument before the jury or Court. But merely because some attorneys may not have speaking roles at trial does not mean that they did not actively participate in the trial. Among other things, attorneys may prepare exhibits, craft questions for the examining attorney to ask, take notes, perform legal research, and consult and strategize with the lead trial attorney. Here, the record shows that Mr. Rogers was particularly valuable given his long experience and expertise in handling workers' compensation matters and his involvement with this case since its early stages. Mr. Rogers's long history with this case, and presumed knowledge of its facts, would be peculiarly helpful in a situation as exists here, where Mr. Raizner, Stafford's lead trial attorney, had little if any involvement with this case until less than one week before trial started.

Stafford still must show that billing judgment was exercised, however.*Green v. Admin'rs of the Tulane Educ. Fund,* 284 F.3d 642, 662 (5 [th] Cir.2002)."Billing judgment is usually shown by the attorney writing off unproductive, excessive, or redundant hours ."*Id.* Where multiple attorneys staff a case the Court must scrutinize whether efforts were duplicated and time properly utilized. *Walker v. U.S. Dep't of Housing and Urban Dev.,* 99 F.3d 761, 768 (5 [th] Cir.1996)."The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted."*Id.* Stafford has failed to explain here why three attorneys needed to be present in the courtroom during the trial of this cause. While this case did raise some interesting evidentiary issues during trial proceedings, the Court can hardly say that such issues were in any way novel or of deep complexity. Considered as a whole, this case was relatively straightforward and could easily have been tried by two, rather than three, attorneys. While the Court does not intend to diminish the contributions of any of the three attorneys who represented Stafford at trial, it finds that Stafford has failed to demonstrate why three lawyers were necessary. The Court will accordingly not include in the fee calculation any time billed by Mr. Burleigh during the course of the three-day trial on October 12, 13, and 15, 2004.

Old Republic also objects to the fees sought by Byron C. Keeling, retained by Stafford as an "appellate specialist". Mr. Keeling states that he has "spent 2.8 hours of time at $350 per hour in reviewing the materials necessary to prepare this affidavit and to

begin the analysis of the potential appeal of the defense of this matter."(Def.'s App. at Ex. 2, p. 4). The Court agrees with Old Republic that Stafford has failed to justify the necessity of Keeling's services in this matter, as no post-judgment motions have been filed requiring the review of an appellate lawyer. Mr. Keeling's hours shall thus be deducted from the hours calculation.

**\*7** The Court next examines Old Republic's charge that Stafford's attorneys performed duplicative legal work. First, Old Republic complains that the time sheets for Mssrs. Raizner, Rogers, and Burleigh during the week of October 11, 2004 depict billing for "trial preparation" without providing an itemization of the specific tasks that were performed. Having reviewed the time records submitted by Stafford's attorneys, the Court finds that any duplication of time during the week of October 11, 2004 will be accounted for by the Court's decision to deduct the hours recorded by Mr. Burleigh during the days of trial (October 12, 13, and 15, 2004), which include time recorded for "trial preparation", from the fee award. Subtracting those hours, the Court finds that the remaining hours spent by Stafford's attorneys on trial preparation was not unreasonable.

Old Republic also complains that the time records of all three of Stafford's trial attorneys reflect that each attorney performed legal research pertaining to the jury charge. Mr. Raizner's time sheet indicates that he spent 7.25 hours on October 14, 2004 preparing for the final day of trial, working on jury charge issues, researching legal issues regarding the charge, and returning to Dallas for the final day of trial. Mr. Rogers's time sheet shows that he spent 4 hours on September 20, 2004 performing legal research, reviewing the jury charge, working on "questions", and preparing the motion in limine. Mr. Burleigh spent 5.75 hours on October 14 researching issues regarding the jury charge and revising the charge. Thus, the record shows that Messrs. Raizner and Rogers performed additional tasks in addition to simply working on the jury charge on the dates on which they recorded time for jury charge work. And the Court finds that some duplication of work on the jury charge is reasonable considering that the charge is possibly the most important legal instrument of the entire litigation, and considering that certain legal issues arose at the charge conference which necessitated further re-working of the charge. In short, the Court declines to deduct any time recorded by Stafford's attorneys for their work on the jury charge.

Next, Old Republic claims that § 408.221 does not provide for the recovery of attorney's fees incurred from preparing an application for attorney's fees and that, even if it did, Mssrs. Raizner and Burleigh duplicated their time preparing Stafford's application. First, the Court finds that Stafford is entitled to recover attorney's fees for time spent on preparing his fee application. Section 408.221(c) provides that a claimant that prevails on a carrier's appeal is entitled to attorney's fees incurred "as a result of the insurance carrier's appeal."The preparation of a fee application for fees that are specifically provided for by statute necessarily result from the carrier's appeal. Second, the Court finds that the 7.5 hours spent by Mr. Burleigh and the 1.75 hours spent by Mr. Raizner on the fee application were reasonable and not duplicative.

**\*8** Old Republic also points out specific discrepancies in Mr. Rogers's affidavit. It notes that Mr. Rogers has billed 10.50 hours for his participation at trial on October 14, 2004. Old Republic correctly notes that trial did not take place on that day, and 10.50 hours must therefore be deducted from the fee calculation. Old Republic also challenges Mr. Rogers's billing entry on May 20, 2004, which indicates that he spent .25 hours receiving and reviewing Defendant's deposition of experts and a letter regarding Dr. Suss. Mr. Silvera states in his affidavit, however, that no experts were deposed before trial in this case, rendering any review of an expert's deposition impossible. (Pl.'s Supp. Resp.App. at Ex. C, p. 6). In the absence of any supplemental or explanatory evidence submitted by Stafford, the Court will deduct an additional .25 hours from the time charged by Mr. Rogers.

Old Republic next objects to certain billings by Mr. Smith as excessive for the work performed. Old Republic contends that only limited discovery was conducted in this case, and that it only served one set of requests for production and one set of interrogatories on Stafford. The Court finds that the 7.75 hours expended by Mr. Smith in preparing responses to this discovery was not unreasonable. Old Republic also complains of Mr. Smith's June 24, 2004 billing of 11 hours of time for the deposition of Stafford and for traveling to and from that deposition. Old Republic contends that Stafford's deposition started at 2:21 p.m. and concluded at 4:02 p.m. The Court agrees that the 11 hours recorded for this deposition is excessive. Allowing two hours for the taking of Stafford's deposition and 1 hour and 30 minutes for travel time to and from Houston, the Court finds that five hours is a reasonable expenditure of time in connection with the taking of Stafford's deposition. Mr. Smith's time shall accordingly be reduced by six hours.

To summarize the foregoing discussion, the Court determines that the lodestar figure should be calculated as follows:

| Attorney | Hours | Billing Rate/ Hour | Total Fee |
|---|---|---|---|
| Mike Doyle | 17.25 | $350.00 | $ 6,037.50 |
| Jeffrey Raizner | 71.5 | $350.00 | $ 25,025.00 |
| Jack F. Burleigh | 110.5 | $250.00 | $20,562.50 |
| | 28.25 (*total time billed on October 12, 13, and 15*) | | |
| | 82.25 | | |
| Timothy N. Smith | 22.65 | $250.00 | $4,162.50 |
| | -6.00 (excessive hours) | | |
| | 16.62 | | |
| Peter N. Rogers | 50.00 | $225.00 | $ 8,831.25 |
| | 10.5 (*no trial on October 14, 2004* ) | | |
| | .25 (*review of expert deposition* ) | | |
| | 39.25 | | |
| Byron C. Keeling | 2.8 | $350.00 | $ 0.00 |
| | 2.8 (*no showing of necessity for appellate specialist* ) | | |
| | 0 | | |
| Total Lodestar | | | $ 64,618.75 |

Amount

---

## C. Whether the Lodestar Fee Should be Adjusted

The Court must next consider whether it should make any upward or downward adjustment based on the *Johnson* factors and/or the factors enumerated in § 408.221(d) that were not already subsumed in the lodestar calculation. The Fifth Circuit has stated that *Johnson* factors one and seven are included in the lodestar calculation and should not be analyzed again when considering lodestar adjustments. *Walker,* 99 F.3d at 771-72 (5 [th] Cir.1996). As to some of the other factors, the Fifth Circuit has further explained:

> **\*9** The Supreme Court has limited greatly the use of the second, third, eighth, and ninth factors, ... and we have held that enhancements based upon these factors are only appropriate in rare cases supported by specific evidence in the record and detailed findings by the courts ... An enhancement based on the eighth factor is appropriate only when the fee applicant can demonstrate that it is customary in the area for attorneys to charge an additional fee above their hourly rates for an exceptional result ... The Supreme Court has barred any use of the sixth factor.

*Id.* (citations, internal quotations, and footnotes omitted.).

Applying the *Johnson* factors, the Court finds that this case does not present exceptional circumstances warranting an adjustment of the lodestar fee. *See City of Burlington,* 505 U.S. at 562. As stated above, an analysis of the first and seventh factors is included in the loadstar calculation and need not be repeated. *Walker,* 99 F.3d at 771-72. Factors two and three-the novelty and difficulty of the case and the skill required to prosecute it-has also presumably been considered, insofar as it played a role in the determination of reasonable hourly rates in this case. Nonetheless the Court finds that this case required a certain degree of skill and was in some ways difficult, as it involved complex medical issues and heavily disputed evidentiary issues. However, as this case was, on balance, a quotidian workers' compensation case, the application of the second and third *Johnson* factors do not warrant an upward adjustment of the lodestar.

Mr. Raizner states that, given the relative small size of his firm, the acceptance of this case necessarily impacted the firm's ability to accept other case. He was unable to point to specific examples of cases that the firm declined because of this case, however. The Court finds that this factor is a wash and should not operate to affect the lodestar. The Court further finds that the fifth, ninth, and twelfth factors have already been considered in the Court's determination of the hourly rates charged by Stafford's attorneys. The $350.00 hourly rate charged by Mssrs. Raizner and Doyle, while seemingly high for representation of a workers' compensation appeal, is reasonable given their experience and skill, and the demonstrated ability of Mr. Raizner at trial. The remaining factors do not sway the Court to modify the lodestar here. In summary, after a thorough review, the Court finds that no need exists for any adjustment to the lodestar fee. Therefore, the lodestar fee of $64,618.75 should be the final attorney's fee for work performed by Stafford's attorneys in this case.

## D. Expenses

Finally, Old Republic now contends that Stafford is not entitled to recover his expenses in this litigation. This, despite the fact that in its previous filing Old Republic simply objected to the reimbursement of such expenses because Stafford failed to adequately document them; no challenge was made to Stafford's entitlement to recover expenses. (Old Republic's Obj. to Def.'s Fee Application, at 10-11). Again, however, Old Republic's newfound argument falters. Section 408.221(b) specifically provides that "an attorney's fee under this section is based on the attorney's time *and expenses* according to written evidence presented to the ... court."TEX. LABOR CODE § 408.221(b) (emphasis added). However, the Court agrees with Old Republic's original point that Stafford is not entitled to recover his expenses in the absence of authenticating documents. Accordingly, the Court orders Stafford to provide the Court with invoices, receipts, and supporting affidavits (including descriptions of the nature of each expense and the reasons therefor) within 10 days of the date of this order.

---

### E. Old Republic's Motion for Approval of Attorney's Fees

**\*10** Section 408.222(a) of the Texas Labor Code provides that "[t]he amount of an attorney's fee for defending an insurance carrier in a workers' compensation action brought under this subtitle must be approved by the commission or court and determined by the commission or court to be reasonable and necessary."TEX. LABOR CODE § 408 .222(a). Subsection (b) requires defense counsel to present written evidence to the Court relating to: "(1) the time spent and expenses incurred in defending the case; and (2) other evidence considered necessary by the commission or court in making a determination under this section."*Id.* at § 408.222(b). The Court first questions whether § 408.222 even applies to this case, inasmuch as Plaintiff's counsel initiated this action and is not "defending" but rather "representing" Old Republic. And second, even if § 408.222 applies, Old Republic has failed to provide the time spent on "defending" this case, nor has it provided any evidence supporting its attorney's fees and expenses. Therefore, the Court denies Old Republic's motion without prejudice to its refiling. If Old Republic chooses to file an amended motion it must do so within 10 days from the date of this order.

### III. Conclusion

It is therefore ORDERED that Defendant Ronald Stafford's Motion for Approval of Second and Final Application for Defendant's Attorneys' Fees be, and it is hereby, GRANTED in part. Defendant Ronald Stafford shall have and recover from from the Plaintiff Old Republic his reasonable and necessary attorney's fees in the amount of $64,368.75. The Court ORDERS that this sum shall be paid within 30 days of the date of this order. Stafford shall have 10 days from the date of this order to provide documents authenticating his claim of expenses. Old Republic's objections to Stafford's supplemental evidence are OVERRULED to the extent not addressed in this order. Old Republic's Motion for Approval of Attorney's Fees is DENIED without prejudice. Old Republic may file a new motion and supporting evidence if it so chooses within 10 days of the date of this order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2026853

---

**End of Document**　　　　　　　　　　　　　　　　　　　© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

**Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)**

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

 KeyCite Yellow Flag - Negative Treatment

53 S.W.3d 310
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION OF TEXAS, et al., Petitioners,

v.

CITY PUBLIC SERVICE BOARD OF SAN ANTONIO and Houston Lighting & Power Company, Respondents.

No. 00–0156.  |  Argued Dec. 6, 2000.  |  Decided
June 28, 2001.  |  Rehearing Overruled Sept. 20, 2001.

City public service board and electric utility sought a declaratory judgment invalidating Public Utility Commission (PUC) rules that guaranteed open access to wholesale electricity transmission networks and established rate formula to determine access charges. The 98th Judicial District Court, Travis County, W. Jeanne Meurer, J., entered summary judgment for PUC, and plaintiffs appealed. On motion for rehearing, the Court of Appeals, Kidd, J., 9 S.W.3d 868, reversed and rendered. On review, the Supreme Court, Enoch, J., held that: (1) the facilities charge imposed by the PUC was a rate; (2) the PUC has authority to set rates for wholesale transmission service provided by investor-owned utilities, but not municipally-owned utilities; and (3) the PUC rules on access fee portion of a facilities charge for wholesale transmission service were invalid.

Affirmed.

Hecht, J., dissented and filed opinion.

West Headnotes (12)

**[1]**   **Public Utilities**   Powers and Functions

The power to fix prices and make rates by a board or commission is no different from any other power in determining whether the board or commission exceeds it authority; thus, the power need not be conferred under statutory or constitutional language that is free from doubt and that admits of no other reasonable construction.

4 Cases that cite this headnote

**[2]**   **Administrative Law and Procedure**   Statutory basis and limitation

**Administrative Law and Procedure**   Implied powers

A state administrative agency has only those powers that the legislature expressly confers upon it; but it may also have implied powers that are reasonably necessary to carry out the express responsibilities given to it by the legislature.

38 Cases that cite this headnote

**[3]**   **Administrative Law and Procedure**   Implied powers

When the legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties.

37 Cases that cite this headnote

**Public Utility Com'n of Texas v. City Public Service Bd. of...**, 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

**[4]**    **Administrative Law and Procedure**  🔑 Statutory basis and limitation

An agency may not exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes.

18 Cases that cite this headnote

**[5]**    **Administrative Law and Procedure**  🔑 Statutory basis and limitation

Courts consider the agency's interpretation of its own powers only if that interpretation is reasonable and not inconsistent with the statute.

5 Cases that cite this headnote

**[6]**    **Electricity**  🔑 Regulation of Charges

Facilities charge that was imposed by the Public Utility Commission (PUC) for wholesale transmission service in the Electric Reliability Council of Texas (ERCOT) grid was a "rate" within the meaning of the Public Utility Regulatory Act of 1995 (PURA), and, thus, the PUC rules on the charge set rates and did not merely establish a pricing methodology; no utility had a choice about whether to collect or pay the facilities charge. V.T.C.A., Utilities Code § 31.002(6); Tex.Admin. Code title 16, §§ 23.67, 23.70.

10 Cases that cite this headnote

**[7]**    **Electricity**  🔑 Regulation of Charges

The Public Utility Commission (PUC) has authority to set rates for wholesale transmission service provided by investor-owned electric utilities. V.T.C.A., Utilities Code §§ 11.003(18), 36.051; Tex.Admin. Code title 16, §§ 23.67, 23.70.

3 Cases that cite this headnote

**[8]**    **Electricity**  🔑 Reasonableness of charges

Wholesale transmission service that one electric utility supplies to another is a "service" within the meaning of the Public Utility Regulatory Act of 1995 (PURA) and its provision authorizing the Public Utility Commission (PUC) to set rates at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public. V.T.C.A., Utilities Code §§ 11.003(18), 36.051.

5 Cases that cite this headnote

**[9]**    **Electricity**  🔑 Regulation of Charges

The Public Utility Commission (PUC) lacks authority to set rates for wholesale transmission service provided by municipally-owned electric utilities. V.T.C.A., Utilities Code §§ 35.001, 35.004–35.006, 35.008; Vernon's Ann.Texas Civ.St. art. 1446c-0, § 2.057(a) (Repealed).

3 Cases that cite this headnote

**[10]**    **Electricity**  🔑 Regulation of Charges

Public Utility Commission's (PUC) rules on access fee portion of a facilities charge for wholesale transmission service in the Electric Reliability Council of Texas (ERCOT) grid were invalid as violating statutory requirements that the

**Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)**

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

fee be based on the cost to provide it and comparable to a utility's use of its own system; each utility paid each other utility the fee regardless of the proximity of transmission systems or any amount of actual use, and the fee was based on the aggregate of all uses and costs in the ERCOT grid. V.T.C.A., Utilities Code §§ 35.004(a, c), 36.051, 36.053; Tex.Admin. Code title 16, §§ 23.67(f–j, m), 23.70(j, o).

6 Cases that cite this headnote

**[11]** **Administrative Law and Procedure** Reenactment or incorporation of statute construed, effect of

The "legislative acceptance doctrine" applies when an agency interpretation of an ambiguous statute has been in effect for a long time and the legislature re-enacts the statute without change.

6 Cases that cite this headnote

**[12]** **Administrative Law and Procedure** Consistent or longstanding construction; approval or acquiescence

**Administrative Law and Procedure** Reenactment or incorporation of statute construed, effect of

The doctrine of legislative acceptance of an agency interpretation of a statute did not apply to codification of a statute at a time when the agency interpretation was new and subject to challenge.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*311** Philip R. Segrest, Shannon M. Sanders, Segrest & Segrest, McGregor, Jim McDermitt, Riley & McDermitt, Waco, Ronald Lynn Beal, Jo Campbell, Waco, for Petitioner.

**\*312** William B. Wagner, Marcy H. Greer, Marc Brian Collier, Louis S. Zimmerman, Filbright & Jaworski, Austin, Jon Clair Wood, W. Roger Wilson, Matthews & Branscomb, San Antonio, Robert J. Hearon, Jr., P.M. Schenkkan, Thomas B. Hudson, Jr., Ron H. Moss, Robin A. Melvin, Graves Dougherty Hearon & Moody, Austin, Hugh Rice Kelly, Houston, for Respondent.

**Opinion**

Justice ENOCH delivered the opinion of the Court, joined by Chief Justice PHILLIPS, Justice OWEN, Justice BAKER, Justice HANKINSON, and Justice JEFFERSON.

The Texas Legislature enacted the Public Utility Regulatory Act of 1995 (PURA95) to promote competition in the wholesale electricity market. [1] In PURA95, the Legislature instructed the Public Utility Commission to "adopt rules relating to wholesale transmission service, rates, and access." [2] We must decide whether the Commission exceeded this statutory authority when it promulgated rules establishing the rates that most Texas electric utilities must pay for wholesale transmission service. The court of appeals held that the Commission did exceed its authority. [3] We affirm the court of appeals' judgment.

[1]       *See* TEX. UTIL.CODE § 35.002.

[2]       *Id.* § 35.006(a).

[3]       9 S.W.3d 868, 877–78.

**Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)**

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

# I. BACKGROUND

The electric industry has three principal components: power generation, power transmission, and power distribution. Transmission, the component at issue in this case, involves transporting electricity over a utility's power lines. Texas's electric utilities have voluntarily interconnected their transmission systems, enhancing reliability and providing opportunities for utilities to purchase power from one another. This interconnected network of transmission lines forms a single grid within the state, known as the Electric Reliability Council of Texas (ERCOT). Although two other regional power grids serve parts of the state, ERCOT serves the majority of the state. In addition, because ERCOT is a wholly intrastate power grid, the federal scheme that the Federal Energy Regulatory Commission (FERC) administers does not generally govern ERCOT.

Power can be moved from any point on the ERCOT grid to any other point on the grid. When a utility purchases wholesale electric power, that power must be transported from the seller to the buyer. Because not all wholesale transactions occur between a buyer and seller whose transmission networks are directly interconnected, and because some power generators own no transmission lines, buyers and sellers must often transmit or "wheel" power across transmission facilities belonging to third parties. Before PURA95, utilities in ERCOT provided wholesale transmission services to each other primarily on an individual, contractual basis.

# II. PURA95

With PURA95, the Legislature endeavored to establish competition in the wholesale electricity market. The Legislature amended the existing Public Utility Regulatory Act (PURA) by adding provisions that in 1997 were codified at Subchapter A of Chapter 35 of the Utilities Code.[4] These **\*313** provisions required all transmission-owning utilities to provide "open access" to their transmission facilities for wholesale transmission.

[4] *See* TEX.REV.CIV. STAT. ANN.. art. 1446c–0 §§ 2.056–2.057, codified at TEX. UTIL.CODE §§ 35.001–.008. The Legislature again amended PURA in 1999. Cites in this opinion are to the pre 1999 version of the act unless otherwise noted.

First, the amendments authorize the Commission to "require a utility ... to provide transmission service at wholesale to another utility," and to "determine whether the terms and conditions for the transmission service are reasonable."[5] Next, the amendments specify that utilities owning or operating transmission facilities "shall provide wholesale transmission service at rates, terms of access, and conditions that are comparable to the rates, terms of access, and conditions of the utility's use of its system."[6] The Commission is responsible for "ensur[ing] that utilities provide nondiscriminatory access to transmission service...."[7] Moreover, when a utility provides wholesale transmission service at a third party's request, the amendments instruct the Commission to "ensure that the costs of the transmission are not borne by the utility's other customers by requiring the utility to recover from the entity for which the transmission is provided all reasonable costs incurred by the utility in providing transmission services necessary for the transaction."[8]

[5] TEX.REV.CIV. STAT. ANN.. art. 1446c–0 § 2.056(a), codified at TEX. UTIL.CODE § 35.005(a).

[6] *Id.* § 2.057(a), codified at TEX. UTIL.CODE § 35.004(a).

[7] *Id.,* codified at TEX. UTIL.CODE § 35.004(b).

[8] *Id.* § 2.057(c), codified at TEX. UTIL.CODE § 35.004(c).

Central to this dispute, PURA95 also provides that "[t]he [C]ommission shall adopt rules ... relating to wholesale transmission service, rates, and access."[9] These rules are to (1) be consistent with PURA95's standards; (2) not be contrary to federal law;

Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

and (3) require transmission services not less than the FERC could require in similar circumstances. [10] PURA95 mandates that all utilities owning or operating transmission services file tariffs with the Commission that are consistent with the Commission's rules. [11] Finally, PURA95 permits the Commission to "require that parties to a dispute over the prices, terms, and conditions of wholesale transmission service engage in a nonbinding alternative dispute resolution process before seeking a resolution from the [C]ommission." [12]

[9]    *Id.* § 2.057(a), codified at TEX. UTIL.CODE § 35.006(a).

[10]    *Id.*

[11]    TEX.REV.CIV. STAT. ANN.. art. 1446c–0 § 2.057(a), codified at TEX. UTIL.CODE § 35.007(a).

[12]    *Id.* § 2.057(d), codified at TEX. UTIL.CODE § 35.008.

### III. THE COMMISSION'S RULES

Responding to PURA95's command, the Commission adopted transmission rules 23.67 and 23.70, effective in March 1996. [13] Rule 23.67 completely replaced the existing rule 23.67, while rule 23.70 was new. Although the rules are extensive, the limited challenge before us relates to the provision that each ERCOT utility pay every other ERCOT utility a "facilities charge" for transmission services. [14] Thirty percent **\*314** of the facilities charge consists of an "impact fee." [15] This fee is calculated using a methodology called "vector-absolute megawatt mile," or "VAMM." [16] VAMM is a distance-sensitive calculation that measures the effects that a utility's planned transmission transactions have on other utilities' transmission systems. [17] The parties do not challenge this part of the facilities charge.

[13]    *See* 21 Tex. Reg. 1397 (1996), adopting 16 TEX. ADMIN. CODE E § 23.67 (Rule 23.67), *and* 21 Tex. Reg. 3343 (1996), adopting 16 TEX. ADMIN. CODEE § 23.70 (Rule 23.70). The rules have been recodified at 16 TEX. ADMIN. CODEE §§ 25.5, 25.191.198 and 25.200–.204. *See* 24 Tex. Reg. 2873 (1999). Subsequent amendments to the rules are not relevant to this dispute. References in this opinion are to the 1996 version of the rules.

[14]    16 TEX. ADMIN. CODEE § 23.67(g).

[15]    *Id.* § 23.67(g)(1).

[16]    *See id.* §§ 23.67(g)(6), 23.70(*o*).

[17]    *See* 21 Tex. Reg. 1403.

Rather, the parties challenge the other seventy percent of the facilities charge. This remaining part is called the "access fee." The access fee is based on each utility's percentage of use of the ERCOT grid. [18] The Commission calculated the access fee by first aggregating all ERCOT utilities' transmission costs. The Commission then determined the maximum amount of electricity, or "total peak load," for the entire grid for 1997 and each utility's percentage of that total. [19] Next, the Commission multiplied each utility's percentage of the total ERCOT peak load by the aggregate transmission costs for the entire grid to determine that utility's total access fee. Thus, for example, because Houston Lighting and Power's peak load for 1997 was 26% of the total ERCOT peak load for that year, HL & P's total access fee was 26% of the total ERCOT transmission costs. The Commission calls the access fee a "statewide postage stamp rate," because it does not depend on the distance the power travels.

[18]    16 TEX. ADMIN. CODEE § 23.67(g)(1).

[19]    *See id.*

**Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)**

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

After promulgating its new rules, the Commission held a series of contested-case hearings to set the specific facilities charge for each utility. The Commission based the total revenue each utility was to receive on the ratio of its transmission costs to the total system-wide transmission costs. [20] Following the hearings, the Commission released a matrix setting out each utility's payments to each other utility. [21] The access fee one utility pays to another is based on the payor's percentage of the ERCOT peak load and the recipient's total transmission costs. [22] For instance, if the payor utility uses 10% of the ERCOT peak load, it pays each recipient utility 10% of the recipient utility's total transmission costs.

[20]    16 TEX. ADMIN. CODEE § 23.67(j)(1).

[21]    *See* Tex. Pub. Util. Comm'n, *Regional Transmission Proceeding to Establish Statewide Load Flow Pursuant to Subst. R. 23.67,* Attachment D, Docket No. 15840 (final order)(August 11, 1997).

[22]    16 TEX. ADMIN. CODEE § 23.67(g)(1).


## IV. THE LAWSUIT

Respondents City Public Service Board of San Antonio (San Antonio) and HL & P sued the Commission in separate actions, seeking a declaration that the rules were invalid. The two cases were consolidated, and a number of parties appeared and aligned themselves with the Commission to defend the rules. [23] All parties moved for **\*315** summary judgment. The trial court granted the Commission's motion and denied San Antonio's and HL & P's.

[23]    Those parties, petitioners here alongside the Commission, are Brazos Electric Power Cooperative, Inc., City of Austin, Lower Colorado River Authority, Public Utilities Board of City of Brownsville, Rayburn Country Electric Cooperative, Tex La Electric Cooperative, Inc., East Texas Electric Cooperative, Inc., Houston County Electric Cooperative, Inc., Deep East Texas Electric Cooperative, Inc., Cherokee County Electric Cooperative Association, Texas New Mexico Power Company, and South Texas Electric Cooperative, Inc. Petitioners are referred to collectively as "the Commission."

San Antonio and HL & P appealed. Concluding that the Act did not give the Commission express authority to set wholesale transmission rates, the court of appeals reversed the trial court's judgment and rendered judgment that subsections (f), (g), (h), (i), (j), and (m) of Rule 23.67 and subsections (j) and (*o*) of Rule 23.70 are invalid. [24] We granted the Commission's petition for review.

[24]    9 S.W.3d 868, 877–78.


## V. STANDARD OF REVIEW

 **[1]**    Our first question is what standard to apply to decide whether the Commission's rules exceed the authority the Legislature gave the Commission in PURA95. In invalidating the rules, the court of appeals relied on this Court's opinion in *Humble Oil and Refining Company v. Railroad Commission of Texas.* [25] Citing *Humble Oil,* the court of appeals observed: "The power to fix prices and make rates by a board or commission cannot be conferred by implication. Such power must be conferred under statutory or constitutional language that is free from doubt, and that admits of no other reasonable construction." [26]

[25]    133 Tex. 330, 128 S.W.2d 9 (1939).

[26]    9 S.W.3d at 874 (citing *Humble Oil,* 128 S.W.2d at 15).

The Commission argues that the court of appeals erred in examining PURA95 under a "super standard" to determine whether the Legislature clearly and explicitly authorized the Commission to set rates. The true test of whether its rules are permissible,

the Commission says, is whether the rules are in harmony with the statute, regardless of how vague or explicit the statute is. San Antonio and HL & P counter that the court of appeals correctly followed *Humble Oil,* which confirmed that the power to set rates is unique and cannot be conferred except by explicit language.

 **[2]**    Despite some suggestive language, however, *Humble Oil* established no special rule for conferring ratemaking power. In fact, *Humble Oil* fits within the ordinary rules we apply to decide whether a state agency has exceeded its authority. The basic rule is that a state administrative agency has only those powers that the Legislature expressly confers upon it. [27] But an agency may also have implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature. [28] The power to set rates is no different from any other power.

[27]        *Public Util. Comm'n v. GTE-Southwest, Inc.,* 901 S.W.2d 401, 407 (Tex.1995); *see also State v. Public Util. Comm'n,* 883 S.W.2d 190, 194 (Tex.1994).

[28]        *GTE-Southwest,* 901 S.W.2d at 407 (quoting *Kawasaki Motors v. Motor Vehicle Comm'n,* 855 S.W.2d 792, 797 (Tex.App.—Austin 1993, no writ)).

Although it was decided more than sixty years ago, we have not cited *Humble Oil* in more than a handful of cases, and not for the proposition that a different rule governs when a state agency establishes rates. [29] But in fact the proposition that a commission has only those powers conferred upon it in clear and unmistakable language is simply an element of the standard we always apply when asked to review  **\*316**  an agency action to see whether the agency has exceeded its statutory authority. As we have said before, "the PUC is a creature of the legislature and has no inherent authority." [30] This is true of every state administrative agency, and as a result every such agency has only those powers expressly conferred upon it by the Legislature —just as *Humble Oil* says. [31]

[29]        See *Railroad Comm'n v. Lone Star Gas Co.,* 844 S.W.2d 679, 686–87 (Tex.1992); *Railroad Comm'n v. City of Austin,* 524 S.W.2d 262, 267 (Tex.1975); *Key Western Life Ins. Co. v. State Bd. of Ins.,* 163 Tex. 11, 350 S.W.2d 839, 848 (1961); *Board of Ins. Comm'rs v. Guardian Life Ins. Co. of Tex.,* 142 Tex. 630, 180 S.W.2d 906, 908 (1944).

[30]        *GTE-Southwest,* 901 S.W.2d at 406; *see also Public Util. Comm'n,* 883 S.W.2d at 194.

[31]        See *GTE-Southwest,* 901 S.W.2d at 407; *Public Util. Comm'n,* 883 S.W.2d at 194.

 **[3]**    **[4]**    **[5]**    But, as noted earlier, when the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. [32] An agency may not, however, exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes. [33] Moreover, we consider the agency's interpretation of its own powers only if that interpretation is reasonable and not inconsistent with the statute. [34]

[32]        *GTE-Southwest,* 901 S.W.2d at 407 (quoting *Kawasaki Motors v. Motor Vehicle Comm'n,* 855 S.W.2d 792, 797 (Tex.App.—Austin 1993, no writ)).

[33]        *Id.* (quoting *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137–38 (Tex.App.—Austin 1986, writ ref'd n.r.e.)).

[34]        *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993).

Applying the rules in this case, we must first ask whether the Legislature expressly gave the Commission the power to set wholesale transmission rates for all utilities. If not, we must ask whether that power is reasonably necessary for the Commission to fulfill the express functions and duties the Legislature did give it.

Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

## VI. DO THE RULES SET RATES?

 **[6]**    Another point we consider is whether Rules 23.67 and 23.70 set rates at all. The Commission argues that the rules do not set rates, but merely establish a pricing methodology. According to the Commission, it set any actual rates in a series of contested-case hearings to which the rules required all utilities to submit. [35] Thus, the Commission argues, the court of appeals erred in concluding that the rules set rates in the first place.

[35]    *See* 16 TEX. ADMIN. CODEE § 23.67(g)(1), (m).

PURA's definition of "rate" is broad:

> 'Rate' includes a compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by an electric utility for a service, product, or commodity ... and a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification that must be approved by a regulatory authority. [36]

[36]    TEX. UTIL.CODE § 31.002(6), formerly TEX.REV.CIV. STAT. ANN. . art. 1446c–0 § 2.0011(6).

Under this definition, the Commission's rules set rates.

The rules require each ERCOT grid utility to pay each other utility in the grid a facilities charge for wholesale transmission service. [37] Thus, they establish a "charge ... that is directly or indirectly ... collected by an electric utility for a service...." [38] Moreover, the rules explain that the facilities charge must consist of the access fee and the impact fee. No utility has a choice about whether to collect  **\*317**  or pay the facilities charge. The elements of the charge are non-negotiable. The only issue for a contested case hearing is to ascertain the precise numbers for each utility. And, as the Commission itself points out, the rules require all utilities to submit to such a hearing to have their rates established.

[37]    16 TEX. ADMIN. CODEE § 23.67(g).

[38]    TEX. UTIL.CODE § 31.002(6).

## VII. DOES THE COMMISSION HAVE THE POWER TO SET RATES?

 **[7]**    The Commission argues that the court of appeals erred in holding that the Commission has no statutory authority to set wholesale transmission rates. The Commission contends that PURA95 explicitly gives it such authority. Even if PURA95 does not, the Commission asserts that it has always had ratemaking power at least for HL & P, because HL & P is an investor-owned utility traditionally subject to the Commission's jurisdiction to establish rates. As we will explain, we agree that the Commission has the power generally to set HL & P's rates for wholesale transmission service, and that the court of appeals erred in this respect. But we do not agree that the same rationale applies to San Antonio, a municipally owned utility.

 **[8]**    The court of appeals erred when it looked only to chapter 35's provisions to find ratemaking authority. The statute must be construed as a whole, and PURA as a whole gives the Commission broad power over certain electric utilities, including investor-owned utilities like HL & P. This power includes the explicit authority to "establish and regulate rates," found in chapter 36. [39] As we have pointed out, the definition of "rate" includes any compensation or charge that a utility demands for a service. [40] PURA defines "service" to include:

[39]    *Id.* § 36.001(a).

40      *Id.* § 31.002(6); *see supra* Section VI.

any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, *other public utilities,* and the public. [41]

41      *Id.* § 11.003(18) (emphasis added).

This definition encompasses wholesale transmission service that one utility supplies to another.

Further, chapter 36 specifies that "[a]n electric utility may not charge or receive a rate for utility service except as provided by this title." [42] And "service" provides the starting point for setting rates under chapter 36. This point is evident from section 36.051, which commands that:

42      TEX. UTIL.CODE § 36.002.

[i]n establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital *used and useful in providing service* to the public in excess of the utility's reasonable and necessary operating expenses. [43]

43      *Id.* § 36.051 (emphasis added).

In view of these statutory provisions, we conclude that chapter 36 permits the Commission to set rates for wholesale transmission service provided by investor-owned utilities.

The chapter further states that the Commission "shall ensure" that the rate a utility demands or receives "is just and reasonable." [44] Moreover, rates may not **\*318** be "unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable and consistent in application to each class of consumer." [45] Finally, the chapter has detailed provisions explaining how the Commission shall determine a utility's rates. For instance, a utility's revenues must permit it to earn a reasonable return on its invested capital. [46] The statute specifies the factors to consider in a "reasonable return," and also delineates "invested capital" components. [47] In establishing a reasonable return for a utility on its invested capital, the Commission must consider "the quality of the utility's services." [48] Additional provisions describe in detail how the Commission must treat other elements involved in establishing rates. [49] Thus, we conclude that the court of appeals erred when it dismissed chapter 36 as applying only to the rates charged to end-users for electricity sales. [50]

44      *Id.* § 36.003(a).

45      *Id.* § 36.003(b).

46      *Id.* § 36.051.

47      *Id.* §§ 36.052–36.053.

48      *Id.* § 36.052(3).

49      *See, e.g., id.* §§ 36.054–.064.

50      *See* 9 S.W.3d at 874.

In fact, HL & P specifically concedes that chapter 36 gives the Commission the authority to set its wholesale transmission rates. It now argues, however, that the Commission may not set these rates by a statewide rule, but only in a contested-case hearing as chapter 36 requires. But HL & P did not raise this point as a ground for summary judgment in the trial court, and did not argue it before the trial court or the court of appeals. We therefore decline to address it.

Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

 **[9]** San Antonio, however, is another matter. San Antonio is a municipally owned utility, and PURA treats municipally owned utilities differently from investor-owned utilities. Throughout most of PURA, including chapter 36, the term "electric utility" excludes municipally owned utilities like San Antonio.[51] Thus, the Commission's jurisdiction over municipally owned utilities is restricted. Unlike investor-owned utilities, municipally owned utilities retain the ability to set their own rates without the Commission's approval.[52] The Commission may establish rates for a municipally owned utility only in limited circumstances.[53] Thus, the Commission's chapter 36 ratemaking authority does not extend to San Antonio.

[51]     *Id.* § 31.002(1).

[52]     *Id.* § 32.002.

[53]     *See, e.g., id.* §§ 33.002(a)-(b), 33.051, 33.052, 33.054.

But chapter 35, in contrast to the rest of PURA, specifically includes municipally owned utilities in its definition of "electric utility."[54] Consequently, all powers that chapter 35 gives the Commission extend to municipally owned utilities. For the Commission to have the power to set wholesale transmission rates for San Antonio, then, chapter 35 must grant that power. But chapter 35 contains no explicit grant of ratemaking authority. Nor is the power to set rates initially by rule necessarily implied from the specific authority chapter 35 does contain.[55]

[54]     *Id.* § 35.001.

[55]     *See GTE-Southwest,* 901 S.W.2d at 407.

First, chapter 35 lacks the clear language the Legislature used in chapter 36—nowhere does chapter 35 give the Commission the explicit power to "establish and regulate rates."[56] Nor does chapter **\*319** 35 contain any detail comparable to chapter 36's provisions regarding the factors to be considered in setting wholesale transmission rates. The Commission asserts that the Legislature did not need to repeat such language in chapter 35, because it need not restate in each new statutory section all powers already bestowed on the Commission. While this may be true, the powers bestowed in chapter 36 do not extend to municipally owned utilities. And section 35.001 says that "electric utility" includes municipally owned utilities for Subchapter A of chapter 35 only.[57] Consequently, chapter 35 does not sweep municipally owned utilities into chapter 36's scheme.

[56]     TEX. UTIL.CODE § 36.001(a).

[57]     *Id.* § 35.001.

Moreover, the specific powers that chapter 35 gives the Commission do not necessarily imply the authority to set rates. The Commission is to "adopt rules relating to wholesale transmission service, rates and access," which must be consistent with chapter 35's standards.[58] Excluding the specific power to "adopt rates" in favor of the power to "adopt rules relating to ... rates" suggests that the Legislature deliberately declined to give the Commission the same kind of authority that it has under chapter 36.[59] The unchallenged parts of Rule 23.67 contain examples of such rules. For instance, Rule 23.67(d) requires utilities to provide ancillary services in conjunction with wholesale transmission service and provides that "such services shall be discretely priced and separately provided on a nondiscriminatory basis [.]"[60] Rule 23.67(e) allows a utility to supply additional ancillary services, with the price to be determined by negotiations between utility and customer.[61] Rule 23.67(*o*) instructs utilities to make filings with the Commission separating out their costs and rates, based on the costs associated with generation, transmission and distribution operations.[62]

[58]     *Id.* § 35.006(a).

Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

59      *See Commercial Standard Ins. Co. v. Bd. of Ins. Comm'rs,* 34 S.W.2d 343, 344 (Tex.App.—Austin 1930, writ ref'd).

60      16 TEX. ADMIN. CODEE § 23.67(d).

61      *Id.* § 23.67(e).

62      *Id.* § 23.67(*o*).

Similarly, the specific power to review rates for reasonableness, which chapter 35 explicitly gives the Commission, is distinct from the power to set rates in the first instance. [63] Although the Commission argues that we must read the phrase "relating to rates" to include the ability at least to set rates, citing *Morales v. Trans World Airlines, Inc.,* [64] and *Continental Airlines, Inc. v. Kiefer,* [65] these cases are inapposite for the reasons the court of appeals explained. [66]

63      *See State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 529–30 (Tex.1975).

64      504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

65      920 S.W.2d 274, 278–79 (Tex.1996).

66      9 S.W.3d at 876–77.

Chapter 35 gives the Commission other express powers as well. The Commission is to ensure that all utilities provide nondiscriminatory access to transmission service. [67] The Commission may also require a utility to provide wholesale transmission service to another utility, and may determine whether the terms for the transmission service are reasonable. [68] And, when a utility provides transmission service at a third party's request, the Commission is to **\*320** ensure that the utility recovers its reasonable costs from the entity receiving the services so that the utility's customers don't bear those costs. [69] None of these powers and duties grants or necessarily requires the ability to initially set wholesale transmission rates.

67      TEX. UTIL.CODE § 35.004(b).

68      *Id.* § 35.005(a).

69      *Id.* § 35.004(c).

An argument is made that, because the Commission may decide whether the terms of service are reasonable, it may determine in advance that, in every case, the postage-stamp method is the only reasonable one for setting rates. This argument does not comport with the limited authority that chapter 35 gives the Commission that we have just described. For if the Commission has the authority initially to set rates, then it could of course predetermine what rate is reasonable. Absent the authority to set rates, though, it is not at all certain that the Commission could set a blanket rate.

Finally, the Commission may require that parties to a dispute "concerning prices or terms of wholesale transmission service" engage in a nonbinding dispute resolution process before coming to the Commission to resolve the dispute. [70] But if all rates for wholesale transmission service are set up front, there will be no "dispute[s] concerning prices." The Commission's rules thereby render this part of the statute meaningless. [71] The Commission points out several pending cases in which utilities are challenging the outcome of individual contested-case hearings in which the Commission set their wholesale transmission rates, arguing that these cases show that disputes still exist that could be subject to ADR. The short answer to this contention is that these are not the disputes between utilities that the statute contemplates. Instead, by its plain language the statute anticipates disputes between individual utilities about the price for wholesale transmission service-which can't exist when the Commission has already said precisely what each utility must pay to each other utility for such service.

70      *Id.* § 35.008.

Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

71      *See* TEX. GOV'T CODE § 311.021(2); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981).

In sum, we agree with the court of appeals that chapter 35 envisions largely an oversight role for the Commission with respect to wholesale transmission transactions. [72] The statute contemplates that one utility will request transmission service from another utility. Should those parties not be able to agree on the terms for service, they can turn to the Commission. In that circumstance, the Commission can order one utility to provide service to another, can determine whether the terms for that service are reasonable, and can ensure that the utility providing service recovers its costs from the utility receiving service. [73] Once confronted with a dispute between utilities, the Commission can arrive at a reasonable rate to resolve that dispute. The Commission also has the option to refer parties to alternative dispute resolution to settle disputes over transmission service pricing. [74] Moreover, to ensure that utilities are providing comparable prices and services and non-discriminatory access, and to protect a utility's customers from bearing others' transmission costs, the Commission has the independent ability to order utilities to appear before it even without a dispute. [75] **\*321** But the Commission does not have the authority under chapter 35 to dictate by rule the rates that each utility must charge each other utility for wholesale transmission service.

72      *See* 9 S.W.3d at 874–75.

73      TEX. UTIL.CODE §§ 35.004(c), 35.005(a).

74      *Id.* § 35.008.

75      *See id.* § 35.004(a)-(c).

The Commission further argues that minor changes made to chapter 35 in the codification process demonstrate that the Legislature approved its rules. In section 2.057(a) of PURA95 as originally enacted, the Commission was instructed to adopt rules relating to wholesale transmission service, rates, and access "within 180 days of the effective date of this section...." [76] When the statute was codified, the 180 day requirement was dropped. The Commission argues that this change indicates the Legislature's approval of its rules. It does not. Rather, it demonstrates no more than the fact that the Legislature was aware that the Commission had adopted rules—that is, the deletion recognized the rules' existence; it did not comment on the rules' substance.

76      TEX.REV.CIV. STAT. ANN.. art. 1446c–0 § 2.057(a).

The Commission also points to the fact that section 2.057(a) commanded utilities to file their tariffs "within 60 days after the commission has adopted transmission pricing and access rules pursuant to this section...." [77] This language was also dropped in the codification. The Commission argues that the phrase "transmission pricing ... rules" recognizes its authority to set rates by rule. But this phrase will not bear the weight the Commission puts on it. A simple reference to "pricing rules," which refers back to previous language, cannot grant additional substantive powers.

77      *Id.*

Thus, we conclude that PURA95, as originally enacted and codified, did not give the Commission any authority to set wholesale transmission rates for municipally owned utilities, including San Antonio. But the Commission retains its existing authority to set wholesale transmission rates for investor-owned utilities, including HL & P, pursuant to chapter 36.

## VIII. RESPONDENTS' CHALLENGE TO THE ACCESS FEE

 **[10]**     Our conclusion that the Commission lacks authority under chapter 35 to set rates for San Antonio means we need not reach San Antonio's remaining issues. For its part, HL & P argues that, even if the Commission had the authority to set its wholesale transmission rates generally (which HL & P has conceded), the Commission exceeded that authority in creating the "access fee" portion of the facilities charge, because the access fee violates a variety of PURA95's requirements. The Commission contends

that we should remand this issue to the court of appeals, which did not reach it. Because the Legislature has already amended the statute in ways which limit the relevance of this case to the 1996–1999 time period, there is nothing to be gained by a remand but further delay. We will therefore consider the issue.[78]

78      *See* TEX.R.APP. P. 53.4.

HL & P argues that the access fee is inconsistent with PURA95's provisions because it creates subsidies among utilities, and because it does not set rates for wholesale transmission service that are comparable with each utility's use of its own system. We agree that the access fee does not comport with the statute.

### A. Costs and Service

The access fee is inconsistent with the statute because it requires payments without **\*322** regard to whether actual services are provided. The statute contemplates that one utility will request transmission service from another, and that the amount paid for that service will be based on the cost to provide it.[79] But the access fee is not related in any way to whether a utility actually uses another utility's transmission lines to transport wholesale power. Nor is it based on the cost of providing wholesale transmission service in any particular transaction, even though the Commission itself acknowledges that the distance power must travel is a significant factor in that cost.[80] Each utility pays each other utility the fee regardless of the proximity of transmission systems or any amount of actual use. Thus, one utility may pay an access fee to another utility even if it never uses the other's lines for a single transmission—even if it has no wholesale transmissions at all. For example, the Commission's own impact fee calculations, done using the VAMM method, demonstrate that HL & P's transmission has no effect on the transmission lines of several utilities located far from Houston; yet, HL & P pays these utilities a percentage of their transmission costs based on HL & P's percentage of usage at ERCOT's peak.[81] The same is true for San Antonio.[82]

79      *See* TEX. UTIL.CODE § 35.004(a).

80      *See* 21 Tex. Reg. 1404.

81      *See* Tex. Pub. Util. Comm'n, *Regional Transmission Proceeding to Establish Statewide Load Flow Pursuant to Subst. R. 23.67,* Attachment D, Docket No. 15840 (final order)(August 11, 1997), *compare* "Postage Stamp Component of TCOS" *with* "Summary of Megawatt Mile Impact."

82      *See id.*

The end result of the access fee requirement is that some utilities pay out more for transmission service than they recover. Thus, as a practical matter, these utilities do not recover their transmission costs from the entities for whom wholesale transmission is provided, contravening the statute.[83] And to the extent they do recover their costs, it may be from utilities for whom they provided no service. What is more, this shortfall, the Commission itself has said, should be factored into the rates that retail customers pay for electric service.[84] Consequently, in direct violation of the statute's requirements, a utility's "other customers" bear the costs of wholesale transmission service.[85]

83      TEX. UTIL.CODE § 35.004(c).

84      *See* 21 Tex. Reg. 1403.

85      TEX. UTIL.CODE § 35.004(c).

The Commission argues that the access fee is consistent with PURA95. First, it points out that in Rule 23.67(*o*), which has not been challenged, it required all utilities to make filings with the Commission separating out their component costs for generation, distribution and transmission operations.[86] Rule 23.67(*o*) further requires each utility to functionally "unbundle"

Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

certain operations. [87] The Commission argues that this unbundling means that a utility's functions as transmission customer and transmission provider are treated as belonging to completely separate companies, so that it is not surprising, and in fact doesn't matter, that a utility may pay more for service as a transmission customer than it receives for service as a transmission provider.

[86]     16 TEX. ADMIN. CODEE § 23.67(*o*).

[87]     *Id.* § 23.67(*o*)(1).

Second, the Commission argues that VAMM does not accurately measure the effects one utility's transmissions have on another utility's lines at all times. Rather, VAMM is a "snapshot" of usage at one **\*323** instant. Because of the nature of electricity, the Commission asserts, a utility's transmissions have overflow effects on other utilities' lines, even if those effects are unintended. Electricity, says the Commission, follows the path of least resistance and doesn't observe man-made boundaries. The access fee accounts for this inadvertent usage.

Third, the Commission insists that the access fee fosters wholesale competition because any utility in ERCOT can buy power from any other utility on the grid without having to factor in transmission costs. The access fee is constant regardless of the distance power must travel or how many wholesale transactions a utility conducts.

We are not persuaded by the Commission's arguments. With respect to unbundling, Rule 23.67(*o*) does not require the transmission-providing and transmission-consuming operations of a utility to be treated as separate companies. Rather, it is the transmission operations and the wholesale purchase and sale activities that are to be separated. [88] Moreover, the Commission fails to explain why both aspects of transmission would not be included in a utility's transmission operations, even if the other functions were unbundled. And in any event, since any unbundling is merely functional, the overall effect remains the same- a utility that pays out more than it takes in, as a whole, does not recover its transmission costs. And the Commission expects those costs to be passed on to other customers.

[88]     *Id.; see also* 21 Tex. Reg. 1410.

With respect to VAMM, certainly the Commission itself thought the method sufficient to measure one utility's effects on another for purposes of setting the impact fee. Indeed, in adopting the method, the Commission said:

> The [VAMM] method *measures all changes in the use of the transmission lines;* it is more stable than the other variants of the megawatt-mile methodology; it will aid in accurate transmission pricing; and it sends the appropriate price signals to generators and loads. [89]

[89]     21 Tex. Reg. 1403 (emphasis added).

Moreover, in the Commission's own words, "while a utility such as HL & P may own transmission lines that connect all of its generators to its loads, the power produced by its generators may actually flow over both its own transmission lines and the transmission lines of *neighboring* utilities." [90] This does not explain why, for example, HL & P must pay an access fee to the Rio Grande Electric Cooperative, which is certainly not a "neighboring" utility. In any event, in PURA95 the Legislature did not direct the Commission to compensate utilities for occasional inadvertent power flows over their transmission systems.

[90]     *Id.* at 1404 (emphasis added).

Finally, although the access fee may encourage wholesale competition, that cannot make up for the fact that it violates the explicit command that the rules be consistent with PURA95's standards. As we noted earlier, an administrative agency may not exercise a new power, or one that is inconsistent with the agency's statutory mandate, simply because the agency perceives that power as expedient. [91]

91      *GTE-Southwest,* 901 S.W.2d at 407.

### B. Comparability

HL & P also argues that the access fee violates PURA95's mandate that the rates a utility charges for wholesale transmission **\*324** service be comparable to its own use of its system. The Commission maintains that the fee is consistent with the comparability requirement because each utility pays itself for transmission service at the same rate as others pay it for the same service. HL & P points out, however, that the rates set by the access fee are not comparable to the existing rates charged retail customers. Those rates are based on a utility's own invested capital and costs. [92] The access fee, on the other hand, is based on the aggregate of all uses and costs in the ERCOT grid. Thus, the access fee is not based on a utility's use of its own system, as the statute contemplates. Nor is it comparable to what a utility charges its retail customers for service. For these reasons, the access fee also violates section 35.004(a)'s comparability requirement.

92      *See* TEX. UTIL.CODE §§ 36.051, 36.053.

### C. Legislative Acceptance

 **[11]**    **[12]**    Petitioner Texas–New Mexico Power Company offers an additional argument in support of the rules. It asserts that the Legislature accepted the Commission's construction of PURA95 when it codified the statute in 1997. But the doctrine of legislative acceptance applies when an agency interpretation of an ambiguous statute has been in effect for a long time and the Legislature re-enacts the statute without change. [93] That is not the case here. The Legislature did not re-enact PURA95, but rather codified it. And the Commission's interpretation of the statute at that time was new, and already subject to a court challenge in this case. Finally, in 1999 the Legislature did amend chapter 35.

93      *See Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 248 (Tex.1991).

In the 1999 amendments to chapter 35, the Legislature specified that the Commission:

> shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region. [94]

94      TEX. UTIL.CODE § 35.004(d), amended by Acts 1999, 76th Leg., ch. 405, § 17.

Thus, the Legislature has now affirmatively told the Commission to price wholesale transmission services entirely by the postage stamp method previously used to set only the access fee.

The parties agree that, following this change, the Commission has the authority to set rates for both investor-owned and municipally owned utilities using the postage stamp method. [95] The Commission argues that the 1999 amendments simply clarified the authority it already had, while HL & P argues that they bestowed an entirely new power. For our purposes, subsequent statutory amendments are of limited usefulness. We must be guided by what the law was in the relevant time period —1995. And PURA95 was not ambiguous with respect to the powers it gave the Commission.

95      *See also* TEX. UTIL.CODE §§ 40.004(1), 40.055(a)(1), added by Acts 1999, 76th Leg., ch. 405, § 39.

The Commission also points out that, although the Legislature added the postage stamp provision, it did not change **\*325** those provisions of the statute with which we have found the Commission's rules to be inconsistent. The Commission suggests

**Public Utility Com'n of Texas v. City Public Service Bd. of..., 53 S.W.3d 310 (2001)**

Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

that this means the Legislature did not think there was any inconsistency. But the Legislature can, and does, choose to amend a statute without reconciling all inconsistencies. In fact, the Legislature has offered instructions for interpreting apparently irreconcilable amendments. [96] And this case does not require us to interpret chapter 35 as it currently appears.

[96]    *See* TEX. GOV'T CODE § 312.014.

Because we have determined that the access fee is inconsistent with the statute's command, we do not reach the further question of whether the rules are contrary to federal law. If, as the Commission argues, the access fee is consistent with orders from the FERC, that still cannot supply statutory authority that our own Legislature has not given. We express no opinion on the court of appeals' discussion of this point.

Finally, the Commission argues that, even if the access fee portions of the rules are invalid, the court of appeals erred in striking Rule 23.67(m) because that rule does nothing more than articulate the statutory requirement that all utilities file tariffs. But in fact the rule mandates that tariffs "shall comply with the provisions of this rule," many of which are invalid. Thus, because Rule 23.67(m) requires compliance with invalid portions of the rules, Rule 23.67(m) itself is invalid.

## IX. CONCLUSION

Because the Commission exceeded its statutory authority in (1) establishing wholesale transmission rates for municipally owned utilities and (2) establishing the access fee, subsections(f), (g), (h), (i), (j) and (m) of Rule 23.67, and subsections (j) and (*o*) of Rule 23.70, are invalid. We therefore affirm the court of appeals' judgment.

Justice HECHT, filed a dissenting opinion.

Justice O'NEILL, did not participate in this decision.

Justice HECHT, dissenting.
I respectfully dissent.

In 1995, the Legislature enacted what is now chapter 35 of the Texas Utilities Code, directing the Public Utility Commission to "adopt rules ... relating to wholesale [electric] transmission service, rates, and access." [1] To comply with this mandate, the Commission adopted two rules, [2] the provisions of which at issue here required that load-serving ERCOT [3] utilities pay each other a "facilities charge" for transmission services. Seventy percent of that charge was an "access fee" calculated by multiplying a utility's percentage of ERCOT's peak load by ERCOT's total transmission costs. Because a utility's access fee was thus largely unrelated to its own transmission costs or the distance between utilities, the Commission referred to it as a "postage stamp" rate. In 1999, the Legislature amended chapter 35 to "price wholesale transmission services within ERCOT based on the postage stamp method"—entirely, not just seventy percent. The **\*326** parties concede that this was within the Legislature's power. The dispute is over whether the Legislature gave the Commission authority to adopt the postage stamp method before the 1999 amendment.

[1]    Public Utility Regulatory Act of 1995, 74th Leg., R.S., ch. 765, § 2.08, 1995 Tex. Gen. Laws 3972, 4000, codified as TEX. UTIL.CODE §§ 35.001–.008. All statutory references are to the Texas Utilities Code.

[2]    Rule 23.67, 21 Tex. Reg. 1397, *amended by* 21 Tex. Reg. 8500 (1996), and Rule 23.70, 21 Tex. Reg. 3343 (1996), formerly codified as 16 TEX. ADMIN. CODEE §§ 23.67 and 23.70, and both repealed by 24 Tex. Reg. 2873 (1999).

[3]    Electric Reliability Council of Texas.

The Court concludes that the Commission had no such authority for two reasons. First, the Court says that the access fee was a rate and the 1995 statute did not empower the Commission to adopt rates. The authority to "adopt rules relating to rates", the Court says, is not the authority to "adopt rates", contrasting the explicit "establish and regulate rates" language of chapter 36. [4] But when the statutory language is read in context, any distinctions disappear. For one thing, no one has yet offered an example of a rule that related to rates without to some extent prescribing rates. Even a rule that said nothing more than the statute—that rates must be reasonable [5] —limits rates. If a mandate to "adopt rules relating to rates" does not authorize ratemaking, what exactly does it authorize? Neither the Court nor the parties have an answer. Moreover, the 1995 statute expressly authorized the Commission, as the Court acknowledges, [6] to "require an electric utility to provide transmission service at wholesale" and to "determine whether terms for the transmission service are reasonable." [7] Could the Commission say in every case, "No rate other than a postage stamp rate is reasonable"? Of course. Then what is the difference between deciding every case on the same rationale and restating that rationale as a rule? Obviously, there is none. The Court's eyes-wide-shut approach to reality reduces to this: the Commission could decide, case by case, that a reasonable rate must be based seventy percent on an access fee methodology, but it could not make its *ratio decidendi* a rule.

[4]     TEX. UTIL.CODE § 36.001(a).

[5]     TEX. UTIL.CODE § 35.005(a).

[6]     *Ante* at 322.

[7]     TEX. UTIL.CODE § 35.005(a).

Second, the Court says that the Commission's rules conflict with three provisions of the statute. One is that "[t]he commission may require that each party to a dispute concerning prices or terms of wholesale transmission service engage in a nonbinding alternative dispute resolution process before seeking resolution of the dispute by the commission." [8] What price disputes are there to resolve, the Court asks, if rates are set by rule? One answer is that the Commission's determination of wholesale rates has required numerous proceedings involving each utility. These may be what the Legislature had in mind. The other two conflicting statutory provisions, according to the Court, are that wholesale transmission rates be "comparable to the rates and terms of the utility's own use of its system", [9] and that such rates "ensure that the utility recovers the utility's reasonable costs." [10] But the facilities charge prescribed by the Commission's rules is comparable enough to a utility's own system use as to be within the "zone of reasonableness" for setting rates, [11] and the charge does not deny a utility recovery of reasonable costs.

[8]     *Id.* § 35.008.

[9]     *Id.* § 35.004(a).

[10]     *Id.* § 35.004(c).

[11]     *See City of Corpus Christi v. Public Utility Comm'n,* 51 S.W.3d 231, 246 (Tex.2001).

More importantly, however, by the 1999 amendment the Legislature required that transmission service rates be set *entirely*— not just seventy percent—using the postage stamp method without changing **\*327** any of the statutory provisions the Court finds to be conflicting. If a prescribed rate methodology conflicts with the availability of alternate dispute resolution, why did the Legislature leave the latter provision untouched when it amended the statute? If postage stamp rates violate chapter 35 because they subsidize less efficient utilities and are unrelated to a utility's costs, how was the Legislature able to prescribe such rates in chapter 35 without doing violence to its own statute? The Court has no answer.

The Court says that we must presume that the Legislature intended by its 1999 amendments to change the law. I do not see how we can possibly tell whether the Legislature intended a change, or a correction, or something else entirely. Neither the Court nor the parties have pointed to any legislative history that could provide an answer. What can be said with absolute certainty, however, is that the Legislature determined in 1999 that the Commission's postage stamp rate was consistent with the overall

scheme of chapter 35 and the best way to achieve its purposes. In light of that determination, I do not understand how it is possible to conclude, as the Court does, that the exact same statute in 1995, minus the provision added in 1999, prohibited the Commission's postage stamp rate methodology.

I would reverse the judgment of the court of appeals and affirm the judgment of the district court upholding the Commission's rules.

**All Citations**

53 S.W.3d 310, Util. L. Rep. P 26,790, 44 Tex. Sup. Ct. J. 1014

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

363 S.W.3d 242
Court of Appeals of Texas,
Texarkana.

STATE OFFICE OF RISK MANAGEMENT, Appellant,
v.
Elaine E. Banks JOINER, Appellee.

No. 06–11–00076–CV.   |   Submitted: Dec. 28, 2011.   |   Decided: March 21, 2012.

**Synopsis**

**Background:** Employer sought review of decision of the Appeals Panel for Department of Insurance—Division of Workers' Compensation that based claimant's right to benefits on her treating physician's impairment rating (IR). The 419th Judicial District Court, Travis County, Amy Clark Meachum, J., rendered judgment in favor of claimant and ordered employer to adopt the impairment rating. Employer appealed.

**Holdings:** The Court of Appeals, Moseley, J., held that:

[1] treating physician's certification of claimant's IR was not invalid for failure to reflect correct date of maximum medical improvement (MMI), and

[2] issue of treating physician's compliance with medical guides to the evaluation of impairment would not be considered.

Affirmed.

West Headnotes (11)

[1]     **Workers' Compensation**   Trial de novo in general

Under the modified de novo standard of review the trial court is informed of the Workers' Compensation Commission's decision, but is not required to accord that decision any particular weight.

2 Cases that cite this headnote

[2]     **Workers' Compensation**   Weight and sufficiency

Under the modified de novo standard of review of a decision of the Workers' Compensation Commission, the trial court is not required to give the designated doctor's opinion special weight.

2 Cases that cite this headnote

[3]     **Workers' Compensation**   Evidence on Trial De Novo

Evidence of the extent of a claimant's impairment is limited in the trial court to that presented to the Workers' Compensation Commission unless the trial court finds the claimant's condition has substantially worsened.

Cases that cite this headnote

**[4]** **Workers' Compensation** Medical impairment; impairment ratings

Fact-finder in a workers' compensation case is required to adopt the specific impairment rating arrived at by one of the physicians who examined the claimant. V.T.C.A., Labor Code § 410.306(c).

Cases that cite this headnote

**[5]** **Workers' Compensation** Presumptions and burden of showing error

The party appealing the impairment rating decision in a workers' compensation case has the burden of proof by a preponderance of the evidence. V.T.C.A., Labor Code § 410.303.

Cases that cite this headnote

**[6]** **Workers' Compensation** In general; questions of law or fact

Trial court's conclusions of law in a workers' compensation case are reviewed de novo.

1 Cases that cite this headnote

**[7]** **Workers' Compensation** In general; questions of law or fact

**Workers' Compensation** Conclusiveness of administrative findings in general

Conclusions of law in a workers' compensation case may not be challenged for factual sufficiency, but are reviewed to determine their correctness based upon the facts.

1 Cases that cite this headnote

**[8]** **Workers' Compensation** In general; questions of law or fact

**Workers' Compensation** Reversal

The appellate court will uphold conclusions of law in a workers' compensation case if the judgment can be sustained on any legal theory supported by the evidence; thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory.

1 Cases that cite this headnote

**[9]** **Workers' Compensation** Medical impairment; impairment ratings

Treating physician's certification of workers' compensation claimant's impairment rating (IR) was not invalid because it failed to reflect the stipulated date of maximum medical improvement (MMI); rule requiring that assignment of an impairment rating must be based on injured employee's condition as of the MMI date did not state consequence of noncompliance, and therefore, rules of evidence governed issue of evidentiary sufficiency. 28 TAC § 130.1(c)(3).

Cases that cite this headnote

**[10]** **Workers' Compensation** Construction and Operation of Statutes in General

When examining the provisions within the Texas Workers' Compensation Act, courts should keep in mind the comprehensive nature of the Act. V.T.C.A., Labor Code § 401.001 et seq.

Cases that cite this headnote

**[11]** **Workers' Compensation** Theory of claim or defense

Issue of whether claimant's treating physician failed to comply with medical guides to the evaluation of permanent impairment in assigning an impairment rating (IR) of thirty-four percent was raised for first time on appeal and, thus, would not be considered by the Court of Appeals; decision of workers' compensation appeals panel was limited to the issue of whether treating physician's certification was invalid because it contained an incorrect date of maximum medical improvement (MMI). V.T.C.A., Labor Code §§ 408.124(b), 410.302(b).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*243** Kevin D. Molina, Office of Attorney General, Tort Litigation, Division, Austin, TX, for appellant.

Elaine E. Banks Joiner, Elgin, TX, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

**OPINION**

Opinion by Justice MOSELEY.

This opinion on rehearing is issued as a substitute for our original opinion issued January 12, 2012.

**I. Background**

This workers' compensation case emanates from a slip and fall injury Elaine E. Banks Joiner sustained while employed by the Texas Department of Health and Human Services in July 2004.[1] As a result of her fall, Joiner underwent a distal clavicle resection arthroplasty of the right shoulder and a partial lateral menisectomy of the right knee.

[1]  Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005). We are unaware of any conflict between precedent of the Third Court of Appeals and that of this Court on any relevant issue. *See* TEX.R.APP. P. 41.3.

Joiner's treating physician, Brent Davis, M.D., examined her on July 17, 2006, issued a report finding a maximum medical improvement date of July 5, 2006,[2] and assessed a permanent impairment rating of thirty-four percent for Joiner. Davis **\*244** later issued a TWCC–69 report of medical evaluation, which indicated a clinical maximum medical improvement date of July 17, 2006. The Department of Insurance—Division of Workers' Compensation (the Division) appointed Elliot Bader, M.D., as the designated doctor.[3] Bader examined Joiner on September 25, 2006, and originally issued a report finding maximum medical improvement on July 3, 2006, and assessing a permanent impairment rating of seven percent. In January 2007, the Division sent Bader a request for a letter of clarification asking if Davis' assessment changed Bader's impairment rating assignment. In response, Bader issued a letter of clarification maintaining his seven percent rating, with a request to re-examine Joiner's right shoulder. After having conducted the requested re-examination, Bader issued an addendum, again maintaining his seven percent rating.

2       "Maximum medical improvement" is defined as the earlier of "the earliest date after which, based on reasonable medical probability, further material recovery from or lasting improvement to an injury can no longer reasonably be anticipated" (referred to as "clinical maximum improvement") or "the expiration of 104 weeks from the date on which income benefits begin to accrue" (referred to as "statutory maximum medical improvement"). TEX. LAB.CODE ANN. § 401.011(30) (West Supp. 2011); *Fireman's Fund Ins. Co. v. Weeks,* 259 S.W.3d 335, 340 (Tex.App.-El Paso 2008, pet. denied). In order to obtain impairment benefits, an employee must be certified by a doctor as having reached maximum medical improvement and must be assigned an impairment rating by a certifying doctor. TEX. LAB.CODE ANN. § 408.123(a) (West 2006). An impairment rating is defined as "the percentage of permanent impairment of the whole body resulting from the current compensable injury." 28 TEX. ADMIN. CODE § 130.1(c)(1) (West, Westlaw current through 2011) (Tex. Dep't of Ins., Div. of Workers' Compensation, Certificate of Maximum Med. Improvements & Evaluation of Permanent Impairment).

3       "Designated doctors" are doctors appointed by mutual agreement of the parties or by the Division to recommend a resolution of a dispute as to the medical condition of an injured employee. TEX. LAB.CODE ANN. § 401.011(15) (West Supp. 2011); *see* 28 TEX. ADMIN. CODE ANN. §§ 130.1, 130.6 (West, Westlaw current through 2011) (Tex. Dep't of Ins., Div. of Workers' Compensation, Designated Doctor Examinations for Maximum Med. Improvement and/or Impairment Ratings).

In May 2007, a second letter of clarification was sent to Bader asking him for the right shoulder range-of-motion measurements taken on February 13, 2007, and informing him that the date of statutory maximum medical improvement was July 10, 2006. Bader issued a second letter of clarification in June 2007, once again maintaining his seven percent rating. The letter included a new form DWC–69 indicating a seven percent impairment rating as of July 10, 2006, the statutory date of maximum medical improvement. [4]

4       To certify maximum medical improvement and assign an impairment rating, the certifying doctor makes a written "Report of Medical Evaluation." 28 TEX. ADMIN. CODE ANN. § 130.1(d) (West, Westlaw current through 2011) (Tex. Dep't of Ins., Div. of Workers' Compensation, Certificate of Maximum Med. Improvements & Evaluation of Permanent Impairment). A report of medical evaluation is comprised of a one-page Division-generated form (the "DWC–69"), and the accompanying medical narrative. *In re Xeller,* 6 S.W.3d 618, 621 & n. 3 (Tex.App.-Houston [14th Dist.] 1999, orig. proceeding).

There is nothing in the record to indicate Davis was advised, as was Bader, of the maximum medical improvement date of July 10, 2006. [5] Davis did not issue an amended report of medical evaluation based on this date.

5       The hearing officer presiding over the contested case hearing made a finding that the parties (Joiner and the State Office of Risk Management (SORM)) stipulated that Joiner reached maximum medical improvement on July 10, 2006.

The dispute resulting in the instant appeal centered on the competing impairment ratings from Bader and Davis. Bader's seven percent rating is based on Joiner's condition as of July 10, 2006, versus Davis' thirty-four-percent rating based on Joiner's condition as of July 5, 2006. [6]

6       The clinical MMI date listed later by Davis was July 17, 2006.

A contested case hearing was held in October 2007, where the issue was, "What **\*245** is the Claimant's impairment rating?" The Division's hearing officer found that Bader's assigned impairment rating of seven percent was not supported by the preponderance of the evidence, but that Davis' impairment rating of thirty-four percent was made in accordance with the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment and is supported by a preponderance of the evidence. The hearing officer concluded that Joiner's impairment rating was thirty-four percent.

The SORM appealed the hearing officer's determination to the Division Appeals Panel. The Appeals Panel reversed the hearing officer's finding that Joiner's impairment rating was thirty-four percent, and found that it was seven percent, based on Bader's report. The Appeals Panel reasoned:

> In the instant case, the hearing officer determined that the claimant's IR is 34% as assigned by Dr. D based on an MMI date of July 17, 2006. As previously mentioned, the parties stipulated that the date of MMI

was July 10, 2006. Because Dr. D assigned an IR that was not based upon the claimant's condition on the stipulated date of MMI, July 10, 2006, the 34% IR assigned by Dr. D cannot be adopted. Accordingly, we reverse the hearing officer's determination that the claimant's IR is 34%.

Joiner appealed the decision of the Appeals Panel to the district court. The district court rendered judgment in favor of Joiner and ordered the SORM to adopt the impairment rating of thirty-four percent given by her treating physician, and as found by the Texas Workers' Compensation Commission hearing officer.[7] The **\*246** SORM appeals the decision of the trial court. We affirm that decision.

[7] The trial court issued findings of fact and conclusions of law. The findings of fact are as follows:

1. Ms. Elaine E. Banks Joiner (Ms. Joiner) was employed by the Department of Health and Human Services when she sustained an injury during the course and scope of her employment on July 5, 2004.

2. She injured her right knee and right shoulder in the course and scope of her employment and had surgery on both compensable body parts.

3. The Department of Insurance—Division of Workers' Compensation (the Department) alleged that the parties stipulated to the date of July 10, 2006 as the statutory date of maximum medical improvement (MMI).

4. Ms. Joiner testified that Regina Cleave, Benefit Review Officer for the Department, stated that her MMI date was July 10, 2006, thus, she did not stipulate to such.

5. Ms. Joiner's treating physician, Brent Davis, M.D. (Dr. D.), examined her on July 17, 2006.

6. Dr. D. issued a report finding clinical MMI date of July 17, 2006 and assessing a permanent impairment rating (IR) of 34% for Ms. Joiner.

7. The Department appointed Elliot Bader, M.D. (Dr. B.), as the designated doctor.

8. Dr. B. examined Ms. Joiner on September 25, 2006.

9. Dr. B. originally issued a report finding statutory MMI on July 3, 2006 and assessing a permanent impairment rating (IR) of 7%.

10. Ms. Regina Cleave, Benefit Review Officer for the Department, sent a letter dated May 23, 2007, to Dr. B. informing him that "the insurance carrier confirmed that the date of statutory MMI is July 10, 2006."

11. Dr. B. amends his report to reflect the changed MMI date to July 10, 2006.

12. Dr. D. is not notified by the Department of the confirmation of statutory date of July 10, 2006, thus, he is not afforded an opportunity to change or amend his report.

13. The designated doctor was given an opportunity to amend his report to reflect the allegedly stipulated-to MMI date of July 10, 2006.

14. The treating doctor did not have an opportunity to amend his report to reflect the allegedly stipulated-to MMI date of July 10, 2006.

15. The treating doctor's examination took place on the "as of" date of 2 years and 12 days whereas the designated doctor's examination took place months after has [sic] stated "as of" date.

16. A contested case was held on October 2, 2007, in Austin, Texas.

17. The Department's hearing officer, Gary L. Kilgore, found that the 34% IR assessed by Dr. D. was made in accordance with the Guides to the Evaluation of Permanent Impairment, fourth edition and is supported by a preponderance of the evidence.

18. The insured appealed this decision pursuant to Texas Workers' Compensation Act, Tex. Lab.Code Ann. § 401.001 *et seq.* (1989 Act).

19. The Appeals Panel decided that Dr. D.'s report could not be considered because of the incorrect MMI date of July 17, 2006.

20. The Appeals Panel adopted Dr. B.'s amended report, certifying the date of MMI as July 10, 2006, and assigning a 7% IR.

21. Any of the above Findings of Fact which may later be determined to be Conclusions of Law shall be deemed as such.

The conclusions of law are as follows:

1. In a trial to the court without a jury, the court in rendering its judgment on an issue described by Section 410.301(a) shall consider the decision of the appeals panel. TEX. LAB.CODE § 410.304(b).

2. This dispute involves compensability or eligibility for or the amount of income benefits, therefore, the review of the Commission appeals panel decision is a modified de novo standard.

3. The party appealing the decision on an issue described in Section 410.301(a) has the burden of proof by a preponderance of the evidence.

4. Evidence of the extent of impairment is limited to that presented to the Division absent a finding that the claimant's condition has substantially changed, and the court can only adopt a specific impairment rating arrived at by one of the doctors in the case.

5. The court, as trier of fact, is to consider the Division's decision and it is not required to accord the decision any particular weight.

6. The opinion of the designated doctor regarding impairment is accorded no special weight.

7. Rule 130.1(c) 3 states that "assignment of an impairment rating for the current compensable injury shall be based on the injured employee's condition as of the MMI date considering the medical record and the certifying examination."

8. It is disputed that the parties stipulated to the MMI date as of July 10, 2006.

9. Rule 130.1 does not state an evidentiary consequence of a misstated MMI date. There is no statutory basis for the Appeals Panel to disregard evidence, i.e., the treating doctor's report, based on a treating doctor misstating the MMI date by 7 days.

10. Tex. Lab.Code § 410.305 and 306 state that the Texas Rules of Evidence and case law govern the legal sufficiency of evidence. Thus, a physician opinion of the extent of those impairments as of 2 years and 12 days after the accident is evidence of the extent of those impairments as of 2 years and 5 days.

11. The Department's hearings officer found the treating doctor's IR by the preponderance of the evidence.

12. Any of the above Conclusions of Law which may be determined to be Findings of Fact shall be deemed as such.

## II. Standard of Review

The Texas Workers' Compensation Act provides that a party who has exhausted its administrative remedies and is aggrieved by a final decision of the appeals panel may seek judicial review of the appeals panel decision. TEX. LAB.CODE ANN. § 410.251 (West 2006); *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.,* 19 S.W.3d 393, 398 (Tex.2000). Issues regarding compensability or eligibility for benefits may be tried to a jury and are subject to a modified de novo review. TEX. LAB.CODE ANN. § 410.301 (West 2006); *Morales v. Liberty Mut. Ins. Co.,* 241 S.W.3d 514, 516–18 (Tex.2007); *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 528 (Tex.1995). Review is limited to the issues that were before the Commission appeals panel; however, the fact-finder does not simply review the appeals panel decision for reasonableness, but decides the issues independently based on a preponderance **\*247** of the evidence. TEX. LAB.CODE ANN. §§ 410.302–.303 (West 2006); *Garcia,* 893 S.W.2d at 531. In this case, the trial court correctly applied a modified de novo standard of review to the issue of Joiner's impairment rating. [8]

[8] The Texas Supreme Court has determined that an appeal challenging an impairment rating is subject to review under Section 410.301 of the Texas Labor Code because it "directly affects eligibility for and the amount of benefits due." *Rodriguez v. Serv. Lloyds Ins. Co.,* 997 S.W.2d 248, 253 (Tex.1999).

**[1] [2]** Under this standard, the trial court is informed of the Commission's decision. *Garcia,* 893 S.W.2d at 528. The trial court is not required to accord that decision any particular weight, however. *Id.* at 515. In addition, the designated doctor's opinion regarding impairment is accorded no special weight. *Id.; Abilene Indep. Sch. Dist. v. Marks,* 261 S.W.3d 262, 268 (Tex.App.-Eastland 2008, no pet.).

**[3] [4] [5]** Evidence of the extent of impairment is limited in the trial court to that presented to the Commission unless the trial court finds the claimant's condition has substantially worsened. *Garcia,* 893 S.W.2d at 515. Finally, the fact-finder is required to adopt the specific impairment rating arrived at by one of the physicians who examined the claimant. [9] *Id.;* TEX. LAB.CODE ANN. § 410.306(c) (West Supp. 2011); *State Office of Risk Mgmt. v. Rodriguez,* 355 S.W.3d 439, 442 (Tex.App.-El Paso 2011, pet. filed). The party appealing the impairment rating decision has the burden of proof by a preponderance of the evidence. *See* TEX. LAB.CODE ANN. § 410.303; *Marks,* 261 S.W.3d at 268.

[9] An injured worker qualifying for impairment income benefits receives seventy percent of his average weekly wage. TEX. LAB.CODE ANN. § 408.126 (West 2006). These benefits are available from the date MMI is certified and continue for three weeks for every percentage point of impairment. TEX. LAB.CODE ANN. § 408.121(a) (West 2006); *Fulton v. Associated Indem. Corp.,* 46 S.W.3d 364, 366 (Tex.App.-Austin 2001, pet. denied). If the impairment rating is fifteen percent or greater, the employee may qualify for supplemental income benefits, which provide long-term disability compensation. TEX. LAB.CODE ANN. § 408.142(a) (West 2006).

The trial court made findings of fact and conclusions of law. The SORM does not specifically challenge any of the trial court's findings of fact; rather, it challenges the ultimate conclusion of law that Joiner's impairment rating was thirty-four percent.

 **[6]**   **[7]**   **[8]**   We review a trial court's conclusions of law de novo. *Villagomez v. Rockwood Specialties, Inc.,* 210 S.W.3d 720, 727 (Tex.App.-Corpus Christi 2006, pet. denied). Conclusions of law may not be challenged for factual sufficiency, but are reviewed to determine their correctness based upon the facts. *Rischon Dev. Corp. v. City of Keller,* 242 S.W.3d 161, 166 (Tex.App.-Fort Worth 2007, pet. denied); *Nat'l Union Fire Ins. Co. v. Burnett,* 968 S.W.2d 950, 953 (Tex.App.-Texarkana 1998, no pet.). We will uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *City of Houston v. Cotton,* 171 S.W.3d 541, 546 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

## III. Issues on Appeal

On appeal, the SORM argues the Davis report is invalid because (1) it does not reflect Joiner's condition as of the stipulated date of MMI, (2) it reflects Joiner's condition past the cut-off of statutory MMI, and (3) Davis did not calculate his **\*248** impairment rating in accordance with the AMA Guides to the Evaluation of Permanent Impairment. The SORM further complains that (1) the trial court was obligated to adopt the seven percent impairment rating certified by Bader, and (2) the trial court did not have jurisdiction over the date of maximum medical improvement.

## IV. Analysis

### A. Validity of Davis' Certification—Maximum Medical Improvement

The SORM initially complains that Davis' certification is invalid because it fails to reflect the stipulated date of maximum medical improvement. The impairment rating for the current compensable injury must be based on Joiner's condition as of the MMI date considering the medical record and the certifying examination. [10] 28 TEX. ADMIN. CODE ANN. § 130.1(c)(3) (West, Westlaw current through 2011) (Tex. Dep't of Ins., Div. of Workers' Compensation, Certificate of Maximum Med. Improvements & Evaluation of Permanent Impairment); *Tex. Builders Ins. Co. v. Molder,* 311 S.W.3d 513, 520 (Tex.App.-El Paso 2009, no pet.).

[10]   The preamble of Rule 130.1(c)(3) clarifies that the IR must be based on the injured worker's condition as of the date of MMI and should not be based on changes in the injured employee's condition occurring after that date, such as when the injured employee's condition changes as a result of surgery that takes place after the date of MMI. *See Appellant v. Respondent,* No. 072242, 2008 WL 687180 (Tex.Work.Comp.Com. Feb. 13, 2008) (discussing Rule 130.1(c)(3)).

Davis' report of July 26, 2006, indicated that he examined Joiner on July 17, 2006. The report reflects maximum medical improvement on July 5, 2006, with an impairment rating of thirty-four percent. [11] Bader's report of September 25, 2006, concluded that Joiner reached maximum medical improvement on July 3, 2006, and had an impairment rating of seven percent. Bader later supplemented his report to indicate a maximum medical improvement date of July 10, 2006. The SORM contends that the parties stipulated to the MMI date of July 10, 2006, and therefore any assignment of impairment rating must be made as of that date. 28 TEX. ADMIN. CODE § 130.1(c)(3) (impairment rating must be based on condition as of MMI date); *see also Pac. Employers Ins. Co. v. Brown,* 86 S.W.3d 353, 360 (Tex.App.-Texarkana 2002, no pet.).

[11]   Throughout its brief, the SORM indicates that Davis' report found Joiner reached clinical maximum medical improvement on July 17, 2006. The SORM fails to mention Davis' report, dated July 26, 2006, which indicates an MMI date of July 5, 2006. For purposes of our legal analysis, the difference in the two dates is insignificant.

 **[9]**   On appeal, neither party claims July 10, 2006, was not the statutory MMI date for Joiner. [12] Rather, the SORM contends the Davis report is invalid on its face because it is not based on Joiner's MMI **\*249** date of July 10, 2006. The SORM further contends that because the report is invalid, it cannot be considered, and is thus no evidence of Joiner's impairment rating. This is a question of statutory interpretation, and is thus a question of law: is the consequence of noncompliance with 28 TEX. ADMIN. CODE § 130.1(c)(3) a complete disregard of the noncompliant impairment rating? In other words, when a physician's report of impairment fails to base the claimant's condition on the date of maximum medical improvement (in this case, July 10, 2006), is that impairment rating invalid and not worthy of consideration as evidence?

12    The Division hearing officer found that the parties stipulated at the contested case hearing that Joiner's date of MMI was July 10, 2006. Joiner did not appeal that finding of fact to the Division Appeals Panel, so Joiner's date of MMI cannot be disputed on judicial review. *See* TEX. LAB.CODE ANN. § 410.302(b) (trial limited to issues decided by appeals panel and on which judicial review sought). Nevertheless, the trial court found that "Regina Cleave, Benefit Review Officer for the Department, stated that [Joiner's] MMI date was July 10, 2006, thus, she did not stipulate to such." The trial court concluded that "[i]t is disputed that the parties stipulated to the MMI date as of July 10, 2006." Because Joiner did not appeal the issue of the correct MMI date to the Appeals Panel or to the trial court, this issue has not been preserved for our review. We thus do not address this issue further.

According to the Division, the rule is to be so interpreted. *See Appellant v. Respondent,* Appeal No. 071398, 2007 WL 4139223, at *3 (Tex.Work.Comp.Com. Sept. 28, 2007) ("In the instant case, the hearing officer determined that the claimant's IR is 9% as assigned by Dr. B, but it is based on a MMI date of July 19, 2006, which is different than the July 26, 2006, MMI date stipulated by the parties. Accordingly, we reverse the hearing officer's determination that the claimant's IR is 9% as assigned by Dr. B as not being based on the claimant's condition as of the July 26, 2006, date of MMI."); *Appellant v. Respondent,* Appeal No. 070867, 2007 WL 2446083, at *2 (Tex.Work.Comp.Com. July 6, 2007) ("Because Dr. L. assigned an IR that was not based upon the claimant's condition on the agreed date of MMI, January 10, 2005, the 2% IR assigned by Dr. L cannot be adopted."); *Appellant v. Respondent,* Appeal No. 070782, 2007 WL 2446080, at *2 (Tex. Work. Comp. Com. June 25, 2007) ("Because Dr. L assigned an IR that was not based on the claimant's condition upon the stipulated date of MMI, August 17, 2006, the 10% IR assigned by Dr. L cannot be adopted."); *Appellant v. Respondent,* Appeal No. 040514, 2004 WL 1567412, at *3 (Tex.Work.Comp.Com. Apr. 28, 2004) ("Because the treating doctor's certification of IR was not based upon the claimant's condition on the stipulated date of MMI, February 9, 2001, it cannot be adopted.").

Because the issue before us involves a question of statutory interpretation, it is a question of law that we review de novo. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). We construe administrative rules in the same manner as statutes. *Rodriguez v. Serv. Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex.1999). We defer to an agency's interpretation of its own rules and limit our review to a determination of whether the interpretation is plainly erroneous or inconsistent with the text of the rule or underlying statute. *Vista Healthcare, Inc. v. Tex. Mut. Ins. Co.,* 324 S.W.3d 264, 272 (Tex.App.-Austin 2010, pet. denied).

 **[10]**    When interpreting statutes, we attempt to ascertain and give effect to the Legislature's intent. *Powell v. Stover,* 165 S.W.3d 322, 326 (Tex.2005). We ascertain that intent by first looking to the plain and common meaning of the statute's words. *Id.; Tex. Mut. Ins. Co.,* 214 S.W.3d at 476. We must also view a statute's terms in context and give them full effect. *Tex. Mut. Ins. Co.,* 214 S.W.3d at 476. When examining the provisions within the Texas Workers' Compensation Act, we should keep in mind the comprehensive nature of the Act. *Id.* If the meaning of the statutory language is unambiguous, a court must interpret it according to its terms consistent with other provisions in the statute. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). A court also considers the objective the law seeks to obtain and the consequences of a particular construction. *Id.*

28 TEX. ADMIN. CODE § 130.1(c)(3) provides, in pertinent part:

> **\*250**    Assignment of an impairment rating for the current compensable injury shall be based on the injured employee's condition as of the MMI date considering the medical record and certifying examination.

Because Davis' report utilizes July 5, 2005, as the date of maximum medical improvement, rather than July 10, 2006, it technically fails to comply with Section 130.1(c)(3). We do not, however, conclude that this technical lack of compliance should result in the determination that the report cannot be considered as evidence of Joiner's impairment rating on the date of maximum medical improvement—July 10, 2006. The preamble to Rule 130.1(c)(3) states:

> The new language in § 130.1(c)(3) states that an IR assessment for an injured employee must be based on the injured employee's condition as of the MMI date. This change clarifies that IR assessments must be based on the injured employee's condition as of the date of MMI and shall not be based on changes in

the injured employee's condition occurring after that date, such as when the injured employee's condition changes as a result of surgery that takes place after the date of MMI.

29 TEX. REG. 2337 (2004). Thus, the intent of the rule is to ensure the impairment rating does not take into account any changes in the employee's condition occurring after the date of maximum medical improvement. Here, there is no evidence to suggest Joiner underwent surgery or suffered any additional physical problems between July 10, 2006 (the date of statutory maximum medical improvement) and July 17, 2006 (the date of Davis' examination of Joiner for purposes of assigning an impairment rating and the date listed on his TWCC–69 report as the clinical maximum medical improvement date). Further, there is no evidence that Joiner's condition changed in any way during the five-day period between July 5, 2006 (the date of maximum medical improvement listed in Davis' July 26 report) and July 10, 2006. Thus, the utilization of Davis' certification as evidence of Joiner's impairment on July 10, 2006, does not frustrate the intent of the rule. [13]

[13]    The intent of the rule is to foreclose the imposition of an impairment rating based on a substantial change of condition after the date of maximum medical improvement. When this occurs, evidence of the extent of impairment is not limited to that presented to the division. *See* TEX. LAB.CODE ANN. § 410.307 (West 2006); *Deleon v. Royal Indem. Co.,* No. 03–08–00532–CV, 2010 WL 323128, at *3 (Tex.App.-Austin Jan. 27, 2010, pet. denied) (mem. op.).

Nothing in the plain language of the rule indicates the intent to render an impairment rating of a certain date as "no evidence" of the impairment rating as of another date. That is, the rule does not state the consequence of noncompliance. To interpret the rule to impose a consequence of noncompliance—the complete omission of Davis' report—which is not included in the rule and which would not effectuate the intent of the rule, is erroneous.

This is especially true in light of the fact that 28 TEX. ADMIN.CODE § 130.1(c)(5) indicates that an impairment rating assigned in violation of subsection (c)(4) is invalid. [14] Clearly, the drafters of the **\*251** rules intended certain impairment ratings to be invalid. However, the drafters failed to include similar language causing an impairment rating which technically fails to comply with Section 130.1(c)(3) to be invalid. If Section 130.1(c)(3) were intended to completely abrogate a report of medical evaluation because it lists an incorrect, retrospective date of maximum medical improvement, the drafters could clearly have indicated this result, just as was done in the case of an impairment rating assigned in violation of subsection 130.1(c)(4).

[14]    28 TEX. ADMIN. CODE § 130.1(c)(5) states:
        If an impairment rating is assigned in violation of subsection (c)(4), the rating is invalid and the evaluation and report are not reimbursable. A provider that is paid for an evaluation and/or report that is invalid under this subsection shall refund the payment to the insurance carrier.
        28 TEX. ADMIN. CODE § 130.1(c)(4) has to do with range of motion, sensory, and strength testing required by the AMA Guidelines.

In *Appellant v. Respondent,* Appeal No. 931125, 1994 WL 31842 (Tex.Work.Comp.Com. Jan. 26, 1994), the claimant contended that Dr. D's assignment of an impairment rating was invalid because he found the date of maximum medical improvement to have occurred on July 8, 1993, the date of his examination, but not the mid-January 1993 statutory date of maximum medical improvement. Thus, according to the claimant, Dr. D's calculation of his impairment rating did not take into consideration his condition on the date of the statutorily imposed maximum medical improvement. The Appeals Panel found no merit to this argument. "Although the Appeals Panel has stated that the 'threshold issue of the existence of MMI cannot be neatly severed from assessment of an 'impairment rating,' and that these issues are 'somewhat intertwined,' ... we have never held that MMI and IR can never be individually considered and decided." *Id.* at *3 (citation omitted).

> IR can be decided separately from MMI, for example, when MMI is agreed to by the parties or when, as in this case, statutory MMI has been reached. In such cases, it is essential only that MMI be reached before an IR is assigned.

*Id.* Even though the foregoing decision predates the revision of Section 130.1(c)(3), its reasoning is consistent with the 2004 revision to that section. The panel recognized that "[i]n such cases, it is essential only that MMI be reached before an IR is

assigned." *Id.* Because the impairment rating was assigned after the date of maximum medical improvement, the "[C]laimant's challenge to Dr. D's IR that Dr. D relied on a later and wrong date of MMI which caused a defective impairment rating is in effect a challenge to the presumptive weight of Dr. D's report." *Id.*

This reasoning applies equally here. In the absence of a statutory basis for interpreting this rule as one of evidence applicable in a district court, it cannot be so interpreted. The Texas Rules of Evidence (and interpretive caselaw) govern issues of evidentiary sufficiency. *See* TEX. LAB.CODE ANN. § 410.305 (West 2006) (Texas Rules of Civil Procedure and any other rules adopted by the Texas Supreme Court control, unless in conflict with this subchapter); TEX. LAB.CODE ANN. § 410.306(b) (West Supp. 2011) (all facts and evidence the record contains are admissible to extent allowed under Texas Rules of Evidence). Here, we find no conflict between the provisions of the Texas Labor Code governing workers' compensation and the Rules of Evidence.

Because there is no statutory basis for the appeals panel or the trial court to disregard evidence, we conclude the trial court was correct in refusing to disregard Davis' report. [15] Further, the trial court **\*252** was correct in concluding Davis' report, including his opinion of Joiner's impairment as of two years after the accident, is evidence of the extent of those impairments as of two years and five days after the accident. We overrule the SORM's initial complaint that Davis' certification is invalid because it fails to reflect the correct date of maximum medical improvement.

[15] We are aware of the Houston court's opinion in *Ausaf v. Highlands Ins. Co.,* 2 S.W.3d 363, 366 (Tex.App.-Houston [1st Dist.] 1999, pet. denied), in which the court held that a certification by a treating doctor was invalid and not to be considered because the doctor's report included a prospective maximum medical improvement date. This decision is based on Section 408.123(b) of the Texas Labor Code, which states that the "certifying doctor shall issue a written report certifying that maximum medical improvement *has been* reached." TEX. LAB.CODE ANN. § 408.123(b) (West 2006) (emphasis added). *Ausaf* is distinguished from this case because it involved a prospective date of maximum medical improvement—that is, beyond the date of the claimant's physical examination. Further, the Labor Code provides it will control if there is any conflict between the Rules of Evidence and the Labor Code. TEX. LAB.CODE ANN. §§ 410.305–.306(b). The provisions of Section 408.123(b) of the Labor Code could be interpreted to conflict with the Rules of Evidence. Here, we find no conflict between the provisions of the Labor Code and the Rules of Evidence.

**B. Validity of Davis' Certification—Maximum Medical Improvement Date Past Statutory Deadline**

Next, the SORM claims Davis' certification is invalid because it lists the date of Joiner's clinical maximum medical improvement seven days after the statutory date of maximum medical improvement. We have heretofore determined that the Davis certification technically failed to comply with 28 TEX. ADMIN. CODE § 130.1(c)(3) because it utilizes an incorrect date of maximum medical improvement. We have nevertheless determined that the certification is some evidence of Joiner's impairment on the correct date of maximum medical improvement. The SORM's argument here, that the clinical maximum improvement date is beyond statutory medical improvement, does not change our preceding analysis. [16] It is simply a different twist on the same issue—whether the Davis certification is not to be considered as evidence of Joiner's impairment because it is based on an incorrect date of maximum medical improvement. We have determined that Davis' certification was correctly considered as evidence of Joiner's impairment on July 10, 2006. [17]

[16] Because Davis listed the date of maximum medical improvement as July 5, 2006, on his July 26 report, this argument is not factually persuasive. The form TWCC 69 lists July 17 as the date of maximum medical improvement. 28 TEX. ADMIN. CODE § 130.12(c) (Tex. Dep't of Ins. Div. of Workers' Compensation, Finality of the First Certification of Maximum Medical Improvement and/or First Assignment of Impairment Rating) states:

> The certification on the Form TWCC 69 is valid if:
>> (1) There is an MMI date that is not prospective;
>> (2) There is an impairment determination of either no impairment or a percentage impairment rating assigned; and
>> (3) There is the signature of the certifying doctor who is authorized by the Commission under § 130.1(a) to make the assigned impairment determination.
> Any argument that the Form TWCC 69 is invalid based on the maximum medical improvement date of July 17 cannot prevail under this section.

Casey Cochran, D.O., testified at trial on behalf of the SORM. Cochran opined that the Davis certification is invalid because the date of maximum medical improvement was assigned past the statutory date. Cochran's testimony is consistent with Rule 130.1(b) and (c), which makes statutory maximum medical improvement the latest maximum medical improvement date that can be chosen, and requires the impairment rating be made as of the date of maximum medical improvement. 28 TEX. ADMIN. CODE ANN. § 130.1(b), (c)(3) (West, Westlaw current through 2011) (Tex. Dep't of Ins., Div. of Workers' Compensation, Certificate of Maximum Med. Improvements & Evaluation of Permanent Impairment). Nevertheless, neither the rule nor Cochran's testimony indicate that a certificate of impairment utilizing an incorrect date of maximum medical improvement cannot be utilized as evidence of impairment on the correct date of maximum medical improvement, where there have been no intervening surgeries or injuries.

**\*253  C. Validity of Davis' Certification—Failure to Comply with AMA Guides**

[11]    In its final point of error, the SORM contends Davis' certification of impairment is invalid because it fails to comply with AMA Guides. The AMA Guides to the Evaluation of Permanent Impairment have been incorporated into the Texas Workers' Compensation Act by statute. TEX. LAB.CODE ANN. § 408.124(b) (West 2006) ("the division shall use 'Guides to the Evaluation of Permanent Impairment,'....").

Cochran, the SORM's expert witness in the area of disability and impairment medicine, testified that Davis utilized range of motion measurements in Joiner's right shoulder and right knee that are inconsistent with measurements taken by Bader in September 2006 and in February 2007, and thus, Davis' measurements are invalid. Cochran further testified that Davis incorrectly assigned impairment for flexion and extension in Joiner's knee, which is prohibited by the AMA Guides. Therefore, according to Cochran, Davis' thirty-four percent impairment rating is medically invalid and cannot be adopted.

In its request for review to the appeals panel, the SORM mentions the AMA Guides in order to explain and to provide background for Bader's decision to utilize diagnosis based estimates as opposed to range of motion in order to determine Joiner's impairment rating. Bader believed range of motion values were invalidated through Joiner's alleged submaximal effort. However, the SORM never maintained the position that Davis' range of motion testing was conducted improperly, thus in some way invalidating his report. [18] The assertion that Davis improperly assigned impairment for flexion and extension in Joiner's knee was made for the first time at trial. [19] This assertion was never made to the appeals panel. The sole argument made to the appeals panel in support of overturning the decision of the hearing officer was the fact that Davis' impairment rating was based upon an incorrect date of maximum medical improvement, and thus could not be adopted.

[18]    Further, the SORM recognizes that the decision to "use the diagnosis based estimates as opposed to range of motion is within the discretion of the evaluating physician and the fact that the treating doctor disagrees with this approach is nothing more than a difference of medical opinion...."

[19]    Upon hearing Cochran's testimony on this issue, the trial court indicated:
> You know what's never also been challenged ... was the fact that Dr. Davis did his report incorrectly. That—I mean, that also was a new issue before the Court today.
> .... This case is before me on limited de novo review, and so everything that your doctor, Dr. Cochran, just testified to, how is it that I can even consider any of that evidence ... ?

A district court trial of a workers' compensation case "is limited to issues decided by the appeals panel and on which judicial review is sought. The pleadings must specifically set forth the determinations of the appeals panel by which the party is aggrieved." TEX. LAB.CODE ANN. § 410.302(b). [20] The appeals panel in this **\*254**  case did not decide the issue of whether Davis' certification was invalid for the reason that it allegedly failed to comply with AMA Guides. [21]  Instead, the decision of the appeals panel was limited to the issue of whether Davis' certification was invalid because it contained an incorrect date of maximum medical improvement:

The SORM utilizes the statutory limitation on issues subject to judicial review to support its argument that the date of maximum medical improvement could not be decided by the trial court. We agree. However, the SORM cannot now ignore the statute and raise an issue on appeal that was not decided by the appeals panel, and upon which judicial review was not sought.

In his decision and order, however, the hearing officer specifically found that Davis' impairment rating was made in accordance with the AMA Guides and is supported by a preponderance of the evidence.

Because Dr. D assigned an IR that was not based upon the claimant's condition on the stipulated date of MMI, July 10, 2006, the 34% IR assigned by Dr. D cannot be adopted. Accordingly, we reverse the hearing officer's determination that the claimant's IR is 34%.

The SORM argues that it is permitted to rely on this new evidence presented to the trial court because the issue on appeal is broadly stated as, "What is the claimant's impairment rating?" Cochran's testimony, while not presented to the appeals panel, contends the SORM falls within the broad issue of the "claimant's impairment rating," and is thus permissible. [22] We disagree. Evidence of the extent of impairment is limited to what was presented to the Division. *See* TEX. LAB.CODE ANN. §§ 410.306–.307. As explained by the Texas Supreme Court in *Garcia,* 893 S.W.2d at 528:

The SORM appears to take a different position on what "issues decided by the appeals panel" means in *Rodriguez,* 355 S.W.3d at 447. In that case, the SORM argued that the claimant's pleadings asked only that the trial court reverse the Division's finding of a five percent permanent impairment, and therefore, failed to preserve error of the Division's decision invalidating a second doctor's impairment rating because the claimant failed to specifically articulate the issue in her pleadings as required under Section 410.302(b) of the Texas Labor Code. *See* TEX. LAB.CODE ANN. § 410.302(b) ("A trial under this subchapter is limited to issues decided by the appeals panel and on which judicial review is sought. The pleadings must specifically set forth the determinations of the appeals panel by which the party is aggrieved.").

[E]vidence of the extent of impairment is limited to that presented to the Commission *unless the court determines that the claimant's condition has substantially changed.* This procedural limitation is akin to those in the rules of civil procedure requiring litigants to disclose witnesses and information at a particular time or be barred from offering that evidence at trial. *See, e.g.,* TEX.R. CIV. P. 215.5. It encourages parties to present relevant evidence during administrative proceedings, thus increasing the accuracy and efficiency of those proceedings. Requiring a party to marshal and disclose evidence diligently does not violate the right to trial by jury.

893 S.W.2d at 528 (emphasis added). Cochran's testimony relating to Davis' alleged noncompliance with the AMA Guides was not presented to the appeals panel, and in accordance with *Garcia,* this Court may not consider such testimony on limited de novo review. The SORM's attempt to broadly define "issue" as basically anything that falls under the umbrella of the "claimant's impairment rating" is inconsistent with the purpose of "encourag[ing] parties to present relevant evidence during administrative proceedings...." *Id.* "Issue," in the context of the Workers' Compensation Act, "is used to refer to disputed matters related to the underlying workers' compensation claim." *Tex. Workers' Compensation Ins. Fund v. Tex. Workers' Compensation Comm'n,* 124 S.W.3d 813, 820 (Tex.App.-Austin 2003, pet. denied).

**\*255** Because the issue of whether Davis' report was invalid under the AMA Guides was not decided by the appeals panel or the trial court, this Court may not decide this issue for the first time on appeal. TEX.R.APP. P. 33.1; TEX. LAB.CODE ANN. § 410.302(b).

### V. Conclusion

We affirm the judgment of the trial court.

**All Citations**

363 S.W.3d 242

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

2010 WL 2601667
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

STATE OFFICE OF RISK MANAGEMENT, Appellant

v.

Ruben C. RAMIREZ, Appellee.

No. 04–09–00541–CV.   |   June 30, 2010.

From the 81st Judicial District Court, La Salle County, Texas, Trial Court No. 07–11–00113–CVL; Donna S. Rayes, Judge Presiding.

**Attorneys and Law Firms**

Kevin D. Molina, Assistant Attorney General, Austin, TX, for Appellant.

David E. Garcia, Law Office of David E. Garcia, P.C., Laredo, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, KAREN ANGELINI, Justice, REBECCA SIMMONS, Justice.

**MEMORANDUM OPINION**

Opinion by KAREN ANGELINI, Justice.

**BACKGROUND**

**\*1**  On March 10, 1998, Ruben Ramirez sustained a compensable injury to his lumbar spine, consisting of mild bulging of the L4–L5 disc and a herniated nucleus pulposus at L5–S1. On September 17, 1998, his treating physician, Dr. Michael Earle performed an L5–S1 laminectomy and discectomy. On April 5, 1999, Dr. Earle certified Ramirez had reached clinical MMI [1] with a permanent impairment rating of 8%. Ramirez then returned to work as a prison guard with the Texas Department of Criminal Justice. On September 15, 2004, Ramirez returned to Dr. Earle and complained of pain in his back. On November 23, 2005, Dr. Earle stated in his narrative report that the non-operated L4–L5 disc had "now progressed to the point where it is causing the source of his chronic symptomatology."In December 2005, Dr. Earle performed another laminecotomy and discectomy, this time on Ramirez's L4–L5 disc.

[1] "MMI" or "Maximum medical improvement" means "the earlier of: (A) the earliest date after which, based on reasonable medical probability, further material recovery from or lasting improvement to an injury can no longer reasonably be anticipated," also called clinical MMI; "(B) the expiration of 104 weeks from the date on which income benefits begin to accrue," also called statutory MMI; or "(C) the date determined by Section 408.104."TEX. LABOR CODE ANN. § 401.011(30) (Vernon Supp.2009). Section 408.104 deals with MMI after a spinal surgery and allows the commissioner to extend the 104–week period if the employee has had spinal surgery, or has been approved for spinal surgery, within twelve weeks before the expiration of the 104–week period. *See id.* § 408.104(a) (Vernon 2006).

On November 22, 2006, Ramirez requested that the Texas Department of Insurance—Division of Workers' Compensation ("the Division") appoint a designated doctor to revisit the issues of maximum medical improvement and impairment rating with respect to his 1998 compensable lumbar injury. The Division assigned Dr. William W. Smith to be the designated doctor. On January 8, 2007, Dr. Smith examined Ramirez and issued a report of medical evaluation, stating that Ramirez had reached statutory MMI on June 27, 2000, and had an impairment rating of 22%.

The workers' compensation carrier, State Office of Risk Management ("SORM"), objected to Dr. Smith's report, arguing that Dr. Smith violated Rule 130.1(c)(3) of the Texas Administrative Code, which requires an "impairment rating for a current compensable injury" to be "based on the injured employee's condition as of the MMI date considering the medical record and certifying examination."SORM explained that the "certifying examination took place six and a half years after the date of statutory MMI" and that "[t]here is no evidence of any change in the claimant's medical condition between his rating on April 9, 1999, and the statutory date of June 2[7], 2000, a time during which the claimant sought no medical treatment."*Id.* SORM argued that "Dr. Smith's rating rates the claim for [the claimant's] condition on January 8, 2007, and not the statutory date of June 27, 2000, or the assigned date of April 5, 1999."*Id.* SORM further argued that Ramirez "had a second surgery to his back on December 16, 2005, over five years after the statutory date of MMI," and that "this surgery and the effects thereof, including any loss of range of motion, should not have been considered and should have been specifically eliminated in the rating."

Based on SORM's objections, the Division, by letter, asked Dr. Smith to clarify his report. On February 26, 2007, Dr. Smith wrote a clarification letter, confirming that his impairment rating was correct. *Id.*

At the administrative level, the Division's Hearing Officer accepted Dr. Smith's opinion and determined that Ramirez's date of MMI was June 27, 2000, and that Ramirez's impairment rating was 22%. The Division's Appeals Panel concluded that the Hearing Officer's decision should become the final decision of the Appeals Panel. SORM appealed this decision to district court.

**\*2** Immediately before trial began, SORM objected to the admission of Dr. Smith's report in evidence, explaining in detail why it believed Dr. Smith's report was unreliable. The trial court overruled the objection. When Ramirez moved to admit Dr. Smith's report in evidence during trial, SORM again objected and informed the trial court it was doing so for the same reasons as stated previously. The trial court then admitted Dr. Smith's report "[s]ubject to the—the objections having previously been heard and ruled on." [2] The jury found in favor of Ramirez. It found that Ramirez's date of MMI was June 27, 2000, and that his impairment rating on that date was 22%. SORM now appeals.

2       On appeal, Ramirez argues that SORM waived its appellate issue because it did not specifically object at trial to Dr. Smith's report being admitted in evidence, but instead gave a general objection. Texas Rule of Appellate Procedure 33.1 states that "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that ... the complaint was made to the trial court by a timely request, objection, or motion that ... stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, *unless the specific grounds were apparent from the context.*" TEX.R.APP. P. 33.1 (emphasis added). Here, the record reflects that the trial court was aware of SORM's previous objections. Therefore, SORM's specific grounds for its objection at trial were apparent from the context, and SORM did not fail to preserve error for appeal.

## DISCUSSION

### A. *Impairment Ratings*

A workers' compensation claimant is eligible to receive impairment income benefits if he continues to have an impairment after reaching MMI. *See*TEX. LAB.CODE ANN. § 408.121 (Vernon 2006). In order to obtain impairment benefits, an employee must be certified by a doctor as having reached MMI and must be assigned an impairment rating by a certifying doctor, the percentage of which expresses the extent to which the claimant's injury permanently impaired his body. *Id.* § 401.011(24) (Vernon Supp.2009), § 408.123(a) (Vernon 2006).

All impairment ratings must be assigned by doctors based on a review of medical records and a certifying physical examination performed explicitly to determine MMI and an impairment rating. *See*TEX. LAB.CODE ANN. § 408.124 (Vernon 2006); 28 TEX. ADMIN. CODE § 130.1(b)(2), (b)(4)(B). At the administrative level, if the Division selects a designated doctor to determine the impairment rating, the designated doctor's rating has presumptive weight and can be overcome only if the great weight of other medical evidence is to the contrary, in which case the Division must adopt the impairment rating of "one of the other doctors." TEX. LAB.CODE ANN. § 408.125 (Vernon 2006).

In assigning an impairment rating, a doctor must perform a complete medical examination of the employee for the explicit purpose of determining MMI, 28 TEX. ADMIN. CODE § 130.1(b)(4)(B); certify that the employee has reached MMI, *id.* § 130.1(b)(2); identify, document, and analyze objective clinical or laboratory findings of permanent impairment for the current compensable injury, *id.* § 130.1(c)(3)(A)-(C); and compare the results of the analysis with the impairment criteria by providing the following: a description and explanation of specific clinical findings related to each impairment, including zero percent impairment ratings, and a description of how the findings relate to and compare with the criteria described in the AMA's *Guides,* explaining any inability to obtain the required measurements, *id.* § 130.1(c)(3)(D). The doctor assigning the impairment rating shall assign one whole body impairment rating for the current compensable injury. *Id.* § 130.1(c)(3)(E).

 **\*3**  In addition, in order to certify MMI and assign an impairment rating for the current compensable injury, the certifying doctor must complete, sign, and submit a report of medical evaluation and a narrative report to the Division and the parties involved within a certain time frame. *Id.* § 130.1(d). The narrative report must include the date of the certifying examination; the date of MMI; findings of the certifying examination, including both normal and abnormal findings and an explanation of the analysis performed to find whether MMI was reached; a narrative history of the medical condition that outlines the course of the injury and correlates the injury to the medical treatment; the current clinical status; diagnosis and clinical findings of permanent impairment as stated above; and the edition of the AMA *Guides* used in assigning the impairment rating. *Id.*

In this case, although Dr. Earle had previously certified that Ramirez had reached clinical MMI on April 5, 1999, with an impairment rating of 8%, the Division adopted the later report by Dr. Smith, which assigned a statutory MMI date of June 27, 2000, with an impairment rating of 22%. SORM then appealed to the district court.

### B. Modified De Novo Review of Division's Decision by District Court

The Division's decision on issues involving compensability of the injury and eligibility for and the amount of income and death benefits is reviewed by the district court under a modified de novo review. *See*TEX. LAB.CODE ANN. §§ 410.301–.308 (Vernon 2006); *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 515 (Tex.1995). Under a modified de novo review, the party appealing the Division's decision on an issue bears the burden of proof by a preponderance of the evidence. TEX. LAB.CODE ANN. § 410.303 (Vernon 2006); *Am. Zurich Ins. Co. v. Samudio,* No. 01–08–00233–CV, 2010 WL 457482, at \*8 (Tex.App.-Houston [1st Dist.] Feb. 11, 2010, no pet. h.).

Further, modified de novo review means that (1) the trier of fact is informed of the Division Appeals Panel's decision, *see*TEX. LAB.CODE ANN. § 410.304 (Vernon 2006); (2) evidence of the extent of impairment is limited to that presented to the Division, unless the court makes a threshold finding that the claimant's condition has substantially changed,[3] *see id.* §§ 410.306(c), 410.307; and (3) the trier of fact must adopt the specific impairment rating of one of the physicians in the case, *see id.* § 410.306(c); *Samudio,* 2010 WL 457482, at \*8; *Bell v. Zurich Am. Ins. Co.,* No. 05–09–00284–CV, 2009 WL 3353638, at \*4 (Tex. App .-Dallas 2009, no pet.), *reh'g denied,*2010 WL 703178. Therefore, the trier of fact has jurisdiction only to adopt an impairment rating assigned by a doctor in the underlying administrative case. *See Samudio,* 2010 WL 457482, at \*8; *Bell,* 2009 WL 3353638, at \*4. The requirement that the impairment rating match a physician's finding is part of the substantive statutory scheme. *Samudio,* 2010 WL 457482, at \*8; *Bell,* 2009 WL 3353638, at \*4. Thus, unless an exception applies, a trial court has no jurisdiction to allow the trier of fact to craft a new impairment rating based on expert testimony presented at trial. *Samudio,* 2010 WL 457482, at \*10.Nor can a trial court remand the case to the Division. *Id.; see Bell,* 2009 WL 3353638, at \*4 ("To the extent that the trial court's judgment contemplates this matter being reconsidered by the Division, the labor code does not permit

such reconsideration or the Division's reopening of evidence of [the claimant]' s impairment rating."); *Tex. Workers' Comp. Comm'n v. Harris County,* 132 S.W.3d 139, 146 (Tex.App.-Houston [14th Dist.] 2004, no pet.)("Although we can understand why it might seem appropriate to remand the issue of [appellant's] impairment rating to the appeals panel ..., no mechanism in the labor code allows for such a remand."); *Tex. Workers' Comp. Comm'n v. Tex. Mut. Ins. Co.,* 119 S.W.3d 886, 887 (Tex.App.-Dallas 2003, no pet.)("[N]othing in the labor code allows the trial court to send matters back to the appeals panel. Further, no mechanism exists in the code for addressing matters remanded from the trial court, and there are no applicable time deadlines that would ensure the appeals panel's timely determination of those matters.").

3      Substantial change was not an issue in this case; thus, evidence of Ramirez's extent of impairment was limited to evidence that had been presented to the Division.

**\*4** Finally, the trial court has no jurisdiction to "set aside" an impairment rating given by a doctor or to find that the claimant is entitled to no benefits by giving him a zero percent rating. *Samudio,* 2010 WL 457482, at \*10.The trial court has jurisdiction only to allow a fact finder to choose one of the impairment ratings assigned by one of the doctors in the administrative case. *See*TEX. LAB.CODE ANN. §§ 410.301, 410.306(c) (Vernon 2006); *Samudio,* 2010 WL 457482, at \*10.In this case, the jury chose the impairment rating and statutory MMI date assigned by Dr. Smith.

### C. Dr. Smith's Report

On appeal, SORM argues that Dr. Smith's report was unreliable and should not have been considered by the jury. And, because the jury should not have considered Dr. Smith's report, it would have had no choice but to accept Dr. Earle's clinical MMI date and impairment rating.

The certification of MMI and assignment of an impairment rating are expert medical opinions. *See*TEX. LAB.CODE ANN. § 401.011(30) (Vernon Supp.2009) (requiring that MMI be based on reasonable medical probability); 28 TEX. ADMIN. CODE § 130.1(c)(3)(C) (requiring doctor assigning an impairment rating to analyze specific laboratory or clinical findings of impairment). Under Texas Rule of Evidence 702, the proponent of expert testimony bears the burden to demonstrate the expert is qualified, which includes showing that the expert's opinion is both relevant and reliable. TEX.R. EVID. 702; *Tex. Mut. Ins. Co. v. Lerma,* 143 S.W.3d 172, 175 (Tex.App.-San Antonio 2004, pet. denied).

In this case, SORM does not challenge Dr. Smith's qualifications; it challenges only the reliability of Dr. Smith's opinion. SORM emphasizes that Dr. Smith's report relies on range of motion measurements taken more than six years after his designated statutory MMI date, and that such measurements cannot reflect Ramirez's condition as of Dr. Smith's designated statutory MMI date as required by Subsection 130.1(c)(3) of the Texas Administrative Code.

Subsection 130.1(c)(3) requires that assignment of an impairment rating for the compensable injury "be based on the injured employee's condition *as of the MMI date considering the medical record and the certifying examination.*" 28 TEX. ADMIN. CODE § 130.1(c)(3) (emphasis added). Thus, any effects of Ramirez's second surgery, which occurred after Dr. Smith's designated statutory MMI date, cannot be considered in determining Ramirez's impairment rating.

Dr. Smith's report of January 16, 2007, concluded that Ramirez reached statutory MMI on June 27, 2000, and had an impairment rating of 22%. Dr. Smith's report stated that he had reviewed the following medical records in formulating his opinion:

*Diagnostic Imaging:* 07–07–98, an MRI of the lumbar spine was reported to show mild bulging of the L4–5 disc bulge and a small mild to moderate right paracentral herniated nucleus pulposus at L5–S1. Robert Thompson, MD, radiologist.

**\*5** *Surgery:* 3–17–98, L5–S1 laminectomy and discectomy. Postoperative diagnosis, right L5–S1 herniated nucleus pulposus. Michael Earle, MD, surgeon.

*Other:* The following occurred after 6–27–2000 the statutory date of maximum medical improvement.

09–25–04, an MRI of the lumbar spine without and with contrast was reported to show degenerative disc disease at L4–5 and L5–S1 with a small posterior central disc protrusion at each level, but no severe spinal canal stenosis. Paul Nevitt, MD, radiologist.

10–27–04, lumbar epidural steroid injection. Michael Earle, MD.

9–26–05, a CT myelogram was reported to show a Grade 1 spondylolisthesis with bilateral spondylolysis. There was no significant spinal canal or neural foraminal stenosis. Paul Nevitt, MD, radiologist.

11–09–05, a post discogramCT scan of the lumbar spine was reported to show a posterior annular disruption at L4–5. No definitive CT abnormality was visualized at the L3–4 interspace. Fred Farrell, MD, radiologist.

12–16–05, bilateral L4–5 laminectomy and discetomy. Postoperative diagnosis L4–5 herniated nucleus pulposus. Michael Earle, MD, surgeon.

03–28–06, a CT scan of the lumbar spine was reported to show degenerative change of the L4–5 and L5–S1 level with post-surgical changes of the L5–S1 level. There was no significant involvement of the central canal. Mild impingement on the neural foramina was seen at both levels with spondylolysis of the pedicles of L5 noted. Amy Benson, MD, radiologist.

Not listed above is Dr. Earle's original report, which determined that Ramirez reached clinical MMI on April 5, 1999, with an 8% impairment rating.

Dr. Smith's report then explained how he calculated Ramirez's impairment rating:

The medical records received *gave no indication of Mr. Ramirez's condition on June 27, 2000. The impairment rating is calculated solely on this designated doctor's certifying examination* .

*Range of motion:* Refer to the attached worksheet. The tightest straight leg raise was 38 °. The hip flexion/extension was 38 °. The ranges of motion of lumbar flexion/extension are valid. The impairment rating based on loss of range of motion is 14 °.

*Table 49, specific disorders:* The medical records received do not indicate any pain or rigidity from the day of surgery, 3–17–98, to the day of statutory MMI, 6–27–2000. Section 2D applies with an 8% impairment.

The whole person impairment rating estimate for this injury is 21%, [4] the combination of 14% with 8%, combined values chart page 246.

[4]    This is clearly a mathematical error. The rating should be 22%.

*No condition that occurred after the statutory date of MMI was considered in the calculation of the impairment rating.*

This impairment rating estimate should be considered permanent, and is not expected to vary more than 3% during the next year.

(emphasis added). Thus, Dr. Smith's report contradicts itself. While Dr. Smith stated in his report that he had not considered any condition that occurred after the statutory date of MMI, he also stated that he calculated the impairment rating solely on his certifying examination of January 8, 2007, and that the medical records he received gave no indication of Ramirez's condition on the statutory date of MMI.

**\*6** After SORM pointed out these inconsistencies, the Division asked Dr. Smith to clarify whether he considered any condition occurring after the statutory date of MMI in his calculation of Ramirez's impairment rating. Dr. Smith responded with the following in his clarification letter:

An impairment rating is based on permanent conditions. If the decrease in the ranges of motion of the lumbar spine is due to the compensable injury, then they are permanent conditions. Permanent conditions do not change. *In all medical probability the ranges of motion were decreased before the finding of statutory MMI. I received no range of motion measurement that the ranges of motion on or before statutory [MMI] were greater than I found.*

SORM noted that an impairment rating of 8% from April 5, 1999, was correct.

The specific disorder table lists an 8% impairment rating for Table 49, section 2D. *This is probably the basis of the 8% impairment rating of April 1999.*

*I did not receive a copy of that impairment rating and do not know the findings of the evaluating physician or any ranges of motion measurements.*

*Whether the surgery of December 2005 contributed to the loss of motion cannot be determined without objective measurements taken with the examination of April 1999.*

*Conclusion*

1. The impairment rating of 21% is correct, *based on the examination finding of January 8, 2007.*As the SORM noted, the certifying examination is a component of the impairment rating.

2. The correctness of any prior impairment rating is unknown and this designated doctor was not requested by the DWC to comment on any prior impairment rating....

The impairment rating estimate of 21% is correct based on my examination of January 8, 2007....

(emphasis added). Thus, according to Dr. Smith's clarification letter, he could not determine whether the 2005 surgery contributed to Ramirez's loss of motion because he did not have Dr. Earle's report from the April 1999 examination, and did not know whether objective measurements were taken at that time or what those measurements were. It is unclear why Dr. Smith was not given Dr. Earle's April 1999 report to consider, but what is clear is that Dr. Smith explicitly stated that he could not know whether the 2005 surgery contributed to the loss of motion without knowing the results of the April 1999 examination.

Although Dr. Smith did not have the benefit of Dr. Earle's April 1999 report, Dr. Earle's report, at SORM's request, was admitted in evidence at trial. The report reflects that Dr. Earle did indeed take objective measurements in April 1999. In his report, Dr. Earle concluded the following:

*Clinically:* Lumbar flexion motion, extension, and left lateral bend, which was taken with double inclinometer system, and is recorded on the chart. Straight leg raising on the right is recorded at 70 °, and *it invalidates the flexion/extension motions* .On examination of lower extremities (EHL, EDC, peroneals, gastroc, soleus)—bilaterally ... grade 5. No obvious weakness remaining. He achieves full extension at the knee. Full flexion of the knee, no resistance at all. Hip abduction, external rotation through 45 °. Internal rotation greater than 35 °. Full extension.

**\*7** *Assessment:* He is at MMI, as of today. Based on the AMA Book of Ratings, intervertebral disc, operated on disc, with residual symptoms, lumbar spine, he has 80%. His symptoms are tolerable, but he still has residual symptoms associated with any increased activity.

*Plan:* He is placed on restriction, where he is not to do any heavy repetitive lifts. I told him occasional lifts he can tolerate, but he will become symptomatic from it, and I gave him up to 75 pounds. The patient is to return to see me on an as needed basis. His MMI, based on Table 49, is an 8% impairment, surgically treated disc, with residual symptoms.

(emphasis added). Like Dr. Smith, Dr. Earle assigned Ramirez an impairment rating based on Ramirez's surgically treated disc. However, unlike Dr. Smith, Dr. Earle did not assign Ramirez any impairment based on loss of motion, determining that some of Ramirez's measurements "invalidated" others.

We hold that Dr. Smith's report is unreliable. Dr. Smith wrote in his clarification letter that he had not received a copy of Dr. Earle's report and could not determine whether the surgery of December 2005 contributed to the loss of motion without objective measurements taken with the examination of April 1999. The record reflects that these objective measurements were taken with the examination of April 1999. Thus, on its face, Dr. Smith's clarification letter admits that Dr. Smith could not determine whether the 2005 surgery contributed to Ramirez's loss of motion. Therefore, Dr. Smith's opinion is unreliable and should not have been considered by the jury.

As noted previously, in a judicial review case, the Texas Workers' Compensation Act requires that the trier of fact adopt one of the impairment ratings assigned by one of the doctors in the underlying administrative case. *See* TEX. LAB.CODE ANN. §§ 408.125(c), 410.306(c) (Vernon 2006); *Samudio,* 2010 WL 457482, at *8. Here, there were two doctors who assigned two different MMI dates and impairment ratings: Dr. Earle found clinical MMI on April 5, 1999, with an 8% impairment rating; and Dr. Smith found a statutory MMI date of June 27, 2000, with a 22% impairment rating. However, because Dr. Smith's findings were unreliable and should not have been considered by the jury, the jury would have had no choice but to adopt Dr. Earle's clinical MMI date and impairment rating. *See Samudio,* 2010 WL 457482, at *8; *Bell,* 2009 WL 3353638, at *4; *Harris County,* 132 S.W.3d at 146; *Tex. Mut. Ins. Co.,* 119 S.W.3d at 887.

## CONCLUSION

We reverse the judgment of the trial court and render judgment that Ramirez reached MMI on April 9, 1999, with an impairment rating of 8%, as certified by Dr. Earle. [5]

[5]    We note that we are reversing the entire judgment, including the award of attorney's fees to Ramirez's attorney, because Ramirez, having lost this appeal, is not a prevailing party. Thus, SORM is not required to pay Ramirez's attorney's fees. *See* TEX. LAB.CODE ANN. § 408.221 (Vernon 2006).

**All Citations**

Not Reported in S.W.3d, 2010 WL 2601667

---

     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    Tara Partners, Ltd. v. City of South Houston,    Tex.App.-Hous. (14 Dist.),    January 13, 2009

164 S.W.3d 368
Supreme Court of Texas.

TEXAS NATURAL RESOURCE CONSERVATION COMMISSION, Petitioner,

v.

LAKESHORE UTILITY COMPANY, INC., Sentry Title Company,
Inc., Alan D. Whatley, and Thelma J. Whatley, Respondents.

No. 02–0988.    |    Argued Nov. 19, 2003.    |    Decided
April 8, 2005.    |    Rehearing Denied June 24, 2005.

**Synopsis**

**Background:** Water and sewer public utility brought action for judicial review of decision by Natural Resource Conservation Commission to deny its application to increase water and sewer tap fees, and Commission brought enforcement action to require utility to refund increase it had already charged. The 98th Judicial District Court, Travis County, entered judgment for utility. Commission appealed. The Austin Court of Appeals, 877 S.W.2d 814, reversed and remanded. On remand, after a bench trial, the 299th Judicial District Court, Travis County, Paul Davis, J., entered judgment for Commission and assessed refunds, interest, penalties, attorney fees, and court costs. Utility appealed. The Austin Court of Appeals, 92 S.W.3d 556, affirmed in part and reversed and remanded in part. Review was granted.

**Holdings:** The Supreme Court, Harriet O'Neill, J., held that:

[1] utility knowingly violated Water Code with respect to tap fees, as basis for civil penalty, and

[2] refund of overcharges could be sought in enforcement action.

Court of Appeals affirmed in part and reversed in part.

West Headnotes (9)

**[1]**    **Statutes**  •  Particular Words and Phrases

Unless the text of a statute dictates a different result, the term "knowingly" merely requires proof of knowledge of the facts, and not knowledge of the law.

Cases that cite this headnote

**[2]**    **Municipal Corporations**  •  Sewer service fees

**Water Law**  •  Penalties for violations of regulations

To prove water and sewer public utility "knowingly" violated the Water Code, as statutory basis for civil penalty, the Natural Resource Conservation Commission needed to establish only that the utility knew the facts that comprised

a violation of the Water Code, i.e., the utility knew it was charging fees that were not approved on the utility's tariff schedule. V.T.C.A., Water Code §§ 13.135, 13.190, 13.414(a).

Cases that cite this headnote

**[3]**   **Municipal Corporations**   Right or Obligation to Connect;  Fees

**Water Law**   Penalties for violations of regulations

Water and sewer public utility knowingly violated Water Code with respect to tap fees charged to homes in two subdivisions, as statutory basis for civil penalty, where utility knew it was charging tap fees that Natural Resource Conservation Commission had not approved, though utility subjectively believed that it was authorized to charge additional tap fees for pumps, tanks, valves, fittings, and controls; approved tap fee was maximum amount to be charged in areas requiring heavy-duty pumping or excessive lifting, so that utility should have known that approved tap fee included costs for specialized pumps and equipment necessary to operate pressure-effluent system for subdivisions, and when utility sought higher tap fee which would include pumps, tanks, valves, fittings, and controls, Commission rejected the proposed increase and ordered utility to refund all charges exceeding approved tap fee. V.T.C.A., Water Code §§ 13.135, 13.190, 13.414(a).

Cases that cite this headnote

**[4]**   **Municipal Corporations**   Power to control and regulate

**Water Law**   Powers and duties

As an administrative agency, the Natural Resource Conservation Commission, which regulates water and sewer public utilities, may exercise only those powers that the Legislature confers upon it in clear and express language, and cannot erect and exercise what really amounts to a new or additional power for the purpose of administrative expediency.

9 Cases that cite this headnote

**[5]**   **Administrative Law and Procedure**   Statutory basis and limitation

An administrative agency is a creature of the Legislature, with no inherent authority of its own.

7 Cases that cite this headnote

**[6]**   **Administrative Law and Procedure**   Implied powers

When the Legislature expressly confers a power on an administrative agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties.

8 Cases that cite this headnote

**[7]**   **Municipal Corporations**   Judicial proceedings

**Water Law**   Refund of overcharges in general

Issuance of order by Natural Resource Conservation Commission, requiring water and sewer public utility to refund overcharges to customers, was not a prerequisite to Attorney General, at Commission's request, bringing enforcement action to require compliance with Water Code, in which action Attorney General would seek refund of overcharges. V.T.C.A., Water Code §§ 13.135, 13.190, 13.411(a).

Cases that cite this headnote

**[8]**      **Water Law**  👈 Refund of overcharges in general

A refund of customer overcharges was a remedy consistent with Water Code provision allowing Attorney General, at Natural Resource Conservation Commission's request, to bring enforcement action to require compliance with Water Code. V.T.C.A., Water Code §§ 13.135, 13.190, 13.411(a).

1 Cases that cite this headnote

**[9]**      **Statutes**  👈 Statute as a Whole;  Relation of Parts to Whole and to One Another

The court determines legislative intent by reading the statute as a whole and interpreting the legislation to give effect to the entire act and not just its isolated portions.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*369** Philip Dale Mockford, Leonard H. Dougal, George Breck Harrison, Jackson & Walker, L.L.P., J. Stephen Dillawn, Atwood & Associates, Austin, J. Albert Kroemer, Prager Metzger & Kroemer, Dallas, for Petitioner.

Greg Abbott, Jane Elizabeth Atwood, Office of Atty. Gen., Howard G. Baldwin, First Asst. Atty. Gen., Jeffrey S. Boyd, Thompson & Knight, Karen Watson Kornell, Office of Atty. Gen., Barry Ross McBee, Office of Atty. Gen., and Linda B. Secord, Office of Atty. Gen., Natural Resource Div., Austin, for Respondent.

**Opinion**

Justice O'NEILL delivered the opinion of the Court.

In this case arising from a Texas Natural Resource Conservation Commission [1] **\*370** enforcement action, we must decide whether the evidence is legally sufficient to support the trial court's determination that a utility company knowingly violated the Water Code by charging its customers unauthorized fees, and whether the Water Code authorizes the Attorney General, at the Commission's request, to seek customer refunds in district court to compel compliance with the Water Code's statutory provisions. Answering both questions in the affirmative, we affirm in part and reverse in part the court of appeals' judgment.

[1]     We refer to the Public Utility Commission and the Texas Water Commission, both predecessors to the Texas Natural Resource Conservation Commission in the regulation of wastewater services, as "the Commission." Effective September 1, 2002, the Texas Natural Resource Conservation Commission changed its name to the Texas Commission on Environmental Quality. 27 Tex. Reg. 8340 (2002); *see* Act of May 28, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1933, 1985.

## I. Facts

Lakeshore Utility Company, Inc., [2] is a water and sewer public utility providing service to customers in two residential subdivisions, Point La Vista and Esquire Estates II, adjacent to Cedar Creek Lake in Henderson County, Texas. Because Lakeshore's customers reside on property just above the lake, a typical gravity- or gradient-flow sewer system cannot be used in the subdivisions. Instead, a more complex and expensive "pressure-effluent system" [3] is used.

[2]     The Commission's amended enforcement action also named as defendants Sentry Title Company, Inc., Lakeshore's parent company, which owns the physical plant and facilities Lakeshore uses, Alan Whatley, the president and a director of both Sentry and Lakeshore,

and Thelma Whatley, who at relevant times was vice-president of both entities. For convenience, we refer to these parties collectively as "Lakeshore."

3      The pressure-effluent system requires that a holding tank, similar to a septic tank, be installed at each home together with one or two specialized cycling pumps to pump a home's wastewater from its holding tank into a utility's sewer mains for transport to a treatment plant. In this case, Lakeshore's pressure-effluent system pumps sewage uphill to Lakeshore's sewer mains at the roadway level.

As a public utility, Lakeshore is subject to the jurisdiction of the Commission, which is charged with exercising regulatory authority over public utilities and fixing and regulating utility rates. *See* Tex. Water Code §§ 13.041(a) (providing that the Commission "may regulate and supervise the business of every water and sewer utility"), 13.181(b) (authorizing the Commission to fix and regulate utility rates), 13.190(a) (mandating that utilities cannot "charge, demand, collect, or receive" a rate for service that is not authorized). Lakeshore's monthly utility rates and tap fees—the fees charged to install water and sewer utility services—must be listed on its approved tariff schedule, or schedule of rates, that is filed with the Commission. *Id.* § 13.136.

In 1977, the Commission accepted a tariff application from Lakeshore and approved monthly rates for both subdivisions as well as tap fees at a flat rate of $200 for water "Tap and Meter Installation" and $600 for sewer "Tap & Installation" at locations requiring "heavy-duty pump[ing] or excessive lift [ing]."

Between 1981 and 1989, Lakeshore submitted numerous tariff applications to the Commission requesting various changes to the Commission's 1977 approved rates and tap fees. Relevant to this case are the tariff applications Lakeshore made in 1981 and 1989 to increase the amounts approved by the Commission in its original 1977 tariff. These applications requested that the Commission approve monthly rate and tap-fee increases at each subdivision. In each instance, while awaiting the Commission's decision, Lakeshore charged its customers the increased amounts that it was requesting the Commission approve. In **\*371** response to each application, the Commission signed an order dismissing Lakeshore's request and directing Lakeshore to refund the increased fees collected from its customers while the application was pending. Because of the importance of the 1981 and 1989 tariff applications—particularly the resulting Commission orders that required Lakeshore to refund its customers—we detail the events surrounding each application below.

**A. The 1981 Tariff Application and Resulting 1983 Orders**

In 1981, Lakeshore sought the Commission's authorization to increase its monthly utility rates and to increase its tap fees to $375 for water and $1,150 for sewer services. Lakeshore's request noted parenthetically that the new sewer rate would include "pump[s], tanks, valves, fittings, & controls." Lakeshore charged its customers the increased amounts pending the Commission's decision. In January 1983, the Commission issued an order denying the requested rate and fee increase and directing Lakeshore to charge tap fees no higher than "actual cost, not to exceed $200.00" for water and "actual cost, not to exceed $600.00" for sewer installation services. Accordingly, Lakeshore was not to charge amounts exceeding those formerly approved on its 1977 tariff. The Commission also ordered Lakeshore "to refund to its customers all monies collected in excess of the rates set forth [in its 1977 tariff]," and to provide the Commission with the name of each customer refunded and the amount within the next two months. Lakeshore was told its failure to comply would result in referral to the Attorney General's office for prosecution. As will be seen, however, Lakeshore continued to charge customers the disapproved amounts.

Just two months after the Commission's January 1983 Order denying Lakeshore's requested increase, Lakeshore was involved in a dispute concerning the Commission's certification of another public utility called the St. Paul Industrial Training School. As part of the certification process, the Commission undertook an examination and inquiry into Lakeshore's tap fee charges and issued an order in March 1983 called the St. Paul Order. In the St. Paul examiner's report, which was adopted by the Commission in its order, the examiner found that Lakeshore had been charging its customers sewer tap fees of $1,150 when the Commission had refused to approve this amount. The examiner noted that Lakeshore's overcharges constituted a violation of the statutory provision providing that "[n]o public utility may, directly or indirectly by any device whatsoever or in any manner; [sic] charge, demand, collect, or receive from any person" any amount other "than that prescribed in the schedule of rates of the public utility." *See* Tex. Water Code § 13.190(a). The examiner concluded that the Commission should monitor Lakeshore's

tap fee charges and "request the Attorney General to bring an action in District Court, in the Commission's behalf" to require Lakeshore's compliance with the provision if the Commission's monitoring revealed that rates other than tariffed rates were charged. It is unclear, though, whether the Commission took any further action to ensure Lakeshore's compliance with either the Commission's January 1983 Order or the St. Paul Order.

### B. The 1989 Rate Application and Resulting Order

In January 1989, Lakeshore filed another request for authorization from the Commission to increase its monthly rates and to increase tap fees for both residential subdivisions to $375 for water and $1,350 for sewer services. While the request was pending, Lakeshore again charged its customers **\*372** the proposed fees. On December 21, 1989, the Commission denied Lakeshore's application and ordered Lakeshore to refund approximately $29,000 in overcharges collected during the pendency of Lakeshore's request by crediting customers' future bills. The refund was ordered pursuant to Texas Water Code section 13.187, which provides: "[A] utility shall refund or credit against future bills all sums collected during the pendency of [a] rate proceeding in excess of the rate finally ordered plus interest as determined by the regulatory authority." *Id.* § 13.187(c). The Commission additionally ordered Lakeshore to provide an accounting to the Commission of all tap fees that Lakeshore customers paid from December 8, 1981, through December 14, 1989. Because the Commission denied Lakeshore's requested increase, Lakeshore's approved tap fee amounts remained the same as those approved in 1977.

### C. The Lawsuit

Both Lakeshore and the Commission brought suit in district court concerning the 1989 Order. Believing the Commission's continued refusal to increase rates and tap fee amounts was unfair, Lakeshore sought judicial review of the Commission's decision denying its 1989 application. The Commission, concerned that Lakeshore was refusing to comply with the 1989 Order, sought to enforce the order under sections 13.411 and 13.414 of the Water Code. The Commission specifically alleged that Lakeshore was actively violating the 1989 Order by failing to refund customers for overcharges and by continuing to charge fees in excess of those approved by the Commission. The Commission sought civil penalties "for each day Lakeshore ... has been in violation of the Water Code and the Commission's order since December 21, 1989," and to enjoin Lakeshore from future violations. The court consolidated the cases and, in a single judgment, found in favor of Lakeshore, reversed the Commission's 1989 Order, and dismissed the Commission's enforcement action.

### D. First Appeal and Remand

The court of appeals reversed the district court's judgment and reinstated the Commission's 1989 order, which required Lakeshore to charge no more then $600 for sewer and $200 for water installation services, and to refund its customers approximately $29,000 in overcharges made during the pendency of Lakeshore's 1989 tariff application. The Commission's reinstated enforcement action was remanded to the district court for further proceedings. *Tex. Water Comm'n v. Lakeshore Util. Co.,* 877 S.W.2d 814 (Tex.App.-Austin 1994, writ denied).

On remand, the Commission amended its original pleadings in the district court to seek customer refunds for overcharges dating back to 1981, when Lakeshore began to charge its customers amounts the Commission had not approved. The Commission claims it amended the original pleadings because it had learned through discovery that Lakeshore had been overcharging its customers for water and sewer services for that period of time.

After a bench trial, the district court found that between 1981 and 2001 Lakeshore had knowingly violated the Texas Water Code by overcharging its customers and assessed civil penalties in the amount of $126,400, which related to tap fee overcharges that occurred both before and after the 1989 Commission proceedings. The court also ordered Lakeshore to refund $106,417.66 to its customers for equipment, tap fee, and monthly rate overcharges between 1981 and 2001, and to pay its customers $68,851.43 in interest on overcharged amounts, plus attorneys' fees and court costs.

**\*373 E. The Second Appeal**

Lakeshore appealed only the parts of the trial court's judgment that ordered it to (1) pay civil penalties for "knowing" Water Code violations that occurred prior to the 1989 Order, and (2) refund unauthorized charges to customers beyond those Lakeshore was obligated to refund by the 1989 Order. The court of appeals affirmed the civil-penalties portion of the judgment, concluding there was legally sufficient evidence in the record to support the trial court's finding that Lakeshore knowingly violated the Water Code before the 1989 proceedings. 92 S.W.3d 556, 563. But the court of appeals reversed that part of the judgment requiring Lakeshore to refund customer overcharges that occurred before the 1989 proceedings, holding that, absent a Commission order directing a utility to refund or credit unauthorized charges, the Water Code does not authorize a district court action to recover those charges. *Id.* at 563–65.

Both the Commission and Lakeshore petitioned this Court to reverse portions of the court of appeals' judgment. Lakeshore contends the court of appeals erred in holding there was legally sufficient evidence that Lakeshore knowingly violated the Water Code before 1989. The Commission argues the court of appeals erred in reversing the trial court's refund order. We granted both petitions for review to consider the issues presented.

## II. Water Code Violations

We first consider whether there is legally sufficient evidence to support the trial court's finding that Lakeshore knowingly violated sections 13.135 and 13.190 of the Texas Water Code before 1989 by charging customers fees higher than those the Commission approved. [4] Section 13.135 provides that "[a] utility may not charge, collect, or receive any rate for utility service ... other than as provided in this chapter." Tex. Water Code § 13.135. Section 13.190 provides that "[a] water and sewer utility may not directly or indirectly ... charge, demand, collect, or receive from any person a greater or lesser compensation for any service rendered or to be rendered by the utility than that prescribed in the schedule of rates of the utility applicable to that service when filed in the manner provided in this chapter." *Id.* § 13.190. At the relevant time, section 13.414(a) of the Water Code provided that "any utility or affiliated interest that *knowingly* violates [chapter 13 of the Water Code] ... is subject to a civil penalty" of up to $5,000 a day. Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 3.005, 1985 Tex. Gen. Laws 2789, 2802 (emphasis added). [5]

[4] The relevant provisions were codified in 1985. *See* Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 3.005, 1985 TEX. GEN. LAWS 2789, 2789–804. The statutory predecessors to these provisions were in effect when Lakeshore began overcharging its customers. Act of May 29, 1975, 64th Leg., R.S., ch. 721, §§ 31, 46, 1975 Tex. Gen. Laws 2327, 2339, 2344. However, the predecessor statutes do not materially differ, and we cite the current provisions throughout this opinion for convenience.

[5] The act was amended in 1991 to remove "knowingly" from the provision and to reduce the amount of the penalty per violation. Act of May 27, 1991, 72d Leg., R.S., ch. 678, § 14, 1991 Tex. Gen. Laws 2463. Lakeshore only contests the civil penalty it was ordered to pay for customer overcharges that the trial court determined it made "knowingly" prior to the Commission's 1989 Order.

[1] [2] The Water Code does not define "knowingly," and we have never interpreted the term as it is used in section 13.414(a); however, " 'unless the text of a statute dictates a different result, the term **\*374** "knowingly" merely requires proof of knowledge of the facts,' " and not knowledge of the law. *United States v. Ho,* 311 F.3d 589, 605 (5th Cir.2002) (quoting *Bryan v. United States,* 524 U.S. 184, 193, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998)); *see also Osterberg v. Peca,* 12 S.W.3d 31, 38 (Tex.2000) (holding as a general proposition that ignorance of the law is not a defense to a statute's violation; the term "knowingly" in the Election Code refers only to a person's knowledge of the act of making or accepting a contribution, and not to whether the contribution violated the Election Code). Our Penal Code recognizes this principle in providing that "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." Tex. Pen.Code § 6.03(b). Federal courts construing knowledge requirements in environmental regulatory statutes—which provide for criminal sanctions very similar to the Water Code's civil penalty provision—have concluded that the proof necessary to establish a "knowing violation" of a regulation is merely proof that the violator had knowledge of the facts comprising the violation. *E.g., Ho,* 311 F.3d at 606 (citations omitted).

We see no reason to depart from this principle when interpreting the proof required to show a knowing violation under section 13.414(a) of the Water Code. If we held otherwise, enforcement of the Water Code would be problematic because the focus would be on whether the person violating the code knew about the specific code provisions and was operating under a correct legal interpretation. *See Osterberg,* 12 S.W.3d 31 at 38. Thus, to prove a "knowing" Water Code violation, the Commission needed to establish only that Lakeshore knew the facts that comprised a violation of the Water Code's provisions—namely, that Lakeshore knew it was charging fees that were not approved on Lakeshore's tariff schedule by the Commission.

Lakeshore admits it routinely charged customers amounts that exceeded the tap fees filed with and approved by the Commission. But relying on *General Electric Co. v. United States Environmental Protection Agency,* 53 F.3d 1324, 1329 (D.C.Cir.1995), Lakeshore contends it did not *knowingly* violate the Water Code in charging these amounts because it was not given "fair notice" that the tanks, pumps, and equipment necessary to effectively transfer wastewater from each home within its pressure-effluent system were included within its designated "tap fee," nor did it know that the Water Code prohibited charging separately for these items. Specifically, Lakeshore claims it lacked "fair notice" because prior to 1987, the Commission's rules failed to define the term "tap fee"[6] and Lakeshore could not "knowingly" violate Commission rules that did not exist during the relevant time period. Lakeshore further argues that the **\*375** definition of "tap fee," once adopted, was unclear because it provided that a utility company could charge customers for "extraordinary expenses" in addition to their approved tap fee amounts, but the definition failed to explicitly define what "expenses" qualified as "extraordinary." As a result, Lakeshore argues it mistakenly believed that the pumps and equipment necessary to operate its pressure-effluent system qualified as "extraordinary expenses"; therefore, Lakeshore did not "knowingly" violate the Water Code in charging for these items in addition to its approved tap fee.

[6]   In 1987, the Commission, for the first time, defined "tap fee":

Tap fee—A tap fee is the charge to new customers for initiation of service where no service previously existed. A tap fee may include the cost of physically tapping the main and installing meters, meter boxes, fittings and other materials, labor, setting up the new customer's account, and allowances for equipment and tools used. Extraordinary expenses such as road bores and street crossing may be added. Other charges, such as extension fees or contributions in aid of construction (CIAC) are not to be added in a tap fee.

12 Tex. Reg. 3121 (1987) (emerg. rule 31 TEX. ADMIN. CODE § 291.3) (adopted Sept. 2, 1987, expired Dec. 31, 1987). The definition of tap fee has been modified since its 1987 adoption, but these modifications are not relevant to our analysis. See 30 TEX. ADMIN. CODE § 291.3(45).

Lakeshore makes a similar argument about an emergency regulation the Commission adopted in 1986 that allowed utility companies to charge residential customers for "unique" and "non-standard" costs in addition to their approved tap fees under certain exceptional circumstances. 11 Tex. Reg. 1266 (1986) (emerg. rule 31 Tex. Admin. Code § 291.84 (adopted March 5, 1986, expired July 3, 1986)).[7] Lakeshore claims that, because the regulation did not define the terms "unique" and "non-standard," Lakeshore "reasonably believed" that the costs associated with its pressure-effluent system qualified as "unique" and "non-standard" and could therefore be charged to customers in addition to its approved tap fees.

[7]   The regulation that Lakeshore refers to has been modified from its original version enacted in 1986. The current regulation provides that:

[c]ontributions in aid of construction shall not be required of individual residential service applicants for production, storage, treatment, or transmission facilities unless that residential customer places unique, non-standard service demands upon the system, in which case, the customer may be charged the additional cost of extending service to and throughout his property ....

30 TEX. ADMIN. CODE § 291.86(c)(1). Because the current provision does not differ substantially from the 1986 version that Lakeshore relies upon, we cite the current provision for convenience.

 **[3]**   We find Lakeshore's argument unpersuasive. Lakeshore admits knowing that it was charging rates and fees that the Commission had not approved, and as we have stated, its subjective interpretation of the Water Code's provisions is immaterial. *See Ho,* 311 F.3d at 606. To prove a knowing violation of the Water Code, the Commission needed to prove only that Lakeshore knew that it was charging more than its approved tariff. We hold that the evidence is legally sufficient to support the trial court's finding that Lakeshore knew it was charging unapproved amounts. To begin, since the inception of Lakeshore's pressure-effluent system in 1977, every Lakeshore customer within the system has been required to install the same or similar

pumps and equipment. Lakeshore's approved 1977 tariff listed its "Tap and Meter Installation" fee at $200 for water and "Tap & Installation" fee at a "maximum" of $600 for sewer locations "requiring heavy-duty pump or excessive lift." Because Lakeshore's approved amounts were for "Tap & Installation" and "Tap and Meter Installation" and specifically included a maximum amount to be charged in areas requiring "heavy-duty pump[ing] or excessive lift[ing]," Lakeshore must have understood that the $200 and $600 amounts were meant to include all installation costs—including those for the specialized pumps and equipment necessary to operate its pressure-effluent system—within a single installation fee.

In 1981, Lakeshore sought to increase its water and sewer tap installation fees to $375 and $1,150, respectively. Lakeshore's rate application specifically stated that the $1,150 sewer installation amount was for "pump[s], tanks, valves, fittings, & **\*376** controls." Lakeshore, therefore, must have understood its tap fee was meant to include each of these costs. In 1983, the Commission rejected Lakeshore's proposed increases, ordered Lakeshore to charge a maximum of $200 for water and $600 for sewer installation services, and ordered Lakeshore to refund customers any charges it had received for unapproved amounts. Because the Commission specifically ordered Lakeshore to refund *any* unauthorized charges above approved amounts, specified the maximum amounts that could be charged, and rejected any additional charges for "pump[s], tanks, valves, fittings, & controls," Lakeshore must have known the Commission disapproved of any charges above those explicitly stated and was prohibited from charging separately for the "pump[s], tanks, valves, fittings, & controls" necessary to operate its pressure-effluent system. Nevertheless, the record reflects that Lakeshore continued to overcharge customers exactly the prohibited amounts at least through 1989, despite a specific warning from the examiner in the St. Paul Order that "charging a tap fee of $1,150, despite the fact that a fee of that magnitude ha [d] not been approved by the Commission[,] ... constitutes a violation of [the Water Code's provisions]."

We agree with the court of appeals that there is legally sufficient evidence in the record to support the trial court's finding that Lakeshore knew it was charging fees that were not approved on Lakeshore's tariff schedule by the Commission. 92 S.W.3d at 563. Accordingly, legally sufficient evidence supports the trial court's conclusion that Lakeshore knowingly violated the Water Code.

### III. Customer Refunds

We next consider the scope of relief the Attorney General may seek in an enforcement action brought at the Commission's request under section 13.411(a) of the Water Code. Section 13.411(a) defines the nature of that relief as follows:

> If the commission has reason to believe that any retail public utility or any other person or corporation is engaged in or is about to engage in any act in violation of this chapter or of any order or rule of the commission entered or adopted under this chapter or that any retail public utility or any other person or corporation is failing to comply with this chapter or with any rule or order, the attorney general on request of the commission, in addition to any other remedies provided in this chapter, shall bring an action in a court of competent jurisdiction in the name of and on behalf of the commission against the retail public utility or other person or corporation to enjoin the commencement or continuation of any act or *to require compliance with this chapter or the rule or order.*

Tex. Water Code § 13.411(a) (emphasis added). The parties agree, and the court of appeals recognized, that the plain statutory language authorizes both (1) requests to enjoin present or future violations, and (2) requests to *compel compliance with the Water Code,* an agency rule, or an order. It is the scope of the latter power—to compel compliance with the Water Code—that lies at the heart of the parties' dispute.

The court of appeals held that, although refunds were recoverable under section 13.411(a), before requesting refunds in district court the Commission had to first issue its own administrative order compelling refunds. Specifically, the court of appeals held that "[a]t most the code gives the Commission, through the attorney general, the authority to seek a district court **\*377** judgment enforcing a Commission order commanding refunds." 92 S.W.3d at 565.

The Commission contends the court of appeals' holding was erroneous. First, the Commission argues that it did issue its own administrative order compelling refunds in 1983 and 1989, and that the district court could, and did, enforce these orders by its judgment. Those orders required Lakeshore to refund customer overcharges made during the pendency of Lakeshore's rate applications and either explicitly or implicitly forbade Lakeshore from charging amounts exceeding those that the Commission had approved. Accordingly, the Commission claims, the 1983 and 1989 Orders are sufficiently broad to support the district court's judgment ordering refunds from 1981 to 2001. Lakeshore, on the other hand, argues that the 1983 and 1989 Orders were not broad enough to encompass overcharges from 1981 to 2001 because the orders only required Lakeshore to refund the unapproved amounts Lakeshore had charged during the pendency of its rate applications.

The Commission next contends that, even if the 1983 and 1989 Orders were not sufficiently broad to cover customer refunds for the twenty-year time period in issue, the court of appeals was wrong in making the district court's power to "require compliance with [the Water Code]" entirely dependent on a prior agency refund order. *See* Tex. Water Code § 13.411(a). The Commission acknowledges that an agency order may be a necessary prerequisite to establishing subject-matter jurisdiction in the district court when a case is filed by a *utility* challenging an agency action. The Commission contends, however, that a prior agency order is not necessary for the *Commission* to bring an original enforcement proceeding in district court to "require compliance" with the Water Code under section 13.411(a). *Id.* According to the Commission, "this is the first time that a district court's original jurisdiction in an enforcement case has been made dependent on an agency order." Lakeshore responds that the Commission lacks statutory authority under section 13.411(a) to pursue a refund action in district court absent a prior Commission order specifically directing such refunds, in essence arguing that the district court's enforcement power is derivative of the Commission's.

We conclude that, whether or not the 1983 or 1989 Orders were sufficiently broad to cover refunds for the entire twenty-year time period in dispute, the Commission has statutory authority to pursue an enforcement action in district court to "require [a utility's] compliance with [the Water Code]," and that authority includes the ability to seek refunds when a utility charges fees that the Water Code prohibits. *See id.*

 **[4]**  **[5]**  **[6]**  We begin with the well-established principle that, as an administrative agency, the Commission may exercise only those powers that the Legislature confers upon it in clear and express language, and cannot erect and exercise what really amounts to a new or additional power for the purpose of administrative expediency. *Pub. Util. Comm'n v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 316 (Tex.2001); *see Pub. Util. Comm'n v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 407 (Tex.1995). This is because, as an administrative agency, the Commission is a creature of the Legislature with no inherent authority of its own. *See City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d at 316; *GTE–Southwest,* 901 S.W.2d at 406; *see also State v. Pub. Util. Comm'n,* 883 S.W.2d 190, 194 (Tex.1994). In deciding whether an agency has acted within its powers, a court should also determine whether an **\*378** agency's power is implied in the statute. When the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d at 316; *GTE–Southwest,* 901 S.W.2d at 407; *Tex. Workers' Comp. Comm'n v. Patient Advocates,* 136 S.W.3d 643, 652 (Tex.2004).

 **[7]**  **[8]**  One of the Legislature's express purposes in enacting the Water Code was to ensure rates, operations, and services that are just and reasonable to consumers:

> The purpose of this chapter is to establish a comprehensive regulatory system that is adequate to the task of regulating retail public utilities to assure rates, operations, and services that are just and reasonable to the consumers and retail public utilities.

Tex. Water Code § 13.001(c). To this end, the Legislature vested the Commission with the power and authority to "regulate and supervise the business of every water and sewer utility," and to "fix and regulate rates of utilities." *Id.* §§ 13.041(a), 13.181(b). Utilities under the Code cannot charge, collect, or receive a rate for services not authorized by the Commission. *Id.* §§ 13.135, 13.190. If a utility charges more than its authorized rates, the Legislature has provided the Commission with a

mechanism for enforcement; by its clear and express language, section 13.411(a) authorizes the Commission to request that the Attorney General bring an action in court "to *require compliance* with [the Water Code]." *Id.* § 13.411(a) (emphasis added). The Legislature neither specified nor limited the types of relief the Attorney General might seek in district court to effect a utility's compliance with the Water Code. For instance, the Legislature did not say that any such relief must be prospective only or that it must be confined to the imposition of civil penalties. Nor did the Legislature say that the Commission had to first issue its own order before it could seek to compel compliance through the district court. The Legislature simply stated that the Attorney General, at the Commission's request, may bring suit "to require compliance" with the Water Code. *See id.* We must therefore determine whether the relief that the Commission sought here—a refund of customer overcharges—is a remedy consistent with its power to compel Lakeshore's compliance with the Water Code through the district court. We hold that it is.

 [9]    Our primary objective in construing the proper scope of an enforcement action under section 13.411(a) is to ascertain and give effect to the Legislature's intent by first looking at the statute's plain and common meaning. *Tex. Workers' Comp. Comm'n,* 136 S.W.3d at 652; *see also* Tex. Gov't Code § 312.005. We determine legislative intent by reading the statute as a whole and interpreting the legislation to give effect to the entire act and not just its isolated portions. *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003).

As we have said, the Legislature's intent in conferring enforcement power through the district court was, at least in part, to ensure that consumers would not be charged unapproved rates. *See* Tex. Water Code § 13.001(a). When a utility has violated the Water Code by overcharging its customers, refunds may be necessary to effect compliance with Water Code provisions mandating that customers be charged only approved amounts. *See id.* §§ 13.135, 13.190. In this case, for instance, the total amount Lakeshore collected from its customers far exceeded the amount Lakeshore was authorized to collect under the Code's provisions; thus, refunds were necessary to bring Lakeshore **\*379**  into statutory compliance and ensure that it did not retain the benefit of unlawful overcharges. In seeking refunds, then, the Commission is not crafting a new or additional power; on the contrary, it is exercising its explicit power to require a utility's compliance with Water Code provisions and thereby vindicate the regulatory process. In seeking the refund, the Commission might have chosen to pursue an agency-level enforcement proceeding before requesting the Attorney General to bring a judicial action, but nothing in section 13.411(a) says that an administrative order is a prerequisite to a judicial one in an action brought to "require [a utility's] compliance with [the Water Code]." *Id.* § 13.411(a).

In sum, we agree with the Commission that the customer refunds it sought were within its express statutory enforcement powers. Accordingly, we reverse that portion of the court of appeals' judgment restricting refunds to only those amounts specifically provided for in the Commission's January 21, 1983 and December 21, 1989 orders.

## IV. Conclusion

We affirm that portion of the court of appeals' judgment that imposes civil penalties based on Lakeshore's knowing violations of the Water Code. We reverse that portion of the court of appeals' judgment disallowing customer refunds and otherwise affirm the court of appeals' judgment.

**All Citations**

164 S.W.3d 368, 48 Tex. Sup. Ct. J. 537

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

KeyCite Yellow Flag - Negative Treatment

**Not Followed as Dicta**     Lawrence v. CDB Services, Inc.,     Tex.,     March 29, 2001

893 S.W.2d 504
Supreme Court of Texas.

TEXAS WORKERS' COMPENSATION COMMISSION, et al., Petitioners,

v.

Hector GARCIA, Jr., et al., Respondents.

No. D–4270.    |    Argued May 11, 1994.    |    Decided Feb. 9, 1995.

Workers and unions brought declaratory judgment action against Workers' Compensation Commission, its executive director, and employer challenging constitutionality of Workers' Compensation Act. Other parties representing employer interests intervened. The 365th District Court, Maverick County, Rey Perez, J., declared Act unconstitutional, and appeal was taken. The Court of Appeals, 862 S.W.2d 61, affirmed in part, reversed in part, and rendered. Commission and executive director appealed. The Supreme Court, Phillips, C.J., held that: (1) statewide union had standing to bring action; (2) one of individual workers did not have standing; (3) Act did not violate open courts provision of Texas Constitution; (4) 15% impairment threshold for supplemental income benefits and maximum medical improvement definition did not violate equal protection; (5) use of impairment, as measured by medical association guides, as factor in determining income benefits for permanent injury did not violate due course of law provision; (6) system of judicial review did not violate right to jury trial; (7) method of calculating average weekly wage for seasonal employees and lower paid workers did not violate equal protection; (8) "designated doctor" provisions of Act were constitutional; (9) provision allowing new employees to opt out of workers' compensation system did not violate equal protection; (10) limitation on attorney fees did not violate equal protection or due course of law guarantee; (11) adjudicative scheme did not violate open courts provision; and (12) Act was not facially invalid impairment of obligation of contract.

Reversed and rendered.

Spector, J., filed concurring and dissenting opinion in which Hightower and Gammage, JJ., joined.

West Headnotes (46)

**[1]**     **Appeal and Error**  🔑  Determination of questions of jurisdiction in general

As standing is component of subject matter jurisdiction, it may be raised by appellate court sua sponte.

13 Cases that cite this headnote

**[2]**     **Declaratory Judgment**  🔑  Necessity

Standing, which is necessary component of subject matter jurisdiction, requires real controversy between parties which will actually be determined by judicial declaration sought.

33 Cases that cite this headnote

**[3]**     **Constitutional Law**  🔑  Persons Entitled to Raise Constitutional Questions;  Standing

**Constitutional Law** 🔑 Third-party standing in general

To challenge statute, plaintiff must suffer some actual or threatened restriction under that statute and must contend that statute unconstitutionally restricts his rights, not someone else's rights.

14 Cases that cite this headnote

[4]     **Constitutional Law** 🔑 Facial invalidity

Under "facial challenge" to constitutionality of statute, challenging party contends that statute, by its terms, always operates unconstitutionally.

43 Cases that cite this headnote

[5]     **Constitutional Law** 🔑 Persons Entitled to Raise Constitutional Questions; Standing

Under "as applied challenge" to constitutionality of statute, plaintiff argues that statute, even though generally constitutional, operates unconstitutionally as to him because of his particular circumstances.

53 Cases that cite this headnote

[6]     **Constitutional Law** 🔑 Overbreadth in General

"Overbreadth doctrine," under which plaintiff argues that statute, even though constitutionally applicable to plaintiff and others, restricts substantial amount of protected conduct, is narrow exception to general rule of standing that prohibits plaintiff from asserting rights of others.

7 Cases that cite this headnote

[7]     **Associations** 🔑 Actions by or Against Associations

Association may sue on behalf of its members when its members would otherwise have standing to sue in their own right, interests it seeks to protect are germane to its purpose, and neither claim asserted nor relief requested requires participation of individual members in lawsuit.

14 Cases that cite this headnote

[8]     **Constitutional Law** 🔑 Workers' compensation

Statewide labor union had standing to bring action challenging constitutionality of Workers' Compensation Act; large majority of union members were covered under Act, although there was no showing of specific members who had suffered compensable injury since effective date of Act, existence of such members could be fairly assumed given that union had 215,000 members, union actively lobbied regarding Act, union president testified that quality and character of workers' compensation system was of "paramount concern" to union, and, as union sought only declaratory relief regarding Act's facial validity, participation of individual members was not necessary. V.T.C.A., Labor Code § 401.001 et seq.

10 Cases that cite this headnote

[9]     **Constitutional Law** 🔑 Workers' compensation

Worker, who suffered from repetitive trauma occupational disease that would likely cause future disability, did not have standing to challenge constitutionality of Workers' Compensation Act, notwithstanding contention that he would be denied all benefits based on Act's requirement that claimant notify employer within 30 days after injury and file

claim within one year after injury and based on fact that 401–week maximum benefit period had already passed; worker had submitted no claim for benefits under Act, and, even assuming that he would file claim, there was no way to predict what outcome would be. V.T.C.A., Labor Code §§ 409.001–409.004.

2 Cases that cite this headnote

[10]  **Constitutional Law**  Scope of inquiry in general

In most instances, appellate court must focus on entire record to determine whether legislature has exceeded constitutional limitations.

Cases that cite this headnote

[11]  **Constitutional Law**  Right of access to the courts and a remedy for injuries in general

Open courts provision of Texas Constitution includes at least three separate constitutional rights: (1) courts must actually be operating and available; (2) legislature cannot impede access to courts through unreasonable financial barriers; and (3) meaningful remedies must be afforded, so that legislature may not abrogate right to assert well-established common-law cause of action unless reason affords action outweighs litigants' constitutional right of redress. Vernon's Ann.Texas Const. Art. 1, § 13.

12 Cases that cite this headnote

[12]  **Constitutional Law**  Conditions, Limitations, and Other Restrictions on Access and Remedies

**Workers' Compensation**  Remedies and procedure in general

In considering open courts challenge to current Workers' Compensation Act, court was required to compare current Act to common-law remedy, not to previous statute. Vernon's Ann.Texas Const. Art. 1, § 13; V.T.C.A., Labor Code § 401.001 et seq.

3 Cases that cite this headnote

[13]  **Constitutional Law**  Conditions, Limitations, and Other Restrictions on Access and Remedies

Open courts provision guarantees that common-law remedy will not be unreasonably abridged, not that legislature will not amend or replace statute. Vernon's Ann.Texas Const. Art. 1, § 13.

7 Cases that cite this headnote

[14]  **Constitutional Law**  Conditions, Limitations, and Other Restrictions on Access and Remedies

**Workers' Compensation**  Imposition of liability without fault

**Workers' Compensation**  Compensation in general

Workers' Compensation Act did not violate open courts provision of Texas Constitution, even though Act used impairment, as measured by medical association's guides, as factor in determining supplemental income benefits for permanent injury and imposed threshold level of 15% impairment for such benefits; Act provided benefits to injured workers without necessity of proving negligence and without regard to employer's potential defenses, and, in exchange for more certain recovery, benefits were limited to full lifetime medical coverage, temporary benefits replacing substantial part of lost wages during convalescence, impairment benefits, and long-term wage replacement for those with moderately severe impairment, impairment was accepted criterion for benefits which it was within legislature's discretion to utilize, even though threshold might deny supplemental benefits to some workers suffering disabilities. Vernon's Ann.Texas Const. Art. 1, § 13; V.T.C.A., Labor Code § 401.001 et seq.

16 Cases that cite this headnote

**[15]    Constitutional Law** ☞ Workers' compensation and employers' liability

**Workers' Compensation** ☞ Compensation in general

Provision of Workers' Compensation Act imposing threshold level of 15% impairment for supplemental income benefits was valid under equal protection clause of Texas Constitution if it was rationally related to legitimate state purpose; threshold did not abridge fundamental right or distinguish between persons on suspect basis, such as race or national origin. Vernon's Ann.Texas Const. Art. 1, § 3; V.T.C.A., Labor Code § 401.001 et seq.

3 Cases that cite this headnote

**[16]    Constitutional Law** ☞ Workers' compensation and employers' liability

**Workers' Compensation** ☞ Compensation in general

Provision of Workers' Compensation Act imposing threshold level of 15% impairment for supplemental income benefits did not violate equal protection clause of Texas Constitution; subjectivity and inconsistency of long-term benefit awards under prior statute was criticized, legislature sought more objective system by basing supplemental benefits on actual lost wages, but imposing threshold, and threshold was rational means to distinguish between moderately severe impairment likely to interfere with long-term employment from less severe impairment, even though threshold did not perfectly correspond to occupational disability and legislature failed to articulate reasons for setting threshold at 15%. Vernon's Ann.Texas Const. Art. 1, § 3; V.T.C.A., Labor Code § 408.142.

5 Cases that cite this headnote

**[17]    Constitutional Law** ☞ Workers' compensation and employers' liability

**Workers' Compensation** ☞ Increase, reduction, or termination of compensation

Workers' Compensation Act provision under which claimant was deemed to reach maximum medical improvement, ending temporary benefits, no later than two years after those benefits began to accrue did not violate equal protection clause of Texas Constitution by creating arbitrary classification; it was not apparent that provision created any classification as it merely established two-year cap on temporary benefits for all claimants, legislature could have concluded that some absolute limit on temporary benefits was necessary component of efficient compensation system, there was medical testimony that most injured workers would actually reach maximum recovery within two years, and, in rare situations where claimant's condition had not stabilized after two years, provision would almost always benefit claimant by inflating impairment rating. Vernon's Ann.Texas Const. Art. 1, § 3; V.T.C.A., Labor Code §§ 401.011(30), 408.102(a).

8 Cases that cite this headnote

**[18]    Constitutional Law** ☞ Procedural due process in general

**Constitutional Law** ☞ Substantive Due Process in General

Like federal due process clause, due course of law provision of Texas Constitution contains substantive as well as procedural component. U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 19.

10 Cases that cite this headnote

**[19]    Constitutional Law** ☞ Reasonableness, rationality, and relationship to object

**Constitutional Law** 🔑 Economic rights and regulation

Under federal due process clause, law, such as economic legislation, that does not affect fundamental rights or interests is valid if it merely bears rational relationship to legitimate state interest. U.S.C.A. Const.Amend. 14.

15 Cases that cite this headnote

**[20]** **Constitutional Law** 🔑 Workers' compensation and employers' liability

**Workers' Compensation** 🔑 Payment, enforcement, and disposition of compensation

Workers' Compensation Act's use of impairment as factor in determining supplemental income benefits for permanent injury and threshold level of 15% impairment for such benefits was sufficiently rational and reasonable to meet substantive due course of law requirements under Texas Constitution. Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Labor Code § 401.001 et seq.

9 Cases that cite this headnote

**[21]** **Constitutional Law** 🔑 Workers' compensation and employers' liability

**Workers' Compensation** 🔑 Compensation in general

Workers' Compensation Act's use of medical association's guides in measuring impairment did not violate substantive due course of law guarantees under Texas Constitution, notwithstanding testimony that rating numbers in guides lacked scientific validity and that guides did not permit percentage ratings for many disabling injuries; there was testimony that guides were most reliable method of measuring physical impairment currently available, and numerous states used guides to measure impairment. Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Labor Code §§ 401.011(24), 408.124.

5 Cases that cite this headnote

**[22]** **Jury** 🔑 Common law or statutory actions, in general

Provision in bill of rights of Texas Constitution guaranteeing right to jury trial maintains right to trial by jury for those actions, or analogous actions, tried by jury when Constitution was adopted in 1876. Vernon's Ann.Texas Const. Art. 1, § 15.

4 Cases that cite this headnote

**[23]** **Jury** 🔑 Nature of Cause of Action or Issue in General

Provision in judiciary article of Texas Constitution guaranteeing right to jury trial protects right to have jury resolve fact questions in all "causes" brought in district courts. Vernon's Ann.Texas Const. Art. 5, § 10.

4 Cases that cite this headnote

**[24]** **Jury** 🔑 Nature and scope in general

**Jury** 🔑 Particular Proceedings in Civil Actions

Access to jury need not be provided at initial adjudication, so long as right to appeal and jury trial on appeal are secured. Vernon's Ann.Texas Const. Art. 1, § 15; Art. 5, § 10.

Cases that cite this headnote

**[25]    Jury** 🔑 Nature of Cause of Action or Issue in General

Although right to jury trial under judiciary article of Texas Constitution is potentially broader than under bill of rights in that it covers all "causes" regardless of whether jury trial was available in 1876, it can also be narrower in that not all adversary proceedings are "causes" within meaning of judiciary article. Vernon's Ann.Texas Const. Art. 1, § 15; Art. 5, § 10.

4 Cases that cite this headnote

**[26]    Jury** 🔑 Trial on Appeal or Other Proceeding for Review

Appeal from administrative decision is not "cause" within meaning of provision in judiciary article of Texas Constitution guaranteeing right to jury trial in all "causes" in district courts. Vernon's Ann.Texas Const. Art. 5, § 10.

5 Cases that cite this headnote

**[27]    Jury** 🔑 Trial on Appeal or Other Proceeding for Review

Workers' Compensation Act's method of judicial review did not implicate right to jury trial under judiciary article of Texas Constitution guaranteeing jury trial in all "causes" in district courts; appeal from administrative decision is not "cause" within meaning of that provision. Vernon's Ann.Texas Const. Art. 5, § 10; V.T.C.A., Labor Code § 401.001 et seq.

1 Cases that cite this headnote

**[28]    Jury** 🔑 Employment and labor relations cases

With regard to central issues regarding income and death benefits, Workers' Compensation Act's remedy is analogous to claim for which right to jury trial is constitutionally preserved; Act is substitute for common-law negligence remedy, which was action tried to jury in 1876. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 401.001 et seq.

5 Cases that cite this headnote

**[29]    Jury** 🔑 Common law or statutory actions, in general

It is important to distinguish between procedural right to jury trial and substantive right to preservation of common-law causes of action; although legislation altering or restricting cause of action is subject to scrutiny under open courts doctrine, that substantive change does not implicate right to jury trial, as long as relevant issues under modified cause of action are decided by jury. Vernon's Ann.Texas Const. Art. 1, §§ 13, 15.

3 Cases that cite this headnote

**[30]    Jury** 🔑 Restrictions on right to appeal

Provisions of Workers' Compensation Act tying benefits to physical impairment did not violate right to jury trial, even though, in many cases, jury would be foreclosed from considering, on appeal to district court of administrative decision, evidence with respect to true nature of worker's disability, loss of earning capacity, or future loss of earnings; legislature replaced common-law cause of action which based compensation in part of loss of earning capacity with statutory cause of action which based compensation in part on impairment, and jury was allowed, under Act, to determine impairment. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 401.001 et seq.

1 Cases that cite this headnote

**[31]    Jury** ☛ Statutory provisions

Workers' Compensation Act provision imposing threshold of 15% impairment on receipt of supplemental income benefits did not violate right to jury trial, notwithstanding contention that threshold imposed arbitrary presumption; threshold was substantive part of benefit scheme, and jury decided whether claimant was at least 15% impaired. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 401.001 et seq.

Cases that cite this headnote

**[32]    Jury** ☛ Restrictions on right to appeal

Workers' Compensation Act provision requiring that jury, on appeal to district court, be informed of Workers' Compensation Commission's decision did not violate right to jury trial; as jury was not required to accord decision any particular weight, provision did not impinge on jury's discretion in deciding relevant factual issues. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 410.304(a).

11 Cases that cite this headnote

**[33]    Jury** ☛ Restrictions on right to appeal

Workers' Compensation Act provision limiting extent of evidence presented to jury, on appeal to district court, to that presented to Workers' Compensation Commission, unless court determined that claimant's condition substantially changed since Commission's decision, did not violate right to jury trial; provision encouraged parties to present relevant evidence during administrative proceedings, thus increasing accuracy and efficiency of those proceedings, and requiring party to marshal and disclose evidence diligently does not violate right to trial by jury. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code §§ 410.306(c), 410.307.

4 Cases that cite this headnote

**[34]    Jury** ☛ Restrictions on right to appeal

Workers' Compensation Act provision requiring jury, on appeal of administrative decision to district court, to adopt specific impairment rating arrived at by one of physicians in case, rather than considering entirety of testimony to find impairment rating, did not violate right to jury trial; requirement that impairment rating match one of physician's findings was part of substantive statutory scheme, disputed issue of fact on appeal was which physician's rating would prevail, and that issue was presented to and decided by jury. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 410.306(c).

23 Cases that cite this headnote

**[35]    Jury** ☛ Restriction or Invasion of Functions of Jury

Texas Constitution's guarantee of jury trial does not prohibit altering manner in which factual questions in particular cause of action are submitted to jury. Vernon's Ann.Texas Const. Art. 1, § 15.

Cases that cite this headnote

**[36]    Jury** ☛ Restrictions on right to appeal

Judicial review of agency orders under substantial evidence rule does not per se violate right to trial by jury; depending on particular order being appealed, and nature and scope of administrative scheme in general, judicial

review proceeding may not be analogous to action tried by jury in 1876 and, thus, may be exempt from provision in bill of rights in Texas Constitution guaranteeing right to jury trial. Vernon's Ann.Texas Const. Art. 1, § 15.

1 Cases that cite this headnote

**[37]** **Workers' Compensation** ⟜ Competent evidence

**Workers' Compensation** ⟜ Substantial evidence

Workers' Compensation Act did not establish impermissible "hybrid" system of judicial review by providing for modified de novo review of some issues under preponderance of evidence standard and review of remaining issue under substantial evidence standard; Act clearly specified factual issues to be reviewed under preponderance standard, detailing controlling procedures, fact finder, although informed of Workers' Compensation Commission's decision, did not review it for reasonableness, but, rather, independently decided issues by preponderance of evidence, and remaining issues were reviewed under substantial evidence test. V.T.C.A., Labor Code §§ 410.255, 410.303, 410.304.

43 Cases that cite this headnote

**[38]** **Constitutional Law** ⟜ Workers' compensation and employers' liability

**Workers' Compensation** ⟜ Payment, enforcement, and disposition of compensation

Workers' Compensation Act provision requiring that seasonal workers' average weekly wage be calculated, for purposes of temporary income benefits, in normal manner adjusted as often as necessary to reflect wages employee could reasonably have expected to earn during period that benefits are paid did not violate equal protection clause of Texas Constitution; adjustment was rationally related to purpose of such benefits, namely, replacing income actually lost due to injury. Vernon's Ann.Texas Const. Art. 1, § 3; V.T.C.A., Labor Code § 408.043(a).

6 Cases that cite this headnote

**[39]** **Constitutional Law** ⟜ Workers' compensation and employers' liability

**Workers' Compensation** ⟜ Payment, enforcement, and disposition of compensation

Workers' Compensation Act provision requiring that seasonal workers' average weekly wage be calculated, for purposes of all benefits except temporary income benefits, by dividing previous year's income by 50, rather than using actual average wage for past 13 weeks as required for other workers, did not violate equal protection clause of Texas Constitution; adjustment was rationally related to statutory scheme in that, without it, benefits would be either artificially high or low depending on point in work cycle in which injury occurred. Vernon's Ann.Texas Const. Art. 1, § 3; V.T.C.A., Labor Code §§ 408.041(a), 408.043(b).

1 Cases that cite this headnote

**[40]** **Constitutional Law** ⟜ Labor, employment, and public officials

**Workers' Compensation** ⟜ Payment, enforcement, and disposition of compensation

Workers' Compensation Act provision placing cap, not applicable to workers earning more than $8.50 per hour, on increased weekly benefit for first 26 weeks of temporary income benefits received by workers earning less than $8.50 hour, of 1/52 of actual earnings for previous year did not violate equal protection clause of Texas Constitution; legislature imposed cap as lower paid workers were generally unaffected by overall statutory cap, and legislature concluded that, without special cap, many lower paid workers would fare better through compensation benefits than they did working, providing disincentive to recovery and return to work. Vernon's Ann.Texas Const. Art. 1, § 3; V.T.C.A., Labor Code § 408.103(b).

2 Cases that cite this headnote

**[41]    Constitutional Law** 👈 Workers' compensation and employers' liability

**Workers' Compensation** 👈 Pleading and evidence

Workers' Compensation Act provision placing presumptive weight on findings of "designated doctor," selected by mutual agreement of parties or by Workers' Compensation Commission, did not violate Texas Constitution, notwithstanding contention that provision arbitrarily subordinated role of claimant's treating physician; legislature could have rationally concluded that relying on opinion of neutral doctor was fairest and most efficient means of settling medical disputes at Commission level. V.T.C.A., Labor Code § 408.125.

2 Cases that cite this headnote

**[42]    Constitutional Law** 👈 Workers' compensation and employers' liability

**Constitutional Law** 👈 Workers' compensation and employers' liability

**Workers' Compensation** 👈 Acceptance or rejection of statute, and election of remedies

Workers' Compensation Act provision allowing new employees hired after effective date of Act to opt out of workers' compensation system did not violate equal protection or due course of law guarantee of Texas Constitution by providing new employees opportunity to opt out, while not affording existing employees similar opportunity; state had legitimate interest in requiring employees to make binding election at beginning of employment, allowing carriers to set premiums and employers to budget costs, and legislature could have rationally concluded that affording all employees covered by previous workers' compensation system simultaneous opportunity to opt out of new system would have caused administrative and budgeting problems. Vernon's Ann.Texas Const. Art. 1, §§ 3, 19; V.T.C.A., Labor Code § 406.034.

11 Cases that cite this headnote

**[43]    Constitutional Law** 👈 Workers' compensation and employers' liability

**Constitutional Law** 👈 Workers' compensation and employers' liability

**Workers' Compensation** 👈 Costs and fees

Workers' Compensation Act provision limiting attorney fees awarded claimant to 25% of recovery did not unreasonably restrict claimant's access to legal representation, in violation of equal protection and due course of law guarantees of Texas Constitution; requiring attorney to charge reasonable fee was valid exercise of legislature's police power, and legislature could have rationally concluded that injured employees must ultimately be guaranteed at least 75% of benefits provided if they are to maintain support of themselves and their families. Vernon's Ann.Texas Const. Art. 1, §§ 3, 19; V.T.C.A., Labor Code § 408.221(h).

14 Cases that cite this headnote

**[44]    Constitutional Law** 👈 Costs and fees; indigency

**Workers' Compensation** 👈 Pleading and evidence

Union and workers failed to establish, in declaratory judgment action, that Workers' Compensation Act's adjudicative scheme violated, on its face, open courts provision of Texas Constitution, notwithstanding contention that sequential resolution of issues under Act posed unreasonable financial barrier to court access; union and workers did not demonstrate that separate adjudication of each issue was required under Act, Act appeared to contemplate joinder of issues at administrative and trial levels, and, as action did not involve actual administrative proceeding, there was no

way to determine whether Act would have effect claimed by union and workers. Vernon's Ann.Texas Const. Art. 1, § 13; V.T.C.A., Labor Code § 401.001 et seq.

1 Cases that cite this headnote

**[45]** **Jury** 🔑 Restrictions on right to appeal

That issues might be judicially reviewed sequentially under Workers' Compensation Act, rather than in single proceeding, did not implicate right to trial by jury. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 401.001 et seq.

Cases that cite this headnote

**[46]** **Constitutional Law** 🔑 Workers' compensation

**Constitutional Law** 🔑 Insurance

**Workers' Compensation** 🔑 Payment, enforcement, and disposition of compensation

**Workers' Compensation** 🔑 Insurance and insurance funds

Workers' Compensation Act section providing that, after injury, employer may, on written request or agreement of employee, supplement income benefits paid by insurer by amount not exceeding specified maximum and requiring insurer to reimburse employer for amount of benefits paid by employer was not facially invalid impairment of obligation of contract. Vernon's Ann.Texas Const. Art. 1, § 16; V.T.C.A., Labor Code § 408.003.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*510** Delmar L. Cain, Shannon H. Ratliff, Scott Moore, Marc O. Knisely, Dan Morales, Austin, for petitioners.

Bill Whitehurst, David R. Richards, Austin, Robert Serna, Crystal City, Robert R. Puente, Jon R. Alworth, San Antonio, for respondents.

**Opinion**

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which GONZALEZ, HECHT, CORNYN, ENOCH, and OWEN, Justices, join.

This case requires us to decide whether various provisions of the Texas Workers' Compensation Act facially violate the Texas Constitution's guarantees of open courts, due course of law, equal protection, jury trial, and obligation of contract. We reverse the judgment of the court of appeals, 862 S.W.2d 61, and uphold the constitutionality of the Act.

**I**

In 1989, the Legislature enacted a new Workers' Compensation Act [1] restructuring workers' compensation in Texas. To understand the new Act and its effect on claims by injured workers, we must first review the compensation system it replaced.

[1]    The new Act, initially located in articles 8308–1.01 through 8308–11.10 of Texas Revised Civil Statutes Annotated, was codified in September 1993, after the court of appeals' decision in this case. *See* Tex.Lab.Code § 401.001, et seq. For convenience, we refer to the Labor Code sections.

### A

Texas first enacted workers' compensation legislation in 1913 to meet the needs of an increasingly industrialized society. Despite escalating industrial accidents, under the common law most injured workers were denied recovery. *See Research Papers of the Joint Select Committee on Workers' Compensation Insurance* ch. 1 at 2 (1988) (hereinafter "*Research Papers* "). Not only was negligence often difficult to prove in an industrial setting, but employers could also invoke as complete defenses the common law doctrines of contributory negligence, assumption of the risk, and fellow servant.

The Employers' Liability Act of 1913 replaced the common law negligence remedy with limited but more certain benefits for
**\*511**  injured workers. Acts 1913, 33rd Leg., ch. 179. The Texas act, which was part of a nationwide compensation movement, was perceived to be in the best interests of both employers and employees. *See Research Papers* ch. 1 at 6. Employees injured in the course and scope of employment could recover compensation without proving fault by the employer and without regard to their or their coworkers' negligence. Acts 1913, ch. 179, pt. I, §§ 7–12. In exchange, the employer's total liability for an injury was substantially limited. *Id.* § 3. Although employers were allowed to opt out of the system, the act discouraged this choice by abolishing all the traditional common law defenses for non-subscribers.[2] *Id.* § 1.

[2]    In 1917, individual employees of subscribing employers were also given the option of electing out of the system. *See* Acts 1917, 35th Leg., ch. 103, § 1. Those opting out retained their common law right of action, which remained subject to all common law defenses. *See* Tex.Rev.Civ.Stat.Ann. art. 8306, § 3a (repealed by Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(7)).

### 1

The intent of the former act was to compensate for medical costs and loss of *wage earning capacity* caused by a work-related injury. Although modified on numerous occasions over the years, the act's basic structure never changed. As of 1989, totally incapacitated employees could recover two-thirds of their average weekly wage for up to 401 weeks.[3] Tex.Rev.Civ.Stat.Ann. art. 8306, § 10 (repealed by Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(7)). Partially incapacitated employees could recover two-thirds of the difference between their average weekly wage and their post-injury weekly earning capacity for up to 300 weeks, subject to an aggregate maximum of 401 weeks for periods of total and partial incapacity. *Id.* § 11.

[3]    The former act calculated average weekly wage under a rather convoluted formula based on a 300 day work-year. Tex.Rev.Civ.Stat.Ann. art. 8309 § 1 (repealed by Acts 1989, 71st Leg., 2nd C.S. ch. 1, § 16.01(15)). The employee's wages earned during the year preceding injury were divided by the number of days actually worked during that year, producing an average daily wage. This daily wage was then multiplied by 300 to produce the annual wage, which was then divided by 52 to produced the average weekly wage. Because there are only 260 work days in a year (52 weeks x 5 days), the 300 day rule inflated the average weekly wage, raising the effective benefit to 77% of gross pay. *See Research Papers* ch. 3 at 69.

Disability from injury was generally referred to as either "temporary" or "permanent" depending on whether it was likely to persist beyond the maximum benefit period. Thus, an injury causing complete incapacity for at least 401 weeks was the functional equivalent of "permanent total" disability, while an injury causing partial incapacity for at least 300 weeks was the functional equivalent of "permanent partial" disability. Conversely, an injury that totally incapacitated a worker for less than 401 weeks was a "temporary total" disability. *See Research Papers* ch. 2 at 11–14.

The former act also provided lifetime benefits for certain injuries conclusively presumed to be totally and permanently incapacitating, such as loss of both feet or both hands, and long-term death benefits for the beneficiaries of a fatally injured

employee. Art. 8306, §§ 8, 11a. For certain other "specific injuries," the act mandated specific compensation in lieu of all other wage-loss benefits. *Id.* § 12. For loss of a thumb, for example, the employee was entitled to two-thirds of the average weekly wage for 60 weeks. *Id.*

The weekly benefits for death, total incapacity, or a specific injury were subject to a statutory maximum and minimum, while the benefits for partial incapacity were subject only to the statutory maximum. *Id.* §§ 8(a), 10(a), 11, 12. These upper and lower limits on the weekly benefit were adjusted annually based on Texas Employment Commission statistics, *id.* § 29, and in 1988 were $238 and $40, respectively. *See Research Papers* ch. 2 at 9. The former act also compensated for all medical costs of a work-related injury, without limit as to amount or duration. Art. 8306, § 7.

### 2

The Industrial Accident Board, a three-member panel appointed by the Governor, administered the former compensation system. *See generally* **\*512** Tex.Rev.Civ.Stat.Ann. art. 8307 (repealed by Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(10)). The Board and its staff monitored work-place injuries, seeking to resolve disputes between claimants and insurers. The adjudicative process began with a "prehearing conference," an informal meeting of the parties presided over by a prehearing officer. *Id.* § 10. Witnesses were not sworn and no record was made, and "no matter occurring during, or fact developed in, a pre-hearing conference [could be] deemed as admissions or evidence or impeachment against the association, employee or the subscriber in any other proceedings except before the Board." *Id.* Under the prehearing officer's guidance, the parties attempted to mutually resolve the disputed issues. If successful, they could enter into binding settlement agreements, subject to Board approval.[4] *Id.* § 12.

[4]      40,000 prehearing conferences were held in 1987, 23,000 of which resulted in settlement agreements. *See Research Papers* ch. 2 at 32.

For claims not settled, the prehearing officer prepared a report stating the officer's recommendations for the award and the basis therefor. *Id.* § 10. These claims then proceeded to the Board for formal hearing. *Id.* Although the parties could appear and give sworn testimony, in most cases the Board simply reviewed its claim file, usually approving the prehearing officer's recommended award. *See Research Papers* ch. 2 at 33.

Any party dissatisfied with the Board decision could appeal to court. Art. 8307 § 5. All issues were subject to de novo review under the normal rules of procedure, including the right to a jury trial on disputed factual issues. *Id.* Settlements were subject to court approval, *id.* § 12a, as was the claimant's attorney's fee, which could not exceed 25 percent of the recovery. Art. 8306 § 7d. At trial, the Board award was inadmissible.

### B

Satisfaction with the former workers' compensation system was never high. A detailed study in 1938 concluded that the system was a "genuine source of embarrassment" in need of "immediate and constructive reform." Karl E. Ashburn, *Report on Texas Workmen's Compensation Insurance Act and Its Administration with Recommendations for Improvement* 7 (1938). Ashburn recommended, among other changes, making coverage mandatory, strengthening the Board, limiting settlement agreements, and eliminating trial de novo.

By the 1980s, loss of confidence in the system had reached crisis proportions. Beginning in 1983, the percentage of claims with indemnity (wage loss) payments began to increase dramatically, as did the proportion of indemnity claims with payments for permanent disability. Joint Select Committee on Workers' Compensation Insurance, *A Report to the 71st Texas Legislature* 3 (1988). Medical costs for injured workers also began increasing at a much higher rate than medical costs outside the compensation system. *Id.* These increases helped cause compensation insurance premiums to more than double between 1984

and 1988. *Id.* at 1. By 1988, the cost of workers' compensation to Texas employers was among the highest in the nation. *Id.* at 4. Business groups claimed that these spiralling costs forced large businesses to locate operations elsewhere and forced small businesses to cease operations or opt out of coverage. *Id.* at 1.

Despite these high costs, the system was also widely perceived to be unfair to injured workers. *Id.* In July 1987, the Legislature created the Joint Select Committee on Workers' Compensation Insurance to study the system and propose changes. After numerous public hearings and meetings, the Committee identified several inequitable features of the former act, including 1) the low statutory maximum benefit, 2) the 401–week limit on benefits, 3) the settlement of claims prior to stabilization of the claimant's medical condition, 4) the subjective "loss of wage earning capacity" standard, and 5) inconsistent jury awards based on geographical location. *Report of Joint Select Committee* at 4. The Committee concluded that persons with serious long-term injuries received benefits "among the very lowest in the nation," while those with minor injuries received relatively high benefits. *Id.* The Committee also **\*513** found that the system suffered from the Board's relative lack of power, and concluded that the delay and cost of de novo review forced premature and inaccurate settlements. *Id.* at 5.

The Committee also discovered that, between 1983 and 1987, the level of attorney involvement in Texas rose from 36 percent to 50 percent of all claims. *Research Papers* ch. 4 at 100–101. By comparison, a 1987 survey of seventeen other jurisdictions found attorney involvement in only 7.8 percent of all claims. *See* National Council on Compensation Insurance, *Workers Compensation Claim Characteristics* 58 (1987). This disparity existed even though the percentage of compensation claims in Texas formally controverted by the insurance carrier (8.8 percent) was only slightly higher than the average in the other seventeen surveyed jurisdictions (7.2 percent). *Research Papers* ch. 4 at 101; *Workers Compensation Claim Characteristics* at 58.

The Committee made numerous recommendations, including the following: 1) make the system more objective by awarding benefits, at least in part, on the basis of physical impairment rather than loss of wage earning capacity; 2) utilize a neutral doctor to resolve disputes; 3) prohibit the settlement of medical benefits; 4) increase the statutory maximum; 5) extend the duration of permanent disability payments; and 6) vest the Board with authority to render binding findings, subject to judicial review only under the substantial evidence rule. *Report of Joint Select Committee* at 10–19.

## C

### 1

In December 1989, a year after the Committee issued its report, the Legislature passed the new Act. This legislation, which became effective January 1, 1991, reflects many of the Committee's recommendations. Like the former law, it compensates for all medical costs flowing from a compensable injury, with no limit as to amount or time. Tex.Lab.Code § 408.021. It also mandates four levels of income benefits: 1) temporary income benefits; 2) impairment income benefits; 3) supplemental income benefits; and 4) lifetime benefits. *See generally Id.* §§ 408.081–408.162.

Temporary income benefits compensate for lost wages while an injured employee is convalescing. They accrue when the employee suffers a disability and continue until "maximum medical improvement." *Id.* §§ 408.101, 408.102. "Disability" simply means the "inability because of a compensable injury to obtain and retain employment at wages equivalent to the preinjury wage," and thus results from any reduction in wage earning capacity. *Id.* § 401.011(16). "Maximum medical improvement" is the point when further material recovery or lasting improvement can no longer be reasonably anticipated, or two years after income benefits begin to accrue, whichever is sooner. *Id.* § 401.011(30).

These temporary benefits are paid weekly at the rate of 70 percent of the difference between the claimant's average weekly wage and the post-injury weekly earnings, [5] subject to the statutory maximum and minimum. *Id.* § 408.103. The Act rejects

the "300 day rule," basing the "average weekly wage" on the actual average wage for the thirteen weeks preceding injury. *Id.* § 408.041(a).

[5]    There is an adjustment for workers earning less than $8.50 per hour, *id.* § 408.103(a)(2), which we address in part VIII–B of this opinion.

A claimant who is left with an "impairment" after reaching maximum medical improvement becomes eligible for impairment income benefits. *Id.* §§ 408.121, 408.122. An impairment is defined as

> any anatomic or functional abnormality or loss existing after maximum medical improvement that results
> from a compensable injury and is reasonably presumed to be permanent.

*Id.* § 401.011(23). The claimant's "impairment rating," which is the percentage of permanent impairment of the whole body, is determined by a physician utilizing the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (the **\*514** "*Guides*"). *Id.* §§ 401.011(24), 408.124. The statute appears to contemplate that both the claimant's and the carrier's physician may make an impairment determination. If their findings conflict, the claimant must be examined by a "designated doctor" selected by mutual agreement of the parties or by the Commission.[6] *Id.* § 408.125. The designated doctor's rating is binding on the Commission if he or she was selected by the parties, while the rating has presumptive weight if the doctor was selected by the Commission. *Id.* In the latter case, the presumption is overcome only if the great weight of the other medical evidence is to the contrary, in which case the Commission must adopt the impairment rating of "one of the other doctors." *Id.*

[6]    The administering agency under the Act is named the Texas Workers' Compensation Commission. *See* Tex.Lab.Code § 402.001.

Impairment benefits are paid at the rate of 70 percent of the claimant's average weekly wage, subject to the statutory maximum and minimum. *Id.* § 408.126. Benefits begin the day after maximum medical improvement and continue for three weeks for every percentage point of impairment. *Id.* § 408.121(a). For example, a claimant who is 10 percent impaired would receive these benefits for thirty weeks. Impairment income benefits are intended to compensate for the impairment itself, and thus are payable without regard to post-injury wages or wage earning capacity.

Supplemental income benefits provide long-term disability compensation. They become payable upon termination of the impairment benefits, but only if the claimant has an impairment rating of 15 percent or more and is earning less than 80% of his or her preinjury average weekly wage as a direct result of the injury. *Id.* § 408.142. These benefits, which are recalculated every quarter, are paid at the weekly rate of 80 percent of the difference between 80 percent of the preinjury average weekly wage and the weekly wage earned during the quarterly reporting period.[7] *Id.* § 408.144(a), (b). A claimant remains eligible for supplemental benefits until 401 weeks after the date of injury. *Id.* § 408.083. Thus, the maximum duration of income compensation is identical under both the new and old systems.

[7]    Supplemental income benefits are also subject to the statutory maximum. *Id.* § 408.144(b).

Lifetime benefits are payable for certain severe injuries, such as loss of both feet or both hands, at the rate of 75 percent of the preinjury average weekly wage, subject to the statutory maximum. *Id.* § 408.161. The Act also provides long-term death benefits at the same rate as lifetime benefits. *Id.* §§ 408.181–408.187.

The maximum temporary benefit is 100 percent of the state average weekly wage for manufacturing production workers.[8] *Id.* § 408.061(a). In 1991 it equaled $426, a significant increase over the maximum benefit under the former act. The maximum impairment and supplemental benefit is 70 percent of the state average, while the minimum temporary and impairment benefit is 15 percent of the state average. *Id.* §§ 408.061(b), (c); 408.062(a).

[8]    This statistic is calculated annually by the Texas Employment Commission.

The Act also addresses the problem of premature settlements. An insurer's liability for lifetime medical care may not be settled or compromised under any circumstances, *id.* § 408.021(d), and a settlement involving an issue of impairment may not be made before the employee reaches maximum medical improvement. *Id.* § 410.256(c).

## 2

The Act also strengthens the enforcement and adjudicatory powers of the Commission. It expressly defines numerous "administrative violations," *id.* § 415.001, empowering the Commission to punish violators with fines up to $10,000. *Id.* § 415.021.

The Commission resolves disputed claims through a three-stage hearing process: 1) the benefit review conference, 2) the contested case hearing, and 3) the administrative appeal. The benefit review conference, like the former prehearing conference, is an informal proceeding aimed at resolving the disputed **\*515** issues by mutual agreement. *Id.* § 410.021. The presiding "benefit review officer," after "thoroughly inform[ing] all parties of their rights and responsibilities," mediates the dispute. *Id.* § 410.026(a). The officer may direct questions to the parties, but he or she may not take testimony or make a formal record. *Id.* § 410.026(c), (d). The officer does, however, prepare a written report detailing each issue not settled at the conference. *Id.* § 410.031. This report must include the officer's recommendation regarding those issues and a recommendation regarding the payment or denial of benefits. *Id.* The officer may issue an interlocutory order directing the insurer to pay benefits. *Id.* § 410.032.

The parties then proceed to a contested case hearing, a formal evidentiary proceeding with sworn testimony and prehearing discovery procedures.[9] *Id.* §§ 410.151–410.169. The hearing officer decides the disputed issues by written decision containing factual and legal findings, awarding benefits if they are due. *Id.* § 410.168(a). The hearing officer's decision is binding during the pendency of an administrative appeal and is final in the absence of appeal. *Id.* § 410.169.

[9] The parties may mutually elect binding arbitration as an alternative to the contested case hearing. Tex.Lab.Code § 410.104.

Any party may appeal the hearing officer's decision to an appeals panel within the Commission. *Id.* § 410.202. The request for appeal and the opposing party's response must "clearly and concisely rebut or support the decision of the hearing officer on each issue on which review is sought." *Id.* § 410.202(c). After considering these briefs and the record from the contested case hearing, the appeals panel may affirm the decision of the hearing officer, reverse and render a new decision, or remand no more than one time to the hearing officer for further consideration and development of the record.[10] *Id.* § 410.203.

[10] If the appeals panel does not decide the case within thirty days after the response is filed, the decision of the hearing officer becomes final and is deemed to constitute the decision of the appeals panel. Tex.Lab.Code § 410.204.

## 3

The Commission's final decision may be appealed to the courts under what might best be described as modified de novo review. For all issues regarding compensability of the injury (for example, whether it occurred in the course and scope of employment) and eligibility for and the amount of income and death benefits, there is a right to trial by jury. Tex.Lab.Code § 410.304. The party appealing bears the burden of proof by a preponderance of the evidence. *Id.* § 410.303. The jury, although informed of the Commission decision, is not required to accord it any particular weight. *Id.* § 410.304(a). Further, the opinion of the designated doctor regarding impairment is accorded no special weight.

In determining the extent of impairment, however, the jury must adopt the specific rating of one of the physicians in the case. *Id.* § 410.306(c). Evidence of the extent of impairment is limited to that presented to the Commission[11] unless the court makes a threshold finding that the claimant's condition has substantially changed, in which case new impairment evidence may be

introduced. *Id.* §§ 410.306(c), 410.307. If the parties dispute whether the claimant's condition has substantially changed, the court must hear from the designated doctor, whose opinion is controlling on this issue "unless the preponderance of the other medical evidence is to the contrary." *Id.* § 410.307(b). The court's finding of substantial change of condition is not revealed to the jury. *Id.* § 410.307(e).

11        The Commission record is admissible to the extent allowable under the Texas Rules of Civil Evidence. Tex.Lab.Code § 410.306(b).

Issues other than compensability of the injury and eligibility for and the amount of income and death benefits are reviewed by the court under the substantial evidence rule. *Id.* § 410.255.

### D

Notably, the Act considers both *impairment* and *disability* in awarding benefits. As discussed above, impairment refers to the extent of permanent injury without regard to its effect on employment, while disability refers  **\*516**  to decreased wage earning ability. For example, if a concert pianist and bank president each lose the fifth finger of their left hand, the extent of impairment to each is the same, while the resulting disability is likely to be much different. *See Guides* at 2 n. 1. Experts agree that both these standards play a proper role in compensation systems. *See, e.g., Report of the National Commission on State Workmen's Compensation Laws* 38 (1972); Arthur Larson, *Workmen's Compensation,* Desk Edition § 57.10 (1988). Impairment benefits compensate for non-economic aspects of an injury, such as decreased ability to engage in social activities and hobbies, while disability benefits compensate for direct economic harm.

Also, long-term benefits under the Act are determined *retrospectively.* That is, supplemental benefits are adjusted periodically over time based on actual lost wages for that period. This contrasts with the former *predictive* system, which fixed benefits at the time of adjudication based on a prediction of the injury's future impact on employment. Studies have shown that a retrospective system is not only more accurate, but also increases an employer's incentive to provide vocational rehabilitation. *See Research Papers* ch. 3 at 45–47.

### II

### A

Plaintiffs brought this suit in district court in Maverick County in November 1990, before the new Act went into effect, challenging its constitutionality. They originally sought declaratory and injunctive relief against the Commission, its executive director, and the private employer of one of the plaintiffs. [12] Other parties representing employer interests later intervened as defendants. [13]

12        This employer did not participate in the trial court and has not been a party to any appeal.

13        These intervenors were the Texas Association of Compensation Consumers, Inc., Klinck Globe, Inc., Klinck Drugstore, Inc., and La Esquina.

After a hearing in December 1990, the trial court issued a temporary injunction prohibiting the Commission and its executive director from rendering a final decision regarding impairment or supplemental income benefits. After a subsequent non-jury trial on the merits, the court held that various provisions of the Act violated the Texas Constitution's guarantees of equal protection (article I, section 3), open courts (article I, section 13), due course of law (article I, section 19), right to jury trial (article I, section 15 and article 5, section 10), and obligation of contract (article I, section 16). Although the statute contains a severability clause,

the court concluded that the unconstitutional portions were too integral to the statutory scheme to be severed out. Therefore, it declared the entire act unconstitutional.

The court's final judgment, however, granted no injunctive relief. Plaintiffs orally withdrew their request for an injunction against the Commission and executive director at trial, and their remaining injunctive claim against the private employer was resolved by a "Mother Hubbard" clause in the judgment denying all relief not expressly granted. Thus, the temporary injunction dissolved when the trial court's judgment was signed on May 22, 1991.

The Commission and executive director then perfected a direct appeal to this Court under section 22.001(c) of the Texas Government Code and Rule 140 of the Texas Rules of Appellate Procedure. We dismissed that appeal, however, as the trial court had not granted or denied injunctive relief against any of the parties to the appeal based on the constitutionality of the statute. *See Texas Workers' Compensation Comm'n v. Garcia,* 817 S.W.2d 60 (Tex.1991). Defendants subsequently perfected an appeal to the court of appeals.

**B**

The court of appeals affirmed the judgment of the trial court in most respects. It held that the Legislature, by adopting an impairment-based system utilizing the *Guides,* violated the open courts, due course of law, and equal protection guarantees. The court held that the Act is intended to substitute for the common law negligence remedy, and that one of its purposes is to provide **\*517** adequate wage-loss benefits to injured workers. Because impairment is not an accurate measure of disability, however, the court concluded that the Act's use of impairment operated to deny meaningful benefits to many seriously disabled workers. 862 S.W.2d at 86. Accordingly, the court found the Act to be a constitutionally inadequate substitute under open courts for a workers' common law remedy. *Id.* The court also concluded that the Act's use of the *Guides* violated equal protection in three ways: 1) by unreasonably distinguishing between workers whose injuries are recognized under the *Guides* and those whose injuries are not recognized; 2) by conclusively presuming maximum medical improvement after two years, an unreasonable classification as to those workers whose conditions have not actually stabilized after that time; and 3) by arbitrarily distinguishing between workers receiving an impairment rating of at least 15 percent and those that do not meet this threshold. *Id.* at 87–90. Finding "absolutely no justification" for the 15 percent threshold, the court ruled that it also violated due course of law. *Id.* at 89–90.

The court further concluded that section 406.034, which allows new employees an opportunity to opt out of the Act's coverage but does not allow current employees covered under the former act a similar opportunity, violates equal protection and due course of law. *Id.* at 92–93. The court also found that the Act's method of judicial review, even though it provides for a trial by jury on the principal compensation issues, violates the right to jury trial by 1) requiring the jury to select between predetermined impairment ratings, 2) imposing the arbitrary presumptive effect of the 15 percent threshold, and 3) repudiating the jury's consideration of historical disability considerations, such as loss of earning capacity. *Id.* at 93–96. Further, by mandating jury trials for some issues and substantial evidence review for others, the Act creates an impermissible system of hybrid review. [14] *Id.* at 96–98.

[14] The court concluded that the Act's use of the designated doctor was not unconstitutional. 862 S.W.2d at 90–92. The court also found that the Act did not unconstitutionally discriminate against low-wage or seasonal workers or impair the obligation of contract. *Id.* at 100–103. The court also concluded that the doctrine of sovereign immunity did not bar suit against the Commission and its executive director in his official capacity, 862 S.W.2d at 72–73, an issue not raised by defendants in this Court.

The court also found that the Act's attorneys' fees provisions violate equal protection and due course of law. Because fees for a claimant's attorney are limited to a maximum of 25 percent of the recovery, and subject to lower caps depending on time, expense and other reasonableness factors, *see* section 408.221, the court concluded that the Act unreasonably impedes claimants from obtaining legal representation, without imposing a similar impediment on insurance carriers. *Id.* at 98–100.

Like the trial court, the court of appeals concluded that the unconstitutional provisions could not be severed out. *Id.* at 104. Therefore, it declared the entire Act invalid. Because plaintiffs no longer sought injunctive relief, however, the court of appeals did not issue an injunction. The Commission has accordingly continued implementing the Act notwithstanding the judgments of the courts below. We granted the applications for writ of error of both the State defendants and the employer defendants to consider the constitutionality of the Act.

III

A

 **[1]** Plaintiffs facially challenge several provisions of the new Act. Before addressing the merits, we consider plaintiffs' standing to raise these claims. [15]

[15]   Although defendants contested plaintiffs' standing below, they do not do so in this Court. Because standing is a component of subject matter jurisdiction, however, it may be raised by an appellate court sua sponte. *See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 445–46 (Tex.1993). Further, plaintiffs now challenge the court of appeals' conclusion that two of the plaintiffs lack standing.

 **[2]**   **[3]** Standing, which is a necessary component of subject matter jurisdiction, requires a) a real controversy between the parties, which b) will be actually determined **\*518** by the judicial declaration sought. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993). *Cf. Pennell v. City of San Jose,* 485 U.S. 1, 8, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (to have standing to challenge a statute, a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"). Thus, to challenge a statute, a plaintiff must first suffer some actual or threatened restriction under that statute. Second, the plaintiff must contend that the statute unconstitutionally restricts the *plaintiff's* rights, not somebody else's. *See Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").

 **[4]**   **[5]**   **[6]** Under a facial challenge, such as that asserted here, the challenging party contends that the statute, by its terms, always operates unconstitutionally. [16] *See New York State Club Ass'n v. New York City,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988); *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Therefore, because they bring facial challenges, plaintiffs by definition are contending that the Act operates unconstitutionally as to them. Thus, to satisfy the requirements of standing, they must demonstrate that they are suffering some actual or threatened restriction under the Act.

[16]   *Texas Association of Business v. Texas Air Control Board,* 852 S.W.2d 440 (Tex.1993), illustrates this approach. There, we held that conditioning judicial review on prepayment of the administrative penalty violated the open courts doctrine without regard to the amount of the penalty, the party's ability to pay, or other surrounding circumstances. 852 S.W.2d at 450. This type of facial challenge contrasts with an "as applied" challenge, under which the plaintiff argues that a statute, even though generally constitutional, operates unconstitutionally as to him or her because of the plaintiff's particular circumstances. *See, e.g., Nelson v. Krusen,* 678 S.W.2d 918, 922 (Tex.1984) (holding two-year medical limitations statute unconstitutional as applied to a plaintiff who could not discover the injury during the two-year period).

   There is also a second type of facial challenge, under which a plaintiff argues that a statute, even though constitutionally applicable to the plaintiff and others, restricts a substantial amount of protected conduct. *See New York State Club Ass'n v. New York City,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988); *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). This "overbreadth doctrine," thus far reserved for First Amendment cases, is a narrow exception to the general rule of standing that prohibits a plaintiff from asserting the rights of others. *Id.*

The plaintiffs are Hector Garcia, John Fuller, Osvaldo Rivera, Texas Legal Services Union Local 2, and the Texas AFL–CIO. The court of appeals held that Garcia and both unions had standing, while Fuller and Rivera did not. We first address the standing of the Texas AFL–CIO, a voluntary association with 215,000 members organized to promote workers' rights.

 **[7]**   **[8]**   An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Texas Ass'n of Business,* 852 S.W.2d at 447 (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). We agree with the court of appeals that the Texas AFL–CIO meets these requirements.

The purpose of the first element "is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *Texas Ass'n of Business,* 852 S.W.2d at 447 (quoting *New York State Club Ass'n,* 487 U.S. at 9, 108 S.Ct. at 2232). Evidence at trial indicates that a large majority of Texas AFL–CIO members are covered under the workers' compensation system. Although there was no showing of specific members who have suffered a compensable injury since the effective date of the Act, we may fairly assume the existence of such members based on the size of the union. By doing so, we are not engaging in "unadorned speculation" that the  **\*519**  Act will be enforced against AFL–CIO members. *See Pennell,* 485 U.S. at 8, 108 S.Ct. at 855. We are satisfied that the Texas AFL–CIO represents members who would have standing to sue in their own right.

Regarding the second element, there is no dispute that worker benefits are germane to the Texas AFL–CIO's purpose. It actively lobbied regarding the Act, and Joe Gunn, its president, testified at trial that the quality and character of the Texas workers' compensation system is of "paramount concern" to the union.

Finally, because the Texas AFL–CIO seeks only declaratory relief regarding the facial validity of the statute, participation of individual union members is not necessary. This union thus has standing.

 **[9]**   Because the other plaintiffs, except for Fuller, bring the same facial challenges and seek the same declaratory relief as the Texas AFL–CIO, we need not address their individual standing and we express no opinion thereon. [17] Fuller, on the other hand, appears to assert a separate challenge based on his special circumstances. The trial court found that he suffers from a repetitive-trauma occupational disease to his knees that will continue to be aggravated by his work and will likely cause future disability. Fuller contends that, regardless of the adequacy of the Act's remedy in general, he will be denied all benefits based on the Act's requirement that a claimant notify the employer within 30 days after injury and file a claim within one year after injury. *See* Tex.Lab.Code §§ 409.001, 409.003. For an occupational disease, the date of injury is when "the employee knew or should have known that the disease may be related to the employment." *Id.* § 408.007. Fuller contends that, in his case, that date was several years ago, automatically rendering any future claim for disability benefits untimely. Further, Fuller points out that all benefits under the Act terminate 401 weeks after the date of injury, a date which has already passed.

17  Although Hector Garcia is a worker subject to the new Act, he has not suffered a physical injury for which he seeks compensation. The court of appeals nonetheless concluded that Garcia has standing because the new Act will affect his benefits if and when he is injured. 862 S.W.2d at 68. Osvaldo Rivera suffered a compensable injury under the Act, but the court of appeals held that he was estopped from challenging the Act because he had accepted temporary income benefits. 862 S.W.2d at 69. Texas Legal Services Union Local 2 is a labor union consisting of 75 members employed by Texas Rural Legal Aid. The court of appeals did not analyze the standing of this union separately from that of the Texas AFL–CIO.

We agree with the court of appeals that Fuller's complaint is premature, defeating his standing. Fuller has submitted no claim for benefits under the Act, and may never do so. Even assuming that he will, there is no way to predict what action the Commission may take on that claim. The Act excuses late filings under certain circumstances that may apply, *see* Tex.Lab.Code §§ 409.002, 409.004, and it is not clear whether the Commission would deny benefits to someone in Fuller's position under the 401–week limitation. Until Fuller files a claim which is rejected by the Commission as untimely, no real controversy exists regarding his particular complaints.

## B

As a second threshold matter, we address the significance of the trial court's findings of fact. The court made sweeping findings as to each aspect of the Act it held to be unconstitutional. Regarding the *Guides,* for example, the court found among other things that 1) "the Act adopts an improper use of the *Guides* ... and that such use of the *Guides* as the determining factor to compensate injured workers for losses occasioned by their injuries is unreasonable and arbitrary and is not reasonably related to any individual or societal interest of the State of Texas;" 2) "the impairment ratings generated from use of the *Guides* have no adequate scientific base" and "have no reasonable relationship to true impairment;" 3) "the 15% threshold as a qualification for supplemental income benefits is arbitrary in and of itself, and further that it is based upon an impermissible and arbitrary use of the AMA *Guides;* " and 4) "a significant number of workers ... who sustain disabling injuries will have less than 15% impairment based on the *Guides,*" and **\*520** thus will be "totally denied access to supplemental income benefits under the Act."

The trial court's specific findings, where relevant, are discussed in the following sections of this opinion. We note at the outset, however, the limited role these findings play in our constitutional review of a legislative enactment. Our approach is as follows:

> In passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable. The wisdom or expediency of the law is the Legislature's prerogative, not ours.

*Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968). Regarding factual inquiries, we have articulated this test:

> [Generally,] the constitutionality of a law is not to be determined on a question of fact to be ascertained by the court. If under any possible state of facts an act would be constitutional, the courts are bound to presume such facts exist; and therefore the courts will not make a separate investigation of the facts, or attempt to decide whether the legislature has reached a correct conclusion with respect to them.

*Corsicana Cotton Mills v. Sheppard,* 123 Tex. 352, 71 S.W.2d 247, 250 (1934). *See also Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific R.R.,* 393 U.S. 129, 138–39, 89 S.Ct. 323, 328, 21 L.Ed.2d 289 (1968) ("The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion."); *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.").

 **[10]**    Thus, we agree with the court of appeals that, in most instances, an appellate court must focus on the entire record to determine whether the Legislature has exceeded constitutional limitations. *See* 862 S.W.2d at 73–74. For example, the trial court's finding that the *Guides* lack scientific validity does not dictate a conclusion that the Legislature has acted arbitrarily or irrationally, if on the record presented it appears that the Legislature could have concluded that the *Guides* are in fact a valid method of measuring impairment. With these principles in mind, we turn to the merits.

## IV

 **[11]**    We first address the court of appeals' conclusion that the Act violates the open courts doctrine because it is an inadequate substitute for a claimant's common law remedy.

The Texas Constitution provides the following "open courts" guarantee:

... All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. art. I, § 13. This provision includes at least three separate constitutional rights: 1) courts must actually be operating and available; 2) the Legislature cannot impede access to the courts through unreasonable financial barriers; and 3) meaningful remedies must be afforded, "so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." *Trinity River Authority v. URS Consultants, Inc.,* 889 S.W.2d 259, 261 (Tex.1994); *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 448 (Tex.1993). Plaintiffs' challenges are based on the third guarantee.

The relevant test for this open courts guarantee is as follows:

> [L]egislative action withdrawing common-law remedies for well established common-law causes of action for injuries to one's "lands, goods, person or reputation" is sustained only when it is reasonable in substituting other remedies, or when it is a reasonable exercise of the police power in the interest of the general welfare.

*Trinity River Authority,* 889 S.W.2d at 262 (quoting *Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951, 955 (1955)). *Accord* **\*521** *Sax v. Votteler,* 648 S.W.2d 661, 665 (Tex.1983); *Waites v. Sondock,* 561 S.W.2d 772, 774 (Tex.1977).

[12] [13] In considering the plaintiffs' open courts challenge, we must compare the current statute to the common law remedy, not to the previous statute. The open courts provision guarantees that a common law remedy will not be unreasonably abridged, not that the Legislature will not amend or replace a statute.

To recover damages at common law, an injured worker was required not only to establish that the employer's negligence proximately caused the injury, but also to avoid the defenses of contributory negligence, assumption of the risk, and fellow servant. As previously noted, this combination of hurdles prevented recovery in a large majority of cases. Although the Legislature has softened the defense of contributory negligence by adopting comparative responsibility, *see* Tex.Civ.Prac. & Rem.Code § 33.001(a), and this Court has abolished the defense of assumption of the risk, *see Farley v. MM Cattle Co.,* 529 S.W.2d 751, 758 (Tex.1975), [18] an injured employee pursuing the common law remedy must still prove that the employer was negligent and that he or she was not more than 50 percent negligent. Although the trial court made no finding on the issue, there was evidence at trial that, even with these changes in the common law, injured employees pursuing negligence claims against their employers recover nothing in a large majority of cases.

[18]  The Court, relying heavily on the Legislature's rejection of contributory negligence as an absolute bar, concluded that "the reasonableness of an actor's conduct in confronting a risk will be determined under principles of contributory negligence." 529 S.W.2d at 758.

[14] In comparison, the Act—carrying forward the general scheme of the former act—provides benefits to injured workers without the necessity of proving negligence and without regard to the employer's potential defenses. In exchange, the benefits are more limited than the actual damages recoverable at common law. We believe this quid pro quo, which produces a more limited but more certain recovery, renders the Act an adequate substitute for purposes of the open courts guarantee. *See Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556 (1916) (upholding constitutionality of former act). *See also Breimhorst v. Beckman,* 227 Minn. 409, 35 N.W.2d 719, 735 (1949) ( "By the weight of authority, it is recognized that compulsory workmen's compensation acts similar to ours do provide a remedy which is an adequate substitute for the common-law or statutory action for damages for injuries sustained by an employe in his employment.").

Of course, statutory benefits, no matter how certain they are to accrue, could be so inadequate as to run afoul of the open courts doctrine. We do not find that to be the case here, however. As discussed, the Act provides full lifetime medical coverage, temporary benefits replacing a substantial part of lost wages during convalescence, impairment benefits, and long-term wage

replacement for those with at least moderately severe impairments. Evidence at trial indicates that the Act, more so than its predecessor, tracks the essential recommendations of the National Commission on State Workmen's Compensation Laws.

In concluding that the Act is an inadequate statutory substitute under the open courts doctrine, the court of appeals focused on its use of "impairment," as measured by the *Guides,* as a factor in determining income benefits for a permanent injury. It concluded that impairment is not an accurate measure of the economic hardship that a worker will suffer from an injury, as it is a purely objective physical determination made without regard to the claimant's age, experience, training, or occupational demands. In denouncing the statutory reliance on the *Guides,* the court pointed to the language of the *Guides* themselves, which state as follows:

> Each administrative or legal system that uses permanent impairment as a basis for disability rating needs to define its own process for translating knowledge of a medical condition into an estimate of the degree to which the individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory **\*522** requirements, is limited by the impairment. We encourage each system not to make a "one-to-one" translation of impairment to disability, in essence creating a use of the *Guides* which is not intended.

*Guides* at 6. *See also Report of the National Commission of State Workmen's Compensation Laws* at 38 (concluding that, although impairment plays a proper role in a workers' compensation system, it should not be the primary factor in measuring long-term benefits). The court also relied on the trial court's finding, unchallenged by defendants, that a significant number of workers who sustain disabling injuries will be less than 15 percent impaired under the *Guides.*[19] 862 S.W.2d at 89. The classic example of this is a concert pianist who loses the little finger of one hand. *See Guides* at 2 n. 1. The court further emphasized that the Act's other measures could have been implemented without the 15 percent threshold requirement. 862 S.W.2d at 89. Thus, the court concluded that the 15 percent impairment threshold for supplemental benefits operates to deny these long-term awards to seriously disabled workers.

[19] The plaintiffs presented statistical evidence regarding the Florida workers' compensation system indicating that, from 1979 to 1989, a small percentage of the workers receiving benefits for a permanent partial injury had an impairment rating exceeding 15 percent. This evidence, however, does not indicate how many, if any, of those workers receiving an impairment rating of less than 15 percent were disabled from engaging in gainful employment.

We believe the court of appeals erred in its constitutional review. It is beyond question that impairment does not directly translate into disability to work. The Act, however, properly defines each of these terms and does not attempt to equate the two. Rather, it allocates income benefits for a permanent injury on a hybrid standard combining both concepts. First, impairment benefits are awarded in direct proportion to the extent of impairment, without regard to the actual wage loss. Second, supplemental income benefits are awarded based on wage loss, if the extent of impairment equals or exceeds 15 percent.[20] Contrary to the reasoning of the court of appeals, there is nothing in the open courts guarantee that requires the Legislature to base compensation benefits solely on wage loss or disability. Although debated among experts, physical impairment is one accepted criteria for measuring benefits, and it was within the Legislature's discretion to utilize this standard. At least twenty-three other states use impairment, as measured by the *Guides* or some similar rating method, in awarding workers' compensation benefits.[21]

[20] The court of appeals' conclusion that the Act allocates supplemental income benefits "solely on the basis of impairment" is thus incorrect. *See* 862 S.W.2d at 85.

[21] *See* Alaska Stat. § 23.30.190; Ariz.Rev.Stat.Ann. § 23–1065(C); Ark.Code Ann. § 11–9–522(g); Colo.Rev.Stat.Ann. § 8–42–107(8)(c); Fla.Stat.Ann. § 440.15(3); Ga.Code Ann. § 34–9–1(5); Idaho Code § 72–430(2); Kan.Stat.Ann. § 44–510d(a)(23); Ky.Rev. Stat.Ann. § 342.730(1)(c); La.Rev.Stat.Ann. § 23:1221(4)(q); Me.Rev.Stat.Ann. tit. 39–A, § 153(8); Mass.Gen.L. ch. 152, § 35; Minn.Stat.Ann. § 176.105; Mont.Code Ann. § 39–71–703(3); Nev.Rev.Stat. § 616.605(2); N.H.Rev.Stat.Ann. § 281–A:31–a; N.M.Stat.Ann. § 52–1–24(A); N.D.Cent.Code § 65–01–02(26); Okla.Stat.Ann. tit. 85, § 3(11); R.I.Gen.Laws § 28–33–18(c); S.D.Codified Laws Ann. § 62–1–1.2; Tenn.Code Ann. § 50–6–241(a)(1); Wyo.Stat. § 27–14–405(g).

Further, we do not believe that the 15 percent threshold violates the open courts provision. [22] The Joint Select Committee, after **\*523** criticizing the subjectivity and inconsistency of long-term awards under the former act, recommended basing these benefits in part on physical impairment, a more objective determination. *Report of the Joint Select Committee* at 14. [23] That this objective standard might deny supplemental income benefits to workers suffering a disability does not, without more, render the Act unconstitutional. The issue, rather, is whether the Act's remedy, judged prospectively as a whole, adequately substitutes for the common law negligence remedy. For example, in *Gentile v. Altermatt,* 169 Conn. 267, 363 A.2d 1 (1975), the court was called upon to decide whether, under the Connecticut open courts provision, a no-fault auto insurance statute provided a reasonable alternative remedy to common law negligence. The court approached the issue as follows:

[22]     This type of impairment threshold, although not typical, is used in some other jurisdictions. Florida, which appears to be the only state combining impairment income benefits and supplemental income benefits in the same manner as Texas, requires a 20 percent impairment threshold for supplemental income benefits. Fla.Stat.Ann. § 440.15(3)(b). In Maine, permanent-partial awards are based on lost wages, but may extend beyond 260 weeks only if the claimant suffers an impairment greater than 15 percent. Me.Rev.Stat.Ann. tit. 39–A, § 213. Similarly, permanent-partial benefits in Massachusetts extend beyond 260 weeks only if certain specific bodily functions or senses are impaired 75 percent or greater. Mass.Gen.L. ch. 152, § 35. Colorado limits total benefits to $60,000 unless the claimant has an impairment rating greater than 25 percent. Colo.Rev.Stat.Ann. § 8–42–107.5.

    Although the remaining states do not utilize any impairment threshold or cutoff, several allocate benefits for a permanent-partial injury in proportion to the extent of impairment, without regard to the amount of actual wage loss. *See* Alaska Stat. § 23.30.190; Colo.Rev.Stat.Ann. § 8–42–107(8) (using impairment with a formula adjustment for age); Nev.Rev.Stat. § 616.605; N.M.Stat.Ann. § 52–1–26 (using impairment with formula adjustments for age, education, and amount of lifting capacity for certain laborers); N.D.Cent.Code § 65–05–12; Okla.Stat.Ann. tit. 85, § 22(3)(a). This approach produces results comparable to those in Texas for impairments under the 15 percent threshold. In Oklahoma and North Dakota, for example, permanent-partial benefits continue for a period equalling the percentage of impairment multiplied by 500 weeks. Thus, a 10 percent impairment produces benefits for 50 weeks, as compared to 30 weeks of impairment income benefits in Texas. *See* Okla.Stat.Ann. tit. 85, § 22(3)(a); N.D.Cent. Code § 65–05–12.

    Other states award benefits based on impairment or wage loss, whichever is greater. *See* Ga.Code Ann. § 34–9–263(c)(14) and State Bd. of Workers' Compensation Rule 263; Kan.Stat.Ann. § 44–510e; Ky.Rev.Stat.Ann. § 342.730(1)(c). *See also* Ark.Code Ann. § 11–9–522(b) (allowing Commission to consider, in addition to impairment, "such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his future earning capacity"); Mont.Code Ann. § 39–71–703 (using impairment with an adjustment for, among other things, wage loss).

[23]     Legislative history confirms the Legislature's desire to produce a more objective system. John Lewis, a workers' compensation expert retained by the Joint Select Committee to evaluate the former system, testified before the Legislative Oversight Committee on Workers' Compensation as follows:

    [W]hat goes on in [the former] system is inherently subjective. The benefit structure that exists particularly for permanent partial is a subjective system. The hope ... is to substitute to a greater degree objectivity so there is less reason to argue, the ability to deliver the benefits much more quickly and without the need for litigation.

    Meeting of the Legislative Oversight Committee on Workers' Compensation, April 10, 1989, Tape 4 at 2–3. Senator Glasgow confirmed during Senate Debate that "what we wanted to do is come up with an objective standard for benefits for injured workers." Senate Debate, November 20, 1989, Tape 5 at 18.

The question as to whether the legislatively created remedy is a reasonable alternative is best decided by viewing in the aggregate the remedies which the act provides.... Thus, for each remedy or item of damage existing under the prior fault system, it is not required that that item be duplicated under the act but that the bulk of remedies under the act be of such significance that a court is justified in viewing this legislation on the whole as a substitute, the benefits from which are sufficient to tolerate the removal of the prior cause of action.

363 A.2d at 12–15; *see also Bushnell v. Sapp,* 194 Colo. 273, 571 P.2d 1100, 1107 (1977) (determining that a no-fault statutory scheme, *taken as a whole,* was a reasonable substitute for traditional tort remedies).

At common law, a person could be, and many were, severely injured, even up to the point of paralysis or amputation of a limb, and yet recover *nothing.* Workers covered by the Act receive lifetime medical benefits, wage replacement during convalescence, impairment benefits, and long-term wage replacement if they suffer a moderately severe physical impairment. We conclude

that these benefits, which are available without regard to the employer's negligence and without reduction for the employee's negligence, adequately replace the common law negligence cause of action. Our duty to enforce the open courts guarantee does not allow us to rewrite legislation merely to try to craft a remedy that we might believe to be more inclusive or equitable. *See Texas State Bd. of Barber Examiners v. Beaumont Barber College,* 454 S.W.2d 729, 732 (Tex.1970) ( "It is not the function of the courts to judge the wisdom of a legislative enactment."). Accordingly,  **\*524**  plaintiffs' open courts claim is overruled.

## V

### A

Plaintiffs also assert an equal protection challenge against the Act's use of impairment. Because impairment does not translate directly into disability, plaintiffs contend that the 15 percent threshold unreasonably and arbitrarily differentiates between those persons meeting the threshold, who are eligible for supplemental income benefits, and those not meeting the threshold, who receive no supplemental benefits.

 [15]    The Texas Constitution guarantees equal protection as follows:

> All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled
> to exclusive separate public emoluments, or privileges, but in consideration of public services.

Tex. Const. art. I, § 3. Because the 15 percent threshold does not abridge a fundamental right or distinguish between persons on a suspect basis, such as race or national origin, it is valid under section 3 if it is rationally related to a legitimate state purpose. *See Richards v. LULAC,* 868 S.W.2d 306, 310–311 (Tex.1993); *Spring Branch Indep. School Dist. v. Stamos,* 695 S.W.2d 556, 559 (Tex.1985). We conclude that it meets this test.

 [16]    The Joint Select Committee criticized the subjectivity and inconsistency of long-term benefit awards under the former act, recommending a more objective system utilizing impairment along with traditional disability factors. The Legislature accordingly based supplemental benefits on actual lost wages, but with a threshold requirement that the claimant suffer at least a 15 percent impairment. It was not irrational for the Legislature to distinguish between moderately severe impairment likely to interfere with long-term employment from less severe impairment. Setting the threshold at 15 percent is a rational means of accomplishing this purpose. Peter Barth, an economist specializing in compensation issues and former executive director of the National Commission on State Workmen's Compensation Laws, testified that the 15 percent threshold "culls out those impairments that are not very serious ... [leaving] supplemental income benefits for workers with more serious impairments." That a 15 percent impairment does not perfectly correspond to occupational disability does not render the threshold invalid under the equal protection clause. *See Weinberger v. Salfi,* 422 U.S. 749, 781–85, 95 S.Ct. 2457, 2474–77, 45 L.Ed.2d 522 (1975); *Idaho Dep't of Employment v. Smith,* 434 U.S. 100, 101–02, 98 S.Ct. 327, 328–29, 54 L.Ed.2d 324 (1977); *Board of Ins. Comm'rs v. Great Southern Life Ins. Co.,* 150 Tex. 258, 239 S.W.2d 803, 812 (1951).

The court of appeals also criticized the Legislature's failure to articulate its reasons for setting the threshold at 15 percent, but this does not render the statute invalid. As noted by the United States Supreme Court:

> [T]his Court has never insisted that a legislative body articulate its reasons for enacting a statute. This is particularly true where the legislature must necessarily engage in a process of line-drawing. The "task of classifying persons for ... benefits ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line." *Mathews v. Diaz,* 426 U.S. 67, 83–84 [96 S.Ct. 1883, 1893, 48 L.Ed.2d 478] (1976), and the fact the line might have been drawn differently at some points is a matter of legislative, rather than judicial, consideration.

*United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

**B**

**[17]**　Under the Act, a claimant is deemed to reach "maximum medical improvement," signaling an end to temporary benefits, no later than two years after those benefits begin to accrue, regardless of whether the claimant's condition has actually stabilized. Tex.Lab. Code §§ 401.011(30), 408.102(a). Plaintiffs contend that this presumption denies equal protection by creating an arbitrary classification. We disagree.

**\*525**　First, it is not apparent that the Act's definition of "maximum medical improvement" creates any classification, as it merely establishes what is in essence a two year cap on temporary income benefits for *all* claimants. Second, even if it could be viewed as creating a cognizable class, it is not irrational. The Legislature could have concluded that some absolute limit on temporary income benefits—which constitute a major benefit under the Act—was a necessary component of an efficient compensation system. Two years is not an arbitrary place to draw the line, as there was medical testimony at trial that most injured workers will actually reach maximum medical recovery within that time period.

Moreover, in those rare situations where the claimant's condition has not stabilized after two years, the presumption will almost always benefit the claimant by inflating the impairment rating. If the claimant is still recovering after two years, the impairment rating, which is determined at maximum medical improvement, will be higher than the actual degree of permanent impairment.

For the foregoing reasons, we conclude that the Act's definition of "maximum medical improvement" does not violate the Texas Constitution's guarantee of equal protection.

**VI**

**A**

**[18]**　Plaintiffs also contend that the Act's use of impairment, as measured by the *Guides,* violates their right to substantive due course of law under the Texas Constitution. This guarantee provides as follows:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19. Like the federal due process clause, this guarantee contains a substantive as well as a procedural component. *See Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex.1977).

**[19]**　**[20]**　We recently recognized that "Texas courts have not been consistent in articulating a standard of review under the due course clause." *Trinity River Authority,* 889 S.W.2d at 263. Our courts have sometimes indicated that section 19 provides an identical guarantee to its federal due process counterpart. *See Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252–53 (1887); *Lindsay v. Papageorgiou,* 751 S.W.2d 544, 550 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Texas Optometry Bd. v. Lee Vision Center, Inc.,* 515 S.W.2d 380, 386 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.). Under federal due process, a law that does not affect fundamental rights or interests—such as the economic legislation at issue here—is valid if it merely bears a rational relationship to a legitimate state interest. *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955). On other occasions, however, our Court has attempted to articulate our own independent due course standard, *see Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140–41 (Tex.1977); *Thompson v. Calvert,* 489 S.W.2d 95, 99 (Tex.1972); *State v. Richards,* 301 S.W.2d 597, 602 (Tex.1957), which some courts have characterized as more rigorous than the federal standard. *E.g.,* 862 S.W.2d at 75; *Yorko v. State,* 681 S.W.2d 633, 636 (Tex.App.—Houston [14th Dist.] 1984), *aff'd,* 690 S.W.2d 260 (Tex.Crim.App.1985). Under any articulation, however, the Act's use of impairment in general and the

15 percent impairment threshold for supplemental income benefits in particular is sufficiently rational and reasonable to meet constitutional due course requirements.

## B

 **[21]**   Plaintiffs also challenge the accuracy of the *Guides* in measuring impairment. John Gunn, an orthopedic surgeon, testified that the sections dealing with injuries to lower extremities have not been updated to reflect new diagnostic techniques. The *Guides'* editor testified that, although they are complete in terms of organ systems, they do not rate mental trauma or chronic pain. Dr. George Smith, a contributing author to the *Guides,* testified that the rating numbers lack "scientific validity" because they are not based on broad epidemiological studies. The trial court found that "[t]he *Guides* do not  **\*526**  permit percentage impairment ratings for many disabling injuries including mental trauma injuries and chronic pain syndrome," and that "impairment ratings generated from use of the *Guides* have no adequate scientific base."

The *Guides'* editor further testified, however, that the *Guides* are the most reliable method of measuring physical impairment currently available. Dr. Smith also testified that the rating tables are based on "thorough state of the art analysis," and that there is currently no better method for evaluating physical impairment. Tom Mayer, author of the spine section, confirmed that the *Guides* are the "reference of choice" for evaluating impairment. As noted earlier, numerous states use the *Guides* to measure impairment. *See* n. 21, *supra.* On this record, we conclude that the Legislature's adoption of the *Guides* as the basis for determining impairment does not violate substantive due course of law. [24]

[24]    The Act specifically requires the Commission to use the " 'Guides to the Evaluation of Permanent Impairment,' third edition, second printing, dated February 1989." Tex.Lab.Code § 408.124(b). At the time of trial, that particular edition was out of print, having been superseded by a more recent edition. Dr. Engleberg, the editor of the *Guides,* testified that although the newer edition may alter some rating numbers, it contained no "major substantive changes." Dr. Engleberg had not studied the newer version in detail at the time of his testimony. Although the Legislature's specification of a particular edition of the *Guides,* now out of print, creates a potential administrative problem, plaintiffs do not contend that it rises yet to the level of a constitutional violation.

Not all impairments, however, are rated under the *Guides. See, e.g., Trindade v. Abbey Road Beef 'N Booze,* 443 So.2d 1007 (Fla.Ct.App. 1st Dist.1983) (knee injury producing instability of the knee, rather than loss of range of motion, received no rating under the *Guides* ). Accordingly, several states using impairment as a basis for benefits do not require strict reliance on the *Guides. See, e.g.,* Alaska Stat. § 23.30.190(b); Ark.Code § 11–9–522(g); Fla.Stat. § 440.15(3)(a); Minn.Stat.Ann. § 176.105(c); N.D.Cent. Code § 65–01–02(26); Okla.Stat.Ann. 85 § 3(11); Tenn.Code Ann. § 50–6–241. Our Act, however, does not allow such flexibility, as it specifically requires all determinations of impairment to be made under the *Guides.* Tex.Lab. Code § 408.124. We express no opinion as to whether the Act might violate due course of law as applied to a claimant suffering from a permanent physical ailment that is not rated under the *Guides.*

## VII

## A

We now address the court of appeals' determination that the Act's system of judicial review denies the right to trial by jury.

The Texas Constitution twice guarantees the right to a jury trial:

> The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency....

TEX. CONST. art. I, § 15 (Bill of Rights).

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury....

TEX. CONST. art. V, § 10 (Judiciary Article).

 [22]    [23]    [24]    Article I, section 15 maintains a right to trial by jury for those actions, or analogous actions, tried by jury when the Constitution was adopted in 1876. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 450 (Tex.1993). Article V, section 10 protects the right to have a jury resolve fact questions in all "causes" brought in the district courts. *See State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 292–93 (Tex.1975); *Tolle v. Tolle,* 101 Tex. 33, 104 S.W. 1049, 1050 (1907). Access to a jury need not be provided at the initial adjudication, so long as "the right to appeal and the jury trial on appeal are secured." *Cockrill v. Cox,* 65 Tex. 669, 674 (1886). In *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917), we held unconstitutional a civil commitment statute that replaced a jury with a commission of physicians:

> **\*527**  A trial by jury means something more than a hearing before a commission such as that prescribed by said act. With us in civil cases it means a due and orderly trial before the statutory number of men, properly qualified for such jury service, impartial, residing within the jurisdiction of the court, drawn and selected according to statute, duly impaneled under the direction of a court of competent jurisdiction, and sworn to render an impartial verdict according to the law and the evidence, the hearing to be in the presence and under the supervision of a court duly authorized and empowered to rule on the evidence, and, except in courts of justices of the peace, to charge on the law of the case, and to set aside the verdict if, in the opinion of the court, it is contrary to the law and the evidence.

196 S.W. at 511–12.

 [25]    [26]    [27]    Although the right to jury trial under the Judiciary article is potentially broader than under the Bill of Rights in that it covers all "causes" regardless of whether a jury was available in 1876, it can also be narrower in that not all adversary proceedings are "causes" within the meaning of the Judiciary Article. *See Credit Bureau,* 530 S.W.2d at 293. One such example is an appeal from an administrative decision. *Id.* (citing *State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912), and *Texas Liquor Control Bd. v. Jones,* 112 S.W.2d 227 (Tex.Civ.App.—Houston 1937, no writ)); *see also Texas Ass'n of Business,* 852 S.W.2d at 450–51. The Act's method of judicial review, therefore, does not implicate the right to jury trial under the Judiciary Article.

 [28]    We still must determine, however, whether it comports with article I, section 15. The Act is a substitute for the common law negligence remedy, which was an action tried to a jury in 1876. Therefore, at least with regard to the central issues regarding income and death benefits, the Act's remedy is analogous to a claim for which the right to jury trial is constitutionally preserved.

 [29]    It is important, however, to distinguish between the procedural right to jury trial and the substantive right to preservation of common law causes of action. Although legislation altering or restricting a cause of action is subject to scrutiny under the open courts doctrine, this substantive change does not implicate the right to jury trial, as long as the relevant issues under the modified cause of action are decided by a jury. *See Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 562 (1916) (holding that former act did not impair right to jury trial because it authorized "a jury trial of the matters in dispute, *under the law as embodied in the Act* ") (emphasis added). As explained by the Supreme Court of Washington in upholding that state's workers' compensation statute:

> The right of trial by jury accorded by the Constitution, as applied to civil cases, is incident only to causes of action recognized by law. The act here in question takes away the cause of action on the one hand and the ground of defense on the other and merges both in a statutory indemnity fixed and certain. If the power to do away with a cause of action in any case exists at all in the exercise of the police power of the state, then the right of trial by jury is thereafter no longer involved in such cases. The right of jury trial being incidental to the right of action, to destroy the one is to leave the other nothing upon which to operate.

*State v. Clausen,* 65 Wash. 156, 117 P. 1101, 1119 (1911).

 **[30]**    The court of appeals confused these concepts in its jury trial analysis. For example, the court emphasized that in many cases under the Act the jury will be limited to determining physical impairment, "foreclosing any consideration of evidence with respect to the true nature of the worker's disability, loss of earning capacity, or future loss of earnings." 862 S.W.2d at 96. That the Legislature has tied benefits to impairment, however, does not implicate the right to jury trial. The Legislature has now replaced the pre–1913 common law cause of action which based compensation in part on loss of earning capacity with a statutory cause of action which bases compensation in part on impairment. The jury is allowed to determine impairment.

 **\*528**   **[31]**    Similarly, the court of appeals focused on the "arbitrary presumptive effect of the 15 percent threshold." *Id.* Again, the use of the 15 percent threshold is a substantive part of the benefit scheme. The jury decides whether the claimant is at least 15 percent impaired. There is no denial of trial by jury.

### 1

The Act provides for a trial by jury on the principal compensation issues: compensability of the injury; eligibility for income and death benefits; and, within limits, the amount of those benefits. *See* Tex.Lab.Code § 410.301. The question presented, therefore, is whether the Legislature has so restricted the jury's role in deciding these issues that it has transgressed the inviolate right to jury trial.

 **[32]**    The Act does specify certain limiting procedures not found in a pure trial de novo. First, the jury is informed of the Commission's decision. Because the jury is not required to accord that decision any particular weight, however, this procedure does not impinge on the jury's discretion in deciding the relevant factual issues. We hold that this procedure does not violate a claimant's right to trial by jury.

 **[33]**    Second, evidence of the extent of impairment is limited to that presented to the Commission unless the court determines that the claimant's condition has substantially changed. This procedural limitation is akin to those in the rules of civil procedure requiring litigants to disclose witnesses and information at a particular time or be barred from offering that evidence at trial. *See, e.g.,* TEX.R.CIV.P. 215 5. It encourages parties to present relevant evidence during administrative proceedings, thus increasing the accuracy and efficiency of those proceedings. Requiring a party to marshal and disclose evidence diligently does not violate the right to trial by jury.

 **[34]**    Finally, the jury is required to adopt the specific impairment rating arrived at by one of the physicians in the case. Tex.Lab. Code § 410.306(c). For example, if three doctors testify,[25] respectively opining that the claimant is 10, 14, and 20 percent impaired, the jury must return one of those three numbers as its verdict. It may not consider the entirety of the testimony to find, for example, an impairment rating of 16 percent. We conclude that this restriction also does not impinge on the right to trial by jury. As explained earlier, the right to a jury trial is incident to the underlying substantive cause of action. *See Anderson v. Hodge Boats & Motors,* 814 S.W.2d 894, 896 (Tex.App.—Beaumont 1991, writ denied); *Garza–Vale v. Kwiecien,* 796 S.W.2d 500, 505–06 (Tex.App.—San Antonio 1990, writ denied). It is within the Legislature's power, subject to the guarantees of open courts and due process, to define the parameters of a cause of action; issues of fact not relevant to the cause of action as defined obviously need not be submitted to a jury. Viewed against this principle, section 410.306(c) is valid.

[25]    This presumably would be a typical scenario, with testimony coming from the claimant's physician, the carrier's physician, and the designated doctor. As earlier noted, the opinion of the designated doctor has no presumptive weight at trial on the issue of impairment.

In allocating impairment and supplemental benefits, the Act requires the Commission to assign an impairment rating corresponding to the rating of one of the examining physicians. *See* § 408.125(e). The Act simply does not contemplate or allow any other rating; e.g., one "in between" the physicians' findings. In other words, the requirement that the impairment rating

match one of the physicians' findings is part of the substantive statutory scheme. Plaintiffs do not contest the validity of this part of the statute on either open courts or due process grounds.

Section 410.306(c) merely reflects the scope of the Act's remedy. Because the ultimate impairment rating must match one of the doctors' findings, the disputed question of fact on appeal can only be which doctor's rating should prevail. Because that issue is presented to and decided by a jury, the right of trial by jury is preserved. A verdict "in between" the doctor's findings would be irrelevant under the Act's benefit scheme, which does not allow for such an impairment rating.

**\*529** **[35]** The Constitution's guarantee of a jury trial simply does not prohibit altering the manner in which factual questions in a particular cause of action are submitted to the jury. "The preservation of the right to trial by jury does not require that the old forms of practice and procedure be retained. 'So long as the substance of the right to jury trial is maintained, the procedure by which this result is reached is wholly within the discretion of the legislature....' " *Bullard v. State,* 548 S.W.2d 13, 17 (Tex.Crim.App.1977) (quoting 47 Am.Jur.2d, Jury § 18 p. 641). One could argue, indeed, that any evidentiary restriction not recognized under the common law in 1876 is a limitation on trial by jury, *see, e.g.,* Tex.R.Civ.Evid. 403 (excluding evidence if probative value is substantially outweighed by risk of prejudice or confusion); Tex.Rev.Civ.Stat.Ann. art. 6701d, § 107C(j) (excluding evidence of use or non-use of seatbelts), even though such rules and statutes have never been challenged on jury trial grounds.

The method of submitting questions to juries has also evolved. Originally, juries were allowed to render general verdicts based upon instructions. Because the number of instructions considered helpful to juries accumulated to the point that an "errorless charge became almost impossible." *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984), the Legislature in 1913 required the use of special issues submitted separately and distinctly. Acts 1913, 33rd Leg., ch. 59, § 1. This special issue system, which undeniably restricted the discretion of the jury in deciding a case, remained in place for sixty years without any question as to its constitutionality. [26]

[26] After it became apparent that the special issue system had also become unworkable, this Court amended Texas Rule of Civil Procedure 277 in 1973 to allow broad form issues, and in 1988 to require broad form issues whenever feasible.

Like the procedures discussed above, section 410.306(c) alters the mode of submitting the case to the jury without undermining the inviolate right to a jury trial. The jury is allowed to decide the key issue of impairment. The Legislature could have concluded, given the complexity of assessing impairment, that it would promote fairness and efficiency to require the fact finder, whether it be a jury or a Commission hearing officer, to adopt a specific impairment rating supported by one of the experts, rather than attempt to blend testimony to arrive at a new number. This is not such a limitation of the jury's essential role as to render the system unconstitutional.

We recognize that, in many areas, juries have been free to consider conflicting expert testimony on a particular issue and, using its judgment as the finder of fact, blend that testimony to arrive at a proper verdict. In condemnation cases, for example, courts have allowed juries to return a verdict on property value in between the appraisals of the parties' experts. *See, e.g., State v. Angerman,* 664 S.W.2d 794, 797 (Tex.App.—Waco 1984, writ ref'd n.r.e.); *Tenngasco Gas Gathering Co. v. Fischer,* 653 S.W.2d 469, 473 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Central Power & Light Co. v. Martinez,* 493 S.W.2d 903, 908 (Tex.Civ.App.—Corpus Christi 1973, no writ). In *Callejo v. Brazos Electric Power Cooperative,* 755 S.W.2d 73, 75 (Tex.1988), a condemnation case, we noted that "jurors are not bound, as a matter of law, to accept the parties' expert testimony." These authorities, however, like all those cited in the concurring and dissenting opinion, assume that the range of answers is not restricted by the substantive law granting the remedy. Compare, on the other hand, the common-law contributory negligence scheme. Jurors were asked at common law only whether the plaintiff and defendant were negligent, producing an all or nothing recovery. The jury was not allowed to answer more "precisely" by assigning negligence percentages to each party, as such answers were simply not then recognized under the substantive law. Similarly, jurors must under the Act choose between the discrete impairment options authorized therein. This is not inconsistent with the right of trial by jury guaranteed by our Bill of Rights.

**2**

Issues other than compensability of the injury, eligibility for income and death benefits, **\*530** and the amount of those benefits are reviewed without a jury under the substantial evidence test. [27] Tex.Lab.Code § 410.255. Although plaintiffs argue in conclusory fashion that this procedure also violates the right to jury trial, none of the parties have briefed this specific issue. The court of appeals likewise did not separately analyze whether reviewing collateral issues under the substantial evidence test violates the right to trial by jury.

[27]    Presumably, these might include such matters as disputes over medical benefits, attorneys' fees, and administrative sanctions.

 **[36]**    Judicial review of agency orders under the substantial evidence rule does not per se violate the right to trial by jury. Depending on the particular order being appealed, and the nature and scope of the administrative scheme in general, the judicial review proceeding may not be analogous to an action tried to a jury in 1876, and thus may be exempt from article I, section 15. *See Texas Ass'n of Business,* 852 S.W.2d at 451; *EnRe Corp. v. Texas Railroad Comm'n,* 852 S.W.2d 661, 664–65 (Tex.App. —Austin 1993, no writ). Further, as noted earlier, we have held that appeals in administrative proceedings are not "causes" within the meaning of article V, section 10. *See Credit Bureau,* 530 S.W.2d at 293.

Accordingly, whether substantial evidence review of an agency decision violates the right to jury trial depends on the specific issue being reviewed and how it relates to the overall administrative scheme established by the Legislature. The present case does not involve the actual review of any collateral issues under section 410.255 and the parties have not yet focused on the specific issues that are likely to fall within the ambit of that section. On this record, we decline to hold that section 410.255 is facially unconstitutional. It may encompass issues for which the right to jury trial must be preserved, but that question must wait until it is squarely presented for review.

**B**

 **[37]**    As discussed above, the Act provides for modified de novo review of some issues under a preponderance standard, and review of the remaining issues under the substantial evidence test. The court of appeals held that this constitutes an impermissible "hybrid" system of judicial review. We disagree.

The court of appeals based its decision on *Southwestern Bell Telephone Company v. Public Utility Commission,* 571 S.W.2d 503 (Tex.1978), and *Southern Canal Company v. State Board of Water Engineers,* 318 S.W.2d 619 (Tex.1958). *Southern Canal* involved judicial review of orders of the State Board of Water Engineers. The controlling statute, Tex.Rev.Civ.Stat.Ann. art. 7477, section 13, provided that the *reasonableness* of the Board order should be reviewed in a trial de novo under a preponderance standard, and not under the substantial evidence rule. The Court found this statute to be internally inconsistent because the reasonableness of an administrative order is not a factual question, but rather a legal issue that by definition hinges on whether substantial evidence supports the administrative order. 318 S.W.2d at 623. The reasonableness of a Board decision thus could not be determined as a factual matter under a preponderance standard.

In *Southwestern Bell,* the Court addressed a statute controlling judicial review of Public Utility Commission orders providing as follows:

> Any party to a proceeding before the Commission is entitled to judicial review under the substantial evidence rule. The issue of confiscation shall be determined by a preponderance of the evidence.

Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69. The Court, relying on *Southern Canal,* held that this statute created an invalid "hybrid" system of judicial review because it mixed the substantial evidence and preponderance standards. 571 S.W.2d at 511. Although

section 69 arguably did not dictate mixed review of any single issue, we emphasized the general ambiguity regarding the scope and effect of the provision's second sentence. For example, the Court concluded that since "confiscation" is a legal question, "[i]t is, of course, incongruous to speak of deciding as a fact **\*531** from the preponderance of the evidence a question of law." *Id.* Further, even if confiscation could be viewed as a factual issue, it was unclear under the statute whether review was limited to the agency record, and, if not, whether a jury could be demanded. *Id.* This uncertainty led the Court to strike the second sentence only, thus mandating substantial evidence review for all issues.

This case is distinguishable from *Southern Canal* and *Southwestern Bell.* The Act clearly specifies certain factual issues to be reviewed under a preponderance standard, detailing the controlling procedures. The fact finder, although informed of the Commission decision, does not review it for "reasonableness," but rather independently decides the issues by a preponderance of the evidence. Remaining factual issues are reviewed under the substantial evidence test. This approach is neither ambiguous nor internally inconsistent. We therefore conclude that the Act does not establish an impermissible hybrid system of judicial review. [28]

[28] We disapprove of *Dickerson–Seely & Assoc. v. Texas Employment Comm'n,* 784 S.W.2d 573 (Tex.App.—Austin 1990, no writ), to the extent it is inconsistent with this holding.

## VIII

Plaintiffs next contend that the Act's method of calculating "average weekly wage" unreasonably discriminates against seasonal employees and those earning less than $8.50 an hour in violation of the equal protection guarantee.

## A

**[38]** A seasonal worker is defined as

> an employee who, as a regular course of the employee's conduct, engages in seasonal or cyclical employment that does not continue throughout the entire year.

Tex.Lab.Code § 408.043(d). Average weekly wage—normally based on the thirteen weeks preceding injury—is adjusted for seasonal employees to reflect their cyclical income. For temporary income benefits, the average is determined in the normal manner except that it is "adjusted as often as necessary to reflect the wages the employee could reasonably have expected to earn during the period that temporary income benefits are paid." *Id.* § 408.043(a).

This adjustment clearly furthers the purpose of temporary income benefits: replacing the income that is actually lost as a result of the disabling injury. Without such adjustment, an injured employee would receive no benefits for an injury occurring at the beginning of the work cycle. Conversely, an injury at the end of the work cycle would entitle the employee to temporary benefits during a period when he or she would have earned no wages. This adjustment is therefore rationally related to a legitimate state purpose, and thus does not violate equal protection.

**[39]** For other benefits payable to a seasonal worker, the average weekly wage is determined by dividing the previous year's income by 50. *Id.* § 408.043(b). This adjustment is also rationally related to the statutory benefit scheme. Without it, benefits would either be artificially high or low depending on the point in the work cycle that the injury occurred.

## B

 **[40]**    Workers earning $8.50 an hour or more receive temporary benefits equalling 70 percent of their average weekly wage, subject to the statutory maximum and minimum. Tex.Lab.Code § 408.103(a)(1). Although workers earning less than $8.50 an hour receive a higher benefit for the first 26 weeks—75 percent of the average weekly wage—this increased benefit is subject to a second cap not applicable to higher wage earners: the benefit cannot exceed 1/52 of the actual earnings for the previous year. *Id.* § 408.103(b). Plaintiffs contend that this additional cap discriminates against lower paid workers in violation of the equal protection clause. We disagree.

Notably, lower paid workers receive a *higher* percentage of their salary as benefits. The second cap will rarely be relevant, as it applies only if the weekly *benefit* exceeds the previous years's weekly *earnings.* Thus, the cap would not be applicable unless the employee's  **\*532**  salary increased by approximately 25 percent during the preceding year.

As explained by the court of appeals, the Legislature imposed the second cap because lower paid workers are generally unaffected by the overall statutory cap, which equaled $426 in 1991. *See* 862 S.W.2d at 103 (citing Floor Debate on S.B.1. 71st Leg., 2nd C.S., Tape 1 at 14 (Dec. 12, 1989)). The Legislature apparently concluded that, without the second cap, many lower paid workers would fare better through compensation benefits than they did working, a clear disincentive to recovery and return to work. *Id.* On this record, the cap is rationally related to a legitimate state purpose. We therefore conclude that it does not violate equal protection.

# IX

 **[41]**    Plaintiffs, without relying on a specific constitutional guarantee, also challenge the "designated doctor" provisions of the Act. Placing presumptive weight on the findings of the designated doctor, according to plaintiffs, arbitrarily subordinates the role of the claimant's regular treating physician.

We conclude that the Act's use of the designated doctor is not invalid. Determining the extent of physical impairment is obviously not an exact science. Evidence at trial indicates that, although the *Guides* increase the consistency and objectivity of impairment diagnoses, there is still a range of findings that might reasonably be reached by competent physicians. The Legislature could have rationally concluded that relying on the opinion of a neutral doctor selected by the Commission or jointly by the parties is the fairest and most efficient means of settling medical disputes at the Commission level. As noted, the designated doctor's opinion regarding impairment has no presumptive weight during judicial review. We accordingly conclude that the designated doctor provisions do not violate the Texas Constitution.

# X

 **[42]**    The Act, like its predecessor, allows employees to opt out of the workers' compensation system. Tex.Lab.Code § 406.034. To do so, the employee must notify the employer within five days after beginning employment that the employee desires to retain his or her common law rights. *Id.* § 406.034(b). The court of appeals concluded that this opt out provision violated equal protection and due course of law because it allows new employees hired after the effective date of the Act to avoid its coverage, without affording existing employees a similar opportunity. We disagree.

Plaintiffs do not dispute that, in general, the State has a legitimate interest in requiring employees to make a binding election at the beginning of their employment. This limitation allows carriers to set an appropriate premium and allows employers to budget the cost of compensation insurance and obtain any necessary supplemental liability insurance. The system would be unworkable if employees could freely opt in and out at any time.

The legitimate rationale for limiting the opt out election to new employees continues to apply even when the scope of benefits is modified. The Legislature could have concluded that affording all Texas employees presently covered by workers' compensation

a simultaneous opportunity to opt out of that system would cause administrative and budgeting problems. Moreover, because the constitutionality of the Act is not predicated on voluntary participation, the Legislature was not required to afford current employees an opportunity to opt out simply because it changed the scope of benefits. [29] Accordingly, we conclude that section 406.034 does not violate equal protection or due course of law.

[29] The Commission argues for the first time in this Court that section 406.034 should be read as allowing such an election. Although the Commission's reading would moot plaintiffs' complaints regarding the opt out provision, we do not believe it is a reasonable construction of the statute. Subsection 406.034(b) expressly requires an election "not later than the fifth day after the date the employee ... begins the employment." This deadline can only be met by new employees. Moreover, the Commission has never advised employers that existing employees must be afforded an opportunity to opt out, despite the fact that the Act has been in effect over four years.

## *533 XI

 [43]    The court of appeals concluded that the Act, by limiting attorneys' fees, unreasonably restricts a claimant's access to legal representation, in violation of equal protection and due course of law. 862 S.W.2d at 98–100. We disagree.

The Act limits fees for both the claimant's and the insurer's attorneys. Tex.Lab.Code §§ 408.221, 408.222. Both must be approved by the Commission or court, based on several enumerated factors such as time and labor required, difficulty of the questions involved, the fee customarily charged in that locality, and the amount involved in the controversy. *Id.* The only limitation placed solely on the claimant's attorney's fee is that, generally, it may not exceed 25 percent of the claimant's recovery. [30] *Id.* § 408.221(h).

[30] The former act limited a claimant's attorney's fee to 25 percent of the recovery, without regard to the specific factors that now must be considered. Tex.Rev.Civ.Stat.Ann. art. 8306, §§ 7c, 7d (repealed).

Requiring an attorney to charge a reasonable fee is a valid exercise of the Legislature's police power. The fee limitations under the Act apply to both sides to the controversy, except for the 25 percent cap. This distinction is not irrational, however, as the Legislature could have concluded that injured employees must ultimately be guaranteed at least 75 percent of the benefits provided if they are to maintain the support of themselves and their families.

Nothing in the record establishes that the fee limitations are so egregious that they will result in a claimant being denied needed legal representation. Although there was testimony that some attorneys no longer accept compensation cases under the Act, there was no showing of any claimant who could not obtain counsel. Based on this record, we hold that the fee limitations do not facially violate the guarantee of due course of law or equal protection. *See Department of Labor v. Triplett,* 494 U.S. 715, 721–726, 110 S.Ct. 1428, 1432–1435, 108 L.Ed.2d 701 (1990) (attorneys' fees restrictions in the Black Lung Benefits Act, 30 U.S.C. § 901 et seq., did not violate due process because, even though there was evidence that fewer attorneys were taking such cases, there was no showing that the restrictions actually prevented claimants from obtaining representation).

## XII

Plaintiffs further argue that the Act's adjudicative scheme violates the open courts guarantee and the right to jury trial because it does not allow for resolution of all issues in a single proceeding. According to plaintiffs, issues such as course and scope of employment, entitlement to temporary benefits, and extent of impairment will be decided sequentially, with a separate benefit review conference, contested case hearing, administrative appeal and judicial appeal for each individual issue. They further note that supplemental income benefits are paid on a monthly basis, rather than in a lump sum as under the former act, and are subject to recalculation every quarter.

 [44]   [45]   Plaintiffs contend that the burden of pursuing a claim under these circumstances creates an unreasonable financial barrier to court access, facially violating the open courts provision. *See Trinity River Authority,* 889 S.W.2d at 261. We disagree. Assuming that the burden and expense of pursuing litigation may create an "unreasonable financial barrier" within the meaning of the open courts provision, an issue we do not decide, plaintiffs have not demonstrated that the Act, on its face, rises to this level. It is not clear that each compensation issue must be adjudicated separately, as claimed by plaintiffs. Although judicial review under section 410.302 is limited to issues decided by the Commission Appeals Panel, this does not prevent the joinder of issues at the administrative or trial level. On the contrary, the Act appears to contemplate such joinder. *See, e.g.,* § 410.023 (purpose of benefit review conference is to "reach agreement on disputed issues involved in the claim"); § 410.031(b) (benefit review officer must prepare a report including "a statement of each resolved issue" and "a statement of each issue raised but not resolved"). There is simply no way to determine on this record, which does not involve an actual administrative **\*534** proceeding, that the Act's adjudicatory scheme will have the effect claimed by plaintiffs. We accordingly reject their facial challenge under the open courts provision. Further, that issues may be judicially reviewed sequentially, rather than in a single proceeding, does not implicate the right to trial by jury. *See, e.g., Ex parte Peterson,* 253 U.S. 300, 309, 40 S.Ct. 543, 546, 64 L.Ed. 919 (1950) (preservation of right to jury trial does not prohibit new forms of practice and procedure).

## XIII

 [46]   Plaintiff Texas Legal Services Union contends that section 408.003 of the Act impairs the right to contract guaranteed under article I, section 16 of the Texas Constitution. Section 408.003 provides in relevant part as follows:

(a) After an injury, an employer may:

(1) initiate benefit payments, including medical benefits; or

(2) on the written request or agreement of the employee, supplement income benefits paid by the insurance carrier by an amount that does not exceed the amount computed by subtracting the amount of the income benefit payments from the employee's net preinjury wages.

(b) If the injury is found compensable and an insurance carrier initiates compensation, the insurance carrier shall reimburse the employer for the amount of benefits paid by the employer to which the employee was entitled under this subtitle....

Texas Legal Services Union, which represents the employees of Texas Rural Legal Aid, has in place a collective bargaining agreement requiring TRLA to provide supplemental disability insurance equal to "the difference between worker's compensation benefits and two-thirds (2/3rds) of the employee's weekly salary up to a maximum of Two Hundred Dollars ($200.00) per week." This supplemental benefit appears to be within the range allowed under section 408.003, and the union does not explain how its collective bargaining agreement has been restricted. On this record, we conclude that section 408.003 is not a facially invalid impairment of the obligation of contract. We need not reach the hypothetical question of whether section 408.003 would operate unconstitutionally if an employer desired to supplement benefits in excess of the employee's net preinjury wages.

## XIV

Defendants contend that the trial court erroneously excluded the "Tillinghast Study," an actuarial report comparing costs and benefits under the present and former compensation systems. Because we uphold the Act's benefit system without regard to this study, we need not reach the issue of whether it was erroneously excluded. Defendants also complain that the trial court excluded the testimony of William Powers, a professor at the University of Texas School of Law, who planned to testify regarding Texas constitutional and common law. Under the circumstances of this case, error in this regard, if any, was harmless. *See* Tex.R.App.P. 184(b).

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment upholding the validity of the Act against plaintiffs' constitutional challenges.

SPECTOR, Justice, joined by HIGHTOWER and GAMMAGE, Justices, concurring and dissenting.

Texans have long recognized that the right of trial by jury is "the only safe guarantee for the life, liberty, and property of the citizen." [1] Today's decision undermines that guarantee by allowing the Legislature to arbitrarily curtail the jury's role. While I join in most parts of the majority opinion, I cannot join in part VII, which abridges an injured worker's right to a jury trial.

[1]    THE DECLARATION OF INDEPENDENCE OF THE REPUBLIC OF TEXAS (1836), *reprinted in* 3 TEX. CONST. ANN. 478, 479 (Vernon 1993).

The Texas Workers' Compensation Act of 1989 sharply restricts the jury's discretion on critical issues. In determining the extent of impairment, the jury must adopt one of the exact impairment ratings offered by a physician in the case. TEX.LAB.CODE § 410.306(c).  **\*535**  Thus, the jury cannot choose to accept only part of a physician's testimony; it must adopt that testimony in full, without regard to the physician's credibility or the jury's own assessment of the underlying facts.

I believe this requirement violates our Constitution. *See* TEX. CONST. art. I, § 15; TEX. CONST. art. V, § 10. The right of trial by jury dictates that a jury must be allowed to decide all matters of fact, and the essence of the jury's role as fact-finder is to weigh and evaluate the evidence. A jury cannot be bound, as a matter of law, to accept expert testimony. *See Callejo v. Brazos Elec. Power Coop., Inc.,* 755 S.W.2d 73, 75 (Tex.1988). Rather, "[t]he jury is the exclusive judge of the facts proved, the credibility of the witnesses and the weight to be given to their testimony." *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951).

We have expressly recognized that the fact-finder is entitled to accept one portion of an expert's testimony, while rejecting another. *Hood v. Texas Indem. Ins. Co.,* 146 Tex. 522, 209 S.W.2d 345, 346 (1948). This principle is firmly embedded in our jurisprudence. *See Texas & P. Ry. Co. v. Brown,* 142 Tex. 385, 181 S.W.2d 68, 72 (1944) ("[A] jury may accept or reject portions of the testimony of a witness...."); *Houston Belt & Terminal Ry. Co. v. Vogel,* 179 S.W. 268, 269 (Tex.Civ.App.—Galveston 1915, writ ref'd) ("The jury were not compelled to credit all the testimony of any witness or reject it all...."); *Houston & T.C.R. Co. v. Taylor,* 20 Tex.Civ.App. 654, 49 S.W. 1055, 1055 (Tex.Civ.App.1899, writ ref'd) ("The jury were not compelled to credit all the testimony of any witness or reject it all."); *Garcia v. Sanders,* 90 Tex. 103, 37 S.W. 314, 317 (1896) ("The jury were not bound to accept or reject in toto the testimony of either [witness]...."); *Garcia v. State,* 522 S.W.2d 203, 206 (Tex.Crim.App.1975) (jury may "accept or reject any or all of the [witnesses'] testimony"); *Austin Fire Ins. Co. v. Adams–Childers Co.,* 246 S.W. 365, 368 (Tex.Comm'n App.1923, judgm't adopted) ("The jury had a right to believe part of [a witness'] evidence and absolutely discard other portions of it."); *New York Underwriters Ins. Co. v. Upshaw,* 560 S.W.2d 433, 434 (Tex.Civ.App.—Beaumont 1977, no writ) ("[T]he jury had the sole right to accept or reject the testimony of each witness in whole or in part."); *Langdeau v. Piske,* 317 S.W.2d 806, 809 (Tex.Civ.App.—Austin 1958, writ ref'd n.r.e.) ("[I]t is peculiarly within the province of the jury to reconcile inconsistencies or accept or reject portions of witnesses' testimony."); *Texlan, Inc. v. Freestone County,* 282 S.W.2d 283, 288–89 (Tex.Civ.App.—Waco 1955, no writ) ("[T]he jury, being the trier of the facts, had the duty and responsibility of passing upon the credibility of the witnesses and determining the ultimate issues before them and, in so doing, they could reject or accept the testimony of each witness in whole or in part as they found the facts to be.").

These authorities establish that the jury is entitled to weigh a physician's testimony and accept it in whole *or in part.* This role is especially important in determining an injured worker's impairment rating. Even the American Medical Association, which promulgated the guides that provide the ratings, insists that an impairment rating "was by no means intended as a precise indicator of impairment." [2] The record establishes that a three percentage point difference in the ratings would not be unexpected, even when two physicians agree on the extent of impairment. Under the Act, three percentage points means nine weeks of impairment income benefits. Three percentage points could also determine whether an injured worker receives any

supplemental income benefits at all, since those benefits are not available to anyone with an impairment rating below fifteen percent.

2        Brief of Amici Curiae American Medical Association et al. at 9.

The Act provides that unless there has been a substantial change in the worker's condition, "evidence of extent of impairment shall be limited to that presented to the commission." TEX.LAB.CODE § 410.306(c). Thus, the jury is bound by a physician's initial conclusion, even if the physician backs off from that conclusion at trial, or admits that the impairment rating was rounded to the nearest five percent, as the guides expressly allow.

 **\*536**  Requiring the jury to adopt fully the testimony of one of the experts, and reject fully the testimony of the others, eviscerates its central function of weighing and evaluating the testimony. Because this derogation of the jury's historic role unconstitutionally impinges on the right of trial by jury, I dissent.

**All Citations**

893 S.W.2d 504, 38 Tex. Sup. Ct. J. 235

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

KeyCite Red Flag - Severe Negative Treatment

**Judgment Reversed by**    Transcontinental Ins. Co. v. Crump,    Tex.,    August 27, 2010

274 S.W.3d 86
Court of Appeals of Texas,
Houston (14th Dist.).

TRANSCONTINENTAL INSURANCE COMPANY, Appellant,

v.

Joyce CRUMP, Appellee.

No. 14–06–00905–CV.    |    Aug. 26, 2008.    |    Rehearing Overruled Nov. 20, 2008.

**Synopsis**
**Background:** Insurer appealed from worker's compensation ruling awarding death benefits to claimant who was wife of deceased employee. The 400th District Court, Fort Bend County, Clifford J. Vacek, J., 2006 WL 4680820, upheld judgment in favor of claimant, and insurer appealed.

**Holdings:** The Court of Appeals, John S. Anderson, J., held that:

[1] causation opinion by treating physician developed using differential diagnosis was based on a reliable foundation and was admissible;

[2] testimony of treating physician was some evidence and legally sufficient to support jury's finding that work related injury was producing cause of employee's death;

[3] action to recover attorney's fees was not covered by constitutional provision that the right to trial by jury shall remain inviolate;

[4] claimant was not required to submit issue of her attorney fees to jury and did not waive her claim;

[5] claimant could recover attorney's fees incurred in preparing for and attending hearing on her attorney's fees; and

[6] claimant incurred attorney's fees as a result of insurer's appeal and insurer was liable for those fees.

Affirmed.

West Headnotes (32)

**[1]    Appeal and Error**  ◯━ Cases Triable in Appellate Court
While evidentiary rulings, including rulings on expert testimony, are normally reviewed for an abuse of discretion, when the trial court admits expert testimony and an appellant challenges the expert testimony as no evidence, the Court of Appeals considers whether the expert testimony is reliable under a de novo standard of review.

1 Cases that cite this headnote

**[2]** **Workers' Compensation** ⊸ Medical Testimony, Statements, Reports, and Records

To evaluate the reliability of a medical expert's opinion based on experts' experience and training in his field in a workers' compensation case, the court considers whether there is an analytical gap between the expert's opinion and the bases on which the opinion was founded.

Cases that cite this headnote

**[3]** **Workers' Compensation** ⊸ Medical Testimony, Statements, Reports, and Records

A causation opinion by a treating physician of a deceased employee whose wife sought workers' compensation death benefits, that employee's work related knee injury was a producing cause of his death, and developed using a differential diagnosis while treating deceased spouse, did not contain an "analytical gap" between his opinion and the bases on which his opinion was founded, but was instead based on a reliable foundation and was properly admitted into evidence.

1 Cases that cite this headnote

**[4]** **Appeal and Error** ⊸ Power of appellate court in general

**Appeal and Error** ⊸ Findings of Court or Referee

**Appeal and Error** ⊸ Extent of Review

**Appeal and Error** ⊸ Sufficiency of Evidence in Support

In reviewing a matter of law challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary, and if there is no evidence to support the finding, only then will the reviewing court examine the entire record to determine if the contrary proposition is established as a matter of law; the issue should be sustained only if the contrary position is conclusively established.

1 Cases that cite this headnote

**[5]** **Evidence** ⊸ Sufficiency to support verdict or finding

Evidence is no more than a scintilla when it is so weak as to do no more than create a mere surmise or suspicion of its existence.

Cases that cite this headnote

**[6]** **Appeal and Error** ⊸ Sufficiency of Evidence in Support

The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse a judgment.

1 Cases that cite this headnote

**[7]** **Appeal and Error** ⊸ Form and requisites

If the Court of Appeals determines the evidence is factually insufficient, it must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; it need not do so when affirming a jury's verdict.

Cases that cite this headnote

**[8]** **Workers' Compensation** ⚷ Death from accidents in general

Testimony of treating physician was legally and factually sufficient to support jury's finding that work related injury was a producing cause death of employee, who was taking immunosuppression drugs because of a kidney transplant, and developed infections as result of the knee injury; physician explained how he used differential analysis and concluded that employee's knee injury caused complications that contributed to his death. V.T.C.A., Labor Code § 410.303.

Cases that cite this headnote

**[9]** **Trial** ⚷ Sufficiency as to Subject-Matter

A proper jury instruction is one that assists the jury and is legally correct. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

1 Cases that cite this headnote

**[10]** **Appeal and Error** ⚷ Cases Triable in Appellate Court

While the Court of Appeals normally reviews the trial court's decisions as to how to charge the jury under an abuse of discretion standard, once the trial court has decided to define a term in the charge for the jury, the Court determines whether the definition misstates the law using a de novo standard of review. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

Cases that cite this headnote

**[11]** **Appeal and Error** ⚷ Conduct of trial or hearing in general

**Trial** ⚷ Authority to instruct jury in general

**Trial** ⚷ Definition or explanation of terms

**Trial** ⚷ Discretion of court

So long as the charge is legally correct, a trial judge is accorded broad discretion regarding the submission of questions, definitions, and instructions to the jury; therefore, the Court of Appeals will review the trial court's legally correct definitions, instructions, and questions for an abuse of discretion. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

Cases that cite this headnote

**[12]** **Appeal and Error** ⚷ Review of questions of pleading and practice

The Court of Appeals may not reverse a judgment for error in the submission of jury instructions, definitions, or questions unless it concludes the error probably caused the rendition of an improper judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

Cases that cite this headnote

**[13]** **Trial** ⚷ Errors in general

To determine whether an improper jury charge constitutes reversible error, the Court of Appeals considers the pleadings, the evidence, and the charge in its entirety. Vernon's Ann.Texas Rules Civ.Proc., Rule 277.

Cases that cite this headnote

**[14]**   **Workers' Compensation**   Two or more causes

Because of courts' liberal interpretation of workers' compensation legislation to carry out its purpose of compensating injured workers and their dependents, a workplace accident or disease is considered to be a producing cause even if it is not a substantial factor in bringing about the injury, disability, or illness; therefore, a workplace injury need not be the sole or primary cause in bringing about the disability or illness but, rather, as long as the occupational injury is a producing cause of the disability or illness, there is a sufficient causal link under the workers' compensation scheme. V.T.C.A., Labor Code § 410.303.

Cases that cite this headnote

**[15]**   **Workers' Compensation**   Necessity of accident and causal connection

**Workers' Compensation**   Two or more causes

An unrelated condition or injury may even be the primary factor in causing an employee's disability or death and still not preclude a recovery of workers' compensation benefits; in addition, a pre-existing condition will not preclude compensation under the system as long as a workplace accident contributed to the injury in some amount. V.T.C.A., Labor Code § 410.303.

1 Cases that cite this headnote

**[16]**   **Workers' Compensation**   Two or more causes

In a workers' compensation case, there may be more than one producing cause of an injury, incapacity, or death. V.T.C.A., Labor Code § 410.303.

1 Cases that cite this headnote

**[17]**   **Workers' Compensation**   Two or more causes

A "producing cause" of an employee's injury or disease as applied in a workers' compensation case, is as an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question; there may be more than one producing cause. V.T.C.A., Labor Code § 410.303.

1 Cases that cite this headnote

**[18]**   **Constitutional Law**   Wisdom

**Constitutional Law**   Expediency

The wisdom or expediency of the law is the legislature's prerogative, not that of the Court of Appeals. V.T.C.A., Government Code § 311.021(1).

Cases that cite this headnote

**[19]**   **Constitutional Law**   Burden of Proof

The party challenging a statute's constitutionality has the burden of proving the statute fails to meet constitutional requirements.

Cases that cite this headnote

[20] **Constitutional Law** • Facial invalidity

**Constitutional Law** • Invalidity as applied

In challenging the constitutionality of a statute, a party may show a statute is unconstitutional on its face or as applied to that party.

Cases that cite this headnote

[21] **Jury** • Common law or statutory actions, in general

Constitution section which provides the right to a jury trial for those actions or analogous actions which were tried by a jury when the Constitution was adopted in 1876 only applies if, in 1876, a jury would have been allowed to try the action or analogous action. Vernon's Ann.Texas Const. Art. 1, § 15.

Cases that cite this headnote

[22] **Jury** • Civil Proceedings Other Than Actions; Special Proceedings

The Workers' Compensation Act is a substitute for the common law negligence remedy, which was an action tried to a jury in 1876, therefore, at least with regard to the recovery of income and death benefits, the Workers' Compensation Act is analogous to a claim for which the right to a jury trial is constitutionally preserved. Vernon's Ann.Texas Const. Art. 1, § 15.

Cases that cite this headnote

[23] **Costs** • Effect of statutes

**Costs** • Particular Actions or Proceedings

Attorney's fees are not recoverable in a negligence suit, therefore, statutory provisions for the recovery of attorney fees in a negligence or analogous action are in derogation of common law.

1 Cases that cite this headnote

[24] **Jury** • Civil Proceedings Other Than Actions; Special Proceedings

**Workers' Compensation** • Proceedings

Because there was no common law action to recover attorney's fees under a common law negligence claim, a claim for attorney's fees brought pursuant to statute providing attorney fees to a workers' compensation death benefit claimant when an insurer appeals is not an action or analogous action that was tried to a jury in 1876; accordingly, a claimant's action to recover attorney's fees is not covered by constitutional provision preserving the right to jury trial. Vernon's Ann.Texas Const. Art. 1, § 15; V.T.C.A., Labor Code § 408.221.

2 Cases that cite this headnote

[25] **Jury** • Trial on Appeal or Other Proceeding for Review

Constitutional provision that in trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury, does not apply to an appeal from an administrative decision. Vernon's Ann.Texas Const. Art. 5, § 10.

Cases that cite this headnote

**[26]** **Workers' Compensation** 🗝 Purpose of legislation

When examining the provisions within the Workers' Compensation Act, the Court of Appeals should keep in mind the comprehensive nature of the Act. V.T.C.A. Labor Code § 401.001 et. seq.

Cases that cite this headnote

**[27]** **Statutes** 🗝 Intent

**Statutes** 🗝 Giving effect to entire statute and its parts; harmony and superfluousness

**Statutes** 🗝 Presumptions, inferences, and burden of proof

In construction of statutes, the Court of Appeals must presume the entire statute is intended to be effective, a just and reasonable result is intended, a result feasible of execution is intended, and the public interest is favored over private interest.

Cases that cite this headnote

**[28]** **Statutes** 🗝 Superfluousness

**Statutes** 🗝 Absent terms; silence; omissions

A court construing a statute reads every word as if it were deliberately chosen and must presume that omitted words were excluded purposefully.

Cases that cite this headnote

**[29]** **Workers' Compensation** 🗝 Proceedings

Worker's compensation death benefit claimant was not required to submit the issue of her reasonable and necessary attorney's fees to the jury for resolution, and thus, she did not waive her claim for attorney's fees when she did not do so. V.T.C.A., Labor Code § 408.221.

Cases that cite this headnote

**[30]** **Appeal and Error** 🗝 Necessity of timely objection

**Appeal and Error** 🗝 Necessity of Specific Objection

**Appeal and Error** 🗝 Scope and Effect of Objection

Rule requiring a timely, specific objection to preserve error requires not only that a party act timely when objecting, but also state with sufficient specificity the grounds for the objection so the trial court can act on the objection; in addition, to preserve error, a party's argument on appeal must comport with its argument to the trial court. Rules App.Proc., Rule 33.1(a).

Cases that cite this headnote

**[31]** **Workers' Compensation** 🗝 Fees on appeal or proceedings to set aside award

Labor Code section providing attorney fees to a workers' compensation death benefit claimant when an insurer appeals also permits claimant to recover the attorney's fees incurred in preparing for and attending the trial court's hearing on her reasonable and necessary attorney's fees. V.T.C.A., Labor Code § 408.221.

1 Cases that cite this headnote

**[32]** **Workers' Compensation** &#128273; Fees on appeal or proceedings to set aside award

Workers' compensation death benefit claimant incurred attorney's fees as a result of insurer's appeal, and insurer thus was liable for reasonable and necessary attorney fees under Labor Code section providing attorney fees to a workers' compensation death benefit claimant who prevails when an insurer appeals, where claimant was required to prepare and submit written evidence to the trial court supporting her request for attorney's fees, and because the parties could not agree on the amount of those fees, her attorney was required to set and attend a trial court hearing on that matter. V.T.C.A., Labor Code § 408.221(c).

2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*90** David L. Brenner, Austin, for appellant.

Peggy M. Campbell, Peter Michael Kelly, Thomas James Barnes, Houston, for appellee.

Panel consists of Justices YATES, ANDERSON, and BROWN.

## OPINION

JOHN S. ANDERSON, Justice.

In this worker's compensation death benefits judicial review proceeding, appellant, Transcontinental Insurance Company, appeals a judgment in favor of appellee, Joyce Crump. Finding no error, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellee was married to Charles Crump, a longtime employee of Frito Lay. Mr. Crump worked in the packaging department at Frito Lay and on May 9, 2000, while training another employee, he struck his right knee on a tape dispensing machine. Because his knee injury occurred at work, Mr. Crump sought, and received, workers' compensation benefits from appellant. Beginning with his workplace knee injury, Mr. Crump's physical condition began a downward spiral until he died on January 23, 2001, only eight months after the injury. The overarching dispute in this appeal is whether Mr. Crump's May 9, 2000 knee injury was a producing cause of his death.

### A. Mr. Crump's Medical History Prior to May 9, 2000

Mr. Crump received a kidney transplant in 1975. To help prevent his body from rejecting the transplanted kidney, Mr. Crump was prescribed immunosuppressant drugs. While these drugs helped his body to not reject his transplanted kidney, they also made it less likely he would be able to resist an infection if it should occur. In addition, in 1978, Mr. Crump contracted meningitis, and in 1994, Mr. Crump had his gallbladder removed. Despite these medical issues, appellee testified that before Mr. Crump's May 9, 2000 work injury, he was healthy, active, had no problems, and, with the exception of his gallbladder **\*91** surgery, rarely missed a day from work. Appellee also testified neither she nor her husband were aware he had hepatitis C or any liver or kidney problems. Both medical doctor expert witnesses who testified also confirmed Mr. Crump's medical records did not

reveal, besides his transplanted kidney and immunosuppressant therapy, any medical issues immediately prior to the May 9, 2000 workplace injury.

## B. Mr. Crump's Medical History From May 9, 2000 Until His Death

After striking his right knee on the tape machine, Mr. Crump came home and was in some pain. According to appellee, Mr. Crump complained his leg was bothering him and he laid around more than normal. Because his leg continued to bother him and he was running a fever, Mr. Crump went to Dr. Khalid Chaudhary about his leg injury on May 15, 2000. Dr. Chaudhary diagnosed a contusion to the right knee and a large hematoma [1] on the inside area of the knee and lower thigh. Dr. Chaudhary prescribed analgesics and antibiotics. With this initial visit to Dr. Chaudhary, Mr. Crump began an eight month medical odyssey that included at least eighty days in three different hospitals, continuous treatment with antibiotics, and finally ended with his death on January 23, 2001.

[1]     A hematoma is a bruise where you have bleeding into soft tissue.

Mr. Crump saw Dr. Chaudhary three more times because his knee injury would not resolve. On June 6, 2000, because Mr. Crump was complaining of fever and burning pain in his right leg, Dr. Chaudhary, concerned a secondary infection had developed in the contused area of Mr. Crump's right leg, referred him to Dr. Camille George, an orthodpedic doctor.

Mr. Crump saw Dr. George the next day. Mr. Crump complained of increased pain, swelling, fever, and warmth in his right leg and ankle. Upon examining Mr. Crump, Dr. George noted extensive swelling and warmth along his inner thigh, calf, and ankle. Her impression was Mr. Crump had cellulitis [2] of the right thigh, the same area where the May 9th injury occurred. After conservative treatment failed, on June 14, 2000, Dr. George recommended immediate hospitalization for the administration of intravenous antibiotics and blood cultures.

[2]     Cellulitis is a skin inflammatory infectious disease process.

Mr. Crump was admitted to Polly Ryon Hospital on June 14, 2000, where he remained until he was transferred to Memorial Southwest Hospital on June 23, 2000, for additional investigation. At the time he was transferred to Memorial Southwest, the doctors diagnosed Mr. Crump with cellulitis of both legs, hepatitis C, [3] a history of kidney transplant, renal insufficiency, and hemochromatosis. [4] Mr. Crump was hospitalized at Memorial Southwest from June 23 until June 26, 2000. At Memorial Southwest, the doctors thought Mr. Crump had a broad, opportunistic infection. According to Dr. John Daller, a transplant surgeon and one of Mr. Crump's many treating physicians, opportunistic infections tend to develop in people who are immunosuppressed. Organisms such as bacteria, fungi, or viruses that a normal person would not have a **\*92** problem with, can make an immunosuppressed person very sick. Dr. Daller also explained the fact a person, such as Mr. Crump, is on immunosuppression therapy can delay the proper diagnosis of an infection. According to Dr. Daller, because a person's immune system is suppressed, the person's body does not react the way a normal person's would and it does not immediately produce pus in the infected area. Thus, the immunosuppression drugs can mask not only the existence of an infection, but also the severity of the infection.

[3]     Hepatitis C is a viral infection that primarily affects the liver. It is a very indolent, chronic infection that can be quiescent and not cause any clinical problems in some people, but in others it can be a slowly progressive disorder that leads to scarring of the liver and cirrhosis. Hepatitis C can be lethal.

[4]     Hemochromatosis is an iron storage disease in the liver.

On June 26, 2000, Mr. Crump was transferred to the University of Texas Medical Branch, Galveston ("UTMB") where Dr. Daller had agreed to treat him. At the time he was transferred, the physicians at Memorial Southwest believed Mr. Crump had sepsis or a body-wide infection with persistent fever. The Memorial Southwest doctors believed the source of the sepsis was Mr. Crump's lungs. On July 3rd, a blood culture showed Mr. Crump had a yeast infection, a type of fungal infection. So, in

addition to the cellulitis in his right leg, Mr. Crump was now suffering from a yeast infection in his blood. According to Dr. Daller, with an immunosuppressed patient, the effort is to keep the patient balanced between sufficient immunosuppression to avoid rejection of the transplanted organ and, at the same time, avoid infection. When the immunosuppressed patient becomes infected, the balance is tipped and it can lead to worsening organ function. To deal with the yeast infection, Dr. Daller prescribed amphotericin B infusions. [5] Dr. Daller also testified that, other than the immunosuppression drug therapy, he was not aware of any ongoing health problems Mr. Crump might have been experiencing prior to this May 9th knee injury. When UTMB discharged Mr. Crump on July 13, 2000, he still had cellulitis of his lower right leg, an infection of the blood from yeast, and there was concern the leg infection might include the yeast infection. Also, because of his critical illness (he had spent time in the intensive care unit at UTMB), Mr. Crump suffered a period of renal failure and his liver function had deteriorated because of his infection.

[5]      A potential side effect of amphotericin B is renal toxicity.

Following his discharge on July 13th, Mr. Crump went back to UTMB from July 22 through July 25, 2000, for angina-like chest pain and again from July 28 until August 4, 2000. During the late July hospitalization, Dr. Steve Weinman, a gastroenterologist, examined Mr. Crump. According to Dr. Weinman, Mr. Crump appeared to be a case of decompensation of HCV-associated cirrhosis of the liver [6] which was triggered by his recent bout of sepsis/fungemia. According to Dr. Daller, Mr. Crump had chronic liver disease but was functioning well with it before the May 9th knee injury. But, once Mr. Crump injured his knee and developed the infection in his leg, this caused a decompensation, or worsening, of his liver disease.

[6]      Cirrhosis of the liver is a process where an agent, which can be viral in nature, drugs, or autoimmune processes, damages the liver. The end result of cirrhosis is a scarring of the normal liver tissue, which reduces its proper functioning. Cirrhosis is a process that usually develops over a long period of time.

On September 16, 2000, UTMB admitted Mr. Crump because of swelling in his right lower leg. He would not be discharged until October 3, 2000. During this hospitalization, Dr. Daller determined Mr. Crump had developed an abscess in the area of the May 9th injury. On September 26, 2000, Dr. Daller took Mr. Crump to the **\*93** operating room where he made an incision and drained purulent material and obtained blood cultures. Because of concern over the possible existence of infection in the wound, Dr. Daller left the wound open to heal from the inside out. This wound had still not healed when Mr. Crump died nearly four months later. The blood cultures taken from Mr. Crump's thigh grew out as histoplasmosis. Histoplasmosis is an airborne fungus endemic to certain areas, including large portions of Texas. A person is normally exposed to the fungus by breathing it, and the fungus then colonizes the lungs and becomes resident flora. Most people exposed to histoplasmosis never develop an infection or any other symptoms; however, people with suppressed immune systems, such as Mr. Crump, are more likely to develop an infection once exposed. Even in people who are immune suppressed, once exposed, they can go years without an infection developing because, according to Dr. Daller, histoplasmosis usually requires a triggering event for an infection to develop. Dr. Daller opined Mr. Crump's May 9th knee injury served as that triggering event. Also, it is possible for the histoplasmosis infection to spread through the body either through the blood or the lymphatic system. Finally, cellulitis can be a side effect of a blood borne infection.

Mr. Crump entered UTMB again between October 13 and October 20, 2000, because of persistent fever and sinus pain. He also went to the Polly Ryon Hospital Emergency Room on October 22, 2000, with a nose bleed. UTMB admitted Mr. Crump again from November 6 until November 18, 2000, because he was experiencing seizures. When UTMB discharged Mr. Crump, his infection had still not resolved as he was taking amphotericin B, an anti-fungal agent, and vancomycin, an antibiotic. The doctors also instructed Mr. Crump to continue changing the dressing on the debridement procedure wound in his leg. Mr. Crump visited a UTMB clinic on January 10, 2001 complaining of back pain.

On January 22, 2001, appellee took Mr. Crump to the Polly Ryon Hospital emergency room. Mr. Crump went to the emergency room with complaints of pain in his right lower back and vomiting. It was also noted Mr. Crump had been running a high fever and was disoriented for several days before coming to the hospital. One of the doctors treating Mr. Crump noted he had been sick since May 2000 with an infection in his right leg. The Polly Ryon medical records also indicate Mr. Crump was experiencing

very low blood pressure. While still in the emergency room, Mr. Crump vomited several times and had to be resuscitated. Mr. Crump was transferred to the Intensive Care Unit where he died on January 23, 2001. Mr. Crump was 43 at the time of his death.

Following Mr. Crump's death, the Harris County Medical Examiner performed an autopsy and found that propoxyphene [7] toxicity was the cause of death. According to Dr. Daller, propoxyphene toxicity can be caused in two ways: (1) an overdose, or (2) the failure of the patient's liver to properly metabolize the drug allowing it to build up in the body over time. The medical examiner also made the following pathological findings: (1) propoxyphene toxicity, (2) atherosclerotic cardiovascular disease, (3) chronic renal failure with intact renal transplant and atrophic native kidneys, and (4) liver fibrosis with ascites and hyposplenia. The death certificate lists **\*94** the cause of death as cardiorespiratory arrest with cirrhosis and ileus. [8]

[7]     Propoxyphene is a component of the painkiller Darvocet, which Mr. Crump was receiving.

[8]     An ileus is a blockage of the intestine.

## C. The Administrative and Trial Proceedings

Contending Mr. Crump's May 9th injury was a producing cause of his death, appellee sought workers' compensation death benefits. On July 11, 2002, the Appeals Panel of the Texas Workers' Compensation Commission (now the Division of Workers' Compensation of the Texas Department of Insurance) affirmed a contested case hearing officer's decision that Mr. Crump's May 9, 2000 work-related injury was a producing cause of his death. Appellant then sought judicial review of the Appeals Panel decision pursuant to chapter 410 of the Texas Labor Code. The party seeking judicial review of the workers' compensation Appeals Panel decision has the burden of proof by a preponderance of the evidence. Tex. Lab.Code Ann. § 410.303 (Vernon 2006). Thus, in seeking judicial review of the Appeals Panel decision, appellant had the burden to prove, by a preponderance of the evidence, that Mr. Crump's May 9, 2000 workplace injury was not a producing cause of his injury.

Prior to trial, appellant sought to exclude the testimony of appellee's medical experts, Dr. Daller. Dr. Daller is a transplant surgeon who treated Mr. Crump during his hospitalizations at UTMB. Appellant argued Dr. Daller's opinion regarding the role Mr. Crump's May 9, 2000 knee injury played in his death was not based on a reliable foundation and should be excluded. The trial court denied appellant's motion.

In addition to appellee, two medical experts testified during the trial: Dr. Daller and Dr. Jason Hunt, appellant's retained medical expert. Dr. Daller, in addition to testifying on the contents and meaning of Mr. Crump's medical records, testified Mr. Crump's work injury was a producing cause of his death because it incited or triggered a series of events that led to his death. In Dr. Daller's opinion, Mr. Crump's knee injury provided the site for the development of an infection, the existence of which was confirmed by blood cultures taken from the injured area, which he was unable to defeat because of the long term effects of his immunosuppressant drug therapy necessitated by his kidney transplant. Dr. Daller further opined this infection negatively impacted the functioning of his organs, including his liver and kidney, which ultimately caused his death.

On direct examination, Dr. Hunt opined Mr. Crump's May 9, 2000 knee injury was not a producing cause of his death. In Dr. Hunt's opinion, Mr. Crump's death was caused by the effects of his chronic health issues including his kidney transplant, hepatitis C, and diabetes. According to Dr. Hunt, Mr. Crump would have died on January 23, 2001, even if he had not injured his knee on May 9, 2000. In forming his opinion, Dr. Hunt relied on (1) the lack of objective medical evidence proving Mr. Crump had a bacterial infection; (2) the autopsy report does not mention cellulitis, histoplasmosis, or the knee injury as a producing cause of the death; (3) the accepted method by which histoplasmosis enters the body is through the lungs and not an injury such as Mr. Crump's knee injury; (4) the fact the four pathological findings listed in the autopsy (propoxyphene toxicity, artherosclerotic cardiovascular disease, chronic renal failure, and liver fibrosis with ascites) are problems or diseases that normally require significant time to negatively impact organ function; (5) his opinion the knee injury would not **\*95** have directly resulted in the toxic levels of propoxyphene found in Mr. Crump's body during the autopsy; and (6) the death certificate did not include a notation that Mr. Crump's death was the result of a work-related injury.

Following his direct testimony, Dr. Hunt was extensively cross-examined by appellee. During this cross-examination, Dr. Hunt refused to disavow his deposition testimony in which he stated the hematoma and contusion on Mr. Crump's leg may have provided a place for the infection to develop and it was possible the wound site was infected. Dr. Hunt also admitted: (1) there was nothing in the medical records to indicate Mr. Crump was experiencing symptoms associated with hepatitis C, or liver dysfunction, prior to his knee injury; (2) his original opinion was that Mr. Crump died as a result of a heart attack or arrhythmia, but he could not tell if there was any evidence in the autopsy report supporting his original opinion; (3) he could not prove Mr. Crump had a bacterial infection but he also could not prove he did not; (4) Mr. Crump received antibiotic therapy from shortly after his knee injury until his death; (5) Mr. Crump's doctors acted correctly when they treated him for infections even if they could not prove through objective testing that he had a bacterial infection; (6) he never said Mr. Crump's wound was never infected, only that he cannot tell if it was infected; (7) there can be more than one contributing factor to a death; (8) the autopsy report noted Mr. Crump's leg wound was still open and emitting a strong odor; (9) Mr. Crump's knee injury never completely healed before his death; (10) a person can have hepatitis C, liver disease, and kidney problems and not be aware of those issues; (11) the histoplasmosis in Mr. Crump's body was lying dormant prior to his knee injury; (12) a bruise can become infected and the medical records indicate Mr. Crump's doctors suspected the bruise was infected within ten days, the normal time for an infection to develop; and (13) Mr. Crump's wound was a contributing factor to his death.

Finally, both appellant and appellee addressed an error on Dr. Hunt's November 12, 2001 report. In his report, beneath his signature, Dr. Hunt stated he was a board certified transplant surgeon. Dr. Hunt admitted he was not a transplant surgeon. He also admitted he wrote the report and proofread it. Finally, Dr. Hunt testified he did not know how the assertion made it onto his report.

The case was submitted to the jury with a single issue.[9] The jury determined Mr. Crump's May 9, 2000 knee injury was a producing cause of his death. Appellee did not submit the issue of her attorney's fees to the jury and instead, over the objection of appellant, submitted the recovery of attorney's fees to the trial court. The trial court awarded appellee **\*96** $160,005.23 for attorney's fees and expenses incurred through the completion of the trial. The trial court also awarded appellee $2,812.50 for attorney's fees incurred in the preparation for and participation in the hearing on the recovery of attorney's fees. This appeal followed.

[9]    The jury question reads:
> **QUESTION NO. 1**
> You are instructed that the Texas Workers' Compensation Commission found that Charles Crump's compensable right knee injury of May 9, 2000 resulted in his death on January 23, 2001.
> "Injury" means damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm.
> "Producing Cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question. There may be more than one producing cause.
> **WAS CHARLES CRUMP'S MAY 9, 2000 INJURY A PRODUCING CAUSE OF HIS DEATH?**
> Answer "Yes" or "No."
> **Answer: Yes**

### DISCUSSION

Appellant raises seven issues on appeal which can be divided into three general categories. Issues one and three address the sufficiency of the evidence. In issue two, appellant contends the trial court improperly instructed the jury on producing cause. In issues four through seven, asserting various arguments, appellant challenges the trial court's award of attorney's fees to appellee. We address each category in turn.

### I. Was Dr. Daller's Opinion Reliable?

In its first issue, appellant argues the evidence is legally and factually insufficient to support the jury's verdict. However, appellant's sufficiency challenge is based on the premise Dr. Daller's testimony constitutes no evidence because it was not based on a reliable foundation and was inadmissible, thus making Dr. Hunt's testimony uncontroverted. Therefore, before addressing appellant's first issue, we examine the third issue challenging the reliability of Dr. Daller's expert testimony.

## A. The Standard of Review

 **[1]** While evidentiary rulings, including rulings on expert testimony, are normally reviewed for an abuse of discretion, when the trial court admits expert testimony and an appellant challenges the expert testimony as no evidence, we consider whether the expert testimony is reliable under a *de novo* standard of review. *Exxon Corp. v. Makofski,* 116 S.W.3d 176, 182 (Tex.App.–Houston [14th Dist.] 2003, pet. denied); *Mo. Pac. R.R. Co. v. Navarro,* 90 S.W.3d 747, 750 (Tex.App.–San Antonio 2002, no pet.).

## B. Dr. Daller's Causation Opinion Was Based on a Reliable Foundation

Appellant argues Dr. Daller's expert testimony connecting Mr. Crump's May 9, 2000 knee injury to his death in January 2001 constitutes no evidence because it was not based on a reliable foundation. To evaluate the reliability of Dr. Daller's causation opinion, appellant asserts we must apply the six factors first adopted by the Texas Supreme Court in *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995). [10] We disagree. [11]

[10]   The six *Robinson* factors include: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995).

[11]   Appellant, citing to the *Navarro* case, contends Dr. Daller was required to exclude other plausible causes of Mr. Crump's death with reasonable certainty. *Mo. Pac. R.R. Co. v. Navarro,* 90 S.W.3d 747, 750 (Tex.App.–San Antonio 2002, no pet.). Once again, we disagree. *Navarro* is distinguishable from this case as it was a toxic tort case dependent upon epidemiological expert testimony to establish that exposure to diesel exhaust fumes could cause the plaintiff's bone marrow cancer. *Id.* at 754. In addition, in support of its proposition that an expert must exclude other plausible causes, the *Navarro* court cited *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex.1997), another toxic tort case in which the plaintiff had to rely on epidemiological studies to establish causation. Finally, in a workers' compensation case, the law provides there can be more than one producing cause of the compensable injury or death. *See Flores v. Employees Ret. Sys. of Tex.,* 74 S.W.3d 532, 549 (Tex.App.–Austin 2002, pet. denied).

 **\*97** **[2]** Instead of applying the six *Robinson* factors, in this case, where Dr. Daller's opinion was based on his experience and training in his field, we consider whether there is an "analytical gap" between the expert's opinion and the bases on which the opinion was founded. *Taylor v. Am. Fabritech, Inc.* 132 S.W.3d 613, 619 (Tex.App.–Houston [14th Dist.] 2004, pet. denied) (citing *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 727 (Tex.1998)).

 **[3]** Dr. Daller utilized a differential diagnosis in reaching his conclusions regarding the connection between Mr. Crump's knee injury and his death. A differential diagnosis is a clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes. *Coastal Tankships, U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 604 (Tex.App.–Houston [1st Dist.] 2002, pet. denied). In a differential diagnosis, a doctor compares a patient's symptoms to symptoms associated with known diseases, conducts physical examinations of the patient, collects data on the patient's history and illness, and then analyzes that data until reaching a final diagnosis and makes a decision on how to properly treat the patient's injury or illness. *Id.* Differential diagnosis is the basic method of internal medicine and enjoys widespread acceptance in the medical community. *Id.* When properly conducted, the technique has important, non-judicial uses and is generally accepted as valid by the medical community and has been subjected to use, peer review, and testing. *Id.* Even with all of the advances of medical science, the practice of medicine remains an art. *Id.* A properly conducted and explained differential diagnosis is not "junk science." *Id.* Medical doctors routinely use differential diagnosis as a sufficient basis on

which to prescribe medical treatment with potential life-or-death consequences. *Id.* Even Dr. Hunt agreed Mr. Crump's treating physicians, including Dr. Daller, acted correctly when they used a differential diagnosis to treat Mr. Crump and that he would have handled Mr. Crump's care the same way. In *Coastal Tankships,* the First Court of Appeals determined a causation opinion by a treating physician developed using a differential diagnosis was based on a reliable foundation and was therefore admissible. *Id.* We agree with the First Court of Appeals and hold Dr. Daller's causation opinion, developed through a differential diagnosis while treating Mr. Crump, does not contain an "analytical gap" between his opinion and the bases on which his opinion was founded. Therefore, we hold Dr. Daller's opinion was based on a reliable foundation and was properly admitted into evidence. We overrule appellant's third issue.

## II. Was the Evidence Legally and Factually Sufficient?

In appellant's first issue, appellant contends (1) Dr. Daller's opinion was not based on a reliable foundation and therefore legally constitutes no evidence; (2) making Dr. Hunt's opinion testimony uncontroverted; (3) which makes the evidence legally and factually insufficient to support the jury's verdict.

### A. The Standard of Review

In this judicial review proceeding, appellant, as the party appealing from the workers' compensation Appeals Panel decision, had the burden of proof to establish that **\*98** Mr. Crump's May 9, 2000 knee injury was not a producing cause of his death. Tex. Lab.Code Ann. § 410.303.

 **[4]**  **[5]**  In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports the verdict. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We must credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 807, 827. If the evidence falls within the zone of reasonable disagreement, we cannot substitute our judgment for that of the fact finder. *Id.* at 822. Unless there is no favorable evidence, or if the contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite, we must affirm. *See id.* at 810–11. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. When, as in this case, an appellant attacks the legal sufficiency of an adverse finding on an issue for which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, only then will the reviewing court examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The issue should be sustained only if the contrary position is conclusively established. *Id.* Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller,* 168 S.W.3d at 816. Evidence is no more than a scintilla when it is so weak as to do no more than create a mere surmise or suspicion of its existence. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). The fact finder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller,* 168 S.W.3d at 819.

 **[6]**  **[7]**  In a factual sufficiency review, we consider and weigh all the evidence supporting and contradicting the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Francis,* 46 S.W.3d at 242. We will set aside the finding only if it so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 616 (Tex.App.–Houston [14th Dist.] 2001, pet. denied). We are not a fact finder. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Id.* If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support

of the verdict; we need not do so when affirming a jury's verdict. *Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex.2006) (per curiam).

## B. The Evidence is Legally and Factually Sufficient

**\*99** The entire foundation of both appellant's legal and factual sufficiency arguments rests upon the contention Dr. Daller's expert testimony was not reliable, was inadmissible, and therefore constitutes no evidence. However, we have already determined Dr. Daller's expert opinion was reliable and was properly admitted by the trial court. Therefore, it must be considered in our sufficiency review.

**[8]** Since appellant had the burden of proof at trial, in our legal sufficiency review, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Francis,* 46 S.W.3d at 241. We need look no farther than Dr. Daller's testimony, detailed above, explaining how Mr. Crump's May 9, 2000 knee injury contributed to his death. This constitutes some evidence supporting the jury's finding. We hold the evidence is legally sufficient. For the same reason, we determine the jury's finding is not against the great weight and preponderance of the evidence. Accordingly, the evidence is factually sufficient. We overrule appellant's first issue.

## III. Did the Trial Court Improperly Instruct the Jury on Producing Cause?

In its second issue, appellant contends the trial court improperly defined "producing cause" [12] in the jury charge. We disagree.

[12] Appellant submitted, and the trial court rejected, the following proposed instruction: " 'Producing cause' means that cause, which in a natural and continuous sequence, produces death and without which, the death would not have occurred."

## A. The Standard of Review

**[9]** **[10]** **[11]** **[12]** **[13]** A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277. A proper jury instruction is one that assists the jury and is legally correct. *Town of Flower Mound v. Teague,* 111 S.W.3d 742, 759 (Tex.App.–Fort Worth 2003, pet. denied). While this court normally reviews the trial court's decisions as to how to charge the jury under an abuse of discretion standard, once the trial court has decided to define a term in the charge for the jury, this court determines whether the definition misstates the law using a *de novo* standard of review. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 525 (Tex.2003). So long as the charge is legally correct, a trial judge is accorded broad discretion regarding the submission of questions, definitions, and instructions to the jury. *Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 664 (Tex.1999). Therefore, we will review the trial court's legally correct definitions, instructions, and questions for an abuse of discretion. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000). We may not reverse a judgment for error in the submission of jury instructions, definitions, or questions unless we conclude the error probably caused the rendition of an improper judgment. *Kiefer v. Cont'l Airlines, Inc.,* 10 S.W.3d 34, 37 (Tex.App.–Houston [14th Dist.] 1999, pet. denied). To determine whether an improper jury charge constitutes reversible error, we consider the pleadings, the evidence, and the charge in its entirety. *Id.*

## B. The Trial Court Properly Defined "Producing Cause"

**[14]** **[15]** **[16]** Courts liberally construe workers' compensation legislation to carry out its purpose of compensating injured workers and their dependents. *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999). Because of this liberal interpretation, **\*100** a workplace accident or disease is considered to be a producing cause even if it is not a substantial factor in bringing about the injury, disability, or illness. *Flores v. Employees Ret. Sys. of Tex.,* 74 S.W.3d 532, 549 (Tex.App.–Austin 2002, pet. denied). Therefore, a workplace injury need not be the sole or primary cause in bringing about the disability or illness; rather, as long as the occupational injury is a producing cause of the disability or illness, there is a sufficient causal link under the workers' compensation scheme. *Id.* An unrelated condition or injury may even be the primary factor in causing an employee's disability or death and still not preclude a recovery of workers' compensation benefits. *Id.* In addition, a pre-existing condition will not preclude compensation under the system as long as a workplace accident contributed to the injury in some

amount. *INA of Tex. v. Howeth,* 755 S.W.2d 534, 536–37 (Tex.App.–Houston [1st Dist.] 1988, no writ). It is settled law in Texas that in a workers' compensation case, there may be more than one producing cause of an injury, incapacity, or death. *Marts v. Transp. Ins. Co.,* 111 S.W.3d 699, 703 (Tex.App.–Fort Worth 2003, pet. denied); *Tex. Workers' Comp. Ins. Fund v. Simon,* 980 S.W.2d 730, 736 (Tex.App.–San Antonio 1998, no pet.); *Nat'l Farmers Union Prop. and Cas. Co. v. Degollado,* 844 S.W.2d 892, 897 (Tex.App.–Austin 1993, writ denied); *Tex. Employers' Ins. Assoc. v. Charles,* 381 S.W.2d 664, 668 (Tex.Civ.App.– Texarkana 1964, writ ref'd n.r.e.).

 **[17]**    Here, the trial court defined "producing cause" as "an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question. There may be more than one producing cause." We conclude this definition accurately states the law as applied to "producing cause" in a workers' compensation case and the trial court did not abuse its discretion when it defined "producing cause" in this manner and rejected appellant's proposed definition. [13]  *See Tex. Employers' Ins. Assoc. v. Fuentes,* 597 S.W.2d 811, 812 (Tex.Civ.App.–Eastland 1980, writ ref'd n.r.e.) (approving identical language as an accurate definition of "producing cause" in a workers' compensation case). We overrule appellant's second issue.

[13]       After the parties submitted their briefs in this matter, the Texas Supreme Court decided *Ford Motor Co. v. Ledesma,* 242 S.W.3d 32 (Tex.2007). In *Ledesma,* the Supreme Court determined the correct definition of "producing cause" in a products liability action as being a substantial factor in bringing about an injury, and without which the injury would not have occurred. *Ledesma,* 242 S.W.3d at 46. We find *Ledesma* distinguishable and inapplicable to this appeal because it is a products liability case which requires the cause to be a substantial factor of the event in issue, a requirement absent from a workers' compensation case.

## IV. The Texas Constitution Does Not Guarantee a Jury Trial on the Issue of Attorney's Fees in a Workers' Compensation Case

The Texas Constitution provides two guarantees of the right to trial by jury. Article I, section 15 provides: "The right to trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency...." Tex. Const. art. I, § 15. The second provision is found at article V, section 10 and it provides: "In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury...." *Id.* art. V, § 10. In its fourth issue, appellant contends section 408.221 of the Texas Labor Code violates its constitutional right to **\*101**  have a jury resolve the contested issue of appellee's reasonable and necessary attorney's fees. According to appellant, this statute violates both article I, section 15 and article V, section 10 of the Texas Constitution. We disagree.

### A. The Standard of Review

 **[18]**    When reviewing the constitutionality of a statute, we begin with the presumption that the statute is constitutional. *Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003); *See* Tex. Gov't Code Ann. § 311.021(1) (Vernon 2005). The wisdom or expediency of the law is the legislature's prerogative, not ours. *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 520 (Tex.1995).

 **[19]**    **[20]**    The party challenging a statute's constitutionality has the burden of proving the statute fails to meet constitutional requirements. *Walker,* 111 S.W.3d at 66. In challenging the constitutionality of a statute, a party may show a statute is unconstitutional on its face or as applied to that party. *Garcia,* 893 S.W.2d at 518 n. 16. In this appeal, appellant contends section 408.221 of the Texas Labor Code is unconstitutional on its face; therefore, appellant must show that the statute, by its terms, always operates unconstitutionally. *Id.* at 518.

### B. Does Section 408.221 Violate Article I, Section 15 of the Texas Constitution?

At trial, appellee argued, and the trial court accepted, that section 408.221 of the Texas Labor Code required the trial court to determine the amount of reasonable and necessary attorney's fees appellee was entitled to recover. Appellant contends on appeal this interpretation of section 408.221 violates article I, section 15 of the Texas Constitution. Section 408.221, provides, in pertinent part:

(b) Except as otherwise provided, an attorney's fee under this section is based on the attorney's time and expenses according to written evidence presented to the division or court.

(c) An insurance carrier that seeks judicial review ... of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, ... death benefits is liable for reasonable and necessary attorney's fees ... incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought.... If the carrier appeals multiple issues and the claimant prevails on some, but not all, of the issues appealed, the court shall apportion and award fees to the claimant's attorney only for the issues on which the claimant prevails. In making that apportionment, the court shall consider the factors prescribed by Subsection (d).

Tex. Lab.Code Ann. § 408.221 (Vernon 2006).

 **[21]**    **[22]**    Article I, section 15 provides the right to a jury trial for those actions or analogous actions which were tried by a jury when the Texas Constitution was adopted in 1876. *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 636 (Tex.1996). Therefore, article I, section 15 only applies if, in 1876, a jury would have been allowed to try the action or analogous action. *Id.* The Workers' Compensation Act is a substitute for the common law negligence remedy, which was an action tried to a jury in 1876. *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 527 (Tex.1995). Therefore, at least with regard to the recovery of income and death benefits, the Workers' Compensation Act is analogous to a claim for which the right to a jury trial is constitutionally preserved. *Id.* However, the Supreme Court did not  **\*102**  address the issue of attorney's fees in *Garcia.*

 **[23]**    **[24]**    Attorney's fees are not recoverable in a negligence suit. *New Amsterdam Cas. Co. v. Tex. Indus., Inc.,* 414 S.W.2d 914, 915 (Tex.1967). Therefore, statutory provisions providing for the recovery of attorney's fees in a negligence or analogous action, are in derogation of the common law. *Id.* Because there was no common law action to recover attorney's fees under a common law negligence claim, we conclude a claim for attorney's fees brought pursuant to section 408.221 is not an action or analogous action that was tried to a jury in 1876. Accordingly, article I, section 15 does not apply to appellee's action to recover attorney's fees.

## C. Does Section 408.221 Violate Article V, Section 10 of the Texas Constitution?

 **[25]**    Article V, section 10's guarantee of a jury trial does not apply to an appeal from an administrative decision such as appellant's. *Garcia,* 893 S.W.2d at 527.

Because article I, section 15, and article V, section 10 do not apply to appellee's action to recover attorney's fees pursuant to section 408.221, the trial court's denial of appellant's request for a jury trial cannot violate those constitutional provisions. We overrule appellant's fourth issue.

## V. Appellee Did Not Waive Her Claim for Attorney's Fees

In issue five, appellant contends appellee waived her claim for attorney's fees when she failed to submit the issue of her reasonable and necessary attorney's fees to the jury for resolution. Once again, we disagree.

## A. The Standard of Review

The availability of attorney's fees under a particular statute is a question of law for the court. *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999). Therefore, we review this issue *de novo. El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999).

 **[26]**    **[27]**    **[28]**    We construe statutory provisions to ascertain and effectuate legislative intent, and we ascertain that intent by first looking to the plain and common meaning of the statute's words. *Tex. Mut. Ins. Co. v. Sonic Sys. Int'l, Inc.,* 214 S.W.3d

469, 476 (Tex.App.–Houston [14th Dist.] 2006, pet. denied). We must also view a statute's terms in context and give them full effect. *Id.* When examining the provisions within the Texas Workers' Compensation Act, we should keep in mind the comprehensive nature of the Act. *Id.* If the meaning of the statutory language is unambiguous, a court must interpret it according to its terms consistent with other provisions in the statute. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). A court also considers the objective the law seeks to obtain and the consequences of a particular construction. *Id.* In our construction, we must presume the entire statute is intended to be effective, a just and reasonable result is intended, a result feasible of execution is intended, and the public interest is favored over private interest. *See* Tex. Gov't Code Ann. § 311.021 (Vernon 2005); *Compass Bank v. Bent Creek Inv., Inc.,* 52 S.W.3d 419, 424 (Tex.App.–Fort Worth 2001, no pet.). A court reads every word as if it were deliberately chosen and must presume that omitted words were excluded purposefully. *See Cornyn v. Universe Life Ins. Co.,* 988 S.W.2d 376, 379 (Tex.App.–Austin 1999, pet. denied). Construction of a statute that would render a provision useless is not favored by law. *Carson v. Hudson,* 398 S.W.2d 321, 323 (Tex.Civ.App.-Austin 1966, no writ).

### *103  B. Because Section 408.221 States the Trial Court Will Determine the Amount of Attorney's Fees, Appellee Did Not Waive Her Claim

 [29]   By its plain language, section 408.221 provides the amount of attorney's fees will be determined by the trial court according to the written evidence submitted to it. Tex. Lab.Code Ann. § 408.221(b). If we were to accept appellant's argument that a workers' compensation claimant must submit the issue of attorney's fees sought pursuant to section 408.221 to the jury, we would render a large portion of the statute's language meaningless. Therefore, because appellee was not required to submit the issue of her reasonable and necessary attorney's fees to the jury for resolution, she did not waive her claim for attorney's fees when she did not do so. We overrule appellant's fifth issue.

### VI. Appellant Waived Its Issue On Appeal Contending It Was Entitled to a Plenary Hearing on Appellee's Attorney's Fees

In its sixth issue, appellant argues appellee waived her claim for attorney's fees because she did not present live testimony at a plenary hearing. We do not reach the merits of this issue because appellant waived its claim of waiver.

 [30]   To preserve error, a timely, specific objection must be made. Tex.R.App. P. 33.1(a). Rule 33.1(a) requires not only that a party act timely when objecting, but also state with sufficient specificity the grounds for the objection so the trial court can act on the objection. *Hoxie Implement Co. v. Baker,* 65 S.W.3d 140, 145 (Tex.App.–Amarillo 2001, pet. denied). In addition, to preserve error, a party's argument on appeal must comport with its argument to the trial court. *Wohlfahrt v. Holloway,* 172 S.W.3d 630, 639–40 (Tex.App.–Houston [14th Dist.] 2005, pet. denied).

In this issue, appellant argues it was entitled to a plenary hearing where the trial court would hear live testimony on the issue of attorney's fees. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex.1992) (explaining a plenary hearing is a hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit). However, the only objection appellant lodged with the trial court on its handling of appellee's attorney's fees was an objection that it was entitled to a jury trial on that issue. [14] This is, of course, a different basis than appellant's argument on appeal in this issue. Accordingly, appellant waived this issue on appeal. Tex.R.App. P. 33.1; *Wohlfahrt,* 172 S.W.3d at 639–40. We overrule appellant's sixth issue.

[14]    In its brief, appellant referenced a single page in the clerk's record and a small section of the reporter's record when addressing preservation of this issue. The clerk's record citation was to an exhibit cover sheet. The reporter's record citation was to a portion of the hearing on appellee's motion for new trial following the trial court granting appellant's motion for summary judgment based on deemed admissions. Neither record citation has any connection with appellant's plenary hearing issue.

### VII. Appellee Could Recover Attorney's Fees Incurred Preparing For and Attending the Hearing on Appellee's Attorney's Fees

 **[31]** In issue seven, appellant contends section 408.221 of the Texas Labor Code does not permit appellee to recover the attorney's fees incurred in preparing for and attending the trial court's hearing on appellee's reasonable and necessary attorney's fees. In response, appellee asserts she is entitled to recovery of those fees **\*104** and appellant's argument is based on a improper rewording of the statute. We agree with appellee.

### A. The Standard of Review

Because this issue addresses the availability of attorney's fees under a particular statute, the standard of review is the same as that stated in section V of this opinion.

### B. Under Section 408.221 Appellee is Entitled to Recover Those Attorney's Fees Incurred as a Result of Appellant's Appeal

 **[32]** Section 408.221(c) provides: "an insurance carrier that seeks judicial review ... of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, ... death benefits is liable for reasonable and necessary attorney fees ... incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought." Tex. Lab.Code Ann. § 408.221(c). Therefore, if the claimant successfully performs the predicate-prevailing on an issue on which the carrier sought judicial review—the claimant is entitled to attorney's fees incurred as a result of the appeal. Here, appellee, through her attorneys, was required to prepare and submit written evidence to the trial court supporting her request for attorney's fees. *See Id.* § 408.221(b). In addition, because the parties could not agree on the amount of appellee's reasonable and necessary attorney's fees, her attorney was required to set and attend a trial court hearing on that matter. We hold appellee incurred these attorney's fees as a result of appellant's appeal. *See Tex. Mun. League Intergovernmental Risk Pool v. Burns,* 209 S.W.3d 806, 819–20 (Tex.App.–Fort Worth 2006, no pet.) (affirming award of post-trial attorney's fees incurred by claimant as a result of worker's compensation insurance carrier's appeal).

In her brief, appellee candidly brought the Dallas court of appeals opinion in *Twin City Fire Ins. Co. v. Vega–Garcia,* 223 S.W.3d 762 (Tex.App.–Dallas 2007, pet. denied) to our attention. In *Vega–Garcia,* the Dallas court of appeals determined section 408.221(c) does not permit the recovery of attorney's fees incurred in pursuit of attorney's fees. *Id.* at 769–70. Because the insurance carrier non-suited its judicial review proceeding, we find *Vega–Garcia* distinguishable from this case and, therefore, it does not change our determination that appellee is entitled to recover those fees incurred as a result of the hearing on attorney's fees. *Id.* at 765. We overrule appellant's seventh issue.

### CONCLUSION

Having overruled all of appellant's issues on appeal, we affirm the trial court's final judgment.

### All Citations

274 S.W.3d 86

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**    Cruz v. Van Sickle,    Tex.App.-Dallas,    December 3, 2014

223 S.W.3d 762
Court of Appeals of Texas,
Dallas.

TWIN CITY FIRE INSURANCE COMPANY, Appellant

v.

Sharon VEGA–GARCIA, Appellee.

No. 05–05–01091–CV.    |    May 9, 2007.    |    Rehearing Overruled June 15, 2007.

**Synopsis**

**Background:** After insurance carrier brought action for judicial review of decision from the Texas Workers' Compensation Commission that workers' compensation claimant was entitled to supplemental income benefits, then nonsuited the action, claimant moved for reinstatement, or, in the alternative, a new trial, asserting entitlement to attorney fees. The 116th Judicial District Court, Dallas County, Robert H. Frost, J., granted claimant a new trial, then entered judgment on a jury verdict awarding claimant attorney fees. Insurance carrier appealed.

**Holdings:** The Court of Appeals, Douglas S. Lang, J., held that:

[1] claimant was the "prevailing party" in the nonsuited action, for purposes shifting the cost of claimant's attorney fees to insurance carrier;

[2] insurance carrier's nonsuit did not preclude claimant from continuing to pursue attorney fees;

[3] the Workers' Compensation Act did not entitle claimant to an award of attorney fees incurred in pursuit of attorney fees; and

[4] evidence was legally sufficient to support award of attorney fees to claimant.

Affirmed in part; reversed and rendered in part.

West Headnotes (18)

**[1]     Appeal and Error**  &#128273;  Cases Triable in Appellate Court

The availability of attorney fees under a particular statute is a question of law for the court; therefore, the Court of Appeals reviews the issue de novo.

1 Cases that cite this headnote

**[2]     Workers' Compensation**  &#128273;  Construction in favor of employee or beneficiary

The Texas Workers' Compensation Act should be liberally construed in favor of injured workers, and a strained or narrow construction of that Act is improper. V.T.C.A., Labor Code § 401.001 et seq.

Cases that cite this headnote

**[3]** **Workers' Compensation** ← Fees on appeal or proceedings to set aside award

Workers' compensation claimant was the "prevailing party" in action initiated by insurance carrier for judicial review of Workers' Compensation Commission decision awarding claimant supplemental income benefits, for purposes shifting the cost of claimant's attorney fees to insurance carrier under the Workers' Compensation Act, even though the insurance carrier nonsuited its claim prior to a judgment on the merits; claimant was required to defend against the carrier's challenge, and, after the nonsuit, claimant was in the same position she would have been in if she had prevailed on the merits. V.T.C.A., Labor Code §§ 408.147(c), 408.221(c).

5 Cases that cite this headnote

**[4]** **Workers' Compensation** ← Review

Insurance carrier's nonsuit of its claim seeking judicial review of Workers' Compensation Commission decision awarding workers' compensation claimant supplemental income benefits did not preclude claimant from continuing to pursue her counterclaim for attorney fees under the fee-shifting provisions of the Workers' Compensation Act; the claim for attorney fees was a claim for affirmative relief and was pending at the time of carrier's nonsuit. V.T.C.A., Labor Code §§ 408.147, 408.221.

3 Cases that cite this headnote

**[5]** **Workers' Compensation** ← Fees on appeal or proceedings to set aside award

Workers' compensation claimant was not entitled to an award of attorney fees incurred in pursuit of attorney fees, following insurance carrier's nonsuit of its claim for judicial review of Workers' Compensation Commission decision awarding claimant supplemental income benefits, but rather, claimant's recoverable attorney fees under the Workers' Compensation Act were limited to those fees incurred in prevailing on the issue on which judicial review was sought; no fees were awarded at the Commission level, such that attorney fees were not an issue on which judicial review was sought. V.T.C.A., Labor Code §§ 408.147, 408.221.

6 Cases that cite this headnote

**[6]** **Costs** ← American rule; necessity of contractual or statutory authorization or grounds in equity

A prevailing party cannot recover attorney fees from an opposing party unless permitted by statute or by contract between the parties.

1 Cases that cite this headnote

**[7]** **Costs** ← Effect of statutes

Where the basis for recovery of attorney fees is statutory, an award of attorney fees may not be supplied by implication but must be provided for by the express terms of the statute in question.

2 Cases that cite this headnote

**[8]** **Costs** ← Evidence as to items

The issue of reasonableness and necessity of attorney fees requires expert testimony. Rules of Evid., Rule 702.

8 Cases that cite this headnote

**[9]** **Evidence** 🔑 Matters involving scientific or other special knowledge in general

**Evidence** 🔑 Necessity of qualification

**Evidence** 🔑 Necessity and sufficiency

An expert witness must be properly qualified and his or her opinion must be relevant and based upon a reliable foundation. Rules of Evid., Rule 702.

Cases that cite this headnote

**[10]** **Evidence** 🔑 Necessity and sufficiency

In determining reliability of the foundation for an expert's testimony, the trial court should evaluate the methods, analysis, and principles relied on by the expert in reaching his opinion and ensure that the opinion has a reliable basis in the expert's discipline. Rules of Evid., Rule 702.

Cases that cite this headnote

**[11]** **Evidence** 🔑 Necessity and sufficiency

The proponent of expert evidence bears the burden of demonstrating that the expert's opinion is reliable. Rules of Evid., Rule 702.

Cases that cite this headnote

**[12]** **Evidence** 🔑 Necessity and sufficiency

If an expert witness's testimony is not reliable, it is not evidence. Rules of Evid., Rule 702.

Cases that cite this headnote

**[13]** **Evidence** 🔑 Necessity and sufficiency

There must be some basis for an expert opinion offered to show its reliability. Rules of Evid., Rule 702.

Cases that cite this headnote

**[14]** **Evidence** 🔑 Necessity and sufficiency

Expert testimony is unreliable if the court concludes there is simply too great an analytical gap between the data and the opinion proffered. Rules of Evid., Rule 702.

Cases that cite this headnote

**[15]** **Evidence** 🔑 Necessity and sufficiency

In reviewing the reliability of expert testimony, the trial court is not to determine whether the expert's conclusions are correct; rather, the court should determine only whether the analysis used to reach those conclusions is reliable. Rules of Evid., Rule 702.

1 Cases that cite this headnote

**[16]**    **Appeal and Error**  •→  Opinion evidence and hypothetical questions

**Appeal and Error**  •→  Necessity of timely objection

When a reliability challenge to expert testimony requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis; however, when the challenge is restricted to the face of the record, for example, when expert testimony is speculative or conclusory on its face, then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. Rules of Evid., Rule 702.

1 Cases that cite this headnote

**[17]**    **Workers' Compensation**  •→  Weight and sufficiency

Evidence was legally sufficient to support jury award of attorney fees to workers' compensation claimant pursuant to Workers' Compensation Act fee-shifting provisions, despite insurance carrier's contention that claimant's attorney provided speculative and unreliable expert opinion as she admitted that she had not kept specific track of time spent on claimant's case; claimant's attorney offered factual, not expert, testimony, her time estimates were based on her notes and past experience performing similar work, and another attorney offered expert testimony as to the reasonableness and necessity of the fees. V.T.C.A., Labor Code §§ 408.147, 408.221; Rules of Evid., Rules 701, 702.

3 Cases that cite this headnote

**[18]**    **Appeal and Error**  •→  Opinion evidence and hypothetical questions

When expert testimony is speculative on its face, a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*764** David Brenner, Burns, Anderson, Jury & Brenner L.L.P., Austin, for Appellant.

Christopher Todd Carver, Gibson Carver LLP, Lubbock, and Kay E. Goggin, Law Offices of Kay E. Goggin, Dallas, for Appellee.

Before Justices MORRIS, LANG, and LANG–MIERS.

**OPINION**

Opinion by Justice LANG.

Twin City Fire Insurance Company filed suit seeking judicial review of a final decision by the Texas Workers' Compensation Commission [1] that Sharon Vega–Garcia, a workers' compensation claimant, was entitled to supplemental income benefits. Twin City filed a nonsuit in that action. However, the trial court granted Vega–Garcia a new trial, submitted the issue of her attorney's fees to a jury, and entered judgment on a jury verdict awarding attorney's fees in favor of Vega–Garcia.

1     The Texas Workers' Compensation Commission was replaced in 2005 by the Texas Department of Insurance, Division of Workers' Compensation. *See* TEX. LAB.CODE ANN. § 402.001 (Vernon 2006). We refer to that authority as it existed at the time of the administrative hearings in this case.

In three issues, Twin City asserts the trial court committed reversible error in awarding attorney's fees to be paid to Vega–Garcia's counsel because: (1) Vega–Garcia was not a "prevailing party" in the underlying litigation and, therefore, was not entitled to statutory attorney's fees under the Texas Labor Code; (2) there is no basis in law to permit Vega–Garcia's attorney to recover attorney's fees of $5126 incurred in pursuing an affirmative claim for attorney's fees; and (3) the expert testimony presented by Vega–Garcia in support of her claim for attorney's fees lacked adequate foundation and, therefore, constituted no evidence as to the reasonableness or necessity of the fees awarded.

We conclude that, under the facts of this case, Vega–Garcia prevailed in the underlying action for purposes of §§ 408.147 and 408.221 of the Texas Labor Code. Further, we determine there is no language in the statutes at issue that affords recovery of attorney's fees for the pursuit of attorney's fees incurred by a workers' compensation claimant on appeal of a commission award. **\*765** Finally, we conclude the record contains sufficient competent evidence to support an award of attorney's fees to Vega–Garcia's counsel to the extent permitted by §§ 408.147 and 408.221. Accordingly, we decide against Twin City on its first and third issues. Twin City's second issue is decided in its favor. We affirm the trial court's judgment in part and reverse and render judgment in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sharon Vega–Garcia sustained injury in a work-related accident on July 30, 1998, and subsequently applied for supplemental income benefits pursuant to the Texas Labor Code. The Texas Workers' Compensation Commission determined Vega–Garcia was entitled to supplemental income benefits for the fifth quarter.

Twin City filed suit in district court, challenging the commission's decision. Vega–Garcia answered, filing a general denial and a claim for attorney's fees pursuant to §§ 408.147(c) and 408.221(c) of the Texas Labor Code. After approximately nine months of litigation, Twin City filed a motion for nonsuit dismissing its action against Vega–Garcia without prejudice, and the trial court so ordered.

Vega–Garcia filed a motion for attorney fees, or in the alternative for reinstatement or for a new trial, asserting entitlement to attorney's fees pursuant to §§ 408.147 and 408.221. She claimed she had "prevailed" in the judicial review lawsuit filed by Twin City. Attached to Vega–Garcia's motion was an affidavit in support of attorney's fees signed by Vega–Garcia's counsel of record, Kay E. Goggin. Supplemental motions and affidavits were later filed.

Twin City filed a brief in opposition to Vega–Garcia's claim for attorney's fees, arguing that Vega–Garcia had not "prevailed" in the underlying litigation because there was "no successful prosecution or defense of any claim or issue on which judicial review was sought, and there has not been a judgment rendered by the trial court from which [Vega–Garcia] could be vindicated." Further, Twin City contended that because Vega–Garcia's counterclaim only alleged reasonable and necessary attorney's fees pursuant to §§ 408.147 and 408.221, that counterclaim did not constitute a claim for affirmative relief and was not capable of surviving a nonsuit. After a hearing, the trial court granted Vega–Garcia's motion for new trial regarding the issue of attorney's fees.

In her brief in support of her motion for attorney's fees, Vega–Garcia argued that because she was found by the commission to be entitled to supplemental income benefits for the fifth quarter and Twin City was "not able to overturn that entitlement," she was a prevailing party pursuant to the Texas Labor Code. Vega–Garcia's motion for attorney fees was granted and, over Vega–Garcia's objection, the trial court ordered a jury trial on the issue of the amount of reasonable and necessary attorney's fees.

At trial, Twin City objected to "all expert testimony in this case," arguing such testimony lacked adequate foundation. The trial court overruled Twin City's objection. In addition, Twin City's motion for directed verdict was denied. The jury returned a verdict assessing attorney's fees in the amount of $18,540 for preparation and trial concerning supplemental income benefits at the trial court level, $5126 for pursuit of attorney's fees, $5000 in the event of an appeal to the court of appeals, and $5000 in the event of an appeal to the Texas Supreme Court. The trial court entered judgment on the verdict and this appeal followed.

## *766  II. AVAILABILITY OF ATTORNEY'S FEES UNDER §§ 408.147 AND 408.221

### A. Standard of Review

 [1]   The availability of attorney's fees under a particular statute is a question of law for the court. *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999). Therefore, we review the issue de novo. *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999).

When interpreting statutes, our primary objective is to ascertain and give effect to legislative intent. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999). *See also* TEX. GOV'T CODE ANN. § 311.011 (Vernon 2005). We ascertain the legislature's intent in the plain and common meaning of the words used. *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000). We must read the statute as a whole and not just isolated portions. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004).

If the meaning of the statutory language is unambiguous, we must interpret it according to its terms, giving meaning to the language consistent with other provisions in the statute. *Id.* We read every word as if it were deliberately chosen and presume that omitted words were excluded purposefully. *See Cornyn v. Universe Life Ins. Co.,* 988 S.W.2d 376, 379 (Tex.App.-Austin 1999, pet. denied). We also consider the objective the law seeks to obtain and the consequences of a particular construction. *City of Sunset Valley,* 146 S.W.3d at 642.

 [2]   The Texas Workers' Compensation Act should be liberally construed in favor of injured workers, and a strained or narrow construction of that Act is improper. *See Keng,* 23 S.W.3d at 349.

### B. Applicable Law

Sections 408.147 and 408.221 of the Texas Labor Code are part of the Texas Workers' Compensation Act. *See* TEX. LAB.CODE ANN. §§ 408.147, 408.221 (Vernon 2006). Section 408.147, titled "Contest of Supplemental Income Benefits by Insurance Carrier; Attorney's Fees," provides that "[i]f an insurance carrier disputes the commissioner's determination that an employee is entitled to supplemental income benefits or the amount of supplemental income benefits due and the employee prevails on any disputed issue, the insurance carrier is liable for reasonable and necessary attorney's fees incurred by the employee as a result of the insurance carrier's dispute and for supplemental income benefits accrued but not paid and interest on that amount." *Id.* § 408.147(c).

Under section 408.221, titled "Attorney's Fees Paid to Claimant's Counsel," an insurance carrier that seeks judicial review of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, income or death benefits is liable for "reasonable and necessary" attorney's fees "incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought by the insurance carrier." *Id.* § 408.221(c). Section 408.221 further provides that "[i]f a carrier appeals multiple issues and the claimant prevails on some, but not all, of the issues appealed, the court shall apportion and award fees to the claimant's attorney only for the issues on which the claimant prevails." *Id.* In approving attorney's fees under § 408.221, the commissioner and the courts are to consider the following:

(1) the time and labor required;

(2) the novelty and difficulty of the questions involved;

 **\*767**  (3) the skill required to perform the legal services properly;

(4) the fee customarily charged in the locality for similar legal services;

(5) the amount involved in the controversy;

(6) the benefits to the claimant that the attorney is responsible for securing; and

(7) the experience and ability of the attorney performing the services.

*Id.* § 408.221(d).


### C. Application of Law to Facts


### 1. Prevailing Party in a Nonsuit

 **[3]**    In its first issue, Twin City asserts that because there was no adjudication on the merits of the disputed issue in the underlying litigation, Vega–Garcia did not "prevail" as that term is understood in legal usage with regard to fee-shifting statutes. Therefore, Twin City contends, the trial court committed reversible error in entering judgment for attorney's fees in favor of Vega–Garcia's attorney and against Twin City. Vega–Garcia argues Texas courts have "clearly and expressly" determined that, upon nonsuit by an insurance carrier in an appeal for judicial review from a decision of the Texas Workers' Compensation Commission, the claimant is the prevailing party for the purposes of invoking the fee shifting statutes contained in the Texas Labor Code.

Several recent Texas cases have addressed the issue presented. *See Am. Home Assurance Co. v. McDonald,* 181 S.W.3d 767, 768 (Tex.App.-Waco 2005, no pet. h.) (holding claimant was "prevailing party" after carrier nonsuited claim); *Dean Foods Co. v. Anderson,* 178 S.W.3d 449, 455 (Tex.App.-Amarillo 2005, pet. denied) (holding claimant was "prevailing party" so as to be statutorily entitled to attorney's fees, even though employer nonsuited appeal and no judgment was rendered on merits); *Pac. Employers Ins. Co. v. Torres,* 174 S.W.3d 344, 346–48 (Tex.App.-El Paso 2005, no pet. h.). In *Torres,* a claimant responded to an insurance carrier's lawsuit for judicial review of a commission decision in the claimant's favor by filing a general denial and a claim for attorney's fees under § 408.221. *See Torres,* 174 S.W.3d at 345. After nearly nineteen months of litigation, the carrier filed a notice of nonsuit. *Id.* The claimant then filed a motion for attorney's fees. *Id.* The trial court ordered the nonsuit, but later entered an order awarding attorney's fees in favor of the claimant in accordance with § 408.221(c). *Id.*

Applying the principles of statutory construction, the El Paso Court of Appeals held the claimant was a prevailing party for purposes of § 408.221(c). *Id.* at 346–47. The court reasoned as follows:

> The statute authorizes the award to the worker if the worker prevails in the underlying case being pursued by the insurance carrier. Here, Pacific Employers Insurance Co. nonsuited its claims on the eve of trial and after considerable discovery had been undertaken. After all of its claims were nonsuited, the employee-defendant, here Appellee, is in the same position he would be in if he had prevailed after a trial on the matter. In fact, he is in the same position that he was prior to the lawsuit being filed, and during the proceedings. As the prevailing party below, he is defending against a challenge by the insurance carrier. We recognize that cases involving a challenge to a workers' compensation award present a novel situation where each party may in fact appeal seeking a trial court review of the administrative decision rendered.

Here, we think it significant that Appellee did not appeal or **\*768** challenge the award below. He was merely in the position of defending that which had been awarded to him by the commission.

*Id.*

Twin City argues that the opposite conclusion was reached in *Cigna Insurance Co. of Texas v. Middleton,* 63 S.W.3d 901, 903 (Tex.App.-Eastland 1999, pet. denied) (holding that attorney's fees were not recoverable by claimant after a nonsuit was filed by insurance carrier). However, *Cigna* is distinguishable on the facts. In *Cigna,* both the insurance carrier and the employee appealed, and each entered a nonsuit of their respective cases. *Id.* Thus, unlike the claimant in the present case, the *Cigna* claimant was not "merely in the position of defending that which had been awarded to him by the commission." *See Torres,* 174 S.W.3d at 347.

In the case before us, Twin City was the only party challenging the decision of the Texas Workers' Compensation Commission. As the prevailing party below, Vega–Garcia was merely defending against Twin City's challenge. Upon nonsuit, Vega–Garcia was in the same position she would be in if she had prevailed after a trial on the matter. *See id.* at 346–47. Section 408.147(c) requires that the claimant prevail "on any disputed issue," and § 408.221(c) requires that the claimant "prevail on an issue on which judicial review is sought by the insurance carrier." *See* TEX. LAB.CODE ANN. §§ 408.147(c), 408.221(c). We conclude Twin City's choice to nonsuit its challenge to the commission's award in this case made Vega–Garcia a prevailing party for the purposes of §§ 408.147 and 408.221. *See Torres,* 174 S.W.3d at 347.

Twin City contends that applying the reasoning of *Torres* would compel carriers to pursue every appeal of a commission decision through to conclusion, essentially eliminating the option to nonsuit. However, *Torres* does not alter the fact that the option of pursuing an appeal of a commission award in favor of a claimant, or terminating such an appeal, lies with the carrier. Rather than eliminating the carrier's option to nonsuit, §§ 408.147 and 408.221 effect a shift of responsibility for payment of attorney's fees. Under those statutes, attorney's fees of a claimant are to be paid out of the claimant's award unless there is an appeal by the carrier. *See* TEX. LAB.CODE ANN. §§ 408.221(b), 408.147(c). Where the claimant prevails in such an appeal, the carrier is liable for "reasonable and necessary attorney's fees ... incurred by the claimant as a result of the ... appeal...." *Id.* § 408.221(c); *see also* § 408.147(c). Accordingly, where a carrier elects to pursue an appeal, causes the claimant to incur attorney fees and expenses, and then files a nonsuit, §§ 408.147 and 408.221 place the burden for attorney's fees not on the claimant, but rather on the carrier that elects to appeal. *Id.*

 **[4]**    Finally, Twin City argues that because Vega–Garcia's counterclaim was solely an action to recover attorney's fees and presented no new issues or controversies, it was not a claim for affirmative relief and, therefore, could not survive a nonsuit. However, Texas courts have held that "[a] request for attorney's fees is a claim for affirmative relief." *See Anderson,* 178 S.W.3d at 453 (attorney's fee claim in suit for judicial review of workers' compensation award was claim for affirmative relief); *see also Falls County v. Perkins & Cullum,* 798 S.W.2d 868, 870–71 (Tex.App.-Fort Worth 1990, no writ) (claim for attorney's fees in DTPA case was request for affirmative relief). Therefore, the trial court did not err in determining Vega–Garcia was entitled to pursue her claim for attorney's fees following nonsuit by Twin City.

 **\*769**  In summary, under the facts of this case, we conclude that when a carrier nonsuits its appeal of a commission award while the claimant's claim for attorney's fees is pending, the claimant "prevails" and may seek attorney's fees under §§ 408.147 and 408.221. We decide against Twin City on its first issue.

### 2. Attorney's Fees Incurred in Pursuit of Attorney's Fees

 **[5]**    In its second issue, Twin City argues that, even if a claimant does prevail in an appeal by an insurance carrier seeking judicial review of a commission decision, the only attorney's fees recoverable are those incurred in defending the suit for judicial review. Twin City contends no basis in law exists to permit the claimant's attorney to recover attorney's fees incurred

in prosecuting an affirmative claim for attorney's fees. Vega–Garcia asserts that analysis of §§ 408.147 and 408.221, in light of the purpose of the Texas Workers' Compensation Act and the disparity between the parties, favors the shifting of fees expended for purposes of defending a challenge to attorney's fees.

 **[6]** **[7]** A prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or by contract between the parties. *Holland,* 1 S.W.3d at 95. Where the basis for such a recovery is statutory, it is well-established that "[a]n award of attorney's fees may not be supplied by implication but must be provided for by the express terms of the statute in question." *Id.* (quoting *First City Bank–Farmers Branch, Tex. v. Guex,* 677 S.W.2d 25, 30 (Tex.1984)).

We recognize provisions of the Texas Workers' Compensation Act should be liberally construed in favor of injured workers. *See Keng,* 23 S.W.3d at 349. However, there is no language in the statutes at issue that can be construed to allow an award of attorney's fees "for pursuit of attorney's fees" incurred by a claimant on appeal of a commission award, as the jury awarded here. *See* TEX. LAB.CODE ANN. §§ 408.147, 408.221. Section 408.147 provides that "[i]f an insurance carrier disputes the commissioner's determination that an employee is entitled to supplemental income benefits or the amount of supplemental income benefits due and the employee prevails on any disputed issue, the insurance carrier is liable for reasonable and necessary attorney's fees incurred by the employee as a result of the insurance carrier's dispute." *Id.* § 408.147(c). Section § 408.221(c) directly links a carrier's liability for attorney's fees to the carrier's having sought judicial review of a final decision of a commission award. *Id.* § 408.221(c). That section provides a claimant is entitled to "reasonable and necessary attorney's fees ... incurred ... as a result of the insurance carrier's appeal if the claimant prevails on the issue on which judicial review is sought." *Id.* The statute specifically states that "[i]f the carrier appeals multiple issues and the claimant prevails on some, but not all, of the issues appealed, the court shall apportion and award fees to the claimant's attorney only for the issues on which the claimant prevails." *Id.*

In the case before us, no attorney's fees were awarded at the commission level. Therefore, the issue of attorney's fees was not an issue on which judicial review was sought by Twin City in the district court. The language of §§ 408.147(c) and 408.221(c) clearly limits recovery of attorney's fees to those fees incurred by Vega–Garcia in prevailing on the issue on which judicial review was sought by Twin City. Here, the jury was asked to determine a reasonable fee for attorney's services incurred "for the pursuit of attorney's **\*770** fees."[2] There is no provision in the applicable statutes for an award of attorney's fees "for the pursuit of attorney's fees." Accordingly, Twin City's second issue is decided in its favor. We reverse the award of attorney's fees to Vega–Garcia in the amount of $5126 for pursuit of attorney's fees and render judgment that Vega–Garcia take nothing on that claim.

[2] The jury was also asked to determine a reasonable fee "for preparation for trial concerning supplemental income benefits," "for an appeal to the Court of Appeals," and "for an appeal to the Supreme Court of Texas." Those awards are not specifically contested by appellant other than as set out above as to the interpretation of the term "prevailing party."

### III. EXPERT TESTIMONY

In its third issue, Twin City contends the trial court erred in permitting expert testimony as to the amount of reasonable and necessary attorney's fees based on speculation, rather than on a reliable foundation. Twin City argues that because expert testimony based on speculation amounts to no evidence, there is no evidence to support the jury's verdict. Vega–Garcia asserts sufficient evidence was presented to support the award of attorney's fees. Although not expressly stated, we construe Twin City's point as one raising legal insufficiency of the evidence.

### A. Standard of Review

In determining the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not. *2218 Bryan St., Ltd. v. City of Dallas,* 175 S.W.3d 58, 65 (Tex.App.-Dallas 2005, pet. denied) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 809 (Tex.2005)). We will uphold the challenged finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *see also Keller,* 168 S.W.3d at 813–14. More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs,* 907 S.W.2d at 499 (quoting *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)); *see also Keller,* 168 S.W.3d at 822.

### B. Applicable Law

 **[8]** **[9]** **[10]** **[11]** **[12]** The issue of reasonableness and necessity of attorney's fees requires expert testimony. *See Woollett v. Matyastik,* 23 S.W.3d 48, 52 (Tex.App.-Austin 2000, pet. denied) (citing *Barrett v. Parchman,* 675 S.W.2d 289, 291 (Tex.App.-Dallas 1984, no writ)). *See also Lesikar v. Rappeport,* 33 S.W.3d 282, 308 (Tex.App.-Texarkana 2000, pet. denied). Pursuant to rule 702 of the Texas Rules of Evidence, an expert must be properly qualified and his opinion must be relevant and based upon a reliable foundation. *See* TEX.R. EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 720 (Tex.1998) (citing *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995)). In determining reliability, the trial court should evaluate the methods, analysis, and principles relied on by the expert in reaching his opinion and ensure that the opinion has a reliable basis in the expert's discipline. *Gammill,* 972 S.W.2d at 725–26. The proponent of the evidence bears the burden of demonstrating that the expert's opinion is reliable. *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004). If the expert's testimony is not reliable, it is not evidence. *Merrell Dow Pharm. v. Havner,* 953 S.W.2d 706, 713 (Tex.1997).

 **\*771** **[13]** **[14]** **[15]** There must be some basis for the expert opinion offered to show its reliability. *See Robinson,* 923 S.W.2d at 557; *In re S.E.W.,* 168 S.W.3d 875, 884 (Tex.App.-Dallas 2005, no pet.). Expert testimony is unreliable if the court concludes "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill,* 972 S.W.2d at 726. "In reviewing the reliability of expert testimony, the court is not to determine whether the expert's conclusions are correct; rather, the court should determine only whether the analysis used to reach those conclusions is reliable." *Helton,* 133 S.W.3d at 254 (citing *Gammill,* 972 S.W.2d at 728).

 **[16]** When a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.2004). However, when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. *Id.*

### C. Application of Law to Facts

 **[17]** Twin City asserts legal insufficiency of the facts based upon several pivotal points of testimony. First, the contract between Vega–Garcia and her counsel, Kay E. Goggin, provides that fees are to be incurred by the hour. Second, Goggin acknowledges she kept no time records and had to "guess" the number of hours she spent working on Vega–Garcia's case by reviewing her case notes and, in some instances, the file materials associated with the case notes. Third, Twin City contends Goggin relied upon her own testimony and that of another attorney, Barbara Lambrano–Williamson, to prove the amount of reasonable and necessary fees incurred. Fourth, Twin City asserts Lambrano–Williamson's testimony was wholly based on Goggin's speculation of actual time.

Vega–Garcia argues Goggin's testimony regarding time estimates was fact testimony rather than expert testimony, and any inconsistencies, therefore, go to the weight to be given the testimony, not its admissibility. In addition, Vega–Garcia asserts

written affidavits of Goggin and expert testimony by Lambrano–Williamson were admitted without objection and provided some evidence to support the award of attorney's fees.

The record before us includes evidence regarding attorney's fees in the form of an affidavit and supplemental affidavit by Goggin and testimony by Goggin, Lambrano–Williamson, and Scott Talbot, an expert called by Twin City. Although the record contains references to Goggin making a "guess" as to some of her calculations of time spent, such testimony was elicited by Twin City on cross-examination through leading questions. [3]

[3]     Goggin's testimony included the following exchange:

Q: Okay. Now, despite the fact that your contract called for hourly billing, you did not keep records of your time?

A. No, I did not.

Q: And I think you've already testified a little bit today that in hindsight if you—you recognize that that was a mistake?

A: I hate to hear the word "mistake." In hindsight it would have been much cleaner and smoother to say, oh, look at this billing program. It's not what attorneys with my experience have done in the past. But I will tell you, after the deposition and hearing all this the last week, uh, I do have a new software program, but I haven't learned how to use it yet on billing.

Q: Well, pursuant to your contract with [Vega–Garcia], don't you feel that you had an obligation to her to keep track of the amount of time that you spent on her case?

A: But I did keep track of the amount of time. I just did not use a—you know, at 1:05 to 1:17 I did blah, blah, blah. I did keep track of what I did.

Q: I think you and I have talked a little bit about the system you used to keep track of her time?

A: Yeah.

Q: It's the notes that you kept regarding her case?

A: Correct.

Q: And—

A: That's how I kept track of time.

Q: And when you went back to estimate for your motion how much time you had spent on the case, you sort of had to guess by looking at those case notes?

A: Correct.

Q: And in fact, last week—

A: Or estimate.

Q: Last week when I took your deposition, you had to guess again?

A: Correct.

Q: And I think you've already testified, and you will agree with me, that the two numbers from your initial motion and the numbers you gave during your deposition are pretty different?

A: Correct. That's—that's why I did it again was to see which one [sic].

Q: And your motion requests approximately twice as many hours as the times that you gave in your deposition. Would you agree with that?

A: I would agree with that.

Q: Okay. And after reviewing your deposition, then you took some time and made some additional changes including to the times that you spent?

A: I sat down and reanalyzed to see which was correct so I could look you in the eye and say I–I know this-

Q: Okay.

A: —or I was wrong and this other number was right.

**\*772**  **[18]**    Texas law provides that when expert testimony is speculative on its face, a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. *Coastal,* 136 S.W.3d at 233. However, the portions of the record cited by Twin City in support of its argument do not reflect "speculation" by an expert, but rather, estimates by Goggin as to what legal work she performed and how long it took her to perform it. Rule 701 of the Texas Rules of Evidence provides that a witness not testifying as an expert can give opinions rationally based on his or her perception if such opinion helps in the determination of a fact in issue. TEX.R. EVID. 701. *See also Sierad v. Barnett,* 164 S.W.3d 471, 483–84 (Tex.App.-Dallas 2005, no pet.) (lay witness can testify about value if he has personal knowledge of facts forming opinion, rational connection exists between facts and opinion, and opinion is helpful); *Montez v. Bailey County Elec. Coop.,* 397 S.W.2d 108, 111 (Tex.Civ.App.-

Amarillo 1965, writ ref'd n.r.e.) (estimates of age, size, weight, distance, etc., made by qualified lay witnesses are generally admissible). Goggin testified her time estimates were based on her notes and her past experience in performing similar work. Accordingly, the record contains a basis for Goggin's personal knowledge and a rational connection of that knowledge with her estimates. *See* TEX.R. EVID. 701.

Twin City further asserts that "[a]lthough inconsistencies in testimony generally relate to credibility, when inconsistencies relate to the foundation of expert testimony and demonstrate the absence of reliability, such inconsistencies affect admissibility of evidence, not credibility." However, Twin City does not identify objectionable testimony by Goggin other than that regarding Goggin's time estimates, which we have already determined constituted factual, not expert, testimony. *See* TEX.R. EVID. 701. The differences in the amounts of time expressed by Goggin resulted not from inconsistencies relating **\*773** to the foundation of expert testimony, but from "differing conclusions as to the underlying factual situation." *Brandt v. Surber,* 194 S.W.3d 108, 132 (Tex.App.-Corpus Christi 2006, pet. filed). Therefore, resolution of any conflicts regarding Goggin's affidavits and testimony were factual disputes within the province of the jury. *See id.* Because the record shows no factual testimony by other witnesses in contradiction to Goggin's affidavits and testimony, we will not review the jury's determinations as to the credibility and weight of that evidence.

Finally, in addition to Goggin's testimony, Vega–Garcia called Lambrano–Williamson to testify as to the reasonableness and necessity of Goggin's fees, and Twin City offered the testimony of Talbot on the same issue. Any alleged "mistake" made by Goggin in her calculations did not, as contended by Twin City, create an impermissible "analytical gap" between the data and Lambrano–Williamson's conclusions. *See SAS & Assoc., Inc. v. Home Mktg. Servicing, Inc.,* 168 S.W.3d 296, 300 (Tex.App.-Dallas 2005, pet. denied). Such alleged errors were a proper subject for Twin City's cross-examination of Lambrano–Williamson and for the opinions of Talbot. *Id.*

Based upon the above analysis and application of the appropriate standard, we conclude the evidence presented was legally sufficient to support an award of attorney's fees by the jury. We decide against Twin City on its third issue.

## IV. CONCLUSION

Under the facts presented, we determine Vega–Garcia prevailed in the judicial review action filed by Twin City and was, therefore, entitled to seek attorney's fees pursuant to §§ 408.147 and 408.221 of the Texas Labor Code. In addition, we conclude §§ 408.147 and 408.221 contain no language affording recovery of attorney's fees for the pursuit of attorney's fees incurred by a workers' compensation claimant on appeal of a commission award. Finally, we conclude the record contains legally sufficient evidence to support the jury's award of attorney's fees to Vega–Garcia's counsel pursuant to §§ 408.147 and 408.221.

We decide against Twin City on its first and third issues. Twin City's second issue is decided in its favor. Accordingly, we reverse the award of attorney's fees to Vega–Garcia in the amount of $5126 for pursuit of attorney's fees and render judgment that Vega–Garcia take nothing on her claim for attorney's fees incurred in the pursuit of attorney's fees in the amount of $5126. The trial court's judgment is otherwise affirmed.

**All Citations**

223 S.W.3d 762

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 17

Vernon's Texas Statutes and Codes Annotated
   Labor Code (Refs & Annos)
      Title 5. Workers' Compensation
         Subtitle A. Texas Workers' Compensation Act
            Chapter 408. Workers' Compensation Benefits (Refs & Annos)
               Subchapter G. Impairment Income Benefits (Refs & Annos)

V.T.C.A., Labor Code § 408.122

§ 408.122. Eligibility for Impairment Income Benefits

Effective: September 1, 2005
Currentness

A claimant may not recover impairment income benefits unless evidence of impairment based on an objective clinical or laboratory finding exists. If the finding of impairment is made by a doctor chosen by the claimant and the finding is contested, a designated doctor or a doctor selected by the insurance carrier must be able to confirm the objective clinical or laboratory finding on which the finding of impairment is based.

**Credits**

Acts 1993, 73rd Leg., ch. 269, § 1, eff. Sept. 1, 1993. Amended by Acts 1995, 74th Leg., ch. 980, § 1.27, eff. Sept. 1, 1995; Acts 2001, 77th Leg., ch. 1456, § 5.03, eff. June 17, 2001; Acts 2005, 79th Leg., ch. 265, § 3.112, eff. Sept. 1, 2005.

Notes of Decisions (16)

V. T. C. A., Labor Code § 408.122, TX LABOR § 408.122
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

Vernon's Texas Statutes and Codes Annotated
    Labor Code (Refs & Annos)
        Title 5. Workers' Compensation
            Subtitle A. Texas Workers' Compensation Act
                Chapter 408. Workers' Compensation Benefits (Refs & Annos)
                    Subchapter G. Impairment Income Benefits (Refs & Annos)

V.T.C.A., Labor Code § 408.123

§ 408.123. Certification of Maximum Medical Improvement; Evaluation of Impairment Rating

Effective: September 1, 2005
Currentness

(a) After an employee has been certified by a doctor as having reached maximum medical improvement, the certifying doctor shall evaluate the condition of the employee and assign an impairment rating using the impairment rating guidelines described by Section 408.124. If the certification and evaluation are performed by a doctor other than the employee's treating doctor, the certification and evaluation shall be submitted to the treating doctor, and the treating doctor shall indicate agreement or disagreement with the certification and evaluation.

(b) A certifying doctor shall issue a written report certifying that maximum medical improvement has been reached, stating the employee's impairment rating, and providing any other information required by the commissioner to:

(1) the division;

(2) the employee; and

(3) the insurance carrier.

(c) The commissioner shall adopt a rule that provides that, at the conclusion of any examination in which maximum medical improvement is certified and any impairment rating is assigned by the treating doctor, written notice shall be given to the employee that the employee may dispute the certification of maximum medical improvement and assigned impairment rating. The notice to the employee must state how to dispute the certification of maximum medical improvement and impairment rating.

(d) If an employee is not certified as having reached maximum medical improvement before the expiration of 102 weeks after the date income benefits begin to accrue, the division shall notify the treating doctor of the requirements of this subchapter.

(e) Except as otherwise provided by this section, an employee's first valid certification of maximum medical improvement and first valid assignment of an impairment rating is final if the certification or assignment is not disputed before the 91st day after the date written notification of the certification or assignment is provided to the employee and the carrier by verifiable means.

(f) An employee's first certification of maximum medical improvement or assignment of an impairment rating may be disputed after the period described by Subsection (e) if:

    (1) compelling medical evidence exists of:

        (A) a significant error by the certifying doctor in applying the appropriate American Medical Association guidelines or in calculating the impairment rating;

        (B) a clearly mistaken diagnosis or a previously undiagnosed medical condition; or

        (C) improper or inadequate treatment of the injury before the date of the certification or assignment that would render the certification or assignment invalid; or

    (2) other compelling circumstances exist as prescribed by commissioner rule.

(g) If an employee has not been certified as having reached maximum medical improvement before the expiration of 104 weeks after the date income benefits begin to accrue or the expiration date of any extension of benefits under Section 408.104, the impairment rating assigned after the expiration of either of those periods is final if the impairment rating is not disputed before the 91st day after the date written notification of the certification or assignment is provided to the employee and the carrier by verifiable means. A certification or assignment may be disputed after the 90th day only as provided by Subsection (f).

(h) If an employee's disputed certification of maximum medical improvement or assignment of impairment rating is finally modified, overturned, or withdrawn, the first certification or assignment made after the date of the modification, overturning, or withdrawal becomes final if the certification or assignment is not disputed before the 91st day after the date notification of the certification or assignment is provided to the employee and the carrier by verifiable means. A certification or assignment may be disputed after the 90th day only as provided by Subsection (f).

**Credits**

Acts 1993, 73rd Leg., ch. 269, § 1, eff. Sept. 1, 1993. Amended by Acts 2003, 78th Leg., ch. 278, § 1, eff. June 18, 2003; Acts 2003, 78th Leg., ch. 1190, § 1, eff. June 20, 2003; Acts 2003, 78th Leg., ch. 1323, § 2, eff. June 21, 2003; Acts 2005, 79th Leg., ch. 265, § 3.113, eff. Sept. 1, 2005.

Notes of Decisions (6)

V. T. C. A., Labor Code § 408.123, TX LABOR § 408.123
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

Vernon's Texas Statutes and Codes Annotated
  Labor Code (Refs & Annos)
    Title 5. Workers' Compensation
      Subtitle A. Texas Workers' Compensation Act
        Chapter 408. Workers' Compensation Benefits (Refs & Annos)
          Subchapter G. Impairment Income Benefits (Refs & Annos)

V.T.C.A., Labor Code § 408.124

§ 408.124. Impairment Rating Guidelines

Effective: September 1, 2005
Currentness

(a) An award of an impairment income benefit, whether by the commissioner or a court, must be based on an impairment rating determined using the impairment rating guidelines described by this section.

(b) For determining the existence and degree of an employee's impairment, the division shall use "Guides to the Evaluation of Permanent Impairment," third edition, second printing, dated February 1989, published by the American Medical Association.

(c) Notwithstanding Subsection (b), the commissioner by rule may adopt the fourth edition of the "Guides to the Evaluation of Permanent Impairment," published by the American Medical Association, or a subsequent edition of those guides, for determining the existence and degree of an employee's impairment.

**Credits**

Acts 1993, 73rd Leg., ch. 269, § 1, eff. Sept. 1, 1993. Amended by Acts 1999, 76th Leg., ch. 1426, § 12, eff. Sept. 1, 1999; Acts 2005, 79th Leg., ch. 265, § 3.114, eff. Sept. 1, 2005.

Notes of Decisions (15)

V. T. C. A., Labor Code § 408.124, TX LABOR § 408.124
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** 

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 20

Vernon's Texas Statutes and Codes Annotated
  Labor Code (Refs & Annos)
    Title 5. Workers' Compensation
      Subtitle A. Texas Workers' Compensation Act
        Chapter 408. Workers' Compensation Benefits (Refs & Annos)
          Subchapter L. Attorney's Fees in Workers' Compensation Benefit Matters (Refs & Annos)

V.T.C.A., Labor Code § 408.221

§ 408.221. Attorney's Fees Paid to Claimant's Counsel

Effective: September 1, 2005
Currentness

(a) An attorney's fee, including a contingency fee, for representing a claimant before the division or court under this subtitle must be approved by the commissioner or court.

(b) Except as otherwise provided, an attorney's fee under this section is based on the attorney's time and expenses according to written evidence presented to the division or court. Except as provided by Subsection (c) or Section 408.147(c), the attorney's fee shall be paid from the claimant's recovery.

(c) An insurance carrier that seeks judicial review under Subchapter G, Chapter 410, of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, income or death benefits is liable for reasonable and necessary attorney's fees as provided by Subsection (d) incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought by the insurance carrier in accordance with the limitation of issues contained in Section 410.302. If the carrier appeals multiple issues and the claimant prevails on some, but not all, of the issues appealed, the court shall apportion and award fees to the claimant's attorney only for the issues on which the claimant prevails. In making that apportionment, the court shall consider the factors prescribed by Subsection (d). This subsection does not apply to attorney's fees for which an insurance carrier may be liable under Section 408.147. An award of attorney's fees under this subsection is not subject to commissioner rules adopted under Subsection (f).

(d) In approving an attorney's fee under this section, the commissioner or court shall consider:

  (1) the time and labor required;

  (2) the novelty and difficulty of the questions involved;

  (3) the skill required to perform the legal services properly;

  (4) the fee customarily charged in the locality for similar legal services;

  (5) the amount involved in the controversy;

(6) the benefits to the claimant that the attorney is responsible for securing; and

(7) the experience and ability of the attorney performing the services.

(e) The commissioner by rule or the court may provide for the commutation of an attorney's fee, except that the attorney's fee shall be paid in periodic payments in a claim involving death benefits if the only dispute is as to the proper beneficiary or beneficiaries.

(f) The commissioner by rule shall provide guidelines for maximum attorney's fees for specific services in accordance with this section.

(g) An attorney's fee may not be allowed in a case involving a fatal injury or lifetime income benefit if the insurance carrier admits liability on all issues and tenders payment of maximum benefits in writing under this subtitle while the claim is pending before the division.

(h) An attorney's fee shall be paid to the attorney by separate draft.

(i) Except as provided by Subsection (c) or Section 408. 147(c), an attorney's fee may not exceed 25 percent of the claimant's recovery.

**Credits**
Acts 1993, 73rd Leg., ch. 269, § 1, eff. Sept. 1, 1993. Amended by Acts 2001, 77th Leg., ch. 1456, § 8.01, eff. June 17, 2001; Acts 2005, 79th Leg., ch. 265, § 3.132, eff. Sept. 1, 2005.

**Editors' Notes**

**REVISOR'S NOTE**

**2015 Main Volume**

(1) The revised law omits as unnecessary the provision of Subsection (b) of the source law that states that an attorney's fee "is subject to a maximum of 25 percent of the claimant's recovery" because this language is duplicative of language in Subsection (e) of the source law. Subsection (e) of the source law is revised in this section as Subsection (e).

(2) The revised law refers to "Section 4.28 of this Act," providing that an attorney's fee is paid from the claimant's recovery. The pertinent part of Section 4.28 is revised as Section 408.147(c), and the revised law reflects this change.

Notes of Decisions (136)

V. T. C. A., Labor Code § 408.221, TX LABOR § 408.221
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 21

Vernon's Texas Statutes and Codes Annotated
Labor Code (Refs & Annos)
Title 5. Workers' Compensation
Subtitle A. Texas Workers' Compensation Act
Chapter 410. Adjudication of Disputes (Refs & Annos)
Subchapter G. Judicial Review of Issues Regarding Compensability or Income or Death Benefits

V.T.C.A., Labor Code § 410.306

§ 410.306. Evidence

Effective: September 1, 2005
Currentness

(a) Evidence shall be adduced as in other civil trials.

(b) The division on payment of a reasonable fee shall make available to the parties a certified copy of the division's record. All facts and evidence the record contains are admissible to the extent allowed under the Texas Rules of Evidence.

(c) Except as provided by Section 410.307, evidence of extent of impairment shall be limited to that presented to the division. The court or jury, in its determination of the extent of impairment, shall adopt one of the impairment ratings under Subchapter G, Chapter 408. [1]

**Credits**

Acts 1993, 73rd Leg., ch. 269, § 1, eff. Sept. 1, 1993. Amended by Acts 2005, 79th Leg., ch. 265, § 3.206, eff. Sept. 1, 2005; Acts 2005, 79th Leg., ch. 728, § 12.003, eff. Sept. 1, 2005.

Notes of Decisions (551)

Footnotes

1        V.T.C.A., Labor Code § 408.121 et seq.

V. T. C. A., Labor Code § 410.306, TX LABOR § 410.306

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.